# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

FLO & EDDIE, INC., individually and on behalf of all others similarly situated,

      Plaintiff,

v.

SIRIUS XM RADIO INC., and DOES 1 through 10,

      Defendants.

CIVIL ACTION No.
13-CV-5784 (CM)

## MEMORANDUM OF LAW IN SUPPORT OF SIRIUS XM'S
## PARTIAL MOTION TO DISMISS PLAINTIFF'S COMPLAINT

R. Bruce Rich
Benjamin E. Marks
Todd Larson
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
*r.bruce.rich@weil.com*
*benjamin.marks@weil.com*
*todd.larson@weil.com*

and

Michael S. Oberman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9294
Fax:  (212) 715-8294
*moberman@kramerlevin.com*

*Attorneys for Defendant Sirius XM Radio Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ............................................................................................................7

THERE IS NO PUBLIC PERFORMANCE RIGHT FOR PRE-1972
RECORDINGS UNDER NEW YORK COMMON LAW .................................................7

    A.    The History of Failed Efforts by the Recording Industry To
Obtain a Right of Public Performance for Sound Recordings.....................8

    B.    New York's Cause of Action for Common Law Copyright
Infringement Does Not Cover Public Performances of Sound
Recordings ..............................................................................................12

    C.    Plaintiff Does Not State a Claim for Unfair Competition By
Alleging That Sirius XM Publicly Performs Its Sound
Recordings Without Permission ...............................................................14

        1.    New York's Cause of Action for Unfair Competition
Does Not Cover Public Performances of Sound
Recordings ....................................................................................14

        2.    Plaintiff Has Failed to Plead Competition Between It
and Sirius XM as Needed To State a Common Law
Unfair Competition Claim .............................................................15

        3.    Plaintiff Has Failed To Plead a Competitive Injury
Adequate To Support a Common Law Unfair
Competition Claim.........................................................................18

CONCLUSION.......................................................................................................20

i

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                    <u>PAGE(S)</u>

*Agee v. Paramount Commc'ns, Inc.*,
    59 F.3d 317 (2d Cir. 1995)................................................................18, 19

*Apple Corps Ltd. v. The Adirondack Grp.*,
    476 N.Y.S.2d 716 (Sup. Ct. 1983).........................................................15

*Arista Records, LLC v. Launch Media, Inc.*,
    578 F.3d 148 (2d Cir. 2009)...............................................................4, 5

*Arista Records LLC v. Lime Grp. LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011)...................................................12, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................16, 17

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................16

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 4 (1979).............................................................................4

*Capitol Records, Inc. v. Greatest Records, Inc.*,
    252 N.Y.S.2d 553 (Sup. Ct. 1964)......................................................12, 15

*Capitol Records, Inc. v. Mercury Records Corp.*,
    221 F.2d 657 (2d Cir. 1955)..............................................................12

*Capitol Records, Inc. v. Naxos of America, Inc.*,
    4 N.Y.3d 540, 830 N.E.2d 250 (2005).......................................... *passim*

*In re DoubleClick Inc. Privacy Litig.*,
    154 F. Supp. 2d 497 (S.D.N.Y. 2001)....................................................8

*Edelman v. Starwood Capital Grp., LLC*,
    No. 0601077, 2008 WL 2713489 (Sup. Ct. June 27, 2008) ...................17

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc., et al.*,
    No. 1:13-cv-23182 (KMM) (S.D. Fla. Sept. 3, 2013) ............................6

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
    No. BC 517032 (Cal. Super. Ct. L.A. Cnty. Aug. 1, 2013) ....................6

*Gaughan v. Nelson*,
    No. 94 CIV. 3859(JFK), 1997 WL 80549 (S.D.N.Y. Feb. 26, 1997).......8

## TABLE OF AUTHORITIES
### (continued)

PAGE(S)

*Hill v. Opus Corp.*,
    841 F. Supp. 2d 1070 (C.D. Cal. 2011) ............................................................................7, 8

*ITC Ltd. v. Punchgini, Inc.*,
    9 N.Y.3d 467, 880 N.E.2d 852 (2007)...........................................................................16

*Metro. Opera Ass'n v Wagner-Nichols Recorder Corp.*,
    101 N.Y.S.2d 483 (Sup. Ct. 1950), *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951)
    (per curiam)...................................................................................................................13, 15

*Parker v. Time Warner Entm't Co.*,
    98 CV 4265 (ERK), 1999 WL 1132463 (E.D.N.Y. Nov. 8, 1999) ...........................8

*Roy Export Co. v. Columbia Broad. Sys., Inc.*,
    672 F.2d 1095 (2d Cir. 1982)........................................................................................16

*Schuloff v. Queens Coll. Found., Inc.*,
    994 F. Supp. 425 (E.D.N.Y. 1998), *aff'd*, 165 F.3d 183 (2d Cir. 1999)..................8

*Tarcher v. Penguin Putnam, Inc.*,
    No. 01 CIV 6754 DLC, 2001 WL 1646453 (S.D.N.Y. Dec. 20, 2001) ...................8

*Yantha v. Omni Childhood Ctr., Inc.*,
    13-CV-1948 ARR JMA, 2013 WL 5327516 (E.D.N.Y. Sept. 20, 2013)..................15, 18, 19

*Zinter Handling, Inc. v. Gen. Elec. Co.*,
    956 N.Y.S.2d 626 (App. Div. 2012) ..........................................................................17

