# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

FLO & EDDIE, INC., individually and on behalf of all others similarly situated,

      Plaintiff,

v.

SIRIUS XM RADIO INC., and DOES 1 through 10,

      Defendants.

CIVIL ACTION No.
13-CV-5784 (CM) (HBP)

## MEMORANDUM OF LAW IN SUPPORT OF
## SIRIUS XM'S MOTION FOR SUMMARY JUDGMENT

R. Bruce Rich
Benjamin E. Marks
Todd Larson
John R. Gerba
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
*r.bruce.rich@weil.com*
*benjamin.marks@weil.com*
*todd.larson@weil.com*

and

Michael S. Oberman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel:  (212) 715-9294
Fax:  (212) 715-8294
*moberman@kramerlevin.com*

*Attorneys for Defendant Sirius XM Radio Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND .....................................................................................3

    A.    The Parties ..............................................................................................3

    B.    The Turtles' Sound Recordings .............................................................4

    C.    Sirius XM's Use of the Recordings at Issue ..............................................4

    D.    Plaintiff's Longstanding Knowledge of Sirius XM's Broadcasts
of Its Pre-1972 Recordings and Stated Rationale for Bringing
This Litigation...............................................................................................5

    E.    Plaintiff's Decades of Acquiescence in the Unlicensed Public
Performance of Its Sound Recordings and The Limited Scope of
Its Licensing Activities ................................................................................6

ARGUMENT .............................................................................................................8

    I.    NEW YORK LAW DOES NOT PROVIDE A RIGHT OF
PUBLIC PERFORMANCE IN PRE-1972 RECORDINGS ...................................8

    A.    Plaintiff's claimed entitlement to an exclusive right of public
performance is undermined by the history and evolution of the
limited federal and state law protections afforded to sound
recordings........................................................................................................8

    B.    New York common law has never provided copyright owners
with an exclusive right of public performance ...........................................12

    C.    Sirius XM's public performances of Plaintiff's Pre-1972
Recordings do not constitute unfair competition under New
York law.......................................................................................................15

    D.    It would be inappropriate, as matters of law and policy, for the
Court to expand New York common law to encompass public
performances of sound recordings long understood to be lawful ..............19

    E.    In any event, the vast majority of sound recordings identified in
the Complaint have never been performed by Sirius XM .........................24

    II.    NEW YORK LAW DOES NOT RECOGNIZE A
REPRODUCTION RIGHT IN COPIES OF PRE-1972
RECORDINGS MADE IN AID OF PUBLIC PERFORMANCES.....................24

**TABLE OF CONTENTS**
**(continued)**

Page

    A.    New York law forbids only the unauthorized reproduction and distribution of copies of sound recordings to the public, not internal, incidental copying in aid of performance ...................................25

    B.    Sirius XM's incidental copying of Plaintiff's Pre-1972 Recordings is protected by the fair use doctrine.......................................27

        1.    Factor One: The Purpose and Character of the Use...…....28

        2.    Factor Two: The Nature of the Work……………………30

        3.    Factor Three: The Amount and Substantiality of the Use………….………………………………………………31

        4.    Factor Four: The Effect of the Use on the Potential Market for or Value of the Copyrighted Work…………..32

III.    STATE LAW REGULATION OF PERFORMANCES BY NATIONWIDE BROADCASTERS LIKE SIRIUS XM WOULD VIOLATE THE COMMERCE CLAUSE AND BE UNCONSTITUTIONAL .........................................................................34

IV.    PLAINTIFF'S CLAIMS ARE BARRED BY LACHES.......................................38

CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms*,
562 F.3d 630 (4th Cir. 2009) ...................................................................28, 29, 31, 32, 33

*Agee v. Paramount Commc'ns, Inc.*,
59 F.3d 317 (2d Cir. 1995).....................................................................................................17

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
738 F.3d 1350 (Fed. Cir. 2013).............................................................................................35

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003)...............................................................................................35, 36

*Am. Civil Liberties Union v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ...........................................................................................36

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994)......................................................................................................32

*Am. Libraries Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997).......................................................................................36

*Apple Corps Ltd. v. The Adirondack Grp.*,
476 N.Y.S.2d 716 (Sup. Ct. 1983) ......................................................................................16

*Arista Records, LLC v. Launch Media, Inc.*,
578 F.3d 148 (2d Cir. 2009)...............................................................................................9, 14

*Arista Records LLC v. Lime Grp. LLC*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011)......................................................................14, 16, 18

*Authors Guild, Inc. v. Google, Inc.*,
954 F. Supp. 2d 282 (S.D.N.Y. 2013)..................................................................................29

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)..................................................................................28, 31, 32, 33

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006).............................................................................................31, 33

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986)...........................................................................................................35, 37

## TABLE OF AUTHORITIES
### (continued)

PAGE(S)

*Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*,
93 CIV. 1116 (AJP), 1995 WL 465130 (S.D.N.Y. Aug. 7, 1995)....................................38, 40

*Calkins v. Playboy Enters. Int'l*,
561 F. Supp. 2d 1136 (E.D. Cal. 2008)...........................................................................30, 31

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)................................................................................27, 28, 30, 31

*Capitol Records, LLC v. Harrison Greenwich, LLC*,
No. 65224 (N.Y. Sup. Ct. May 13, 2014) (Decision & Order)..................................14

*Capitol Records, Inc. v. Mercury Records Corp.*,
221 F.2d 657 (2d Cir. 1955)...........................................................................................14, 26

*Capitol Records, Inc. v. Naxos of America, Inc.*,
830 N.E.2d 250 (N.Y. 2005)............................................................................... *passim*

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013)..............................................................................................32

*Castle Rock Entm't, Inc. v. Carol Pub. Grp.*,
150 F.3d 132 (2d Cir. 1998)........................................................................................32, 34

*City of Philadelphia v. Lead Indus. Ass'n, Inc.*,
994 F.2d 112 (3d Cir. 1993)........................................................................................19, 20

*Dwyer by Dwyer v. Mazzola*,
171 A.D.2d 726 (N.Y. App. Div. 1991) ...........................................................................38

*Eberhart v. LA Pilar Realty Co.*,
45 A.D.2d 679 (N.Y. App. Div. 1974) (per curiam)..........................................................39

*EMI Records Ltd. v. Premise Media Corp.*,
No. 601209/08, 2008 WL 5027245, 2008 N.Y. Misc. LEXIS 7485 (N.Y. Sup. Ct.
2008) .............................................................................................................................27, 28, 32

*Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*,
89 F. Supp. 2d 483 (S.D.N.Y. 2000).............................................................................39, 40

*Estate of Hemingway v. Random House, Inc.*,
53 Misc. 2d 462 (N.Y. Sup. Ct. 1967), *aff'd*, 23 N.Y.2d 341 (1968) .........................15, 26, 30

## TABLE OF AUTHORITIES
### (continued)

PAGE(S)

*Feist Publ'ns v. Rural Tel Serv. Co.*,
    499 U.S. 340 (1991)...........................................................................................20, 21

*Field v. Google Inc.*,
    412 F. Supp. 2d 1106 (D. Nev. 2006)...............................................................28, 29

*Goldstein v. California*,
    412 U.S. 546 (1973)...........................................................................................37, 38

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
    879 F.2d 1005 (2d Cir. 1989)............................................................................19, 20

*Halstead v. Grinnan*,
    152 U.S. 412 (1894)...........................................................................................15, 27

*Harper & Row Publishers v. Nation Enters.*,
    471 U.S. 539 (1985)....................................................................................21, 27, 30

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989).................................................................................................35

*In re Linker*,
    23 A.D.3d 186 (N.Y. App. Div. 2005) ....................................................................40

*ITC Ltd. v. Punchgini, Inc.*,
    880 N.E.2d 852 (N.Y. 2007)...................................................................................17

*Kane v. Comedy Partners*,
    No. 00 Civ 158 (GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003) ................30

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...........................................................................29, 31

*Metro. Opera Ass'n v Wagner-Nichols Recorder Corp.*,
    101 N.Y.S.2d 483 (Sup. Ct. 1950), *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951) (per
    curiam) ...............................................................................................13, 14, 16, 18

*NCAA v. Miller*,
    10 F.3d 633 (9th Cir. 1993) ...................................................................................35

*Nunez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000)..............................................................................31, 33

**TABLE OF AUTHORITIES**
(continued)

**PAGE(S)**

*NXIVM Corp. v. Ross Inst.*,
　　364 F.3d 471 (2d Cir. 2004) ................................................................. 32

*Perfect 10 v. Amazon, Inc.*,
　　508 F.3d 1146 (9th Cir. 2007) .............................................................. 29

*Pike v. Bruce Church, Inc.*,
　　397 U.S. 137 (1970) .............................................................................. 37

*Princeton Univ. Press v. Mich. Document Servs.*,
　　99 F.3d 1381 (6th Cir. 1996) ............................................................... 33

*Sony Computer Entm't v. Connectix Corp.*,
　　203 F.3d 596 (9th Cir. 2000) ............................................................... 30

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
　　464 U.S. 417 (1984) ......................................................................... 28, 31

*Technitrol, Inc. v. Memorex Corp.*,
　　376 F. Supp. 828, 835 (N.D. Ill. 1974), *aff'd sub nom.*, *Technitrol, Inc. v. NCR Corp.*,
　　513 F.2d 1130 (7th Cir. 1975) (per curiam) .................................... 39, 40

*Tetra Tech., Inc. v. Harter*,
　　823 F. Supp. 1116 (S.D.N.Y. 1993) ...................................................... 35

*Tidler v. Eli Lilly & Co.*,
　　851 F.2d 418 (D.C. Cir. 1988) .............................................................. 19

*Varconi v. Unity Television Corp.*,
　　11 Misc. 2d 191 (N.Y. Sup. Ct. 1958) ............................................. 38, 39

*White v. Priester*,
　　78 A.D.3d 1169 (N.Y. App. Div. 2010) ................................................ 38

*Yantha v. Omni Childhood Ctr., Inc.*,
　　13-CV-1948 ARR JMA, 2013 WL 5327516 (E.D.N.Y. Sept. 20, 2013) ............ 16, 17, 18

**Statutes**

17 U.S.C. § 106 .............................................................................................. 9

17 U.S.C. § 107 ................................................................................ 27, 28, 30, 31

**TABLE OF AUTHORITIES**
**(continued)**

PAGE(S)

17 U.S.C. § 110......................................................................................................22, 23

17 U.S.C. § 114........................................................................................................9, 11

17 U.S.C. § 301..............................................................................................................12

17 U.S.C. § 801..............................................................................................................11

17 U.S.C. § 802..............................................................................................................11

17 U.S.C. § 803..............................................................................................................11

17 U.S.C. § 804..............................................................................................................11

17 U.S.C. § 805..............................................................................................................11

Act of Feb. 3, 1831, ch. 16, 4 Stat. 436 ........................................................................8