**Statutes**

17 U.S.C. § 102..................................................................................................................4

17 U.S.C. § 106..........................................................................................................4, 5, 9, 11

17 U.S.C. § 114.............................................................................................................5, 9

17 U.S.C. § 301...........................................................................................................4, 5

Act of Jan. 6, 1897, 29 Stat. 481....................................................................................4

Pub. L. No. 104-39, 109 Stat. 336 (1995).................................................................5, 11

Pub. L. No. 92-140, 85 Stat. 391 (1971).....................................................................4, 9

# TABLE OF AUTHORITIES
## (continued)

**PAGE(S)**

**Other Authorities**

117 Cong. Rec. 2002 (Feb. 8, 1971) ............................................................9

141 Cong. Rec. S945-02 (Jan. 13, 1995) ....................................................12

*Authorizing A Composer's Royalty in Revenues from Coin-operated Machines and to*
*Establish a Right of Copyright in Artistic Interpretations: Hearings Before Subcomm.*
*on Patents, Trade-marks, and Copyrights of the Comm. on the Judiciary on H.R.*
*1269, H.R. 1207, and H.R. 2570*, 80th Cong., 1st Sess. 6 (Comm. Print 1947) .....................10

*Economic Conditions in the Performing Arts: Hearings Before the Select Subcomm. on*
*Ed. of the Comm. on Ed. and Labor*, 87th Cong., 1st 2d Sess. 64-65 (Comm. Print
1962) ....................................................................................10, 11

Fed. R. Civ. P. 12 .............................................................................1, 8

Fed. R. Civ. P. 56 ..............................................................................8

H.R. Rep. No. 92-487 (1971) ....................................................................9

H.R. Rep. No. 104-274 (1995) ..................................................................5, 10

*Revision of Copyright Laws: Hearings Before the Comm. on Patents*,
74th Cong., 2d Sess. 622 (Comm. Print 1936) ....................................................10

S. Rep. No. 92-72 (1971) ........................................................................9

*Second Supplementary Register's Report on the General Revision of the U.S. Copyright*
*Law* (1975) ...................................................................................11

*Statement on S. 227 of ASCAP* (Mar. 9, 1995), 1995 WL 552160 (Westlaw) .............................12

*Supplementary Register's Report on the General Revision of the U.S. Copyright Law*,
89th Cong., 1st Sess. (Comm. Print 1965) ........................................................11

*Testimony of Jason S. Berman Chairman and CEO of RIAA Before the Judiciary*
*Subcomm. on Counts & Intellectual Property: Hearing on H.R. 1506*,
(June 21, 1995) 1995 WL 371088 (Westlaw) ........................................................11

*Testimony of the NAB Before the House Judiciary Comm. Subcomm. on Courts &*
*Intellectual Property on H.R. 1506* (June 21, 1995), 1995 WL 371107 (Westlaw) ..........11, 12

Defendant Sirius XM Radio Inc. ("Sirius XM") respectfully submits this memorandum in support of its Partial Motion to Dismiss the Complaint of Flo & Eddie, Inc. ("Plaintiff") under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

By this action, Plaintiff, the owner of sound recordings made nearly fifty years ago and publicly performed widely ever since by myriad broadcast and other outlets, asks the Court to radically transform the scope of protection accorded to sound recordings under New York common law. Plaintiff asks the Court to recognize a right of public performance for sound recordings under New York common law in the absence of any supporting precedent—indeed, in the face of the New York Court of Appeals' definitive statements of the elements of common law copyright infringement and unfair competition causes of action in New York, which make no mention of any such right. *See Capitol Records, Inc. v. Naxos of America, Inc.*, 4 N.Y.3d 540, 830 N.E.2d 250 (2005). The result Plaintiff seeks would dramatically expand New York law and unravel a century of contrary understandings between the music and broadcasting industries.

Plaintiff alleges that it has owned some 100 master recordings of songs by the rock group The Turtles since 1971. Compl. ¶ 2. It concedes that none of these sound recordings is entitled to protection under federal copyright law, as the Copyright Act only affords protection to sound recordings made on or after February 15, 1972, and each of the sound recordings at issue here was made before that date. *Id.* Deliberately left without rights under federal law, Plaintiff asserts that Sirius XM's broadcasts of sound recordings created before February 15, 1972 ("Pre-1972 Recordings") infringe a purported performance right under New York common law and alleges that the performances at issue support a recovery of more than $100 million in damages supposedly sustained by Plaintiff and members of a putative class of similarly situated owners of

Pre-1972 Recordings. *Id.* ¶¶ 25, 26. Underscoring the lack of legal foundation for Plaintiff's performance right claim, the Complaint leaves unanswered why, if a state-law performance right in Pre-1972 Recordings in fact exists, Plaintiff waited more than four decades to assert it, let alone why Plaintiff has asserted this supposed right against just one broadcaster out of many thousands of music users. Nothing about Sirius XM's scale of operations or its ability to deliver digital-quality music and other offerings to subscribers nationwide suffices to fill the legal vacuum in which Plaintiff's performance right-based claims were fashioned.