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971).................8, 9

**Other Authorities**

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8D.06 [E] (Lexis 2013) ........23

117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) (statement of Sen. John McClellan) ......................9

141 Cong. Rec. S945-02 (daily ed. Jan. 13, 1995) ........................................................11

*Authorizing a Composer's Royalty in Revenues from Coin-operated Machines and to*
    *Establish a Right of Copyright in Artistic Interpretations: Hearings Before Subcomm.*
    *on Patents, Trade-marks, and Copyrights of the H. Comm. on the Judiciary on H.R.*
    *1269, H.R. 1270, and H.R. 2570*, 80th Cong. (Comm. Print 1947) (statement of Fred
    Waring, President of the Nat'l Ass'n of Performing Artists) ..................................10

Comments of SoundExchange, Inc., *Music Licensing Study: Notice and Request for*
    *Public Comment*, Docket No. 2014-03 (May 23, 2014) ........................................23

*Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H. Comm. on the*
    *Judiciary on H.R. 4347, H.R. 5680, H.R. 6831, H.R. 6835*, 89th Cong. (Comm. Print
    1965) (statement of Abraham L. Kaminstein, Register of Copyrights)...................10

H.R. Rep. No. 92-487 (1971)..........................................................................................9

H.R. Rep. No. 104-274 (1995).................................................................................9, 11, 22

**TABLE OF AUTHORITIES**
**(continued)**

PAGE(S)

H.R. Rep. No. 105-796 (1998) (Conf. Rep.)................................................................27

*Music Licensing Study: Notice and Request for Public Comment*, 79 Fed. Reg. 14,739
     (March 17, 2014) ...............................................................................................23

*Performance Royalty: Hearings Before the Subcomm. on Patents, Trademarks, and
     Copyrights of the S. Comm. on the Judiciary on S.1111*, 94th Cong. (Comm. Print
     1975) (statement of Barbara Ringer, Register of Copyrights)...............................10

Press Release, ASCAP, *ASCAP Reports Strong Revenues in 2013* (Feb. 12, 2014),
     *available at* http://www.ascap.com/press/2014/0213-2013-financials.aspx ...........................15

Radio Stations and Web-TV broadcast live Worldwide, available at
     http://www.surfmusic.de/country/new+york.html. ...............................................36

*Revision of Copyright Laws: Hearings Before the H. Comm. on Patents*, 74th Cong.,
     (Comm. Print 1936) (statement of H.A. Huebner, representing Brunswick Record
     Corp. and Columbia Phonograph Co.)......................................................................10

S. Rep. No. 92-72 (1971)................................................................................................9

S. Rep. No. 104-128 (1995). ..........................................................................................22

*Second Supplementary Register's Report on the General Revision of the U.S. Copyright
     Law*, at 218-21 (1975), *available at* 9 Melville B. Nimmer & David Nimmer, *Nimmer
     on Copyright*, App. 16 (Lexis 2013)......................................................................10

*Statement on S. 227 of ASCAP* (Mar. 9, 1995), 1995 WL 552160 (Westlaw) ...............12

*Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, at
     51 (1965), *available at* 9 Melville B. Nimmer & David Nimmer, *Nimmer on
     Copyright*, App. 15 (Lexis 2013)......................................................................10, 11

*Testimony of Jason S. Berman, Chairman and CEO of RIAA Before the H. Judiciary
     Subcomm. on Courts & Intellectual Property: Hearing on H.R. 1506* (June 21, 1995),
     1995 WL 371088 (Westlaw).....................................................................................11

*Testimony of the NAB Before the H. Judiciary Subcomm. on Courts & Intellectual
     Property: Hearing on H.R. 1506*, § C (June 21, 1995), 1995 WL 371107 (Westlaw)............12

U.S. Const. art. I, § 8.....................................................................................................34

**TABLE OF AUTHORITIES**
**(continued)**

P<span>AGE(S)</span>

U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings*
(2011)..................................................................................................................12, 21, 22, 23

## PRELIMINARY STATEMENT

By this action, Plaintiff, the owner of sound recordings made nearly fifty years ago and publicly performed widely ever since by myriad broadcast and other outlets, seeks radically to transform the scope of protection accorded to sound recordings under New York common law. Plaintiff asks the Court to recognize an exclusive right of public performance for sound recordings under New York law (and of reproductions made in support thereof) in the absence of any supporting precedent—indeed, in the face of the decades of acknowledgement by the recording industry, the U.S. Copyright Office, and Congress alike that no such right exists. The result Plaintiff seeks would dramatically expand New York law and unravel a century of contrary understandings between the music and broadcasting industries.

Plaintiff brings suit over some 100 recordings of songs by The Turtles made prior to 1972. It concedes that none of these recordings is entitled to protection under federal copyright law, as the Copyright Act only affords protection to sound recordings made on or after February 15, 1972 ("Post-1972 Recordings"). Seeking to fill a deliberate legislative gap, Plaintiff asserts that Sirius XM's broadcasts of sound recordings created before that date ("Pre-1972 Recordings"), and the incidental copies made in aid of such broadcasts, infringe purported rights under New York common law, giving rise to a recovery of more than $100 million in damages supposedly sustained by Plaintiff and members of a putative class of similarly situated owners of Pre-1972 Recordings. Plaintiff has no explanation for why, if these claimed state-law rights in Pre-1972 Recordings in fact exist, Plaintiff waited more than four decades to assert them, and no explanation for why Plaintiff has asserted them against just one broadcaster (more than a dozen years after the inception of *its* commercial operations) out of many thousands of music users engaging in precisely the same conduct in the State of New York. Plaintiff's facile reference to Sirius XM's ability to deliver music to subscribers digitally does not even begin to fill the legal

vacuum in which Plaintiff's claims have been fashioned, let alone meaningfully distinguish Sirius XM from its terrestrial radio competitors, which routinely broadcast in digital format.

The focus of New York common law has been to afford relief to owners of Pre-1972 Recordings solely to combat *copying and commercial distribution* of sound recordings by record pirates or other competitors. The discovery record confirms that there is no competitive threat akin to record piracy here: Plaintiff has conceded that Sirius XM does not compete with Plaintiff, and it cannot point to a single lost sale or license as a result of Sirius XM's activities. These admissions completely undermine the groundless allegations of competitive injury and marketplace impact that were added in the Amended Complaint to avert a motion to dismiss.

In contrast to the protection afforded against unlicensed copying generating competitive sales, New York law has never provided a means for record companies to collect enormous sums of money from radio broadcasters or other music users arising out of performances of Pre-1972 Recordings, or for the incidental copies made in aid of those performances. A contrary determination by this Court would immediately turn the thousands of radio broadcasters, webcasters, nightclubs, retail establishments, and the like that perform such recordings within New York into serial copyright infringers.

The role of a district court sitting in a diversity action is to apply authoritative New York law, not reformulate it in the radical fashion sought by Plaintiff. Indeed, that sought-after expansion implicates important policy considerations that only confirm the inappropriateness of the unprecedented relief sought herein. The only rationale Plaintiff has mustered for a ruling in its favor is a myopic and highly one-sided notion of "fairness," which reduces to the plea that it should be paid for Sirius XM's uses of its sound recordings. This conception of intellectual property rights is both boundless and woefully incomplete. It ignores the very *raison d'etre* for

copyright protection—creating incentives for the creation of new works—application of which to works created prior to 1972 would, by definition, be inapposite.  It also ignores that the retroactive application of such a newly-crafted right could not plausibly be described as "fair," providing Plaintiff as it would an entirely undeserved windfall, while imposing significant, retroactive penalties on Sirius XM (and, by necessary implication, countless other New York entities) for conduct undertaken for decades in good-faith reliance on existing law.  Both policy and precedent defeat Plaintiff's claims.

Sirius XM is entitled to summary judgment on two other grounds.  First, the sought-after expansion of New York law raises issues of constitutional dimension.  Were New York to regulate performances of Pre-1972 Recordings by a nationwide service such as Sirius XM, the impact would necessarily be extraterritorial, with effects on Sirius XM's ability to conduct its business that transgress the Commerce Clause.  Second, Plaintiff's failure to pursue its claims in timely fashion, instead of lying back while Sirius XM continued to invest billions in building its business, entitles Sirius XM to summary judgment on its laches defense, barring much of the relief sought here.

For the foregoing reasons, Sirius XM is entitled to summary judgment and dismissal of the Complaint with prejudice.

## FACTUAL BACKGROUND

### A.     The Parties

Plaintiff is a California corporation that purports to own certain sound recordings of songs by The Turtles.  Plaintiff's principals, Mark Volman and Howard Kaylan, two of the original members of The Turtles, each own 50% of the company.  They are also the sole officers, directors, and employees of Plaintiff.  Evan Cohen is Plaintiff's administrator, business manager, and lawyer.  Sirius XM's Statement of Uncontested Material Facts ¶¶ 1-2 ("SXM 56.1").

Defendant Sirius XM is a satellite radio provider that operates a nationwide broadcast service. Sirius XM is the result of the July 2008 merger between Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Radio Inc. ("XM"), each of which was operating its own satellite radio service: Sirius since February 2002, and XM since September 2001. Sirius XM has continued to operate both services since the merger. SXM 56.1 ¶¶ 3, 7, 10-12.

B.      **The Turtles' Sound Recordings**

A now-defunct record label, White Whale Records ("White Whale"), created a number of sound recordings of The Turtles' songs. Each of these recordings was created prior to February 15, 1972. Thereafter, through a series of transactions, Volman and Kaylan purportedly acquired the rights in these sound recordings. Plaintiff contends that Volman and Kaylan subsequently transferred all the rights to Plaintiff. SXM 56.1 ¶¶ 17-20. Plaintiff has failed to produce an agreement evidencing such a transfer.

C.      **Sirius XM's Use of the Recordings at Issue**

Sirius XM broadcasts over 135 channels of music, sports, news, talk, and other entertainment content nationwide to its subscribers. Sirius XM delivers its broadcasts to subscribers via satellite radio and, with the assistance of certain third parties, by streaming over the Internet. Sirius XM also offers an Internet feature called MySXM. MySXM allows subscribers to personalize to a limited extent the streams of content they receive, but it does not allow subscribers to play particular songs on demand. Nor does Sirius XM offer downloads of any of Plaintiff's recordings. SXM 56.1 ¶¶ 4-6, 31-32, 34, 41, 43.

In order to broadcast and stream sound recordings, Sirius XM has to make a number of copies of those recordings. When Sirius XM obtains a copy of a sound recording for use in connection with its programming, it creates a digital copy for storage on the computer servers (and backup servers) that house its library of recordings. In connection with developing the

sequence of songs within a program, Sirius XM sometimes utilizes copies of "tips and tails," short portions of the beginnings and ends of songs, to ensure harmonious transitions in and out of songs.  When Sirius XM broadcasts a sound recording, it needs to make certain temporary (or "cache") copies to enable the transmission.  Sirius XM relies on certain third parties to assist with delivery of its Internet streaming service, and in the course of its activities, Sirius XM and these third parties may also create certain temporary copies of streamed data.[1]  None of the server copies made by Sirius XM and none of the temporary copies made by Sirius XM and these third parties are ever accessible to the public.  SXM 56.1 ¶¶ 24-25, 31-32, 35-36, 40.