As we demonstrate herein, New York common law has afforded relief to owners of Pre-1972 Recordings solely to combat copying and distribution of sound recordings by record pirates or other commercial competitors. It has never provided a means for record companies to collect enormous sums of money from broadcasters or other music users arising out of performances of Pre-1972 Recordings. A determination by this Court that New York law provides a performance right in such older recordings would immediately turn every radio and television broadcaster, webcaster, nightclub, retail establishment, fitness center, and the like that performs such recordings within the State of New York into a serial copyright infringer. The Court should reject Plaintiff's invitation to disrupt industry practices that have prevailed over a century and informed countless transactions involving sound recordings during that time.

While the Complaint contends that the claimed injury to Plaintiff and the putative class derives from multiple asserted unauthorized acts on the part of Sirius XM—to wit, the "unauthorized reproduction, performance, distribution, or other exploitation" of Pre-1972 Recordings (*id.* ¶ 1)—it is unquestionably the asserted performance right that is central to this action. *See id.* ¶ 2 (adverting to Sirius XM's performances of Turtles recordings "every hour of every day" to subscribers in New York); *id.* ¶ 3 (describing the various platforms by which Sirius

XM programming allegedly is transmitted).  Sirius XM therefore brings this motion for partial dismissal of the Complaint at the threshold of this action because there is no performance right for sound recordings under New York common law.  A ruling in Sirius XM's favor would materially narrow this dispute, resulting in more efficient litigation of the case and conservation of judicial resources, impacting, among other matters, the propriety of class treatment, the identity of prospective class members should class treatment be determined appropriate, as well as the scope of fact and putative damages discovery more generally.  What would remain is the balance of Plaintiff's claims premised on alleged reproductions made by Sirius XM.  Sirius XM intends to seek disposition of that part of Plaintiff's claims on a motion for summary judgment on the basis that Sirius XM only makes non-actionable server copies of sound recordings in aid of its broadcast transmissions (and not copies for sale or distribution via download as Plaintiff alleges), but recognizes that limited discovery must first be completed before it addresses those claims.

## BACKGROUND

**Terminology and Statutory Background**

Plaintiff alleges in the preamble to the Complaint that it owns "sound recordings of musical performances that initially were 'fixed' (*i.e.*, recorded) prior to February 15, 1972," and later alleges that it engages in the business of licensing, *inter alia*, the "performance of its Pre-1972 Recordings." *Id.* ¶ 5.  Although the Complaint asserts claims only under New York common law, the allegations of the Complaint as well as the arguments made below addressing those allegations are best understood in relation to certain definitions and rights found in the federal Copyright Act, which we briefly summarize here.

The Copyright Act recognizes two separate copyrights associated with recorded music—one copyright in the music and lyrics (together, a "musical composition") and another in a

recorded rendition of that song, *e.g.*, when it is recorded by a particular singing group or orchestra (a "sound recording"). *See* 17 U.S.C. § 102(a)(2), (7).  While musical compositions have enjoyed copyright protection since 1897, sound recordings—the category of works at issue in this case—were *not* covered by the federal Copyright Act until February 15, 1972, the effective date of the Sound Recording Act of 1971.  *See* Act of Jan. 6, 1897, 29 Stat. 481; Pub. L. No. 92-140, 85 Stat. 391 (1971) ("Sound Recording Act").  The Sound Recording Act afforded only *prospective* protection—only recordings created on or after the effective date would be protected under federal law—and limited that protection to the right "[t]o reproduce and distribute" "tangible" copies of sounds recordings.  Sound Recording Act, 85 Stat. 391; *see also Naxos*, 4 N.Y.3d at 555-56, 830 N.E.2d at 260.

The upshot of the Sound Recording Act was twofold.  First, Pre-72 Recordings like those at issue in this case remained subject to state law and whatever protections such law did (or did not) provide.  *See Naxos*, 4 N.Y.3d at 555-56, 830 N.E.2d at 260; *see also* 17 U.S.C. § 301(c) (preserving unspecified state law remedies for Pre-1972 Recordings).  Second, even as to those post-72 recordings granted federal copyright protection for the first time, the copyright owners (usually record companies) received no right of public performance, and therefore "no right to extract licensing fees from radio stations and other broadcasters of recorded music." *Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009).  Congress thus put sound recordings on a distinctly different footing than musical compositions, which had long enjoyed a public performance right.  *See* 17 U.S.C. § 106(4); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 4 (1979) ("Since 1897, the copyright laws have vested in the owner of a copyrighted musical composition the exclusive right to perform the work publicly for profit. . .") (citing Act of Jan. 6, 1897, 29 Stat. 481); *Arista Records v. Launch Media*, 578 F.3d at 152

("Notably, unlike the copyright of musical works, the sound recording copyright created by the [Sound Recording Act] did not include a right of performance.").

Finally, effective on February 1, 1996, the Digital Performance Right in Sound Recordings Act of 1995 granted owners of sound recordings created on or after February 15, 1972 the right "to perform the copyrighted work publicly by means of a digital audio transmission." Pub. L. No. 104-39 § 2(3), 109 Stat. 336 (1995) (codified at 17 U.S.C. §§ 106(6), 114); *see also Arista Records v. Launch Media*, 578 F.3d at 154 (the Act gave "sound recording copyright holders an exclusive but 'narrow' right to perform—play or broadcast—sound recordings via a digital audio transmission") (citing H.R. Rep. No. 104-274, at 12, 13-14 (1995)). Pursuant to section 106(6), Sirius XM is required to pay royalties for its digital audio transmissions of copyrighted sound recordings protected by federal law. Because Congress has never afforded copyright protection to Pre-72 Recordings, they remain protected, if at all, under state law.