Of the 100 Pre-1972 Recordings identified by Plaintiff in the Amended Complaint, Sirius XM has performed 15.  It has never performed the others.  SXM 56.1 ¶¶ 21, 23.

### D.      Plaintiff's Longstanding Knowledge of Sirius XM's Broadcasts of Its Pre-1972 Recordings and Stated Rationale for Bringing This Litigation

Plaintiff has been aware of the Sirius and XM services for at least ten years.  Volman has been a Sirius XM subscriber for over seven years, and Cohen has been a subscriber for approximately five years.  Plaintiff has long known that Sirius XM was playing certain of its Pre-1972 Recordings.  SXM 56.1 ¶¶ 46-48.  Despite this awareness, Plaintiff never requested that Sirius XM license the right to publicly perform any of these sound recordings or to make copies in aid of such performances, nor asked Sirius XM to stop broadcasting its works.  Prior to filing this lawsuit, Plaintiff never communicated to Sirius XM that it believed Sirius XM was infringing its rights nor sought compensation of any kind from Sirius XM in connection with performances of its recordings.  SXM 56.1 ¶¶ 49-50.

---

[1] Sirius XM relies on Akamai, a content-delivery network, to deliver its Internet service.  Sirius XM uses QuickPlay as an intermediary for delivery of Internet streams to mobile devices, and Sirius XM uses Omnifone to assist with the delivery of MySXM.  SXM 56.1 ¶¶ 31-32, 35.

Neither Kaylan nor Volman read the Complaint before it was filed, nor had they done so prior to being deposed.  Kaylan's "only understanding" of why this suit was commenced is that "we weren't paid" royalties by Sirius XM.  Volman's response to the rationale for the suit was, "Well, I'm not sure."  After a break in his testimony requested by his counsel, he added that the suit was brought to raise awareness of the absence of performance royalties for owners of Pre-1972 Recordings.  SXM 56.1 ¶ 61.

**E.**      **Plaintiff's Decades of Acquiescence in the Unlicensed Public Performance of Its Sound Recordings and The Limited Scope of Its Licensing Activities**

The same Turtles' recordings at issue in this lawsuit have been played on broadcast radio stations since those songs were recorded in the 1960s and early 1970s, and on Internet radio since the 1990s.  SXM 56.1 ¶¶ 65, 71.  Retail stores, bars, restaurants, fitness centers, and many other physical establishments publicly perform sound recordings, including those by the Turtles.  Plaintiff alleged the existence of a thriving licensing market for its recordings (Am. Compl. ¶ 3, 43, 47), but now admits that it has never licensed, tried to license, or sued any of the radio stations, simulcasters, webcasters, or physical establishments that publicly perform (as well as make server or other incidental copies of) Plaintiff's recordings.  SXM 56.1 ¶¶ 66-68, 73-74, 76.  By comparison, ASCAP, an organization that licenses performing rights in underlying *musical compositions* contained within sound recordings (which, as explained below, are distinct works for copyright purposes) has licenses in place with over 7,600 such New York entities, including 564 radio stations, 61 television stations, 3,267 bars and restaurants, and 824 retail stores.  SXM 56.1 ¶ 78.

Plaintiff's licensing activities have been limited to (a) licensing various entities to sell copies of certain Turtles' tracks on albums, CDs and other physical media; (b) licensing producers to include Turtles' songs in the soundtracks of movies, television programs, and

commercial advertisements; and (c) licensing certain digital uses of its recordings through The

Orchard, a distributor of music and video content that aggregates the rights to millions of sound

recordings from tens of thousands of independent record labels, and then licenses those

recordings, on a catalog-wide basis, to music users around the world. ████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

        Plaintiff's modest U.S. licensing income from The Orchard has come almost entirely

from the sales of digital downloads by services such as Apple iTunes. ████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████ No music provider has ever refused to take a license from

Plaintiff ███████████ or sought a lower royalty rate because Sirius XM plays Pre-1972

Recordings without a license.  Sirius XM has never event come up in such discussions.  SXM

56.1 ¶ 50.

## ARGUMENT

I. **NEW YORK LAW DOES NOT PROVIDE A RIGHT OF PUBLIC PERFORMANCE IN PRE-1972 RECORDINGS**

A. **Plaintiff's claimed entitlement to an exclusive right of public performance is undermined by the history and evolution of the limited federal and state law protections afforded to sound recordings**

As an important backdrop to an examination of the body of New York common law from which Plaintiff seeks to extract its asserted performance right in Pre-1972 Recordings (as discussed in Points I.B and C *infra*), we review the historical landscape pertaining to the protections afforded to sound recordings by state and federal law respectively. That examination reveals a uniform recognition, spanning many decades that: (i) state law protections for sound recordings (including, though not limited to, New York) *do not* extend to public performances thereof; (ii) Congress considered, but up until 1995 rejected, record industry overtures to augment federal copyright law to provide first-time recognition of such a performance right; and (iii) Congress's limited recognition of such a right beginning in 1996 pertained solely to Post-1972 Recordings. No part of that historic record remotely suggests, let alone supports, the notion pressed by Plaintiff that state law in general, or New York common law in particular, has recognized a public performance right in *any* sound recordings, pre- or post-1972.

Since at least 1831, musical compositions, as distinct from the sound recordings in which those compositions are sometimes embodied, have been protected by federal copyright laws. *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436, Declaration of John R. Gerba, dated May 30, 2014 ("Gerba Decl."), Exhibit ("Ex.") 7. It was not until enactment of the Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971) ("Sound Recording Act"), that sound recordings began to receive any protection at all under federal law. The Sound Recording Act was expressly intended to address record piracy, which had "rapid[ly] increase[d]" in preceding years

due to technological advances and inconsistent state law protection.  117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) (statement of Sen. John McClellan), Gerba Decl. Ex. 13; *see also Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009); H.R. Rep. No. 92-487, at 2 (1971), Gerba Decl. Ex. 14; S. Rep. No. 92-72, at 1, 7 (1971), Gerba Decl. Ex. 15.  In furtherance of this goal, owners of qualifying recordings—those created on or after the effective date of the Act, February 15, 1972—were granted carefully circumscribed prospective rights that were designed to combat record piracy, specifically the rights "[t]o reproduce and distribute" "tangible" copies of sound recordings.  Sound Recording Act §§ 1, 3, Gerba Decl. Ex. 16; 17 U.S.C. § 106(1), (3).

In so acting, Congress withheld from owners of sound recordings additional rights conferred by federal law upon owners of musical compositions, most notably, an exclusive right of public performance.  *See* Sound Recording Act §§ 1(a), 3, Gerba Decl. Ex. 16; 17 U.S.C. § 114(a) (stating that sound recording rights "do not include any right of performance under section 106(4)" of the Copyright Act); *see also* H.R. Rep. No. 92-487, at 14, Gerba Decl. Ex. 14. Congress viewed the addition of a performance right as an unnecessary augmentation of the rights needed to accomplish the main goal of the legislation.  *See* H.R. Rep. No. 104-274, at 11 (1995), (recordings "were not granted the rights of public performance, on the presumption that the granted rights would suffice to protect against record piracy"), Gerba Decl. Ex. 17.

Congress clearly understood that it was leaving public performances of sound recordings unregulated *at either the state or federal level*.  The common understanding among all interested parties was that, unlike at least some pre-existing state protection against record piracy, radio broadcasters and myriad other users of sound recordings were unconstrained by state law from

publicly performing such works without incurring liability.  But a small sampling of the

legislative record dating back to the 1930s amply demonstrates this uniform recognition:

### Record Producers' Testimony Before Congress

o **1936:**  "[T]he law up to date has not granted" protection against radio stations' "indiscriminate use of phonograph records."  *Revision of Copyright Laws: Hearings Before the H. Comm. on Patents*, 74th Cong., at 622 (Comm. Print 1936) (statement of H.A. Huebner, representing Brunswick Record Corp. and Columbia Phonograph Co.), Gerba Decl. Ex. 8.

o **1947:**  While "use of records . . . has become standard practice with hundreds of radio stations," the performing artist "has no rights at all beyond an original agreement with the manufacturer."  *Authorizing a Composer's Royalty in Revenues from Coin-operated Machines and to Establish a Right of Copyright in Artistic Interpretations: Hearings Before Subcomm. on Patents, Trade-marks, and Copyrights of the H. Comm. on the Judiciary on H.R. 1269, H.R. 1270, and H.R. 2570*, 80th Cong., at 6 (Comm. Print 1947) (statement of Fred Waring, President of the Nat'l Ass'n of Performing Artists), Gerba Decl. Ex. 9.

### Reports to Congress by the Register of Copyrights

o **1965:**  Proposed addition of a public performance right for sound recordings was "explosively controversial" and opposed by both "users who would have to pay additional royalties" and composers who "would probably get a smaller slice of the pie." *Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, at 51 (1965), *available at* 9 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, App. 15 (Lexis 2013), Gerba Decl. Ex. 11.  The Register echoed this sentiment in testimony related to an earlier version of the Sound Recording Act of 1971:  "By recognizing sound recordings as copyrightable works with rights of reproduction and distribution, but by denying them rights of public performance, the bill reflects—accurately, I think—the present state of thinking on this subject in the United States."  *Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary on H.R. 4347, H.R. 5680, H.R. 6831, H.R. 6835*, 89th Cong., at 1863 (Comm. Print 1965) (statement of Abraham L. Kaminstein, Register of Copyrights), Gerba Decl. Ex. 12.

o **1975:**  Record performing artists had been "given no legal rights whatever to control or participate in the commercial benefits of the vast new electronic audience" for broadcasting. *Performance Royalty: Hearings Before the Subcomm. on Patents, Trademarks, and Copyrights of the S. Comm. on the Judiciary on S.1111*, 94th Cong. 11 (Comm. Print 1975) (statement of Barbara Ringer, Register of Copyrights), Gerba Decl. Ex. 19; *see also Second Supplementary Register's Report on the General Revision of the U.S. Copyright Law*, at 218-21 (1975), *available at* 9 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, App. 16 (Lexis 2013) (reporting that sound recording performance right had been removed from proposed revision of copyright law because it would "impose severe financial burdens

on broadcasters"), Gerba Decl. Ex. 18.