**The Complaint**

Plaintiff's principals have been performing together as The Turtles since 1965. Compl. ¶ 2. Plaintiff has owned the entire catalog of 100 master recordings made by The Turtles since approximately 1971. *Id.* Each of these master recordings was made prior to February 15, 1972, and therefore each falls outside of the scope of federal copyright protection. *Id.*; 17 U.S.C. § 301(c). While the Complaint includes allegations that Sirius XM has copied Plaintiff's Pre-1972 Recordings onto central servers and enables subscribers to download streams of sound recordings for later or multiple listenings, Compl. ¶ 3, the focus of the Complaint is that Sirius XM performs Turtles recordings "every hour of every day" to subscribers in New York. *Id.* ¶ 2. Apart from the bare allegation that Plaintiff "is engaged in the business of distributing, selling, and/or licensing the reproduction, distribution, sale, and performance of its Pre-1972

Recordings," *id.* ¶ 5, and notwithstanding its contention that its recordings include "numerous iconic hits," *id.* ¶ 2, Plaintiff fails to allege a single instance in which it has licensed the public performance of its recordings, that any radio broadcaster, webcaster, bar, restaurant, retail establishment or other third party that publicly performs music has ever requested such a license from it, or that any third party has refused to take a license from Plaintiff because of Sirius XM's use of the recordings.

Plaintiff also alleges that Sirius XM's "use of the Pre-1972 Recordings is likely to cause confusion, mistake or deception as to the source, sponsorship, affiliation or connection between Plaintiff and the other Class Members, and Defendants." *Id.* ¶ 31.  Even though Sirius XM (together with its predecessors) has been offering its service continuously since 2001, Plaintiff neither identifies a single instance of actual confusion by anyone, nor alleges how Sirius XM's inclusion of Plaintiff's songs among the millions of tracks it performs each year by thousands of recording artists could possibly deceive or confuse the public into the mistaken belief that Plaintiffs are somehow sponsoring or affiliated with Sirius XM.

**<u>Related Actions</u>**

Plaintiff has filed a nearly identical suit against Sirius XM in California, on behalf of the same putative class, the only meaningful difference being that Plaintiff there seeks relief under California law rather than New York. *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. BC 517032 (Cal. Super. Ct. L.A. Cnty. Aug. 1, 2013) (subsequently removed to the federal district court for the Central District of California).  Shortly after filing this action, Plaintiff filed a third action in Florida, again identical save for pressing claims under Florida law. *Flo & Eddie, Inc. v. Sirius XM Radio, Inc., et al.*, No. 1:13-cv-23182 (KMM) (S.D. Fla. Sept. 3, 2013).  Sirius XM has filed motions to transfer those cases to the Southern District of New York.

## ARGUMENT

### THERE IS NO PUBLIC PERFORMANCE RIGHT FOR PRE-1972 RECORDINGS UNDER NEW YORK COMMON LAW

The Complaint hinges on the mistaken notion that New York common law affords to the owner of a Pre-1972 Recording the exclusive right of public performance. Because no such right exists, no liability arises out of Sirius XM's broadcasting of Pre-1972 Recordings. This conclusion is compelled by:

(i) Longstanding, consistent customs and practices that for over a century have recognized the absence of a performance right for sound recordings. This is reflected in the largely unsuccessful, decades-long efforts of the record industry (of which Plaintiff and the putative class members are a part) to secure a first-ever performance right for sound recordings *in any venue*, which yielded in 1995 only the limited grant under federal copyright law of such a right, confined to digital audio transmissions of post-1972 recordings (see Point A *infra*). This legislative history confirms the utter absence of pre-existing New York (or any other state) law conferring upon sound recording owners the right to license public performances of their sound recordings of any vintage.

(ii) The authoritative construction given to New York's common law of copyright infringement and unfair competition by the New York Court of Appeals and lower court decisions interpreting these bodies of New York common law (*see* Points B and C *infra*).

Those portions of the Complaint premised on a public performance right for Pre-1972 Recordings fail to state a claim upon which relief may be granted, and partial dismissal of the Complaint is warranted. *See, e.g.*, *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1082 (C.D. Cal.

2011) (granting motion to dismiss parts of plaintiff's claims); *Gaughan v. Nelson*, No. 94 CIV.

3859(JFK), 1997 WL 80549, at *6 (S.D.N.Y. Feb. 26, 1997) (granting motion to dismiss part of

claim); *Tarcher v. Penguin Putnam, Inc*., No. 01 CIV 6754 DLC, 2001 WL 1646453, at *3

(S.D.N.Y. Dec. 20, 2001) (denying plaintiff's motion for reconsideration of the court's partial

dismissal of breach of contract claim).  In the alternative, pursuant to Rules 12(d) and 56(a) of

the Federal Rules of Civil Procedure, the Court could convert this motion to a partial motion for

summary judgment addressed to that part of each claim premised on an exclusive right of public

performance.