In 1995, in enacting the Digital Performance Rights in Sound Recordings Act ("Digital Performance Rights Act"), Congress responded affirmatively—to a point—to the record industry's persistent drive for recognition of a sound recording performance right. Senator Feinstein, a co-sponsor, stated that performers and record companies still "ha[d] no legal right to control or to receive compensation for [a] public performance of their work[s]." 141 Cong. Rec. S945-02 at S949 (daily ed. Jan. 13, 1995), Gerba Decl. Ex. 23. In enacting this legislation, Congress created such a right applicable *only* to Post-1972 Recordings and, at that, brigaded the right with numerous limitations, exceptions, and protections for users newly made subject to it. These included the creation of a compulsory statutory license designed to ensure that various categories of services delineated by the statute, including satellite radio, would be assured uninterrupted access to the sound recordings involved and that such access would be provided at a reasonable price. An elaborately structured agency rate-setting process was established as a part of this framework; the responsible agency, the Copyright Royalty Board, has actively regulated the Post-1972 Recording performance royalties payable by entities including Sirius XM. *See* H.R. Rep. 104-274, at 22, Gerba Decl. Ex. 17; 17 U.S.C. §§ 114(d), 114(f), 801-805.

The entire record surrounding federal creation of a circumscribed sound recording performance right applicable to Post-1972 Recordings once again confirms the absence of existing state laws affording sound recording owners public performance rights in Pre-1972 Recordings. Consider, for example, the following statements:

o **Recording Industry Association of America**:  "Under existing law, record companies and performers . . . have *no rights* to authorize or be compensated for the broadcast or other public performance of their works." *Testimony of Jason S. Berman, Chairman and CEO of RIAA Before the H. Judiciary Subcomm. on Courts & Intellectual Property: Hearing on H.R. 1506* (June 21, 1995), 1995 WL 371088 (Westlaw) (emphasis added), Gerba Decl. Ex. 20.

o **National Association of Broadcasters**: "[P]ublic performance rights" in sound recordings are "essentially alien to ways we have conducted our business for over 60 years"; their imposition "would be enormously disruptive and harmful." *Testimony of the NAB Before the H. Judiciary Subcomm. on Courts & Intellectual Property: Hearing on H.R. 1506*, § C (June 21, 1995), 1995 WL 371107 (Westlaw), Gerba Decl. Ex. 21.

o **American Society of Composers, Authors and Publishers ("ASCAP")**: "[E]stablished user industries[,]" such as broadcasters, "have fully developed in an economic context which *does not call for payment for performing rights in sound recordings* [and] should not incur payments for those rights now." *Statement on S. 227 of ASCAP*, § II(C) (Mar. 9, 1995), 1995 WL 552160 (Westlaw) (emphasis added), Gerba Decl. Ex. 22.

Plaintiff undoubtedly will point to the fact that the protections afforded Post-1972 Recordings under federal law do not preempt such protections as may be afforded Pre-1972 Recordings under state law. *See* 17 U.S.C. § 301(c) (preserving unspecified state law remedies for Pre-1972 Recordings). While true, this recognition merely begs the issue. The foregoing record (together with the authorities discussed herein) makes abundantly clear that state law— and, for immediate purposes, New York law—has *not* afforded parallel protection to Pre-1972 Recordings in the form of a public performance right. An exhaustive study by the U.S. Copyright Office concurs. *See* U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings* 44-45 (2011), Gerba Decl. Ex. 24.

**B.** **New York common law has never provided copyright owners with an exclusive right of public performance**

As established by the New York Court of Appeals in *Capitol Records, Inc. v. Naxos of America, Inc.* ("*Naxos*"), New York's common law tort of copyright infringement is directed at unauthorized reproduction and commercial distribution of infringing copies of sound recordings and not at public performances (nor, as discussed in Point II *infra*, reproductions made solely in aid of public performance without distribution of those copies). 4 N.Y.3d 540 (2005). In *Naxos*, Capitol Records, which owned the U.S. rights to certain sound recordings of classical music works made in the 1930s that had fallen into the public domain in the United Kingdom, sued a

competing record company which had lawfully acquired copies of those recordings abroad and manufactured and sold copies in the U.S. *Id.* at 544-45. Capitol asserted claims for common law copyright infringement and unfair competition, among others. *Id.* at 545. Capitol contended that it alone possessed the exclusive rights to make and distribute the recordings in New York and elsewhere in the U.S. *Id.* The Second Circuit certified several questions to the New York Court of Appeals, including whether "a cause of action for common law copyright infringement include[s] some or all of the elements of unfair competition?" *Id.* at 546.

To answer the questions, the Court of Appeals first engaged in a comprehensive and scholarly analysis of Anglo-American copyright history dating to the 15th century, culminating in an exhaustive review of the protections afforded to sound recordings in New York over the past 100 years. *Id.* at 546-62. The court also examined New York sound recording cases asserting claims of unfair competition rather than common law copyright (which was commonly understood to expire upon publication and was thus not typically available as a cause of action for sound recordings sold to the public). *Id.* at 554 (citing *Metro. Opera Ass'n v Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 796 (N.Y. Sup. Ct. 1950), *aff'd*, 279 A.D. 632 (N.Y. App. Div. 1951) (per curiam) (finding that defendants who *made and sold* recordings of Met performances engaged in "piratical conduct" that injured the Opera's own sale of records)). The court held that a claim for common law copyright infringement under New York law contains the following elements: "(1) the existence of a valid copyright; and (2) *unauthorized reproduction* of the work protected by copyright." *Metro. Opera Ass'n*, 4 N.Y.3d at 550, 563 (emphasis added) (citing, *inter alia*, New York's original copyright statute, L. 1786, Ch. 54, which had protected the right to "print" and "publish" books). It proceeded to clarify that an act of distribution is also required. *See id.*; Point II.A *infra*. The court made no mention of a right of public performance

after its exhaustive canvassing of the antecedents to its ruling.  *Id.*; *see also Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d at 152 (noting that, except as provided by the federal Digital Performance Rights Act, sound recording owners had "no right to extract licensing fees from radio stations and other broadcasters of recorded music").

Indeed, no New York court (with the exception of a single recent outlier) has ever held that unlicensed public performances of Pre-1972 Recordings constitute copyright infringement.[2] The sound recording common law copyright claims recognized by New York courts exclusively have involved defendants that made and commercially distributed copies of sound recordings owned or licensed by the plaintiffs in competition with them.  *See, e.g.*, *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955); *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ("*Lime Grp.*"); *see generally* Point II.A *infra*.

This absence of a New York public performance right in sound recordings has long been recognized by the record industry.  *See* Point I.A, *supra*.  Plaintiff's—and the entire record industry's—decades of inaction in the face of millions of unlicensed performances of Pre-1972 Recordings is further testimony to the absence of such a right.  This inaction on Plaintiff's part cannot be explained by a lack of knowledge of infringing conduct or an absence of economic incentive.  Plaintiff has been aware that its Pre-1972 Recordings were being publicly performed without licenses for decades.  Over the past half-century, countless radio broadcasters, music services and public establishments have played Plaintiff's Pre-1972 Recordings without a license

---

[2] *See Capitol Records, LLC v. Harrison Greenwich, LLC,* No. 65224 (N.Y. Sup. Ct. May 13, 2014) (Decision & Order), attached to the Gerba Decl., Ex. 32.  The case involves a restaurant website using a 1970 recording that played when users visited the site.  The court's original order ignored the plaintiff's performance rights claims, but the defendant did not challenge the plaintiff's subsequent request to amend the order to state that Harrison engaged in an "unauthorized performance."  The court granted the unopposed motion without discussion and without reference to any New York (or other) case law.

or payment to Plaintiff or a demand therefor.  For their part, Sirius and XM began performing

certain of those recordings more than a decade ago.  SXM 56.1 ¶¶ 21, 65-68, 72-74, 76.

ASCAP collected close to a billion dollars in license fees

nationwide in 2013.  *See* Press Release, ASCAP, *ASCAP Reports Strong Revenues in 2013* (Feb.

12, 2014), *available at* http://www.ascap.com/press/2014/0213-2013-financials.aspx.  Plaintiff's

contention that there has existed a comparable state right of public performance in sound

recordings with the potential of affording Plaintiff, along with the rest of the record industry,

similarly significant sums of money, that Plaintiff simply has not bothered to enforce prior to the

instant lawsuit lacks credibility.  A far more plausible explanation is found in the Supreme

Court's observation that:

> [s]o strong is the desire of every man to have the full enjoyment of
> all that is his, when a party comes into court and asserts that he has
> been for many years the owner of certain rights, of whose
> existence he has had full knowledge, and yet has never attempted
> to enforce them, there is a strong persuasion that, if all the facts
> were known, it would be found his alleged rights either never
> existed or had long since ceased.

*Halstead v. Grinnan*, 152 U.S. 412, 416 (1894).

**C.    Sirius XM's public performances of Plaintiff's Pre-1972 Recordings do not
constitute unfair competition under New York law**

Plaintiff fares no better under the doctrine of unfair competition.  *See, e.g.*, *Estate of*

*Hemingway v. Random House, Inc.*, 53 Misc. 2d 462, 71-72 (N.Y. Sup. Ct. 1967), *aff'd on other*

*grounds*, 23 N.Y.2d 341 (1968) (noting that "New York's state and federal courts have refused to

permit a litigant to escape the limitations of copyright protection simply by renaming his cause

of action as 'unfair competition'").  *Naxos* made clear that a claim for unfair competition under

New York law requires, to start, the "unauthorized copying and distribution" of plaintiff's sound recordings. 4 N.Y.3d at 563-64 (citations omitted). Dating back to the 1950s, the cause of action has been applied solely in the context of record piracy or, more recently, its digital file-sharing equivalent. *See, e.g.*, *Lime Grp.*, 784 F. Supp. 2d at 437; *Apple Corps Ltd. v. The Adirondack Grp.*, 124 Misc.2d 351, 354-55 (N.Y. Sup. Ct. 1983); *Metro. Opera Ass'n*, 199 Misc. 786. No New York case has ever found the unlicensed *public performance* of sound recordings to be unfair competition. The Court need go no further to reject Plaintiff's unfair competition claim with respect to Sirius XM's broadcast activities.

In any event, Plaintiff cannot establish that it competes with Sirius XM in the marketplace or that Sirius XM has caused it any competitive injury as comprehended by New York unfair competition law. *See Naxos*, 4 N.Y.3d at 563-64 (citations omitted) (holding that a plaintiff must also show "competition in the marketplace or similar actions designed for commercial benefit . . . or deception of the public"). The requirements of marketplace competition and competitive injury were surveyed at length in the recent case of *Yantha v. Omni Childhood Ctr., Inc.*, 13-CV-1948 ARR JMA, 2013 WL 5327516 (E.D.N.Y. Sept. 20, 2013). In *Yantha*, the district court dismissed the plaintiff's unfair competition claim for failing to demonstrate a cognizable competitive injury, explaining that unfair competition does not simply mean that the defendant "benefits" in some general sense by getting something without paying for it, but that it uses what it takes *to compete against the plaintiff* or otherwise put the plaintiff at a competitive disadvantage. *Id.* at *7. The court held that, "to state a claim for unfair competition, a plaintiff must allege either a direct financial loss, lost dealings, or lost profits resulting from the anticompetitive acts at issue, or, at the very least, that defendant diverted plaintiff's customers and business to defendant." *Id.* (internal quotation marks and citations

omitted) (explaining that competitive injury could also include a defendant "obtaining business that should rightfully be plaintiff's or in any other way usurping her commercial advantage"); *see also ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478 (2007) ("[M]isappropriation theory . . . prohibits a defendant from using a plaintiff's property right or commercial advantage . . . *to compete unfairly against the plaintiff* in New York." (emphasis added)); *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 327 (2d Cir. 1995) (dismissing an unfair competition claim as "baseless" because sound recording owner "failed to plead facts indicating that his record sales or licensing revenues have in any way been affected by" the defendant's activities).