A.      **The History of Failed Efforts by the Recording Industry To Obtain a Right of Public Performance for Sound Recordings**

For nearly a century, the recording industry tried, and failed, to obtain a public

performance right for sound recordings.  The legislative history of those efforts to amend the

Copyright Act to provide this sought-after right reflects the widespread and uniform

understanding, shared by Congress, the United States Copyright Office, the recording industry,

and broadcasters alike, as to its historic absence under state law, whether in New York or

elsewhere.  The Court may consider such legislative history on a motion to dismiss for failure to

state a claim. *See, e.g.*, *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497 (S.D.N.Y.

2001); *Schuloff v. Queens Coll. Found., Inc.*, 994 F. Supp. 425 (E.D.N.Y. 1998), *aff'd*, 165 F.3d

183 (2d Cir. 1999); *Parker v. Time Warner Entm't Co.*, 98 CV 4265 (ERK), 1999 WL 1132463

(E.D.N.Y. Nov. 8, 1999).

As introduced above, the words "sound recording" appeared for the first time in the

Copyright Act in 1971, when Congress granted a new copyright for sound recordings previously

left unprotected under federal law.  This new grant of rights was limited:  Federal copyright

protection was afforded only to recordings created on or after February 15, 1972, and the scope

of that protection was circumscribed and much narrower than that already afforded to musical compositions. *See* Sound Recording Act §§ 1, 3; 17 U.S.C. § 106(4)-(5) (public performance and display rights for musical compositions). The limitations on the scope of the right were intentional. The stated goal of the Sound Recording Act was to address the problem of rampant record piracy, which had "rapid[ly] increase[d]" in preceding years due to technological advances. 117 Cong. Rec. 2002 (Feb. 8, 1971); *see also* H.R. Rep. No. 92-487, at 2 (1971) (explaining that the Act was intended to combat the problem of "record pirates" and the "widespread unauthorized reproduction of phonograph records and tapes"); S. Rep. No. 92-72, at 1 (1971) (the Act's purpose was "protecting against unauthorized duplication and piracy of sound recordings"); S. Rep. No. 92-72, at 7 (1971) ("Neither the present Federal copyright statute nor the common law or statutes of the various States are adequate [to combat record piracy].") In furtherance of those goals, owners of qualifying sound recordings were granted exclusive rights of reproduction and commercial distribution of their works. *See* 17 U.S.C. § 106(1), (3).

At the same time, however, Congress determined *not* to extend to owners of sound recordings the right to prevent others from publicly performing those recordings without license authority. *See* Sound Recording Act §§ 1(a), 3; 17 U.S.C. § 114(a) (stating that sound recording rights "do not include any right of performance under section 106(4)"); *see also* H.R. Rep. No. 92-487, at 14 (1971) ("[T]he exclusive right accorded by this bill does not extend to the reproduction of the sounds themselves, as, for example, by playing a sound recording over the radio."). The record industry's advocacy for a performance right was viewed by Congress as an unnecessary augmentation of the rights needed to accomplish the main goal of the legislation. *See* H.R. Rep. No. 104-274, at 11 (1995) (explaining that sound recordings "were not granted the

rights of public performance, on the presumption that the granted rights would suffice to protect against record piracy").

The denial of a federal performance right comported with the uniform understanding that, unlike for the rights of reproduction and distribution, where a patchwork of state laws had existed to address record piracy, there was *no* existing protection for public performance of sound recordings at the state level.  Indeed, it was clearly recognized that the prospect of creating a performance right for the first time would have been so novel, and so vehemently opposed by broadcasters (which for the first time ever would have become subject to licensing and performance royalty obligations in respect of sound recordings) that legislation embodying that right could not have passed.  As early as the 1930s, during congressional hearings on one such piece of proposed legislation, record producers acknowledged that "the law up to date has not granted" protection against radio stations' "indiscriminate use of phonograph records."  *Revision of Copyright Laws: Hearings Before the Comm. on Patents*, 74th Cong., 2d Sess. 622 (Comm. Print 1936).  This lament was repeated during 1947 hearings on similar bills, with record industry representatives noting that "use of records . . . has become standard practice with hundreds of radio stations," concerning which the performing artist "has no rights at all beyond an original agreement with the manufacturer."  *Authorizing A Composer's Royalty in Revenues from Coin-operated Machines and to Establish a Right of Copyright in Artistic Interpretations: Hearings Before Subcomm. on Patents, Trade-marks, and Copyrights of the Comm. on the Judiciary on H.R. 1269, H.R. 1207, and H.R. 2570*, 80th Cong., 1st Sess. 6 (Comm. Print 1947).  Similarly, during 1961 and 1962, performing artists complained to Congress as to the absence of royalties "from repeated use" of "[p]laying [records] on radios."  *Economic Conditions in the*

*Performing Arts: Hearings Before the Select Subcomm. on Ed. of the Comm. on Ed. and Labor*, 87th Cong., 1st & 2d Sess. 64-65 (Comm. Print 1962).

The Register of Copyrights observed in a 1965 report to Congress that the proposed addition of a public performance right for sound recordings was "explosively controversial" and noted the heavy opposition from music users. *Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, 89th Cong., 1st Sess. 51 (Comm. Print 1965). A decade later, the Register reported to Congress that a sound recording performance right had yet again been removed from the proposed general revision of federal copyright law because of the concern that it would "impose severe financial burdens on broadcasters." *Second Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, 218-21 (1975).