    While Plaintiff attempted to plead the sort of facts missing in *Yantha* in response to Sirius XM's motion to dismiss the original Complaint, the discovery record exposes those allegations as groundless. Kaylan readily conceded that Sirius XM does not compete with Plaintiff. *See* SXM 56.1 ¶ 80 (Kaylan Tr. 94:2-4 ("I don't know how we would be considered a competitor with a satellite provider. We don't do that."). Kaylan likewise conceded that he did not know how Sirius XM performing the Turtles' recordings "would cause anything one way or another to lose or gain" and stated "I don't understand how it would affect sales particularly." SXM 56.1 ¶ 81. When asked about terrestrial radio play, Kaylan similarly indicated that he doubted that "because radio plays our records, we lose sales." SXM 56.1 ¶ 70. Volman, for his part, admitted that he could not identify a single lost sale caused by Sirius XM's activities and indicated that he was not aware of any evidence that Sirius XM has impaired Flo & Eddie's ability to sell or license its Turtles' recordings. SXM 56.1 ¶ 79. Cohen ███████████████████████ ███████████████████████████████████████████████████████ likewise admitted that they could not point to any specific license fees or sales that Plaintiff had lost on account of the activities of Sirius XM. SXM 56.1 ¶ 81. Indeed, Plaintiff has admitted that it does not

license, never has licensed, and has never even *tried* to license any of the radio stations or webcasters with which Sirius XM competes.  SXM 56.1 ¶¶ 66-68, 73-74.

In light of these concessions, Plaintiff can point to no facts establishing that Sirius XM has caused Plaintiff to lose "profits to which [it] was entitled," "diverted [its] business," or "otherwise deprived [it] of proceeds [it] would have been able to reap but for defendants' unfair competition."  *Yantha*, 2013 WL 5327516, at *7.[3]  Plaintiff's unfounded allegations that "digital transmissions" are substituting for sales of records, that Sirius XM is "diverting" to itself income that otherwise would have flowed to Plaintiff in the form of sales, or that Sirius XM is causing Plaintiff to suffer "lost license fees" and "lost sales," Am. Compl. ¶ 47, are fiction.  The same is true of Plaintiff's allegation that Sirius XM places "downward pressure" on the fees that Plaintiff can charge other services for such rights.  Am. Compl. ¶ 47.  Cohen admitted that he has *never* had a conversation with any other entity about the licensing fees that they would be willing to pay for the rights to exploit Plaintiff's Pre-1972 Recordings,

_____

[3] *Compare Metro. Opera Ass'n*, 199 Misc. at 804 (defendants' marketing of inferior recordings of Metropolitan Opera made plaintiff "likely to lose the major part of its royalties from the sale of the authorized records"); *Lime Grp.*, 784 F. Supp. 2d at 437 (explaining that "[a]n unfair competition claim usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property" and holding that "[f]ree distribution of the Recordings through LimeWire competes with Plaintiffs' sales of the Recordings").

Plaintiff's allegation that Sirius XM's "unauthorized use of the Pre-1972 Recordings is likely to cause confusion, mistake or deception as to the source, sponsorship, affiliation or connection between Plaintiff and the other Class Members, and Defendants," Am. Compl. ¶ 46, is similarly baseless.  Plaintiff admits that there is no evidence of actual confusion, and Kaylan acknowledged that he has never thought that any of the artists whose recordings are performed on Sirius XM's service are somehow sponsoring Sirius XM.  SXM 56.1 ¶¶ 83-84.  There is no reason to believe that Sirius XM's broadcasts are likely to start causing confusion or deception as to any affiliation with Plaintiff.

Plaintiff's unfair competition claim with respect to Sirius XM's performances boils down to an argument, not that Sirius XM has "diverted" or "usurped" sales or license revenue that Plaintiff otherwise would have collected, but merely that Sirius XM is broadcasting its sound recordings without paying for them.  But if the mere refusal to take a license to engage in a business concededly different from the Plaintiff's was sufficient to establish that Sirius XM is "competing" with the Plaintiff, the competition requirement would be stripped of all meaning: every unauthorized taking would amount to a competitive injury.  That is *not* the law of New York.  *See, e.g.*, *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1025 (2d Cir. 1989) (rejecting "novel" "free rider" unfair competition counterclaim because it was not "grounded in any New York case of which [the Second Circuit] [was] aware").

**D.     It would be inappropriate, as matters of law and policy, for the Court to expand New York common law to encompass public performances of sound recordings long understood to be lawful**

The responsibility of a federal court in a diversity case is to apply the law of the state in which the court sits, not to modify that law.  *See, e.g.*, *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) ("We must apply the law of the forum as we infer it presently to be, not as it might come to be." (citation omitted)); *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994

19

F.2d 112, 123 (3d Cir. 1993) ("Our role is to apply the current law of the appropriate jurisdiction, and leave it undisturbed.").  As the Second Circuit observed in refusing to expand New York's law of unfair competition to encompass "free riding" by a defendant that did not compete with the plaintiff, "it is not the role of a federal court . . . to undertake such an expansion of New York law."  *H.L. Hayden*, 879 F.2d at 1025.  This requires denial of the relief sought by Plaintiff here.

There is, in any event, no reason to believe that the New York Court of Appeals would expand state common law to encompass an exclusive right of public performance in Pre-1972 Recordings, and there are many reasons to believe that it would not.  First, the creation of a public performance right under New York common law for Pre-1972 Recordings would do little to achieve the central purpose of copyright:  to provide incentives for the creation of *new* works for dissemination to the public.  *See Feist Publ'ns v. Rural Tel Serv. Co.*, 499 U.S. 340, 349-50 (1991) ("The primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.'") (quoting U.S. Const. art. I, § 8, cl. 8).

The legal protections against unauthorized reproduction available to creators of sound recordings prior to 1972, which did not include a performance right, provided ample legal incentive for the creation and dissemination of those recordings.  Plaintiff, by its own admission, has already earned millions of dollars from the sale and distribution of copies of its recordings.[4] Am. Comp. ¶ 43.  As Plaintiff, by definition, cannot make any new Pre-1972 Recordings now, the proposed new right would not provide incentives to creative activity.  Rather than expand the

---

[4] More generally, the broad new right that Plaintiff asks this Court to create would apply retroactively to works that were made—at minimum—42 years ago and that would include recordings made as far back as 90 years ago. These recordings (depending on the release date and popularity) could have been sold first on 78s; then on LPs; then on cassette tape; then on CDs; and then as digital downloads—thus providing their creators many successive revenue streams.  In all events, each such recording was created at a time when there was absolutely no expectation of a performance right.

number of overall works available to the public, the creation of a new performance right would *reduce* the availability of Pre-1972 Recordings.  At a minimum, the proposed right would impose new and unanticipated fees on Sirius XM and other users if they wish to continue to perform Pre-1972 Recordings; that, in turn, would likely lead users either to raise the fees that they charge to consumers and/or to decrease their use of Pre-1972 Recordings in response.  Either way, public access almost assuredly would decline, with a conceded adverse impact on Plaintiff's ability to sell its recordings. SXM 56.1 ¶ 85 (Kaylan Tr. 71:7-22 (acknowledging promotional impact of radio play)).  For many Pre-1972 Recordings, licenses may not be available at any price, due to lack of information about who owns them.  *See* U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings* 76 & n.303.  Because the new exclusive right of performance urged by Plaintiff would produce a pure windfall to recording owners without any commensurate benefit to the public, there is no reason to recognize it.  *See Feist*, 499 U.S. at 349-50; *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 546 (1985) ("The monopoly created by copyright . . . rewards the individual author in order to benefit the public.").

 Second, the creation of a new performance right for Pre-1972 Recordings would impose unfair burdens upon stockholders of Sirius XM and other businesses that were built in good-faith reliance upon the extant legal regime.  Those investors took huge risks.  SXM 56.1 ¶ 13.  To impose retroactively new burdens on these enterprises surely would be unfair.

Third, the creation of the proposed right would also threaten the careful balance of federal and state laws that currently governs the use of sound recordings.  Putting to one side the constitutional problem addressed in Point III *infra*, having states adopt differently configured regimes would enable one state to encroach upon the legitimate interests of other states and would create intractable problems for companies such as Sirius XM that operate a uniform

national service.  Of equal concern, the proposed right would frustrate a key goal of the compulsory licensing regimes created by Congress in 1995 and 1998 to govern digital audio transmissions of Post-1972 Recordings by satellite broadcasters (including Sirius XM) and webcasters: to preserve incentives for innovative services such as satellite radio to make sound recordings publicly available by depriving the record industry of the right to withhold access to its works and/or charge exorbitant royalties as a condition of their use.  *See* H.R. Rep. No. 104-274, at 12-14 (1995); S. Rep. No. 104-128, at 14-15 (1995).

The relief sought by Plaintiff would run roughshod over this Congressional solicitude for public access to sound recordings, creating as it would an unqualified state common law right, without compulsory licensing, that would require users to negotiate license fees directly for each Pre-1972 Recording.  The resultant combination of transaction costs and license fees would harm both users and consumers who would be denied access to performances of some works and bear the increased costs associated with performances of others.  Conversely, an attempt to formulate a structure for a New York common law performance right that mimics the federal framework would be a daunting challenge.  For example, if the state right were tempered by a compulsory license, who would design and administer the rate-making procedures?  How would courts deal with uses of recordings for which ownership information is not readily available and the "confusion caused by cold information trails leading to long dead owners and record companies that have gone out of business[?]"  *See* U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings* 76 n.303 (citation omitted), Gerba Decl. Ex. 24.  Would the common law right be subject to the long list of exemptions to the federal public performance right?  *See, e.g.*, 17 U.S.C. § 110(1) (exemption for classroom performance or display); *id.* § 110(3) (exemption for performance or display in the course of religious services or worship); *id.*

§ 110(5)(B) (exemption for some performances by small businesses).  Even SoundExchange, the record industry's agent in the collection of royalties under the statutory license for federally copyrighted recordings, concurs: in a recent Copyright Office filing, it stated that the state-law remedy sought by Plaintiff "will not lead to a sensible licensing regime" and that state-law regimes "do not provide the simplicity and efficiency that Congress contemplated when enacting the statutory licenses."  Comments of SoundExchange, Inc. at 12, *Music Licensing Study: Notice and Request for Public Comment*, Docket No. 2014-03 (May 23, 2014), Gerba Decl. Ex. 26.