Similar recognition of the absence of a sound recording public performance right under state law was expressed during the enactment of the Digital Performance Rights in Sound Recordings Act of 1995. Pub. L. No. 104-39 § 3(3), 109 Stat. 336 (creating limited right in "digital audio transmissions" of sound recordings at 17 U.S.C. § 106(6)). In the lead-up to the legislation, the Recording Industry Association of America ("RIAA") acknowledged that, "[u]nder existing law, record companies and performers . . . have *no rights* to authorize or be compensated for the broadcast or other public performance of their works." *Testimony of Jason S. Berman Chairman and CEO of RIAA Before the Judiciary Subcomm. on Counts & Intellectual Property: Hearing on H.R. 1506*, (June 21, 1995) 1995 WL 371088 (Westlaw) (emphasis added). For its part, the broadcast industry's major trade association, the National Association of Broadcasters, testified that "public performance rights" in sound recordings are "essentially alien to ways we have conducted our business for over 60 years" and that their imposition "would be enormously disruptive and harmful." *Testimony of the NAB Before the House Judiciary Comm.*

*Subcomm. on Courts & Intellectual Property on H.R. 1506*, § C (June 21, 1995), 1995 WL 371107 (Westlaw).   The American Society of Composers, Authors and Publishers ("ASCAP") echoed this recognition, testifying  that "established user industries" such as broadcasters "have fully developed in an economic context which *does not call for payment for performing rights in sound recordings* [and] should not incur payments for those rights now."  *Statement on S. 227 of ASCAP*, § II(C) (Mar. 9, 1995), 1995 WL 552160 (Westlaw) (emphasis added).  The Senate co-sponsors of the legislation were in accord.  *See* 141 Cong. Rec. S945-02 at S949 (Jan. 13, 1995) (statement of Sen. Feinstein) (noting that performers and record companies still "ha[d] no legal right to control or to receive compensation for [a] public performance of their work[s]"); *id.* at S947 (statement of Sen. Hatch).

### B.   New York's Cause of Action for Common Law Copyright Infringement Does Not Cover Public Performances of Sound Recordings

There is not now, and there never has been, any public performance right for sound recordings under New York law.  No New York court has ever held that unlicensed public performances of Pre-1972 Recordings constitute copyright infringement.  Nothing in the history or controlling body of New York law in any way cuts against the common understanding that no such performance right exists.  To the contrary, the only common law copyright claims upheld by New York courts have involved defendants—most often record pirates or digital file-sharing sites trafficking in pirated song files and, at least, competitors for sale of records—which made and distributed copies of sound recordings owned or licensed by the plaintiffs.  *See, e.g.*, *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955); *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011); *Capitol Records, Inc. v. Greatest Records, Inc.*, 252 N.Y.S.2d 553 (Sup. Ct. 1964).

New York's tort of copyright infringement is thus directed at unauthorized reproduction and not at public performance. This recognition is confirmed by the New York Court of Appeals' 2005 opinion in *Naxos*, a case involving a record company defendant which restored and sold copies of certain recordings made in the 1930s. Capitol Records sued Naxos in federal court claiming that Capitol alone owned the exclusive rights to make and distribute the recordings in New York and elsewhere in the U.S. The Second Circuit certified several questions to the New York Court of Appeals, including whether "a cause of action for common law copyright infringement include[s] some or all of the elements of unfair competition?" 4 N.Y.3d at 546, 830 N.E.2d at 254. To answer the questions, the Court of Appeals first engaged in a comprehensive and scholarly analysis of Anglo-American copyright history dating to the 15th century, culminating in an exhaustive review of the protections afforded to sound recordings in New York over the past 100 years. 4 N.Y.3d at 546-62, 830 N.E.2d at 254-65. The court also examined New York sound recording cases asserting claims of unfair competition rather than common law copyright (which was commonly understood to expire upon publication and was thus not typically available as a cause of action for sound recordings sold to the public). *See, e.g.*, *Metro. Opera Ass'n v Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492 (Sup. Ct. 1950), *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951) (per curiam) (finding that defendants who *made and sold* recordings of Met performances engaged in "piratical conduct" that injured the Opera's own sale of records). The court held that a claim for common law copyright infringement under New York law contains the following elements: "(1) the existence of a valid copyright; and (2) unauthorized *reproduction* of the work protected by copyright." 4 N.Y.3d at 550, 563, 830 N.E.2d at 257, 266 (emphasis added) (citing, *inter alia*, New York's original

copyright statute, L. 1786, Ch. 54, which had protected the right to "print" and "publish" books). The court made no mention of a right of public performance.

Thus, as defined by the New York Court of Appeals following its review of hundreds of years of history, a New York common law copyright claim does *not* reach unlicensed public performances of Plaintiff's Pre-1972 Recordings. Although Plaintiff's Complaint begins with the bald assertion that New York "common law" protects its recordings from unauthorized "performance," Plaintiff acknowledges just one sentence later that a common law copyright infringement claim in New York consists of the two elements identified in *Naxos*: "(1) the existence of a valid copyright; and (2) unauthorized *reproduction* of the work protected by copyright." Compl. ¶ 1 (emphasis added). The conclusion is inescapable: to the extent Plaintiff's common law copyright claim is predicated on Sirius XM's public performances of its recordings in New York, it should be dismissed.