This array of policy counter-arguments underscores the inappropriateness of Plaintiff's effort to upend decades of settled practice and extract punitive retroactive penalties through litigation rather than having such a consequential matter considered through legislation, where all interested stakeholders (many of which are not parties to this action) could be heard, where a full complement of policy judgments could be made, and which would change the law prospectively rather than retroactively.  *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8D.06 [E] (Lexis 2013) (observing that there is a "general doctrine that copyright statutes do not apply retroactively").  Consistent with this recognition, the Copyright Office is currently reviewing potential legislative recommendations concerning federalization of performance rights in Pre-1972 Recordings, such as SoundExchange's advocacy for inclusion of performance rights payments in relation to Pre-1972 Recordings under the *federal* Section 114 license, as opposed to being separately licensed under state law.  *See* U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound Recordings*, Gerba Decl. Ex. 24; *Music Licensing Study: Notice and Request for Public Comment*, 79 Fed. Reg. 14,739 (March 17, 2014) (announcing music licensing Notice of Inquiry including this topic) (incorrectly printed in the Federal Register as Vol. 78), Gerba Decl. Ex. 25; *see also* Frear Decl. ¶ 15 & Exs. C-D.

E.     **In any event, the vast majority of sound recordings identified in the
       Complaint have never been performed by Sirius XM**

Plaintiff attached to the Amended Complaint a list of 100 Pre-1972 Recordings it

purports to own.  Am. Compl., Schedule A.  Only 15 of these 100 recordings have ever been

broadcast by Sirius XM.  SXM 56.1 ¶¶ 21, 23.  As to the remaining 85 recordings upon which

Plaintiff has sued, Plaintiff's claims also fail because those songs have never been performed by

Sirius XM.

II.    **NEW YORK LAW DOES NOT RECOGNIZE A REPRODUCTION RIGHT IN
       COPIES OF PRE-1972 RECORDINGS MADE IN AID OF PUBLIC
       PERFORMANCES**

As a tag-along to its meritless contention that Sirius XM violates New York law by

publicly performing its recordings, Plaintiff asserts that Sirius XM has violated New York

common law by making unauthorized copies of its recordings in connection with its broadcast

activities.  That claim fails for numerous reasons.  To begin, undisputed record evidence makes

clear that Sirius XM does not, as Plaintiff alleges, distribute copies of Plaintiff's recordings to its

users in the form of digital downloads (or any other copies that users are able to retain and

access).  SXM 56.1 ¶ 41.  While certain devices marketed by Sirius XM in the past did allow

Sirius XM users to record and save songs of their own volition, that copying is insulated from

attack here by a class-wide settlement agreement from a previous litigation that binds Plaintiff.

*See* SXM 56.1 ¶¶ 86-93; Final Order and Judgment, *In re XM Satellite Radio Copyright

Litigation*, No. 06 CV 3733 (LAK) (S.D.N.Y. Mar. 22, 2011), Dkt. No. 123; Final Order and

Judgment, *Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc.*, No. 07 CV 6307 (AKH)

(S.D.N.Y. Jan. 9, 2012), Dkt. No. 57.  That leaves only the internal, incidental reproductions

Sirius XM makes in New York State solely in aid of public performances that themselves require

no license: server and backup copies and various temporary copies created in the course of

broadcasting and streaming performances.  For reasons described below, Plaintiff's common law

claims do not reach those internal, incidental copies.

> **A.**     **New York law forbids only the unauthorized reproduction and distribution**
> **of copies of sound recordings to the public, not internal, incidental copying in**
> **aid of performance**

In *Naxos*, the Court of Appeals stated that a claim for common law copyright

infringement under New York law contains the following elements: "(1) the existence of a valid

copyright; and (2) unauthorized reproduction of the work protected by copyright."  4 N.Y.3d at

563.  It proceeded to clarify that an act of *distribution* is also required to establish a *prima facie*

case: "Copyright infringement is distinguishable from unfair competition, which in addition to

unauthorized copying *and distribution* requires competition in the marketplace or similar actions

designed for commercial benefit."  *Id.* (emphasis added).  By the plain language of *Naxos*,

Plaintiff's unfair competition claim must fail because the copies made by Sirius XM are not

distributed to the public.[5]   That fact dooms Plaintiff's common law copyright claim as well.

*Naxos*' formulation of the unfair competition claim clarifies and supplements its formulation of

common law copyright infringement, making clear that the distribution of copies is a

requirement of *both* claims.

 Besides the language itself, at least three additional reasons support this reading of

*Naxos*.  First, that understanding squares with the sound recording case law in New York, which

(as noted earlier) has focused on copies made and distributed to the public, typically by record

pirates, *see* Point I.B, *supra*, and not server or other intermediate copies made solely to enable

---

[5] The additional shortcomings of Plaintiff's unfair competition claim described in Point I.C., above (there addressing Sirius XM's performances) apply just as forcefully to reproductions. Plaintiff cannot demonstrate that, by making these internal copies, Sirius XM competes with Plaintiff or that Plaintiff has suffered any kind of competitive or other injury as a result.

such public performances.  Prior New York courts in analogous settings similarly have required plaintiffs to establish unlawful commercial distribution as an element of a New York common law infringement claim.  For example, in *Hemingway*, the court rejected a claim of common law copyright infringement to the extent it was based on copying that appeared in galley proofs of a book about Ernest Hemingway but did not appear in the final, published book.  *See* 53 Misc. 2d at 464-65.  The court deemed the copying that appeared in galley proofs "irrelevant to plaintiffs' case" even though 16 copies were submitted to several publications for review purposes, and held that "plaintiffs' rights, if any, must rest upon matter contained in the published version of [the book]."  *Id.* at 465; *see also Capitol Records v. Mercury Records Corp.*, 221 F.2d at 663 (describing common-law right as one to "make and vend" and "to copy and sell the records"); *Naxos*, 4 N.Y.3d at 548 (common law copyright infringement based on New York's earliest copyright statute, L. 1786 ch. 54, which preserved common law rights to the extent that they concerned "the printing or publishing of any book or pamphlet").

Second, recognizing an infringement claim for copies made solely in aid of public performance would have the same economic effect as creating a performance right itself, as the record industry could extract the entire perceived economic value of the public performances by taxing the reproductions necessarily made to facilitate them.  Plaintiff's reproduction-based claims are simply an attempt to achieve indirectly what the absence of a performance right under New York law precludes it from achieving directly.

Third, Plaintiff's long history of inaction is powerful evidence that this type of internal copying is not actionable under New York law.  By its own admission, Plaintiff has never pressed such a claim, and has never licensed a single radio broadcaster, webcaster, background/foreground music service, retail establishment, or bar to make copies of its Pre-1972

Recordings in aid of their public performance, although the prevalence of such copying has been well known in the industry since at least the 1990s.  SXM 56.1 ¶¶ 65-78; H.R. Rep. No. 105-796, at 89-90 (1998) (Conf. Rep.), Gerba Decl. Ex. 33 (describing "multiple" copies of "ephemeral" recordings made by webcasters for use on different servers and for transmissions at different bit rates).  Just as Plaintiff's acquiescence in the widespread public performance of its Pre-1972 Recordings corroborates the absence of any New York common law right of public performance, the same is true as to Plaintiff's longstanding inaction with respect to copies made solely in aid of public performance.  *See Halstead*, 152 U.S. at 416.

As a matter of both precedent and sound policy, Plaintiff's claims should be dismissed to the extent they rely on copies made in aid of non-actionable public performances.

### B.  Sirius XM's incidental copying of Plaintiff's Pre-1972 Recordings is protected by the fair use doctrine

Even were Sirius XM's reproductions of Plaintiff's Pre-1972 Recordings potentially actionable under New York law, they would in any event fall comfortably within the scope of the fair use doctrine.  Fair use is "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent."  *Harper & Row*, 471 U.S. at 546; *see also EMI Records Ltd. v. Premise Media Corp.*, No. 601209/08, 2008 WL 5027245, 2008 N.Y. Misc. LEXIS 7485, at *11 n.3 (N.Y. Sup. Ct. 2008) (quoting *Harper & Row*).  As the Supreme Court has explained, "[f]rom the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, 'to promote the Progress of Science and useful Arts.'"  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575-77 (1994) (citations omitted).

The extensive common law of fair use was codified in Section 107 of the Copyright Act, which instructs courts to evaluate invocations of fair use on a case-by-case basis by considering

the following non-exclusive list of factors: (1)  the purpose and character of the use; (2)  the

nature of the copyrighted work; (3)  the amount and substantiality of the portion used; and (4)

the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. §

107.  Courts applying the fair use doctrine to claims of common law copyright infringement

under New York law are guided by the very same test.  *See EMI Records*, 2008 N.Y. Misc.

LEXIS, at *9-31.

### 1.    Factor One: The Purpose and Character of the Use

The "central purpose" of the first-factor inquiry is to determine "whether the new work

merely supersedes the objects of the original creation . . . or instead adds something new, with a

further purpose or different character, altering the first with new expression, meaning, or

message"; it is to determine "whether and to what extent the new work is transformative."

*Campbell*, 510 U.S. at 579 (quotation marks and citations omitted).  While transformation is not

required for a finding of fair use, the goal of copyright "is generally furthered" by transformative

works that generate value beyond that inhering in the original.  *Id.*; *see also Sony Corp. of Am. v.

Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984).  The defendant's use of the

copyrighted work "need not alter or augment the work" to be transformative.  *A.V. ex rel.

Vanderhye v. iParadigms*, 562 F.3d 630, 639-40 (4th Cir. 2009) ("*Vanderhye*").

The copies made by Sirius XM do not "supersede" Plaintiff's original creation.  They are

internal, incidental copies made from purchased or promotional CDs and made solely to allow

for public performances.  Because the copies are not accessible by the public, they do not (and

cannot) "supersede" copies that otherwise would be purchased.  Moreover, Sirius XM's copying

is plainly transformative.  Transformative uses of copyrighted works include uses for a new

purpose, distinct from that for which the copyrighted work was created.  *See, e.g.*, *Bill Graham

Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 610 (2d Cir. 2006); *Field v. Google Inc.*, 412

F. Supp. 2d 1106, 1119 (D. Nev. 2006) (holding Google's caching function transformative because caching "serves different and socially important purposes in offering access to copyrighted works through 'Cached' links and does not merely supersede the objectives of the original creations"); *see also Perfect 10 v. Amazon, Inc.*, 508 F.3d 1146, 1164-65 (9th Cir. 2007). There is no dispute that Sirius XM makes copies of Plaintiff's Pre-1972 Recordings for an entirely different purpose than does Plaintiff.  Plaintiff's purpose in making copies of its recordings has been to sell those copies to consumers, while Sirius XM's purpose in making copies is not to sell them but, rather, to facilitate lawful broadcasts.  Neither Plaintiff nor the record label that actually created the recordings, White Whale, is or ever has been engaged in the business of publicly performing the recordings.  In turn, no part of Sirius XM's business involves distribution and sale of copies of sound recordings.