### C. Plaintiff Does Not State a Claim for Unfair Competition By Alleging That Sirius XM Publicly Performs Its Sound Recordings Without Permission

Plaintiff's unfair competition claim, to the extent directed at Sirius XM's broadcasts, fails to state a claim upon which relief may be granted for at least three reasons. First, New York's tort of unfair competition does not prohibit the unauthorized public performance of a sound recording. Second, Plaintiff does not allege the requisite competition in the marketplace between itself and Sirius XM or any other marketplace activity that could give rise to such a claim. Third, Plaintiff does not allege any competitive injury, as required to state a claim for unfair competition under New York law.

#### 1. New York's Cause of Action for Unfair Competition Does Not Cover Public Performances of Sound Recordings

The New York Court of Appeals made clear in *Naxos* that a claim under New York law for unfair competition with the owner of a sound recording requires "unauthorized copying and

distribution" of a plaintiff's work, as well as "competition in the marketplace or similar actions designed for commercial benefit … or deception of the public." *Naxos*, 4 N.Y.3d at 563-64, 830 N.E.2d at 266 (citations omitted); *see also* Compl. ¶ 1 (acknowledging that unauthorized reproduction is an element of a claim for unfair competition under New York law).  Consistent with this holding, the cause of action has been applied in the context of record piracy or its digital file-sharing equivalent.  *See, e.g.*, *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d at 437; *Apple Corps Ltd. v. The Adirondack Grp.*, 476 N.Y.S.2d 716, 719 (Sup. Ct. 1983); *Capitol Records v. Greatest Records*, 252 N.Y.S.2d 553; *Metro. Opera Ass'n*, 101 N.Y.S.2d 483. No New York case has ever found the unlicensed public performance of sound recordings to be unfair competition.  To the extent that Plaintiff's claim for unfair competition is based on public performance, rather than unauthorized reproduction, *see* Compl. ¶¶ 1, 2, 16(C), it should be dismissed.

### 2. *Plaintiff Has Failed To Plead Competition Between It and Sirius XM as Needed To State a Common Law Unfair Competition Claim*

The New York Court of Appeals has made clear that a claim for unfair competition under New York law requires "competition in the marketplace or similar actions designed for commercial benefit … or deception of the public." *Naxos*, 4 N.Y.3d at 563-64, 830 N.E.2d at 266 (citations omitted).   This requirement was recently discussed at length in *Yantha v. Omni Childhood Ctr., Inc.*, 13-CV-1948 ARR JMA, 2013 WL 5327516 (E.D.N.Y. Sept. 20, 2013). There, the district court dismissed the plaintiff's unfair competition claim for failing to adequately allege competition between the parties, explaining that unfair competition does not simply mean that the defendant benefits by getting something without paying, but that it does so to gain an unfair competitive advantage *over the plaintiff*.  *Id.* at *7 (noting lack of allegation of defendant "obtaining business that should rightfully be plaintiff's or in any other way usurping

her commercial advantage"); *see also ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478-79, 880 N.E.2d 852, 859 (2007) ("[M]isappropriation theory . . . prohibits a defendant from using a plaintiff's property right or commercial advantage . . . *to compete unfairly against the plaintiff* in New York." (emphasis added)); *Roy Export Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) ("An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property *to compete against the plaintiff's own use of the same property.*" (emphasis added)).

Plaintiff's allegations on this element of the claim do not come close to satisfying the pleading standards established by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). There, the Supreme Court explained:

> [T]he pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

*Id.* at 678-79 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007)). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient and courts "'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The Complaint contains only the conclusory statement that Sirius XM "unfairly and directly compet[es]" with Plaintiff and other members of the putative class, Compl. ¶ 30, without a single factual allegation to support this "threadbare recital of the elements of [the] cause of action." *Id.* The Complaint does not, for example, allege that Sirius XM competes with the Plaintiff as a creator, seller, or licensor of sound recordings, nor does it allege that Plaintiff offers a satellite radio broadcast service (or any other broadcast service) in competition with Sirius XM. The

Complaint is devoid of even any allegations that Plaintiff has ever licensed a competitor of Sirius XM to make public performances of Pre-1972 Recordings, or that Sirius XM has paid another record company (that is, one of Plaintiff's competitors) for the right to publicly perform its Pre-1972 Recordings.  Although each of the 100 works at issue was recorded more than 40 years ago, Plaintiff does not point to a single broadcaster, webcaster, bar, restaurant, retail establishment or other third party that has ever taken a license from it for the right to perform any of its "numerous iconic hits."  These shortcomings are fatal to the pleading.  *See, e.g.*, *Edelman v. Starwood Capital Grp., LLC*, No. 0601077, 2008 WL 2713489 (Sup. Ct. June 27, 2008) (granting motion to dismiss because unfair competition "requires competition in the marketplace"); *Zinter Handling, Inc. v. Gen. Elec. Co.*, 956 N.Y.S.2d 626, 630 n.6 (App. Div. 2012) (dismissing claim because "Plaintiff failed to plead . . . that it was in competition with GE for commercial benefit" (citing *Edelman v. Starwood Capital Grp., LLC*, 892 N.Y.S.2d 37, 39 (App. Div. 2009)).