Numerous courts have recognized that such "intermediate" copying in furtherance of a lawful end is transformative, even if the underlying work is reproduced in its entirety without augmentation.  *See, e.g.*, *Vanderhye*, 562 F.3d at 639-40 (copying and archiving entirety of student term papers to facilitate detection of plagiarism held to be transformative and fair use); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-20 (9th Cir. 2003) (finding copying, storage, and display of copyrighted photographs by Internet search engine to be transformative and fair use); *Authors Guild, Inc. v. Google, Inc.*, 954 F. Supp. 2d 282, 291-92 (S.D.N.Y. 2013) (digital copying of entire books in furtherance of Google's indexing and search functionality found to be "highly transformative" and fair use).

A secondary consideration under the first fair-use factor to which Plaintiff will undoubtedly point is whether the copying is commercial or not-for-profit.  "The crux of [this] distinction," the Supreme Court has observed, "is not whether the sole motive of the use is

monetary gain, but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.  While Sirius XM is a for-profit enterprise, the record is devoid of any evidence of a market for this type of internal, intermediate copying of Plaintiff's Pre-1972 Recordings.  Because the commercial nature of its intermediate, internal copying is "'indirect or derivative'" at best, it does not weigh against fair use.  *Sony Computer Entm't v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000) (quoting *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1993) (as amended)); *see also Calkins v. Playboy Enters. Int'l*, 561 F. Supp. 2d 1136, 1141 (E.D. Cal. 2008) (discounting commercial use where copies of photograph distributed in magazine not sold separately nor advertised on cover).  *Cf. Hemingway*, 53 Misc.2d at 464-65 (finding copying that appeared only in galley proofs but not in book as published to be "irrelevant" to infringement analysis).  In any event, the Supreme Court more generally has discounted the force of commerciality in applying a fair use analysis.  As noted in *Campbell*, if "commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" 510 U.S. at 584; *see also Kane v. Comedy Partners*, No. 00 Civ 158 (GBD), 2003 WL 22383387, at *3 (S.D.N.Y. Oct. 16, 2003).  The commercial nature of a transformative use carries little weight where, as in this case, the copying is intermediate and the factors considered together point toward fair use.  Accordingly, the first factor weighs heavily in favor of fair use.

### 2.      Factor Two: The Nature of the Work

The second fair-use factor concerns the nature of the plaintiff's copyrighted work.  17 U.S.C. § 107(2).  Courts consider two separate elements of the nature of the work: whether the work is creative, as opposed to factual, in nature, and whether the work has already been

distributed to the public. *See, e.g.*, *Vanderhye*, 562 F.3d at 640-41; *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006). Plaintiff's recordings fall on the creative end of the spectrum, but they had been widely disseminated to the public for more than 30 years before Sirius XM and XM commenced broadcasting. SXM 56.1 ¶ 65. In any event the second factor "may be of limited usefulness where [a] creative work . . . is being used for a transformative purpose." *Bill Graham Archives*, 448 F.3d at 612. The second factor is thus neutral and entitled to little, if any, weight.

### 3.     Factor Three: The Amount and Substantiality of the Use

The third fair-use factor looks at the amount and substantiality of the portion used in relation to the copyrighted work as a whole. 17 U.S.C. § 107(3). As the Supreme Court has explained, "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87; *see also Sony*, 464 U.S. at 449-50 (finding copying of entire television programs for time-shifted viewing to be fair use). Where, as here, the transformative purpose of the copying necessitates the use of the entire work, the third factor does not weigh against a finding of fair use. *See, e.g.*, *Bill Graham Archives*, 448 F.3d at 613 (finding that copying of the entire work "does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make fair use" of the work); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) (finding that copying less than plaintiff's entire photograph would have made the picture useless to the defendant's news story); *Calkins*, 561 F. Supp. 2d at 1143 ("To use a lesser portion of the Photograph would have defeated PEI's purpose for using it."); *Kelly*, 336 F.3d at 821 (concluding that copying plaintiff's photographs in their entirety was "reasonable" because it was "necessary" for defendant's purpose). The extent of Sirius XM's copying is necessary to facilitate its lawful public performances. Sirius XM could not perform Plaintiff's Pre-1972 Recordings if it copied only fragments of those recordings to its servers, and it makes other copies solely to facilitate the lawful performances and ensure

consistent delivery to its customers.  In view of the reasonable extent of Sirius XM's copying,

factor three is, at worst, neutral.

> ### 4.      Factor Four:  The Effect of the Use on the Potential Market for or Value of the Copyrighted Work

The transformative, non-superseding nature of the copies made by Sirius XM in aid of its

public performances is confirmed by the absence of *any* impact on the actual or any potential

market for Plaintiff's Pre-1972 Recordings.  The fourth fair-use factor requires an assessment of

"'the effect of the use upon the potential market for or value of the copyrighted work.'"  *EMI*

*Records*, 2008 N.Y. Misc. LEXIS, at *30 (quoting 17 U.S.C. § 107(4)).  The primary focus of

this factor is not upon "whether the secondary use suppresses or even destroys the market for the

original work or its potential derivatives, but whether the secondary use usurps the market of the

original work."  *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004); *Cariou v. Prince*,

714 F.3d 694, 708 (2d Cir. 2013); *Vanderhye*, 562 F.3d at 643.

The mapping Also relevant under the fourth factor is whether the defendant's activity might erode the

value of a "potential" market for the plaintiff's work.  Analysis of the possible impact of the

defendant's behavior on "potential markets," however, is limited by two important principles.

First, the inquiry is limited to possible impacts on "traditional, reasonable, or likely to be

developed markets."  *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

Second, the set of potential markets that is cognizable under the market-harm inquiry does not

include markets in which the plaintiff's works are used in transformative ways.  *See Bill Graham*

*Archives*, 448 F.3d at 615 ("[C]opyright owners may not preempt exploitation of transformative

markets. . . . Since DK's use of BGA's images falls within a transformative market, BGA does

not suffer market harm due to the loss of license fees." (citation and internal quotation marks

omitted)); *see also Castle Rock Entm't, Inc. v. Carol Pub. Grp.*, 150 F.3d 132, 145 n.11 (2d Cir.

1998) ("[B]y developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work, a copyright owner plainly cannot prevent others from entering those fair use markets.").  A copyright holder cannot establish market harm just by pointing to the defendant's failure to pay a license fee for its use of the work.  *See Bill Graham Archives*, 448 F.3d at 614; *Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1387-88 (6th Cir. 1996) (observing that copyright holder must have a right to copyright revenues before finding that a failure to pay license fee equals market harm).

A copyright owner's failure to adduce any evidence of harm to the actual or potential market for the copyrighted work weighs heavily in favor of fair use.  In *Blanch v. Koons*, the fact that the plaintiff admitted she had "never licensed any of her photographs for use in works of graphic or other visual art" and that the defendant's use of her photograph in a painting "did not cause any harm to her career or upset any plans she had" for the photograph led the court to conclude that the fourth factor "greatly" favored the defendant.  467 F.3d at 258; *see also id.* at 262 (Katzmann, J., concurring) ("[T]he fourth factor of the fair-use analysis dramatically favors Koons, in that Blanch failed to show that Koons' use of her work actually harmed her in any way[.]"); *Vanderhye*, 562 F.3d at 643 (finding fair use where plaintiffs conceded that defendant's use of their school papers had not "impinged on the marketability of their works or interfered with their use of the works" (internal quotation marks and citation omitted)); *Nunez*, 235 F.3d at 25 (noting lack of evidence of a market for sale of modeling photographs to newspapers to illustrate controversy and that plaintiff did "not suggest that he ever tried to sell portfolio photographs to newspapers").

Here, Plaintiff cannot show any adverse effect whatsoever on the actual or any potential market for the Pre-1972 Recordings arising from the copies made by Sirius XM in aid of public

performance. To the contrary, the testimony of Plaintiff's principals and agents confirms there is

none. SXM 56.1 ¶¶ 79-82. Nor is there any concern about what would happen if this type of use

became widespread because it is already widespread and has been for decades. The copies that

Sirius XM makes in aid of public performance simply do not "substitute[] for the market of the

original work." *Castle Rock*, 150 F.3d at 145. Not only is Plaintiff unable to point to a single

sale it has lost or license fee affected as a result of Sirius XM making copies in aid of public

performance, Plaintiff's witnesses conceded the absence of evidence of lost sales or diminished

license revenues as a result of the performances themselves. SXM 56.1 ¶¶ 79-82.

> For all these reasons, the fourth factor tilts decisively in favor of fair use. Because factors

one and four tilt heavily in favor of fair use, and factors two and three are neutral, an overall

evaluation of the factors compels the conclusion that they weigh decisively in favor of fair use.

## III. STATE LAW REGULATION OF PERFORMANCES BY NATIONWIDE BROADCASTERS LIKE SIRIUS XM WOULD VIOLATE THE COMMERCE CLAUSE AND BE UNCONSTITUTIONAL

> Sirius XM offers a nationwide service. By law and technological necessity, its

broadcasts are uniform throughout the country, and the radio receivers, mobile devices, and

computers through which Sirius XM subscribers access the broadcasts are routinely transported

across state lines by subscribers. The practical effect of Plaintiff's proposed state-law regulation

of public performances would be that Sirius XM could not play Pre-1972 Recordings *to any*

*subscribers anywhere* without complying with the dramatic expansion of New York law that

Plaintiff proposes. SXM 56.1 ¶¶ 7-8. Although for reasons set forth above the Court need not

reach this issue to grant Sirius XM's motion for summary judgment, that expansion is barred by

the Commerce Clause. U.S. Const. art. I, § 8.

> Appreciating the Constitution's "special concern" with "the maintenance of a national

economic union unfettered by state-imposed limitations on interstate commerce," the Supreme

Court has long held that the Commerce Clause precludes state regulation of "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) (quotation omitted).  This bar against extraterritorial regulation applies equally to enactments of a state legislature and to the pronouncements of the courts.  *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013) ("Neither the California courts nor the California legislature are permitted to regulate commerce entirely outside of the state's borders."); *Tetra Tech., Inc. v. Harter*, 823 F. Supp. 1116, 1124 (S.D.N.Y. 1993).  The Supreme Court has developed a categorical approach to state economic regulation like that proposed here: "When a state statute directly regulates . . . interstate commerce . . . [the Court has] generally struck down the statute without further inquiry."  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). If the regulation has such a "practical effect" on interstate commerce, "it violates the Commerce Clause per se."  *NCAA v. Miller*, 10 F.3d 633, 638-39 (9th Cir. 1993); *see Healy*, 491 U.S. at 336 ("The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State").