Plaintiff fares no better by alleging that Sirius XM's "unauthorized use of the Pre-1972 Recordings is likely to cause confusion, mistake or deception as to the source, sponsorship, affiliation or connection between Plaintiff and the other Class Members, and Defendants." Compl. ¶ 31.  As *Iqbal* makes clear, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." 556 U.S. at 678.  Plaintiff does not allege *any facts* to support the legal conclusion concerning confusion it hopes this Court will reach.  Plaintiff does not allege a single instance of actual confusion, even though it alleges that Sirius XM has been playing its sound recordings "every hour of every day."  Compl. ¶ 2.  Moreover, there is no factual allegation that even attempts to explain how anything Sirius XM does might cause confusion or deception as to an affiliation between Sirius XM and Plaintiff and the owners of other Pre-1972

Recordings broadcast on the Sirius XM service.  The Complaint simply gives no basis on which this Court could credit Plaintiff's naked assertion about a purported likelihood of confusion as to source, sponsorship or affiliation.

Plaintiff's unfair competition claim with respect to Sirius XM's performances boils down to a claim that Sirius XM is broadcasting its sound recordings without paying for them.  But this contention is insufficient to state a claim for unfair competition under New York law.

### 3.  *Plaintiff Has Failed To Plead a Competitive Injury Adequate To Support a Common Law Unfair Competition Claim*

Plaintiff's Complaint also fails to "allege a commercial or competitive *injury* cognizable under New York law." *Yantha*, 2013 WL 5327516, at *6 (granting motion to dismiss).  This deficiency is also fatal.  In *Yantha*, the court probed at length the requirement to plead "competitive injury":

> The complaint is deficient . . . in stating a competitive injury as a result of any unfair competition by defendants.  Although the law of unfair competition has been broadly construed to provide protection from any form of commercial immorality, the tort is not all-encompassing.  Not every act, even if taken in bad faith, constitutes unfair competition.  Instead, to state a claim for unfair competition, a plaintiff must allege either a direct financial loss, lost dealings, or lost profits resulting from the anticompetitive acts at issue, or, at the very least, that defendant diverted plaintiff's customers and business to defendant. . . . Plaintiff . . . cannot claim that she lost profits to which she was entitled, or that defendants diverted her business, or that defendants otherwise deprived her of proceeds she would have been able to reap but for defendants' unfair competition.  Consequently, plaintiff cannot allege a direct competitive injury.

*Id.* at *7 (internal quotation marks and citations omitted).

Similarly, in *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317 (2d Cir. 1995), the defendants, a television network and the local stations through which it distributed programming, synchronized portions of sound recordings to video without a license to create a feature for the *Hard Copy* program.  The plaintiff, who owned the copyrights in the sound recordings, alleged unfair competition under New York law.  The court dismissed the unfair competition claim as

"baseless" because the plaintiff "failed to plead facts indicating that his record sales or licensing revenues have in any way been affected by Paramount's use of the recording." *Id.* at 327. Consequently, "[t]here is no reasonable ground for believing that [plaintiff] has suffered economic losses as a result of appellees' actions, or that consumers think less of the recording." *Id.*

The Complaint here fails for similar reasons. Plaintiff alleges that Sirius XM has "impaired [its] ability to sell, lawfully exploit, or otherwise control [its] Pre-1972 Recordings," Compl. ¶¶ 4, 25, and done "enormous and irreparable harm," *id.* ¶ 4. The Complaint also alleges that Plaintiff and other putative class members have been "damaged" in an amount exceeding $100 million, *id.* ¶¶ 26, 33, and suffered "great and irreparable injury," *id.* ¶¶ 28, 35. But these conclusory and unsupported allegations fail to describe any actual financial losses or lost dealings Plaintiff has suffered due to Sirius XM's broadcasting of the Pre-1972 Recordings. Just as in *Agee*, Plaintiff has "failed to plead facts indicating that [its] record sales or licensing revenues have in any way been affected by [Sirius XM's] use of the recordings – or that Plaintiff "has suffered economic losses . . . or that consumers think less of the recording[s]." 59 F.3d at 327. And just like the plaintiff in *Yantha*, Flo & Eddie cannot claim that Sirius XM has "diverted [its] business" or "otherwise deprived [it] of proceeds [it] would have been able to reap but for defendants' unfair competition." 2013 WL 5327516, at *7. Again, Plaintiff's claimed injury is merely that Sirius XM (like every other broadcaster) does not pay license fees to perform Plaintiff's recordings. This is not legally cognizable injury under New York unfair competition law. There were no "proceeds" the company failed to "reap" on account of Sirius XM's activities; "but for" Sirius XM's unlicensed use, Flo & Eddie would have been in the exact same position they find themselves now.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice to the extent

its claims are premised on a common law public performance right for Pre-1972 Recordings

under New York law.

Dated: New York, New York          Respectfully submitted,
       October 28, 2013

                                             By:   /s/ R. Bruce Rich               
                   R. Bruce Rich
                   Benjamin E. Marks
                   Todd Larson
                   WEIL, GOTSHAL & MANGES LLP
                   767 Fifth Avenue
                   New York, New York  10153
                   Tel:  (212) 310-8000
                   Fax:  (212) 310-8007
                   *r.bruce.rich@weil.com*
                   *benjamin.marks@weil.com*
                   *todd.larson@weil.com*

                 and

                   Michael S. Oberman
                   KRAMER LEVIN NAFTALIS & FRANKEL
                   LLP
                   1177 Avenue of the Americas
                   New York, New York 10036
                   Tel:  (212) 715-9294
                   Fax:  (212) 715-8294
                   *moberman@kramerlevin.com*

                   *Attorneys for Defendant Sirius XM Radio Inc.*