Applying these "dormant" Commerce Clause principles, courts have struck down state regulations that, in practical effect, regulated conduct beyond the state's boundaries where, as here, the regulated activity necessarily was national in scope.  For example, in *Am. Booksellers Found. v. Dean*, the Second Circuit held that a Vermont statute prohibiting the dissemination of material "harmful to minors" per se violated the dormant Commerce Clause as applied to the posting of material on a website.  342 F.3d 96 (2d Cir. 2003).  "Because the internet does not recognize geographic boundaries," the court held, Vermont's regulation impermissibly "project[ed] its legislation into other States."  *Id.* at 103 (quoting *Healy*, 491 U.S. at 334).  That

Vermont aimed to protect its own residents, or that the statute regulated some in-state activity, was not sufficient to save the statute. *Id; see also Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (invalidating a New Mexico prohibition on posting harmful material on the Internet because the statute "cannot effectively be limited to purely intrastate communications over the Internet because no such communications exist") (citation omitted); *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 170-72 (S.D.N.Y. 1997) (same).

As in these examples, recognizing a New York public performance right in Pre-1972 Recordings would, as to any broadcast activity that is national in scope, impermissibly regulate extraterritorial conduct in violation of the dormant Commerce Clause.[6] Sirius XM broadcasts identical programming throughout the United States, and its Internet offerings simulcast those same channels (plus others). *See* Sirius XM 56.1 ¶ 7. The programming is undifferentiated by geography: the same channels that are broadcast to subscribers in New York are simultaneously broadcast to subscribers in every other state in the continental U.S. *Id.* Indeed, Sirius XM's FCC licenses *prevent* it from offering state-specific programming. *Id.* Nor are Sirius XM's satellite and Internet delivery systems designed to direct (or restrict) the transmission of signals or programming to particular states or the location of the radio receiver unit; indeed, many of Sirius XM's subscribers listen through radios installed in their vehicles or on mobile phones or laptop computers, which inevitably cross state lines. *Id.*; *see also Am. Booksellers*, 342 F.3d at

---

[6] Just as numerous radio stations located outside of New York can now be heard in New York, over 140 New York radio stations are currently making their programming available nationwide through digitally-transmitted Internet "simulcasts." *See* Radio Stations and Web-TV broadcast live Worldwide, *available at* http://www.surfmusic.de/country/new+york.html. Numerous stations include Pre-1972 Recordings in their programming, including some that specialize in "oldies" recordings. *See id.* There is no record indication that such performances of Pre-1972 Recordings are licensed.

103 ("A person outside Vermont who posts information on a website or on an electronic

discussion group cannot prevent people in Vermont from accessing the material.").

Against this background, it is clear that recognizing a broad, state-law right of public

performance in Pre-1972 Recordings in New York would have the "practical effect" of directly

regulating broadcast activity in other states.  If such a right were recognized, Sirius XM could

not broadcast Pre-1972 Recordings on any of its channels to any of its subscribers anywhere in

the United States, including in all of the other states that do not recognize any such public

performance right, without securing a license or otherwise complying with the New York

regulation.  By effectively requiring Sirius XM to obtain a license or other consent to play Pre-

1972 Recordings anywhere in the country, New York would impermissibly "project its

legislation into other States by regulating the price to be paid" for public performances of those

recordings in other states.  This is a per se violation of the Commerce Clause.  *See Brown-*

*Forman*, 476 U.S. at 582 ("Forcing a merchant to seek regulatory approval in one State before

undertaking a transaction in another directly regulates interstate commerce.").[7]

Neither *Goldstein v. California*, 412 U.S. 546 (1973), nor 17 U.S.C. § 301(c), is to the

contrary.  The Court in *Goldstein* recognized (indeed, was premised on the assumption) that

geographic limitations inherent in prohibitions on *copying and piracy* prevented one state's laws

from intruding into other states: "If one State grants such protection, the interests of States which

do not are not prejudiced since their citizens remain free to copy within their borders those works

---

[7] Even if a New York public performance right in Pre-1972 Recordings did not directly regulate interstate commerce (which it would), it would still run afoul of the Commerce Clause under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  In *Pike* and its progeny, the Supreme Court held that even a statute that regulates commerce evenhandedly and has only incidental effects on interstate commerce still violates the Commerce Clause if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." *Id.* at 142.

which may be protected elsewhere." *Id.* at 558.  The *Goldstein* Court thus was not presented

with "the type of prejudicial conflicts which would arise, for example, if each State exercised a

sovereign power to impose imposts and tariffs." *Id.* at 559.  Adopting a performance right in

Pre-1972 Recordings, however, would do just that: it would require Sirius XM and other

broadcasters to secure a license to broadcast those songs anywhere in the nation.  If unable to

obtain a license for a particular recording, Sirius XM would have to forego broadcasting it

everywhere.  *See* Sirius XM 56.1 ¶¶ 7-8.

**IV.     PLAINTIFF'S CLAIMS ARE BARRED BY LACHES**

Plaintiff's claims are barred by laches, because "equity aids the vigilant, not those who

sleep on their rights." *Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*, 93 CIV. 1116 (AJP),

1995 WL 465130, at *5 (S.D.N.Y. Aug. 7, 1995) (citation omitted).  The doctrine applies where,

as here, a defendant can show prejudicial delay, "regardless of whether the statutory limitations

period has expired." *White v. Priester*, 78 A.D.3d 1169, 1171 (N.Y. App. Div. 2010).  Courts

considering the application of laches to New York law claims for copyright infringement and

unfair competition have found those claims barred in their entirety.   *See, e.g.*, *Byron*, 1995 WL

465130, at *6-*10 (barring common law unfair competition claim); *Varconi v. Unity Television

Corp.*, 11 Misc. 2d 191, 196-97 (N.Y. Sup. Ct. 1958) (barring common law copyright claim).  At

a minimum, Plaintiff's inexcusable delay precludes its efforts to obtain equitable relief.

Under New York law, a party asserting laches must show: "(1) conduct by an offending

party giving rise to the situation complained of, (2) delay by the complainant asserting his or her

claim for relief despite the opportunity to do so, (3) lack of knowledge or notice on the part of

the offending party that the complainant would assert his or her claim for relief, and (4) injury or

prejudice to the offending party in the event that relief is accorded the complainant." *See Dwyer

by Dwyer v. Mazzola*, 171 A.D.2d 726, 727 (N.Y. App. Div. 1991).

As to the first element, there is no dispute that Sirius XM's broadcast and streaming activities (including reproductions in furtherance thereof) gave rise to Plaintiff's causes of action. As to the second element, there is likewise no dispute. Where a plaintiff "has had knowledge of the existence of certain rights, or might have acquainted himself with them by the use of reasonable diligence, it would be inequitable to permit the plaintiff to assert them if the lapse of time is so great as to prejudice the defendant as to his defense." *Varconi*, 11 Misc. 2d at 197. Plaintiff has known about Sirius XM and its inclusion of Pre-1972 Recordings among its broadcasts for at least a decade, and Volman has been a subscriber for more than seven years. SXM 56.1 ¶ 46-48. This falls well within the range of delay that other courts applying New York common law have held to constitute laches. *See, e.g.*, *Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*, 89 F. Supp. 2d 483, 485-86 (S.D.N.Y. 2000) (barring common law unfair competition claim after eight-year delay), *aff'd*, 14 F. App'x 102, 106 (2d Cir. 2001); *Eberhart v. LA Pilar Realty Co.*, 45 A.D.2d 679, 680 (N.Y. App. Div. 1974) (per curiam) (granting dismissal of petitioners' claims where "petitioners slept on their rights for the greater part of a year").

The third element, lack of knowledge or notice on the part of Sirius XM that Plaintiff would assert its claim for relief, is also uncontroverted. XM began broadcasting in 2001 and Sirius began broadcasting in 2002. Plaintiff admitted that it never complained about, let alone indicated it might sue over, the unlicensed use of its Pre-1972 Recordings prior to filing its related lawsuit against Sirius XM in California, which preceded this action by a matter of weeks. SXM 56.1¶ 49. In addition, Plaintiff has never asserted its purported right of public performance against any other broadcaster, notwithstanding widespread use of its recordings for nearly 50 years. Accordingly, there is no dispute as to the absence of notice to Sirius XM that Plaintiff would assert a claim. *See, e.g.*, *Technitrol, Inc. v. Memorex Corp.*, 376 F. Supp. 828, 835 (N.D.

Ill. 1974) ("Courts have applied the doctrine of laches to an entire industry where a patentee remained silent as to its rights with respect to an entire industry and permitted widespread infringement."), *aff'd sub nom., Technitrol, Inc. v. NCR Corp.*, 513 F.2d 1130 (7th Cir. 1975).

As to the fourth element of Sirius XM's laches defense, "[p]rejudice may be demonstrated 'by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay.'" *In re Linker*, 23 A.D.3d 186, 189 (N.Y. App. Div. 2005) (citation omitted). Prejudice sufficient to establish laches results from the "substantial expenditure of resources and effort to develop [a] business in the United States." *Eppendorf-Netheler-Hinz-GmbH*, 89 F. Supp. 2d at 487; *see also Technitrol*, 376 F. Supp. at 831 ("NCR's investment and sales have increased many times, thereby resulting in its substantially changing its position."). In addition, there is a "sliding scale" for the amount of prejudice that must be shown; where there is no excuse for the delay, the defendant "need show little prejudice." *Byron*, 1995 WL 465130, at *7 (internal quotation marks and citation omitted). This standard is easily surpassed here. Sirius XM has spent *billions* of dollars in developing its satellite broadcast systems, Internet streaming capabilities, and broad variety of program content, in good-faith reliance on the extant legal regime in which no license to perform Pre-1972 Recordings is required. SXM 56.1 ¶ 13-15, 51. Had Plaintiff (or any record label for that matter) previously established a viable right of public performance in its Pre-1972 Recordings, Sirius XM could have taken appropriate steps to avoid the type of overreaching damages claims in excess of $100 million that Plaintiff now asserts (including, *inter alia*, excluding Plaintiff's recordings from its programming). Accordingly, Sirius XM is entitled to summary judgment on its laches defense.

## CONCLUSION

For the foregoing reasons, Sirius XM is entitled to summary judgment and the Complaint should be dismissed with prejudice.

Dated: New York, New York
      May 30, 2014

Respectfully submitted,

By:   /s Benjamin E. Marks_____
    R. Bruce Rich
    Benjamin E. Marks
    Todd Larson
    John R. Gerba
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York  10153
    Tel:  (212) 310-8000
    Fax:  (212) 310-8007
    *r.bruce.rich@weil.com*
    *benjamin.marks@weil.com*
    *todd.larson@weil.com*

and

    Michael S. Oberman
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
    1177 Avenue of the Americas
    New York, New York 10036
    Tel:  (212) 715-9294
    Fax:  (212) 715-8294
    *moberman@kramerlevin.com*

*Attorneys for Defendant Sirius XM Radio Inc.*