**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FLO & EDDIE, INC., a California
corporation, individually and on behalf of all
others similarly situated,

               Plaintiff,

     v.

SIRIUS XM RADIO, INC., a Delaware
corporation; and DOES 1 through 10,

               Defendants.

Civil Action No.:13-CIV-5784(CM)(HP)

## FLO & EDDIE'S MEMORANDUM OF LAW IN OPPOSITION TO SIRIUS XM'S MOTION FOR SUMMARY JUDGMENT

Henry Gradstein
Maryann R. Marzano
Harvey W. Geller
Gradstein & Marzano, P.C.
6310 San Vicente Blvd., Suite 510
Los Angeles, California 90048
Telephone:  323-776-3100
Email: hgradstein@gradstein.com
Email: mmarzano@gradstein.com
Email: hgeller@gradstein.com

and

Evan S. Cohen
1180 South Beverly Drive, Suite 510
Los Angeles, California 90035
Telephone:  310-556-9800
Facsimile: 310-556-9801
Email: esc@manifesto.com

Attorneys for Plaintiff Flo & Eddie, Inc.

**TABLE OF CONTENTS**

I.      INTRODUCTION. ................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND.............................................3

    A.      The Parties. ............................................................................................4

        1.      Flo & Eddie (The Turtles)...............................................................4

        2.      Sirius XM...........................................................................................6

    B.      Sirius XM's Reproductions of Pre-1972 Recordings. .................................7

    C.      Sirius XM's Performance of Pre-1972 Recordings. ...................................9

III.    SIRIUS XM IS LIABLE FOR ITS PERFORMANCE OF PRE-1972
       RECORDINGS. ...................................................................................................9

    A.      New York, Not Federal, Law Governs This Case. ....................................9

    B.      Ownership Of The Artistic Performance In A Recording Includes The
        Right To Exclude All Others From Using That Performance. ..................11

    C.      Sirius XM's Performance of Pre-1972 Recordings Constitutes Common
        Law Copyright Infringement and Unfair Competition. ...........................13

    D.      Direct Competition is Not Required for Unfair Competition. ..................18

IV.     SIRIUS XM IS LIABLE FOR ITS REPRODUCTIONS OF PRE-1972
       RECORDINGS. .................................................................................................20

    A.      DISTRIBUTION IS NOT REQUIRED FOR SIRIUS XM TO BE
        LIABLE FOR ITS REPRODUCTIONS. ................................................20

    B.      SIRIUS XM'S REPRODUCTIONS ARE NOT FAIR USE.................21

        i.      Purpose and Character. .................................................................24

        ii.     Nature of Copyrighted Work. ......................................................27

        iii.    Amount of Work Used....................................................................28

        iv.     Effect on Potential Market. ..........................................................28

V.      THE DORMANT COMMERCE CLAUSE DOES NOT RESTRICT NEW
       YORK'S REGULATION OF PRE-1972 RECORDINGS.................................29

VI.   SIRIUS XM'S LACHES DEFENSE IS MERITLESS. ......................................................33

    A.   Laches Is Not A Defense to A Claim for Damages. ................................................33

    B.   Laches Is Not A Defense When The Claims Are Timely Under The
        Applicable Statute of Limitations. ...............................................................................34

    C.   Sirius XM Cannot Establish Prejudice. ....................................................................36

VII.   CONCLUSION.......................................................................................................................39

# TABLE OF AUTHORITIES

## Cases

*ABC, Inc. v. Aereo*, Inc., 2014 U.S. LEXIS 4496 (U.S. June 25, 2014) ....................................... 18

*ACLU* v. *Johnson*, 194 F.3d 1149, 1160-64 (10th Cir. 1999) ........................................................ 32

*Agee v. Paramount Communs.*, 59 F.3d 317 (2d Cir. 1995) ........................................................... 22

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994 ............................................... 27

*Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) .............................................. 32

*American Booksellers Found. v. Dean,* 342 F.3d 96, 104 (2d Cir. 2003) ...................................... 32

*AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) ....................... 25

*Apple Corps, Ltd. v. Adirondack Grp.*, 124 Misc. 2d 351, 476 N.Y.S.2d 716 (Sup. Ct. 1983) ... 13

*Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ........................... 19

*Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. LEXIS 16165 *36
   (S.D.N.Y. Aug. 28, 2002) ............................................................................................................. 19

*Arrow Air, Inc.* v. *Port Auth. Of New York and New Jersey*, 602 F. Supp. 314, 321
   (S.D.N.Y. 1985) ............................................................................................................................ 31

*Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013) ................................. 26

*Barnhart v. Thomas*, 540 U.S. 20 (2003) ...................................................................................... 21

*Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 766 fn. 3 (E.D. Pa. 2001) ........................ 9

*Bowers* v. *NCAA, Inc.*, 151 F. Supp. 2d 526, 538 (D.N.J. 2001) .................................................. 31

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ....................................... 24, 27, 28, 29

*Capitol Records LLC v. Escape Media Group, Inc.*, Case No. 12-cv-06646 .............................. 13

*Capitol Records LLC v. Harrison Greenwich LLC*, No. 65224
   (N.Y. Sup. Ct. May 13, 2014 ....................................................................................................... 12

*Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011) ....................... 19

*Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540 (2005) ...................................... passim

*Capitol Records, LLC v. Harrison Greenwich, LLC*, 984 N.Y.S.2d 274 (2014) ......................... 12

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013) ............................. 16

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) ............... 9

*CBS, Inc. v. Garrod*, 622 F. Supp. 532 (M.D. Fla. 1985) ........................................................... 11

*Central Valley Chrysler-Jeep* v. *Witherspoon,* 456 F. Supp. 2d 1160, 1183-84 (E.D. Cal. 2006) ................................................................................................................ 30, 32

*Country Rd. Music, Inc., v. MP3.com*, 279 F. Supp. 2d 325 (S.D.N.Y 2003) ...................... 24, 28

*Deravin v. Kerik*, 335 F.3d 195, 204 (2d Cir. 2003) ...................................................... 30

*Dutcher v. Vandeloo*, 946 N.Y.S.2d 66 (N.Y. Sup. Ct. 2012) .......................................... 33

*EMI Records Limited v. Premise Media Corp. L.P.*, 2008 N.Y. Misc. LEXIS 7485 (N.Y. Sup. Ct. Aug. 8, 2008) ........................................................................ 23

*Erie v. Tomkins*, 304 U.S. 64 (1938)........................................................................ 14

*Estate of Hemingway v. Random House, Inc.*, 53 Misc. 2d 462 (1967) ............................ 20

*Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117, 127 (1978) ................................. 31

*Fade v. Pugliani*, 8 A.D.3d 612, 615  (2004) ............................................................. 33

*Fisher v. Star Co.*, 231 N.Y 414 (1921)..................................................................... 14

*Gaylord v. United Stat*es, 595 F.3d 1364 (Fed. Cir. 2010)............................................ 25

*Goldstein v. California*, 412 U.S. 546 (1973)........................................................... 9, 31

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005 (2d Cir. 1989).................... 19

*In re County of Erie*, 546 F.3d 222 (2d Cir. 2008) .................................................. 38, 39

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)............................ 21, 25

*International News Service v. Associated Press*, 248 U.S. 215 (1918) ...................... 14, 15, 18

*John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003) ................................. 39

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033 (9th Cir. 2009) .............. 38

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ............................................. 26

*Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522 (9th Cir. 2008) ........................... 29

*Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010)............................................................................ 39

*Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44 (1980) .................................. 30

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293 (S.D.N.Y. 2010) ..... 34, 35

*Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786 (Sup. Ct. 1950).... passim

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ........................................... 18

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) .................................. 28

iv

*Morris v. Zimmer*, 2011 U.S. Dist. LEXIS 130919 *20 (S.D.N.Y. Nov. 10, 2011)................... 33

*Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 961 (N.D. Cal. 2006).............. 31

*Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 137 F.3d 81 (2d Cir. 1998) ............................... 30

*Ne. Bancorp v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985)................... 30

*New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) ................................... 30

*Newton v. Diamond*, 204 F. Supp. 2d 1244 (C.D. Cal. 2002) ................................................ 10

*Paramount Pictures Corp. v. Carol Pub''g Grp.*, 11 F. Supp. 2d 329, 337 (S.D.N.Y. 1998) ..... 37

*People ex rel. Short v. Warden of City Prison*, 145 A.D. 861, 130 N.Y.S. 698 (1911) .............. 12

*People v. Dixson*, 798 N.Y.S.2d 659 (2005)....................................................................... 11

*Pereira v. United Jersey Bank*, 1997 WL 773716, at *6 (S.D.N.Y. Dec. 11, 1997) ................... 38

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ......................................... 26

*Petrella v. MGM*, 134 S.Ct. 1962 (2014)......................................................... 34, 35, 36

*Pfeiffer v. Berke*, 121 N.Y.S.2d 774, 779 (Sup. Ct. 1953) ............................................... 33

*Pike v. Bruce Church*, 397 U.S. 137 (1970) ..................................................................... 33

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
2013 U.S. Dist. LEXIS 109298 *95 (E.D.N.Y. Aug. 2, 2013)................................... 33, 36

*Premier Capital, LLC v. Best Traders, Inc.*,  88 A.D.3d 677, 678 (2011) ........................... 34, 35

*Roy Exp. Co. Establishment v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095 (2d Cir. 1982)......... 18

*RST (2005) Inc. v. Research in Motion, Ltd.*, 2008 U.S. Dist. LEXIS 105982 *12
(S.D.N.Y. Dec. 16, 2008) ......................................................................... 34, 35

*Sea Air Shuttle v. Virgin Islands Port Authority*, 800 F. Supp. 293, 304 (D.V.I. 1992),.............. 31

*Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993) ................................... 27

*Shamrock Farms v. Veneman*, 146 F.3d 1177, 1179-80 (9th Cir. 1998)................................... 33

*Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ............. 27

*Sony Corp. v. Universal City Studios,* 464 U.S. 417, 451 (1984).......................................... 29

*Soto* v. *Tu Phuoc Nguyen*, 634 F. Supp. 2d 1096 (E.D. Cal. 2009)........................................ 32

*SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1222 (D.C. Cir. 2009)................... 9

*Technitrol, Inc. v. Memorex Corp.*, 376 F. Supp. 828 (N.D. Ill. 1974) ................................... 36

*UMG Recordings v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000).................... 24, 27, 28

*UMG Recs., Inc. v. Escape Media Grp., Inc.*, 107 A.D.3d 51, 964 N.Y.S.2d 106 (2013) ..... 10, 18

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ...................................................... 38, 39

*United States v. Gonzales*, 520 U.S. 1, 5 (1997) ........................................................................ 30

*United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009) ................................................................. 12

*Victory v. Baker*, 67 N.Y. 366 (1876) ........................................................................................ 12

*Waring v. WDAS Broadcasting Station, Inc.*, 327 Pa. 433 (1937) ............................................ 17

White v. *Mass. Council of Const. Employers, Inc.,* 460 U.S. 204, 213 (1983) ........................... 30

*White v. Priester*, 78 A.D.3d 1169, 1171 (2010) ...................................................................... 36

*Zimmerman v. Wolff*, 622 F. Supp. 2d 240, 245 (E.D. Pa. 2008) ............................................. 32

<u>Statutes</u>

17 U.S.C. § 106 .......................................................................................................................... 12

17 U.S.C. § 107 ..................................................................................................................... 22, 24

17 U.S.C. § 112(e) ...................................................................................................................... 29

17 U.S.C. § 301(c) ................................................................................................................ 22, 30

California Civil Code Section 980(a)(2) ..................................................................................... 17

<u>Other Authorities</u>

6 W.F. Patry, Patry On Copyright § 18.55 at 18-198 (2010 ed.) ............................................... 10

http://en.wikipedia.org/wiki/Progressive_download ................................................................. 21

*Webster's Third New International Dictionary* (1986). .............................................................. 22

<u>Regulations</u>

37 C.F.R. 382.2 .......................................................................................................................... 29

I.      **INTRODUCTION.**

Sirius XM Radio, Inc. ("Sirius XM") has built a massive multi-billion dollar business that provides music on a subscription fee basis to over 25 million subscribers through its satellite and Internet radio systems.  However, Sirius XM made the decision to only obtain licenses to reproduce and perform those recordings that were initially fixed *after* February 15, 1972 ("post-1972 recordings").  With respect to the tens of thousands of recordings that were initially fixed *before* February 15, 1972 ("pre-1972 recordings"), Sirius XM decided that it did not need to obtain licenses and did not need to pay any royalties to either reproduce or perform those recordings.

Sirius XM tries to rationalize its failure to license pre-1972 recordings by making the non-controversial point that post-1972 recordings are covered by the federal Copyright Act and pre-1972 recordings are not.  It is, however, the conclusion that Sirius XM draws from this distinction that subjects it to liability.  Indeed, Sirius XM has concluded that because pre-1972 recordings are not protected by the federal Copyright Act, they must be in the "public domain" and, thus, it can do whatever it wants with those recordings *for free*.

But in its haste to toss the artistic creations of older artists into the dustbin of history, Sirius XM ignored the fact that Section 301 of the Copyright Act explicitly leaves to the individual states the right to protect pre-1972 recordings – *and that New York has long provided that very protection*.  To be sure, New York has provided protection for sound recordings based on common law copyright infringement and unfair competition for quite some time.  *See e.g.*, *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540 (2005); *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786 (Sup. Ct. 1950).

Sirius XM's "public domain" argument is as contrived and meritless as all of its other arguments and defenses, starting with its wishful (but incorrect) view that ownership of a sound

recording in New York does not include ownership of the performance right.  Ownership of a sound recording includes the artistic performance embodied in that sound recording – and that necessarily includes the right to exclude all others from using or exploiting that performance. New York has never carved out the performance right from the bundle of rights that comprise ownership, and *Naxos* certainly does not do that.  The longstanding protections provided by New York are robust and not limited – as Sirius XM tries to do – by misconstruing *Naxos* or by relying on the federal Copyright Act, testimony before Congress, and the Copyright Office.

But Sirius XM's infringing conduct extends far beyond violating the performance right. ***Sirius XM is also separately liable for its reproduction of pre-1972 recordings***.  Sirius XM admits that it not only reproduced tens of thousands of pre-1972 recordings to create and populate numerous libraries and databases for itself and third parties, but Sirius XM has also admitted that every single time it broadcasts or streams a recording, it makes at least four (and sometimes more) new copies of those recordings.  Sirius XM does not dispute that the exclusive ownership of a pre-1972 recording includes the reproduction right and it does not dispute that every copy it made of a pre-1972 recordings was unauthorized.  Instead, Sirius XM nonsensically contends that because it believes that exclusive ownership does not include the performance right then it is somehow "fair use" for it to take for free all of the other rights that even it admits fall within the definition of "exclusive ownership."  In other words, in Sirius XM's view of the world, if exclusive ownership of a pre-1972 recording does not include the performance right, then it is fair use to take all of the other rights as well.  Novel, but wrong – particularly given that the *Naxos* court explicitly held that fair use is ***never*** a defense under New York law to the copying of an entire recording.

The time has come for Sirius XM to understand that it is not enough for it to pay only when it reproduces and performs the recordings of artists whose recordings are covered by the

Copyright Act.  Iconic artists whose recordings are protected by state law – such as The Turtles, Nat King Cole, Hank Williams, Billie Holliday, and The Beatles – are not only deserving of their place in history, but they are also entitled to be paid for their work.  New York law requires that Sirius XM to obtain licenses if it wants to reproduce and perform pre-1972 recordings in connection with its satellite and Internet services, ***and New York law holds Sirius XM liable for failing to do so***.  Sirius XM does not give music away for free, and it certainly should not expect legendary artists to do so either.

## II.   FACTUAL AND PROCEDURAL BACKGROUND.

Pre-1972 recordings comprise the historical backbone of the music industry and include every sound recording that was fixed prior to February 15, 1972.  Those recordings include Plaintiff Flo & Eddie, Inc.'s ("Flo & Eddie") iconic hits when they performed as The Turtles, such as "Happy Together," "It Ain't Me Babe," "She'd Rather Be With Me," "You Baby," "She's My Girl," and "Elenore."

As part of its satellite, Internet, and other related services, Sirius XM exploits without a license pre-1972 recordings**.  (Geller Decl. ¶ 21, Ex. 23 [Frear Depo. 58:10-16, 66:16-67:2, 77:20-81:15; 90:11-92;25])**  Sirius XM does not dispute that it has not obtained licenses for the pre-1972 recordings that it has exploited, that it has not paid any royalties or fees in connection with the pre-1972 recordings it has exploited  **(Geller Decl. ¶ 22, Ex. 24 [Frear Depo. 69:10-16])**, or that pre-1972 recordings provide significant value to it.  Rather, Sirius XM takes the position that pre-1972 recordings are in the public domain and, thus, no licenses are required to exploit them.  As Sirius XM's Executive Vice President, Chief Financial Officer, and 30(b)(6) designee testified:

Q.  Is it Sirius XM's position that pre-1972 recordings are in the public domain?
A.  Yes. (**Geller Decl. ¶ 4, Ex. 3 [Frear Depo. 25:19:21])**[1]
* * *
Q. …At any point in time has Sirius XM ever entered into any license which granted it the right to copy any of the recordings on Schedule A?
A.  To my knowledge, we've never entered into discussions with The Turtles with respect to their songs.  That -- my understanding is that they're in the public domain and so we simply are using them under that theory.  (**Geller Decl. ¶ 4, Ex. 3 [Frear Depo. 75:13-76:2])**

In light of Sirius XM's unlicensed and unlawful use of pre-1972 recordings, on August 16, 2013, Flo & Eddie filed suit against Sirius XM for common law copyright infringement and unfair competition.  Flo & Eddie filed a First Amended Complaint on November 13, 2013, alleging the same causes of action.

A.    **The Parties.**

1.    **Flo & Eddie (The Turtles)**

The Turtles were formed by teenagers Howard Kaylan, Mark Volman, Don Murray, Al Nichol, Charles Portz, and Jim Tucker in 1965.  As with many bands that began their careers in Southern California, The Turtles and started out playing surf-rock music. Their enormous talent was immediately recognized by the independent record label White Whale Record Co., Inc. ("White Whale").  White Whale signed The Turtles to a recording agreement on May 24, 1965. Murray and Portz left the group in 1966 and were subsequently replaced by John Barbata and James Pons.  In 1969, John Seiter replaced Barbata.  (**Volman Decl. ¶ 2**)

In the late summer of 1965, The Turtles achieved breakthrough success with their cover of the Bob Dylan song "It Ain't Me Babe," which reached the Billboard Top Ten.  The Turtles

---

[1]  This was at least the second time that Frear testified in this manner.  The first time was before the Copyright Royalty Board, which consists of a panel of three judges who determine rates and terms for statutory licenses for post-1972 recordings under the federal Copyright Act.  (**Geller Decl. ¶ 5, Ex. 4 [Frear Depo. 35:13-36:12]**)

had another hit with "You Baby," in 1966.  Thereafter, in 1967, The Turtles released "Happy

Together."  That song not only became their biggest hit, and No. 1 on the Billboard chart, but it

is widely recognized as one of the great iconic recordings of 1960s, and, in particular, the 1967

social phenomenon known as the "Summer of Love."  The hits continued with "She'd Rather Be

With Me," also in 1967, "Elenore" in 1968 and "You Showed Me" in 1969. **(Volman Decl. ¶ 3)**

In 1970, a dispute arose between The Turtles and White Whale regarding royalties that

were owed to The Turtles.  On April 27, 1970, this dispute led to the filing of a complaint by the

then-current members of The Turtles against White Whale in Los Angeles Superior Court.  In

that suit, The Turtles claimed that White Whale had systematically underpaid them royalties that

they were owed from the exploitation of The Turtles' recordings.  Subsequently, the parties

agreed to a settlement.  As part of that settlement and in exchange for a release and waiver of

claims by The Turtles (including a waiver of the large amount of underpaid royalties owed to

The Turtles), White Whale transferred to Kaylan, Volman, Nichol, Seiter, and Pons all right, title

and interest in and to the original master recordings of The Turtles.  This transfer included the

100 master recordings listed on Exhibit A to the Complaint in the instant case.  Thereafter, in

exchange for payments from Kaylan and Volman, on May 1, 1971, Nichol, Seiter, and Pons

transferred all of their right, title, and interest in and to The Turtles' master recordings and the

name The Turtles to Kaylan and Volman. **(Volman Decl. ¶¶ 4-6)**

Ultimately, Kaylan and Volman transferred all of the rights to The Turtles' master

recordings to Flo & Eddie, a corporation created in 1971 and owned and controlled exclusively

by them.  For the last four decades, Flo & Eddie has been exploiting The Turtles' master

recordings by, among other things, licensing the rights to make and sell records and licensing the

rights for The Turtles' recordings to be used in movies, TV shows, and commercials.  More

recently, Flo & Eddie has licensed The Turtles' recordings to The Orchard to be exploited

digitally, including through the iTunes and Amazon stores.  In addition, Kaylan and Volman continue to devote their time and effort to promoting The Turtles and their music, and have been the main act on annual summer tours, such as the "Happy Together Tour," which features The Turtles and other musical groups from the 1960s.  **(Volman Decl. ¶ 7)**

> ## 2.   Sirius XM

Sirius XM claims to be the ***largest radio broadcaster in the United States measured by revenue*** and is the result of the 2008 merger of Sirius Satellite Radio and XM Satellite Radio. Sirius XM operates both a subscription based nationwide satellite radio service as well as a subscription based Internet radio service.  Sirius XM claims to have 25.8 million paying subscribers.  **(Geller Decl. ¶ 6, Ex. 5.)**  In exchange for monthly subscription fees which range from $9.99-$18.99, a subscriber can get access to, among other things, Sirius XM's broadcasts of commercial-free music.  **(Geller Decl. ¶ 6, Ex. 6.)**

Through its network of satellites, ground based terrestrial repeaters, and command and control earth stations, Sirius XM's satellite radio service broadcasts on hundreds of channels, including a number of channels devoted solely to playing pre-1972 Recordings, such as "40s on 4," "50s on 5," and "60s on 6."  **(Geller Decl. ¶ 6, Ex. 7.)**  In addition to its satellite radio service, Sirius XM also streams and distributes music over the Internet.  Sirius XM's Internet radio service includes most of the same channels offered by Sirius XM as part of its satellite service.  However, Sirius XM's Internet radio service also offers channels, features, and mobile and smart phones applications that are not available through the satellite radio service.  Two of the features that Sirius XM offers through its Internet service are Sirius XM On Demand (which allows subscribers the ability to download certain broadcasts from a catalog of content to listen to whenever they want) and MySXM (which permits subscribers to personalize their music listening experience). **(Geller Decl. ¶ 6, Ex. 8.)**

B.      **Sirius XM's Reproductions of Pre-1972 Recordings.**

In virtually every step of the process of operating its satellite and Internet radio services,

Sirius XM makes reproductions of pre-1972 recordings (including many of The Turtles

recordings identified on Exhibit A to the complaint).  Those reproductions start with Sirius XM's

creation of vast music libraries and databases, of which there are three: Prophet, Dalet 5.1, and

Dalet Plus.  **(Geller Decl. ¶ 7, Ex. 9 [Smith 2/11/14 Depo. 154:2-8])**[2]  In creating these music

libraries and databases, Sirius XM copied tens of thousands of pre-1972 Recordings, including

many of The Turtles recordings. **(Geller Decl. ¶ 9, Ex. 11 [Smith 3/12/14 Depo. 38:6-44:19])**[3]

From there, Sirius XM copied its entire Prophet, Dalet 5.1, and Dalet Plus music libraries

and databases to create backup libraries and databases and then copied them again to create

disaster recovery libraries and databases.  **(Geller Decl. ¶ 11, Ex. 13 [Smith 2/11/14 Depo.**

**154:13-157:7, 73:3-77:19])**  In addition, Sirius XM did not just make copies of its music

libraries and databases for itself, it created additional copies of those libraries and databases

(including pre-1972 recordings) to give to third parties, such as Omnifone, Rock and Roll Hall of

Fame, Graceland Estate, and Margaritaville.  **(Geller Decl. ¶ 12, Ex. 14 [Smith 2/11/14 Depo.**

**158:2-165:15], [Smith 3/12/14 Depo. 51:11-55:14])**

Creating music libraries and databases, however, was only the beginning of Sirius XM's

copying activities.  In connection with its broadcasting of songs, Sirius XM creates many

---

[2] Sirius XM testified that it maintains information that identifies which recordings within the
Prophet, Dalet 5.1, and Dalet Plus databases are pre-1972 recordings.  **(Geller Decl. ¶ 8, Ex. 10
[Smith 3/12/14 Depo. 12:10-13:6, 17:3-6, 19:24-20:10])**

[3] Sirius XM testified that it copied at least 18,000 pre-1972 recordings to the Prophet database
and 24,000 pre-1972 recordings to the Dalet 5.1 and Dalet Plus databases.  However, it also
admitted that it probably copied many more than that. **(Geller Decl. ¶ 10, Ex. 12 [Smith 3/12/14
Depo. 60:8-62:11])**

additional copies of pre-1972 recordings (including The Turtles recordings), starting with what it refers to as "tips and tails."  "Tips and tails" are the beginnings and endings of recordings that are used by Sirius XM's programmers to bracket the voice transitions that it broadcasts between songs.  The "tip and tails" are first copied to workstations by Sirius XM's programmers who then insert the voice transitions in between the "tips" and the "tails."  A copy of the entire sequence (tips, tails, and voice transition) is then transferred from the workstation back to Sirius XM's music libraries and databases and stored for later use.  **(Geller Decl. ¶ 13, Ex. 15 [Smith 2/11/14 Depo. 18:6-25, 52:20-56:18], [Smith 3/12/14 Depo. 80:2-84:21])**  Thereafter, because Sirius XM broadcasts songs from a "play out" server instead of from one of its libraries, Sirius XM transfers a new copy of each song to one of its "play out" servers each time it broadcasts that song to Sirius XM's subscribers.  **(Geller Decl. ¶ 14, Ex. 16 [Smith 2/11/14 Depo. 19:2-16, 114:15-117:11], [Smith 3/12/14 Depo. 88:2-91:16])**[4]  In addition, in order to create redundancies in its broadcasting, after a song is transmitted from the "play out" server but before that song is perceived by Sirius XM's subscribers, Sirius XM makes additional copies, such as buffer copies.  **(Geller Decl. ¶ 15, Ex. 17 [Smith 2/11/14 Depo. 92:7-97:7, 111:15-112:10, 118:22-120:2, 135:18-137:18, 138:7-13])**  Finally, Sirius XM has authorized a third party company, Quickplay Media, to copy all of Sirius XM's broadcasts in order to create a five hour cache so that the broadcasts can be repackaged for later on demand delivery to mobile devices.  **(Geller Decl. ¶ 16, Ex. 15 [Smith 2/11/14 Depo. 178:16-179:17, 193:16-19; 214:9-19])**

---

[4] By way of example, if a particular song is broadcast one hundred times, it will be copied to the play out server one hundred times.  *Id*.

C.    __Sirius XM's Performance of Pre-1972 Recordings__.[5]

As part of its satellite and Internet radio services, Sirius XM performs pre-1972 recordings (including The Turtles recordings) by broadcasting and streaming those recordings to delivery partners who operate content delivery networks **(Geller Decl. ¶ 17, Ex. 19 [Smith Depo (2/11/14) 176:5-179:17,]; [Smith 3/11/14 Depo. 46:5-20, 96:21-97:25, 104:8-108:21])**, by broadcasting and streaming those recordings directly to its own subscribers **(Answer ¶¶ 6 and 38, [Dkt. 34]; Geller Decl. ¶ 18, Ex. 20 [Sirius XM 12/31/13 10-K pp. 1-5], [Smith 2/11/14 Depo. 194:22-25])**, and by broadcasting and streaming those recordings to the end users of the Dish Network **(Geller Decl. ¶ 19, Ex. 21 [Smith 2/11/14 Depo. 224:22-226:18])**  In addition, Sirius XM has authorized third parties to broadcast and stream recordings to Sirius XM's end users.  **(Geller Decl. ¶ 20, Ex. 22 [Smith 2/11/14 Depo. 33:25-35:25; 176:5-18])**

III.    __SIRIUS XM IS LIABLE FOR ITS PERFORMANCE OF PRE-1972 RECORDINGS.__

A.    __New York, Not Federal, Law Governs This Case.__

Unlike recordings made after February 15, 1972, recordings made prior to that date are not covered by federal copyright law and are instead protected by the laws of the individual states.  While state protection of pre-1972 recordings has always been the rule, it was specifically codified by Congress in 1971 when it passed the Sound Recording Amendment which for the first time granted federal copyright protection to post-1972 recordings.  In doing so, Congress made it clear that with respect to pre-1972 recordings "any rights or remedies under the common law or statutes of any state shall not be annulled or limited by this title until February 15, 2067."

---

[5] The broadcast of a song (whether recorded or performed live) over terrestrial or satellite radio constitutes a performance. *SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1222 (D.C. Cir. 2009).  The same is true for transmissions over the Internet.  *Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 766 fn. 3 (E.D. Pa. 2001).

17 U.S.C. § 301(c).  Thereafter, the Supreme Court unequivocally confirmed the broad power of

the States to protect pre-1972 recordings.  *Goldstein v. California*, 412 U.S. 546 (1973); *see also*,

6 W.F. Patry, Patry On Copyright § 18.55 at 18-198 (2010 ed.) ("States are thus free to extend

pre-1972 recordings the full panoply of rights granted original works of authorship by the federal

Copyright Act and beyond...") [6]

      In its motion, Sirius XM provides a lengthy discussion of the history of the performance

right in sound recordings under the federal Copyright Act, including Congressional legislative

history, Reports to Congress from the United States Copyright Office, Congressional testimony,

and a study by the United States Copyright Office.  The problem with all of this so-called

"evidence" is that it has nothing to do with New York law.[7]  While Sirius XM mentions § 301(c)

in passing, it dismisses it because it "merely begs the issue."  (Motion at 12).  However, § 301(c)

does not beg the issue, ***it resolves it***.  Congress has made it clear that the states have complete

jurisdiction over the protection of pre-1972 recordings unburdened by any of the limitations of

the Copyright Act – a fact that New York courts expressly recognize.  *See UMG Recs., Inc. v.*

*Escape Media Grp., Inc.*, 107 A.D.3d 51, 964 N.Y.S.2d 106 (2013) (court ruled that safe harbor

set forth in § 512(c) of the DMCA was not a defense to infringement of pre-1972 recordings).

Thus, federal law regarding the protection of post-1972 recordings and any attempts to change

that law are of no value in determining New York law with respect to pre-1972 recordings.  The

same is true for the statements of the Copyright Office.  That office exists to enforce and

---

[6] Recordings are to be distinguished from the musical compositions embodied in them.  *See e.g.*,
*Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-1249 (C.D. Cal. 2002).  Musical compositions
are protected by federal copyright law and are not at issue in this litigation.

[7] Twenty-one of the thirty-three exhibits relied on by Sirius XM all involve the federal Copyright
Act, Congressional testimony regarding the Copyright Act, U.S. House and Senate reports, and
reports by the U.S Copyright Office.  *See* Declaration of John Gerba, Exhibits 7-26, and 33.
These exhibits are irrelevant, non-binding, non-precedential, and inadmissible hearsay.

implement the Copyright Act, not to make determinations or pronouncements regarding the scope of New York law.[8]

**B.**  **Ownership Of The Artistic Performance In A Recording Includes The Right To Exclude All Others From Using That Performance.**

The correct starting point for the analysis in this case must begin with the recognition that that the artistic performances embodied in pre-1972 recordings are a form of property that are entitled to the full protection of New York law.  *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540 (2005); *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786 (Sup. Ct. 1950).[9]  As those courts correctly recognized, the property rights inherent in the ownership of artistic performances act to exclude others from "profit[ing] from the labor, skill, expenditure, name and reputation of others." *Id*. at 796.  The breadth of property rights in New York is not open to dispute.  *See e.g.*, *People v. Dixson*, 798 N.Y.S.2d 659 (2005) ("[T]he definition of property was 'intended to embrace every species of valuable right and interest, and whatever tends in any degree, no matter how small, to deprive one of that right, or interest, deprives him of his property'") (citing *People ex rel. Short v. Warden of City Prison*, 145 A.D. 861, 130 N.Y.S. 698 (1911); *Victory v. Baker*, 67 N.Y. 366, 368 (1876) (ownership of personal

---

[8]   Although irrelevant, it is important to note that Sirius XM misstates the U.S. Copyright Office's position as to whether that Office believes that a performance right exists under state law.  **(Motion at p. 12)**  On March 17, 2014, the Copyright Office stated that "[a] person wishing to digitally perform  a pre-1972 sound recording cannot rely on Section 112 and Section 114 statutory licenses and ***must instead obtain a license directly from the owner of the sound recording copyright***." (emphasis added) **(Geller Decl. ¶ 25, Ex. 27)**  Thus, the Copyright Office does not support Sirius XM's view of the law.

[9]   New York is not alone in recognizing that artistic performances embodied in pre-1972 recordings are entitled to protection.  *See, e.g*. *Capitol Records, Inc. v. Erickson*, 2 Cal. App. 3d 526 (1969); *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 564 (1977); *Capitol Records, LLC v. Bluebeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010); *CBS, Inc. v. Garrod*, 622 F. Supp. 532, 535-536 (M.D. Fla. 1985) .

property "carries with it to the owner the right to enjoy, use and manage it in any way he pleases"); *United States v. Ivezaj*, 568 F.3d 88, 93 (2d Cir. 2009) (holding that New York recognizes broad ownership rights in intangible property).

Thus, under New York law, because the right and ability to exclude others from profiting from a recording is unqualified, it is necessarily a much broader bundle of rights than the list of enumerated rights in the Copyright Act which are intended only to act as a limited grant of rights. *See* 17 U.S.C. § 106. In its motion, Sirius XM ignores the important distinction between ownership of all rights and a statutory grant of limited rights. When viewed from the proper perspective, the issue is not whether New York has granted a performance right; rather, the issue is whether it has excluded the performance right from the bundle of rights that result from the ownership of the artistic performances embodied in pre-1972 recordings – and the answer to that question is "no."

Indeed, no case in New York has ever treated the performance right differently from any of the other rights in a pre-1972 recording. In fact, in a case decided a little over a month ago, the New York Supreme Court found liability for the unauthorized performance of a pre-1972 sound recording. *Capitol Records LLC v. Harrison Greenwich LLC*, No. 65224 (N.Y. Sup. Ct. May 13, 2014) (clarifying that the prior grant of summary judgment included the unauthorized public performance of The Rumor Recording). *See* Dkt 49-32 in the instant case and *Capitol Records, LLC v. Harrison Greenwich, LLC*, 984 N.Y.S.2d 274 (2014). Sirius XM relegated *Harrison Greenwich* to a footnote and described the decision in that case as an "outlier." **(Motion at p. 14)** It is not often that a case that is on point is described as an "outlier." It is no more an outlier than Magistrate Judge Sarah Netburn's May 28, 2014, Report and Recommendation in the matter of *Capitol Records LLC v. Escape Media Group, Inc.*, Case No. 12-cv-06646 (Dkt. 90) wherein the Court found Escape Media's Internet streaming service

(Grooveshark) liable for common law copyright infringement for the digital performance of pre-1972 sound recordings.[10]

     The reason why these cases are not outliers is because what has always been and what continues to be protected in pre-1972 recordings are the recorded artistic performances embodied in those recordings – in other words, ***the sounds***. *Apple Corps, Ltd. v. Adirondack Grp.*, 124 Misc. 2d 351, 476 N.Y.S.2d 716 (Sup. Ct. 1983) (recognizing property right in the performance embodied on a recording). And the protection that is provided is the right to exclude others from using those sounds. Those sounds are personal property and are entitled to protection regardless of how they are infringed or the technology used to accomplish that infringement. New York courts have never once said that the exclusive ownership rights in pre-1972 recordings should be defined differently depending on the method of infringement, or that the protection of property rights is based on how those rights are used. When it comes to artistic performances, it does not matter from either a factual or legal standpoint whether the sounds are infringed by being copied as part of bootlegged CDs or whether the sounds are infringed by being sold as unlicensed digital streams.

     **C.**     **Sirius XM's Performance of Pre-1972 Recordings Constitutes Common Law Copyright Infringement and Unfair Competition.**

     The protection afforded to owners of pre-1972 recordings is rooted in the concept that liability should attach to the conduct of people who attempt to profit off the property of others. This fundamental principle of the law was articulated as far back as 1918 by the United States Supreme Court in *International News Service v. Associated Press*, 248 U.S. 215, 239-40 (1918)

---

[10] Escape Media filed objections to that Report and Recommendation with District Judge Alison Nathan. However, those objections did not specifically address any issues regarding pre-1972 recordings. (Dkt. 94) As of this filing, no ruling has been made on the Objections.

wherein it held that the theft of an intangible property interest (in that case, the timely collection and distribution of news) constituted actionable misappropriation:

> [D]efendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, ***and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown***, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. (emphasis added)

*International News Service*, 248 U.S. at 239-40.

While *International News Service* was based on federal common law that ceased to exist as a result of *Erie v. Tomkins*, 304 U.S. 64 (1938) , New York courts nevertheless recognized the soundness and logic of that decision and have hardwired it into New York common law, starting with *Fisher v. Star Co.*, 231 N.Y 414, 429 (1921) (adopting the rationale of *International News Service* and holding that "the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired.")

*International News Service* then extended its reach further into New York law in *Metro. Opera Ass'n.* In that case, the plaintiff (an opera producing company) sought to enjoin the defendant record company from producing and distributing unauthorized records of opera performances produced by the plaintiff. The defendant sought to dismiss plaintiffs' complaint on the grounds that its cause of action for unfair competition failed to allege sufficient facts: (1) of "palming off" on defendant's part, (2) that defendant was in direct competition with plaintiff, and (3) plaintiff did not have any actual property rights in the recordings. The court rejected these arguments, finding that the plaintiff opera company did in fact have exclusive and protectable property rights in, among other things, the productions created by it and the licensing of its performances to the co-plaintiff record company and broadcast company, and that those companies also had protectable rights to exclusively record and broadcast the performances. The

court also held that the tort of unfair competition no longer required allegations of "palming off" or actual competition with the plaintiff, and that the modern view of unfair competition was based upon "the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality, and a court of equity will penetrate and restrain any guise resorted to by the wrong-doer." *Metro. Opera Ass'n* at 796 (citing to *Int'l News Serv. v. AP*, 248 U.S. 215 (1918)).

*Metro. Opera Ass'n* ultimately became the foundation for the New York Court of Appeals decision in *Naxos*. The issue in *Naxos* was whether Naxos Records' restoration and reissuance of a number of sound recordings made in the 1930s constituted common law copyright infringement and unfair competition under New York law. Capitol Records, which held the U.S. licenses for those works, had also remastered and reissued them. Capitol Records sued Naxos in the Southern District of New York. Naxos prevailed in the District Court by claiming that the works were in the public domain in their country of origin. On appeal, the Second Circuit concluded that there were three questions that it needed the New York Court of Appeals to answer. In response to these questions, the New York Court of Appeals held that for purposes of protection under New York law: (1) it does not matter if recordings are in the public domain in their country of origin, (2) the elements of common law copyright infringement and unfair competition are not co-extensive because unfair competition requires copying, distribution, and competition in the marketplace ***or*** similar actions designed for commercial benefit; and (3) a common law copyright claim is not defeated by a "new product."

Rather than recognizing that the common law copyright and unfair competition laws of New York are broad in scope and purposely flexible in the protections afforded pre-1972 recordings, Sirius XM argues for a narrow construction of New York law bounded by the precise conduct at issue in *Naxos*. However, it was only in the context of the allegations in that case that

15

the *Naxos* court held that New York common law copyright infringement considers reproduction

to be an infringement.  But by answering the question raised by that case, it can hardly be

concluded that the court was defining the scope of New York law in connection with cases (and

issues) that were not before it.  In fact, the *Naxos* court said just the opposite when it stated:

> In the absence of the protective legislation, Congress intended that the
> owner of rights to a sound recording should rely on the 'broad and
> flexible' power of the common law to protect those property rights after
> public dissemination of the work.  ***As Metropolitan Opera so aptly
> observed more than five decades ago, the common law 'has allowed the
> courts to keep pace with constantly changing technological and
> economic aspects so as to reach just and realistic results.'*** (citation
> omitted) (emphasis added)

*Naxos*, 4 N.Y.3d at 555.  It is also important to note that when the *Naxos* court was addressing

the elements of common law copyright infringement, it did so in the context of answering the

question as to whether "malicious intent or bad faith" is a necessary element of a state common

law copyright infringement claim.  *Id*. at 563.  There is nothing in the opinion that suggests

(much less states) that the answer to that question was intended to address forms of infringement

not even before the court.  The *Naxos* court was merely making the point that malicious intent

and bad faith were not required to prove a claim for common law copyright infringement under

New York law.  And the proof of that is the *Naxos* court makes no mention of the distribution

right being an element of common law copyright infringement, yet, liability for the unlawful

distribution of sound recordings is routinely found under New York law.  *Capitol Records, LLC

v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 fn.8 (S.D.N.Y. 2013)

      Liability under New York law for infringement and misappropriation of the performance

right in pre-1972 recordings is just not the controversial proposition that Sirius XM makes it out

to be.  Moreover, enforcement of that right in this case will not upset the delicate balance that

Sirius XM claims has existed for decades.  Leaving aside that exploiting the property of another

for free is not a balance, the fact remains that New York is not alone in providing protection for

the performance right inherent in the ownership of pre-1972 recordings.  Indeed, *in Capitol Records, LLC v. Bluebeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010), the defendants (owners of two websites) were transmitting and distributing to members of the public by digital download and by digital streaming pre-1972 recordings as well as recordings subject to federal copyright protection.  The defendants were sued by the owners of certain pre-1972 recordings for violation of Civil Code Section 980(a)(2), misappropriation, conversion, and unfair competition.  Two different District Court judges in the Central District of California found that ***the performance right in pre-1972 recordings was entitled to the same level of protection as the reproduction and the distribution right*** because "by offering free digital streaming transmissions" of plaintiffs' recordings, defendants' actions can cause irreparable damage to the perceived value of plaintiffs' music and to plaintiffs' digital distribution strategies and relationships." *Capitol Records LLC v. Bluebeat, Inc.*, USDC, Central District of California, Case No. 09-8030 (Order Granting Temporary Restraining Order, Dkt. 13 at p. 6; Order Granting Preliminary Injunction, Dkt. 24 at p. 7).  Subsequently, summary judgment was granted to the plaintiffs.  *Bluebeat*, 765 F. Supp. 2d at 1206.  **(Geller Decl., ¶ 24, Ex. 26)**

Similarly, in *Waring v. WDAS Broadcasting Station, Inc.*, 327 Pa. 433 (1937), the Pennsylvania Supreme Court held that the performers of musical works embodied in sound recordings had a protectable common law property interest in the performances in those recordings, and accordingly had the right to ***enjoin the unauthorized public performance of the recordings***.  Thus, because the defendant radio station aired the recordings without plaintiff's authorization, the court enjoined the broadcasts under an unfair competition theory, holding that defendant "did appropriate and utilize for its own profit the musical genius and artistry of plaintiff's orchestra in commercial competition with the orchestra itself." *Id.* at 452-453 (citing

to *International News Service* for the proposition that taking the fruits of another's labor for commercial benefit is "to reap where one has not sown.")

The overblown parade of horribles that Sirius XM foresees if New York law regarding the broad protection of artistic performances in pre-1972 recordings is upheld is not a reason for it to ask this Court to ignore that law.  Sirius XM is not permitted "to reap where [it] has not sown."  And the fact that it developed new technology does not change that analysis or relieve Sirius XM from the obligation to pay for the property owned by others.  The law is never too impotent to deal with new technology.  *UMG Recs., Inc. v. Escape Media Grp., Inc*, 107 A.D.3d 51, 964 N.Y.S.2d 106 (2013) ; *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *ABC, Inc. v. Aereo*, Inc., 2014 U.S. LEXIS 4496 (U.S. June 25, 2014).

### D.    Direct Competition is Not Required for Unfair Competition.

Despite the fact-intensive nature of a claim for unfair competition, Sirius XM argues that it is nevertheless entitled to summary judgment because Flo & Eddie does not compete with Sirius XM – and that the principals of Flo & Eddie confirmed this when they testified that "I don't know how we would be considered a competitor with a satellite provider.  We do not do that."  **(Motion at p. 16)**  The problem with Sirius XM's argument is that New York law does not require actual competition in connection with a claim for unfair competition.  *Metro. Opera Ass'n*, 199 Misc. at 795.  At its most basic level, unfair competition is:

> [A] broad and flexible doctrine...encompassing any form of commercial immorality or simply as endeavoring to reap where (one) has not sown; it is taking the skill, expenditures and labors of a competitor, misappropriating for the commercial advantage of one person … a benefit or property right belonging to another.  The tort is adaptable and capacious.

*Roy Exp. Co. Establishment v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982); *see also Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. LEXIS 16165 *36 (S.D.N.Y.

Aug. 28, 2002) (an unfair competition claim may be grounded in the appropriation of the exclusive property of the plaintiff by the defendant).

To establish a claim for unfair competition, the owner of a pre-1972 recording need only show one of the following: (i) the defendant competed with the plaintiff in the marketplace; (ii) the defendant acted for commercial benefit; *or* the defendant deceived the public." (emphasis added) *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011). Sirius XM has gone to great lengths to disprove Section (i), but completely ignores Section (ii). And there can be no doubt that Section (ii) is applicable here given that Sirius XM acts for a commercial benefit – indeed, it sells access to pre-1972 recordings to its subscribers.

Significantly, even if competition is a necessary element of a claim for unfair competition, as a matter of law, Sirius XM competes with Flo & Eddie. That is because dissemination by Sirius XM of the same content that Flo & Eddie monetizes is "competition" under New York law. *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 437 (S.D.N.Y. 2011). It is not necessary that Flo & Eddie each own a competing satellite service in order for there to be competition. The competition occurs in the sale of performances on the pre-1972 recordings. Flo & Eddie sells those performances, and so does Sirius XM. The fact that Sirius XM's subscribers can get those performances from Sirius XM necessarily means that they do not have to satisfy their demand for the performances from a licensed source.

Sirius XM does not get around these longstanding holdings by citing to *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005 (2d Cir. 1989) for the proposition that "free riding" is not unfair competition. First of all, what Sirius XM is doing is not "free riding;" it is *stealing*.

Moreover, the "free riding" referred to in *H.L. Hayden Co*. has absolutely nothing to do with Sirius XM's conduct.[11]

## IV.   SIRIUS XM IS LIABLE FOR ITS REPRODUCTIONS OF PRE-1972 RECORDINGS.

Not only is Sirius XM liable for infringing the performance right in pre-1972 recording, it is also separately liable for infringing the reproduction right.  Sirius XM argues that this liability should not attach to its conduct because: (1) it does not distribute those recordings to the public; and (2) it is fair use for it to make those reproductions.  Sirius XM is wrong on both counts.

### A.   DISTRIBUTION IS NOT REQUIRED FOR SIRIUS XM TO BE LIABLE FOR ITS REPRODUCTIONS.

Undaunted by its narrow, cramped reading of *Naxos* with respect to the issue of the performance right, Sirius XM then distorts *Naxos* by contending that for reproduction to be actionable as copyright infringement, it must also be coupled with distribution to the public. *Naxos* says no such thing.  Sirius XM is either purposely trying to mislead this Court or it needs a grammar refresher when it uses the following quote to argue that the *Naxos* court "clarif[ied] that an act of *distribution* is also required for a *prima facie* case" of copyright infringement:

**(Motion at p. 25)**

> Copyright infringement is distinguishable from unfair competition, which in addition to unauthorized copying and distribution requires competition in the marketplace or similar actions designed for commercial benefit.

The clause in the quoted portion from *Naxos* describes the elements of a claim for unfair competition, ***not a claim for copyright infringement***.  Indeed, under "the rule of the last

---

[11] Sirius XM seems to cite *Estate of Hemingway v. Random House, Inc.*, 53 Misc. 2d 462 (1967) for the additional proposition that common law copyright and unfair competition claims under New York law are co-extensive, such that if the copyright claims fails the unfair competition also must fail.  That is not the law.  *Naxos*, 4 N.Y.3d at 563.

antecedent," a limiting clause or phrase "modifies the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Thus, as a matter of law and grammar, it is wrong for Sirius XM to conclude that its supposed failure to distribute its reproductions to the public, "dooms Plaintiff's common law copyright claim as well." **(Motion at p. 25)**

It is also wrong from a factual standpoint for Sirius XM to claim that it does not distribute its reproductions to the public. Sirius XM gave a copy of its entire database and library to Omnifone – a third party. In addition, Sirius XM allows Quick Play (another third party) to cache five hour blocks of its programming for later distribution. **(Geller Decl., ¶ 16, Ex. 18 [Smith 2/11/14 Depo. 178:16-179:14])**. Finally, the type of streaming technology that Sirius XM uses distributes entire copies of every song that it broadcasts through the Internet. As Sirius XM admitted, the streaming technology that it uses is what is commonly referred to as "progressive downloads." **(Geller Decl., ¶ 26, Ex. 28 [Smith 2/11/14 Depo. 203:18-204:10])** That type of technology results in a copy of the performance being downloaded to the end users computer by Sirius XM. *See* http://en.wikipedia.org/wiki/Progressive_download In other words, by using "progressive download" technology, Sirius XM is distributing an actual copy of each recording to each subscriber accessing that stream through the Internet.

## B.     SIRIUS XM'S REPRODUCTIONS ARE NOT FAIR USE.

Sirius XM engages in an elaborate fair use analysis in its brief but never once acknowledges that that court in *Naxos* has already decided that, ***under New York law***, it is ***never*** fair use to make copies of entire pre-1972 recordings.

> In the related area of the federal "fair use" doctrine, it is a general rule that the reproduction of an entire copyrighted work constitutes infringement (see *Infinity Broadcast Corp. v Kirkwood*, 150 F.3d 104, 109 [2d Cir 1998], quoting 4 Nimmer on Copyright § 13.05 [A] [3], at 13-181). ***We see no justification for adopting a different rule of state law.*** Thus, even assuming that Naxos has created a "new product" due to its remastering efforts that enhance sound quality, that product can be deemed to infringe

> on Capitol's copyright to the extent that it utilizes the original elements of
> the protected performances.

*Naxos*, 4 N.Y.3d at 564

The holding in *Naxos* is dispositive of Sirius XM's defense that it was fair use for it to make copies of entire pre-1972 recordings. This analysis does not change merely because Sirius XM now wants to refer to those copies as "incidental." *Naxos* does not recognize an exception for "incidental" copies. Moreover, under any recognized definition, there is nothing "incidental" about the copies that Sirius XM has made and continues to make. Indeed, "incidental" means "[s]ubordinate, nonessential, or attendant in position or significance: as a: occurring merely by chance or without intention or calculation . . . b: being likely to ensue as a chance or minor consequence." *Webster's Third New International Dictionary* 1142 (1986). Intentionally and repeatedly copying tens of thousands of recordings in order to perform those recordings is the opposite of "by chance," "minor," and "nonessential." The copies of pre-1972 recordings that Sirius XM made and continues to make are not as a result of Sirius XM's performance of those copies; they were made as a precursor to those performances.[12]

Instead of focusing on New York law that explicitly holds that "fair use" is not available in connection with the reproduction of entire recordings (much less tens of thousands of recordings), Sirius XM nevertheless invites this Court to adopt § 107 of the Copyright Act as a limitation on the scope of rights under New York common law. However, doing so, would directly violate § 301(c) of the Copyright Act which specifically prevents the Court from using any portion of the Copyright Act to limit or annul any aspect of New York law. There is perhaps

---

[12]  In *Agee v. Paramount Communs.*, 59 F.3d 317 (2d Cir. 1995) , Paramount Communications' attempt to use the same "incidental" argument to defend against a claim for federal copyright infringement was rejected by Second Circuit.

nothing more limiting than applying the fair use exception in § 107 to the common law copyrights of the owners of pre-1972 recordings.

In an attempt to try and suggest that New York courts have accepted the fair use limitations of § 107, Sirius XM cites to *EMI Records Limited v. Premise Media Corp. L.P.*, 2008 N.Y. Misc. LEXIS 7485 (N.Y. Sup. Ct. Aug. 8, 2008).  However, Sirius XM's use of that case is highly misleading.  As an initial matter, the court in *Premise Media* is inferior to the court in *Naxos* and thus has no ability to overrule or deviate from its ruling – a fact which the court in *Premise Media* recognized when it expressly acknowledged that fair use is unavailable as a defense when "an entire copyrighted work" is reproduced.  *Id*. at *9. What the court in *Premise Media* actually addressed was a ***15 second*** use of the song "Imagine" by John Lennon in a documentary film that supposedly criticized the idea and viewpoint of that song.  Under those very limited circumstances, the court in *Premise Media* decided that it could analyze that 15 second use by looking at § 107 and the cases decided thereunder.

While it is not at all clear that the court in *Naxos* would endorse what the court did in *Premise Media*, one thing is clear: ***nothing*** in *Premise Media* suggests or holds that "fair use" is available as a defense to Sirius XM in connection with its reproduction of tens of thousands of recordings in their entirety to create vast music libraries and databases, backup libraries and databases, disaster recovery libraries and databases, libraries and databases for third parties, broadcast copies on "play out" servers, buffer copies, and five hour cached copies so that the broadcasts can be repackaged for later on demand delivery to mobile devices.

Significantly, however, even if the Court were permitted to rely on § 107 and the cases decided thereunder, it is nevertheless clear that Sirius XM's so-called "fair use" defense would still fail.  Indeed, the facts and conduct underpinning Sirius XM's claim of fair use have already been found to be insufficient under § 107 in *UMG Recordings v. MP3.com, Inc.*, 92 F. Supp. 2d

349 (S.D.N.Y. 2000).  As the Hon. Jed Rakoff noted at the outset of his opinion wherein he flatly

rejected MP3.com's fair use defense: "[t]he complex marvels of cyberspatial communication

may create difficult legal issues; but not in this case."  And not in this case either.

      In *UMG Recordings*, the defendant (MP3.com) had created a service called

"My.MP3.com," which permitted its subscribers to store, customize, and listen to the recordings

from any place where they have an internet connection.  In order to facilitate the service,

MP3.com purchased tens of thousands of popular CDs and, without authorization, copied them

onto its computer servers so they it could then perform them later for its subscribers.  MP3.com

had performance licenses but did not obtain any licenses to reproduce the recordings.  MP3.com

argued in both *UMG Recordings*, as well as in the follow-on case *Country Rd. Music, Inc., v.

MP3.com*, 279 F. Supp. 2d 325 (S.D.N.Y 2003), that its copying of the recordings was "fair use"

in order to facilitate its performance of those recordings.

      In rejecting MP3.com's fair use defense, Judge Rakoff analyzed the four factors

identified in the Copyright Act as being relevant to that defense: "(1) the purpose and character

of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the

portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the

potential market for or value of the copyrighted work."  17 U.S.C. § 107.

### i.    **Purpose and Character.**

      With respect to "the purpose and character of the use," Judge Rakoff noted that MP3.com

did not dispute that its purpose was commercial, thus, he moved on to analyzing whether the new

use was a transformative "space shift" as MP3.com contended or whether the "new use

essentially repeats the old [use]" without "infusing it with new meaning, new understanding, or

the like." *MP3.com* at 351 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579

(1994)).  Judge Rakoff held that MP3.com's so-called transformative use was "simply another

way of saying that the unauthorized copies are being retransmitted in another medium" and rightly found that the creation of server copies by MP3.com added no "'new aesthetics, new insights and understandings' to the original music recordings it copies." *Id*.

Sirius XM's claim that its wholesale reproduction of entire recordings is a transformative use is indistinguishable from the failed argument that MP3.com made. Sirius XM's *ipse dixit* that its use is transformative because it is "distinct from that which the work was created" **(Motion at p. 28)** ignores the very purpose of recordings; namely, to allow a consumer to hear the songs on them. Consumers do not buy CDs to use them as coasters, they do not buy digital downloads from iTunes to consume hard drive space, and they do not subscribe to the free Spotify service because they enjoy advertisements. Consumers do all of those things to listen to the recorded artistic performances embodied in those recordings – in other words, *the sounds*. And it is those exact same sounds that Sirius XM is reproducing in their entirety and selling to its subscribers in their entirety. Sirius XM has not changed the sounds, has not incorporated small parts of those sounds into other works, and has not used the sounds for comment, criticism or parody. Instead, Sirius XM's use of pre-1972 recordings serves entirely the same purpose as the recordings were intended to serve. Sirius XM's reproductions do not convey "a new expression, meaning, or message." *Gaylord v. United Sta*tes, 595 F.3d 1364, 1372-73 (Fed. Cir. 2010). They convey *the exact same expression, meaning, and message*. That is not transformative; that is infringement. *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) ("[A] use of copyrighted material that "merely repackages or republishes the original" is unlikely to be deemed a fair use.) (citation omitted); see also *AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) (rejecting fair use defense for the online news service).

None of the cases relied on by Sirius XM change the conclusion that its copying of pre-1972 recordings is not transformative. For example, Sirius XM relies on two search engine cases

from the Ninth Circuit that, on their face, have nothing to do with what Sirius XM is doing.  In

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) , the court held that Google's

display of small images called "thumbnails," which were reduced, lower-resolution versions of

the plaintiff's copyrighted photographs of nude models, was a fair use of the images.  *Id*. at

1154-55, 1168.  The court found that the "thumbnails" were "highly transformative" since their

function was to serve as a pointer to a source of information rather than serving as a form of

entertainment. *Id*. at 1165.  Of course, Sirius XM's only purpose in making the reproductions is

to broadcast music, which under any analysis is entertainment.  Similarly, in *Kelly v. Arriba Soft

Corp.*, 336 F.3d 811 (9th Cir. 2003), the court held that it was fair use for an Internet search

engine to display small low-resolution pictures that when enlarged "result[ed] in a significant

loss of clarity of the image, making them inappropriate as display material."  *Id*. at 818.  The

court found that under, these circumstances, their use was "unrelated to any aesthetic purpose"

and did not "supplant the need for the originals."  *Id*. at 820.  The display of degraded copies of

photographs by a search engine is not the least bit applicable to what Sirius XM is doing.

Equally unavailing is Sirius XM's reliance on *Authors Guild, Inc. v. Google Inc.*, 954 F.

Supp. 2d 282 (S.D.N.Y. 2013).  A transformative use was found in that case based on Google

Books' digitization of books and subsequent display of snippets of those books in response to

search inquiries that allowed readers, scholars, researchers, and others to find books.  Google

Books was not a tool that could be used to read entire books, as such, the snippets were found to

be similar to the degraded thumbnail images in *Perfect 10* and *Kelly*.  Sirius XM, on the other

hand, does not sell snippets of songs – it reproduces and sells access to entire songs in their

original form with nothing added to them.

In addition to not being transformative, Sirius XM's use of pre-1972 recordings is clearly

commercial.  Sirius XM concedes, as it must, that it is a "for-profit enterprise" and that it is using

the reproductions of pre-1972 recordings that it makes in order to facilitate its sale of the

performances on those recordings.  But it tries to minimize the commercial nature of its use by

contending that its copying is only "intermediate" and "internal" **(Motion at p. 30).**  That

argument is routinely rejected.  *See e.g. Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d

Cir. 1994) (holding that even though the copying of journal articles by in-house researches was

not "commercial exploitation," the court "need not ignore the for-profit nature" or "indirect

economic advantage" that Texaco obtained because of the use).[13]

Because Sirius XM's reproductions of the pre-1972 recordings are not the least bit

transformative and because Sirius XM is using them for a commercial purpose, this factor tips

decidedly in Flo & Eddie's favor.

### ii.   Nature of Copyrighted Work.

There can be little dispute that recordings are at the core of intended copyright protection

(*Campbell*, 510 U.S. at 586), and, as Judge Rakof noted in *UMG Recordings*, "far removed from

the more factual or descriptive work more amenable to 'fair use'."  *UMG Recordings*, 92 F.

Supp. 2d at 352.  That tips this factor strongly in Flo & Eddie's favor.  Rather than simply

acknowledging the obvious, Sirius XM argues that this factor is neutral because the recordings in

this case have "been disseminated to the public for more than 30 years before Sirius and XM

commenced broadcasting."  **(Motion at p. 31)**  It is not surprising that Sirius XM did not cite a

case for that proposition.

---

[13] Sirius XM also wrongly tries to pigeon-hole its conduct into the Ninth Circuit's "reverse
engineering" holdings in *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596
(9th Cir. 2000) and *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527 (9th Cir. 1993).
Sirius XM does not contend that it reverse engineered anything.  And, as Judge Rakoff noted
when the exact same issue was raised by MP3.com, those cases involved "the copying of
software in order to develop a new product whereas MP3.com copied the recording onto its
servers not to create any new form of expression *but rather to retransmit the same expression in
a different medium*."  *UMG Recordings*, 92 F. Supp. at 351 fn.2 (emphasis added)

### iii. **Amount of Work Used**.

Although Sirius XM acknowledges copying tens of thousands of pre-1972 recordings in their entirety over and over again, it nevertheless claims that it had to do that in order to "facilitate its lawful public performances." **(Motion at p.31)** There are three problems with that argument. First, it is factually false. Sirius XM admitted that did not have to make any copies in order to facilitate its performances. As Frear testified:

> Q. Can Sirius XM broadcast a recording through its satellite service by playing a CD?
> A. Yes. **(Geller Decl., ¶ 27, Ex. 29 [Frear Depo. 53:19-22])**

The second problem with Sirius XM's argument is that it has already been found to be legally wrong. *UMG Recordings*, 92 F. Supp. 2d at 352; *Country Rd. Music*, 279 F. Supp. 2d at 325. When the "heart" of a work is taken (as is the case here since Sirius XM took the entire recordings), the amount of the work used necessarily weighs against a finding of fair use. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1179 (9th Cir. 2012) . And the third problem with Sirius XM's argument is that it had no right to make the performances in the first place. Any one of these three problems results in the third factor tipping in Flo & Eddie's favor.

### iv. **Effect on Potential Market**.

Sirius XM claims that the copies *it* made do not have an adverse effect "on the actual or potential market for pre-1972 recordings." However, that is the wrong test. The United States Supreme Court held that the correct test does not simply focus on the uses for which fair use is claimed. The correct test is whether "unrestricted and widespread" similar uses would adversely impact the market. *Campbell*, 510 U.S. at 590. Not only does Sirius XM misstate the relevant test, but then it concludes that there is no effect on any markets because there is no market for "copies made...in aid of public performance." **(Motion at p. 33-34)** That is not true. In the context of post-1972 recordings, not only does this market exist, but it is a statutorily required

market.  *See* 17 U.S.C. § 112(e) and 37 C.F.R. 382.2.  Thus, the market exists for post-1972

recordings and there is no reason that it should not exist for pre-1972 recordings given *Naxos*.

     Even if a potential market did not exist, market harm is still presumed "when a

commercial use amounts to mere duplication of the entirety of an original."  *Campbell*, 510 U.S.

at 591.  The fact that Sirius XM has made tens of thousands copies of entire pre-1972 recordings

by itself tilts the fourth factor completely in Flo & Eddie's favor, even more so when it is

considered that its reproductions are not the least bit transformative.  Sirius XM's argument

regarding the alleged lack of actual harm ignores this presumption and has no bearing on

whether its conduct is impacting a potential market.  *See Leadsinger, Inc. v. BMG Music Publ'g*,

512 F.3d 522, 531-32 (9th Cir. 2008) ("We have, however, concluded that Leadsinger's use is

intended for commercial gain, and it is well accepted that when "the intended use is for

commercial gain," the likelihood of market harm "may be presumed" *(*citing *Sony Corp. v.

Universal City Studios,* 464 U.S. 417, 451 (1984)).

     In any event, the real market here is the market to license recordings, and that market is a

vibrant one.  Flo & Eddie routinely and regularly license their masters to make and sell records

and license the rights for The Turtles' recordings to be used in movies, TV shows, and

commercials.  The licenses for movies, TV shows, and commercials include all rights necessary

to accomplish that use including reproducing the song for later broadcast.  That is the same

reproduction that Sirius XM says is "fair use."

## V.  THE DORMANT COMMERCE CLAUSE DOES NOT RESTRICT NEW YORK'S REGULATION OF PRE-1972 RECORDINGS.

     In a further misguided attempt to avoid liability for its exploitation of pre-1972

recordings, Sirius XM argues that the regulation of pre-1972 recordings by New York would

"impermissibly regulate extraterritorial conduct in violation of the dormant Commerce Clause."

**(Motion at p. 36)**   While there is over a hundred years of jurisprudence debating whether and when the Dormant Commerce Clause is applicable, there is no dispute that it is never applicable when Congress **has** spoken.

Indeed, "[w]hen Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."  *Ne. Bancorp v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985) .  In fact, "[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause **even if it interferes with interstate commerce**."  *White* v. *Mass. Council of Const. Employers, Inc.,* 460 U.S. 204, 213 (1983) (emphasis added); *see also Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 137 F.3d 81 (2d Cir. 1998) (same).  This is because "Congress may use its powers under the Commerce Clause to '[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy . . . .'"  *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (quoting *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44 (1980); *see also Central Valley Chrysler-Jeep* v. *Witherspoon*, 456 F. Supp. 2d 1160, 1183-84 (E.D. Cal. 2006) (same).

Here, Congress spoke loudly when it enacted § 301(c) of the Copyright Act wherein it "specifically authorized" protection of rights in pre-1972 recordings under state common and statutory law.  Section 301(c) is explicit both in its authorization and its scope: "[a]ny rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067."  "Any" rights means "all" rights, not simply a subset of rights. *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (Absent limiting language by Congress, the word "any has an expansive meaning" and is interpreted to mean all.); *see also Deravin v. Kerik*, 335 F.3d 195, 204 (2d Cir. 2003).

Despite this clear law, Sirius XM invites the Court to ignore the will of Congress, the text of § 301(c), and the plain language of *Goldstein* confirming that the states have the absolute right to protect pre-1972 recordings as they see fit.  According to Sirius XM, the only relevant consideration is whether New York law protecting pre-1972 recordings somehow burdens interstate commerce.  Again, that is not the test.  *Bowers* v. *NCAA, Inc.*, 151 F. Supp. 2d 526, 538 (D.N.J. 2001) ("If Congress authorizes a state activity that may otherwise arguably violate the Dormant Commerce Clause, there is no 'dormant' Commerce Clause issue.")[14]  Moreover, it is of no consequence that Sirius XM might be required to modify its operations or obtain licenses to continue exploiting pre-1972 recordings. *See Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117, 127 (1978) (rejecting the "notion that the Commerce Clause protects the particular structure or method of operation in a retail market"); *Arrow Air, Inc.* v. *Port Auth. Of New York and New Jersey*, 602 F. Supp. 314, 321 (S.D.N.Y. 1985) ("If a regulation is otherwise valid under the Commerce Clause, it is not rendered invalid simply because an operator has to change its market structure."); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 961 (N.D. Cal. 2006) ("Courts have held that when a defendant chooses to manufacture one product for a nationwide market, rather than target its products to comply with state laws, defendant's choice does not implicate the commerce clause.")

Courts routinely reject the precise argument that Sirius XM is asking this Court to credit. For example, in *Sea Air Shuttle v. Virgin Islands Port Authority*, 800 F. Supp. 293, 304 (D.V.I. 1992), the Court held that Virgin Island's planning and development regulations that governed

---

[14] *Bowers* involved language in the Americans with Disabilities Act that, like § 301(c), provided that "[n]othing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any...law of any State...that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." *Id.* at 538-39.

the lease of seaplane ramps did not violate the Dormant Commerce Clause because the Federal

Aviation Act provided that it "shall not be construed to limit the authority of any State...to

exercise its proprietary powers and rights."  Similarly, in *Soto* v. *Tu Phuoc Nguyen*, 634 F. Supp.

2d 1096 (E.D. Cal. 2009), in defending against claims of victims of a bus accident, Greyhound

claimed that any state action premised on the absence of seatbelts violated the Dormant

Commerce Clause because federal law did not require the installation of seatbelts in buses.  The

Court rejected this argument, noting that the "savings clause" in § 30103(e) of the National

Traffic and Motor Vehicle Safety Act ("[c]ompliance with a motor vehicle standard under this

chapter does not exempt a person from liability at common law") indicated "an express

delegation of power to the states," and thus "the Commerce Clause does not apply."  *Id*. at 1107;

*see also Zimmerman v. Wolff*, 622 F. Supp. 2d 240, 245 (E.D. Pa. 2008) (Court rejected the

argument the Pennsylvania Dog law violated the Dormant Commerce Clause because the Federal

Animal Welfare Act preserved and expressly authorized states to promulgate their own standards

with respect to domestic animals.); *Central Valley Chrysler-Jeep*, 456 F. Supp. 2d at 1184

(California clean air regulations not barred by Dormant Commerce Clause notwithstanding that

they were more stringent than applicable standards under federal law because federal Act

permitted the Administrator of the EPA to waive application of federal law).

  In contrast to the foregoing, all of the cases cited by Sirius XM are inapplicable because

they did not involve a statutory scheme in which Congress authorized states to regulate interstate

activities.  *See, e.g.*, *American Booksellers Found. v. Dean,* 342 F.3d 96, 104 (2d Cir. 2003)

(invalidating Vermont regulation where there was no Congressional statute or savings clause

authorizing state regulation); *ACLU* v. *Johnson*, 194 F.3d 1149, 1160-64 (10th Cir. 1999) (never

discussing whether state regulation was authorized by federal law); *Am. Libraries Ass'n v.*

*Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (enjoining New York penal code section restricting

transmission through the internet of material harmful to minors where there was no

Congressional statute or savings clause authorizing state regulation).[15]

## VI.   SIRIUS XM'S LACHES DEFENSE IS MERITLESS.

Recognizing the futility of its legal arguments, Sirius XM tries one last gambit: laches.

Sirius XM's laches argument suffers from a number of problems, not the least of which is it is a

defense to equitable claims and the claims in this case are legal.  Equally problematic for Sirius

XM is the fact that laches is not available as a defense to claims that are timely under the

applicable statute of limitations.  Finally, even if Sirius XM could get beyond these hurdles (and

it cannot), Sirius XM cannot as a factual matter establish the critical factual element of

"prejudice" – both because the facts do not exist to support it and, even if they did, Sirius XM is

now barred from asserting them.

### A.   Laches Is Not A Defense to A Claim for Damages.

Sirius XM makes the broad statement in its motion that "Plaintiff's claims are barred by

laches" without ever discussing that it is a defense that applies to equitable claims only.  *Dutcher

v. Vandeloo*, 946 N.Y.S.2d 66 (N.Y. Sup. Ct. 2012).  Laches has no applicability to claims for

damages.  *Fade v. Pugliani*, 8 A.D.3d 612, 615 (2004); *Morris v. Zimmer*, 2011 U.S. Dist.

LEXIS 130919 *20 (S.D.N.Y. Nov. 10, 2011).  Even when a cause of action seeks equitable

relief in addition to damages, laches still does not act as bar.  *Pfeiffer v. Berke*, 121 N.Y.S.2d

774, 779 (Sup. Ct. 1953); *see also Point 4 Data Corp. v. Tri-State Surgical Supply & Equip.,

Ltd.*, 2013 U.S. Dist. LEXIS 109298 *95 (E.D.N.Y. Aug. 2, 2013).

---

[15] Because Congress authorized state protection of pre-1972 recordings, the balancing test
described in *Pike v. Bruce Church*, 397 U.S. 137 (1970) is irrelevant.   *Shamrock Farms v.
Veneman*, 146 F.3d 1177, 1179-80 (9th Cir. 1998).   Once Congress authorizes state action,
there is nothing to balance.

None of this is particularly controversial, yet, all of it was ignored by Sirius XM.  An examination of the Complaint in this action reveals that every one of Flo & Eddie's claims seeks damages and is considered a legal claim.

**B.**      **Laches Is Not A Defense When The Claims Are Timely Under The Applicable Statute of Limitations.**

Sirius XM does not contend (nor could it) that Flo & Eddie's claims are untimely under the applicable statute of limitations.  That fact alone is fatal since laches is not available as a defense "in an action at law commenced within the period of limitation."  *Premier Capital, LLC v. Best Traders, Inc.*,  88 A.D.3d 677, 678 (2011); *see also RST (2005) Inc. v. Research in Motion, Ltd.*, 2008 U.S. Dist. LEXIS 105982 *12 (S.D.N.Y. Dec. 16, 2008) ("Laches cannot be a defense to a legal action for damages if the action was commenced within the statute of limitations period."); *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293 (S.D.N.Y. 2010) (granting summary judgment dismissing laches affirmative defense, where breach of contract action was filed within limitations period).

The logic of not allowing laches to bar timely legal claims was recently address by the United States Supreme Court in *Petrella v. MGM*, 134 S.Ct. 1962 (2014).  *Petrella* involved the motion picture Raging Bull.  Raging Bull was based on the copyrighted screenplay of the life of boxing champion Jake LaMotta.  The screenplay had been written by Petrella and LaMotta and, through a series of transaction, the rights to the screenplay had been assigned to MGM.  Because Petrella died during the initial term of copyright, the renewal rights in the copyright reverted to his heir (Paula) and never vested in MGM.  Paula Petrella renewed the copyright in 1991 and seven years later notified MGM that its exploitation of Raging Bull violated her copyright.  Paula Petrella then did nothing until she filed suit on January 6, 2009, for federal copyright infringement, seeking monetary and injunctive relief limited to the acts of infringement

occurring during the limitations period.  MGM moved for summary judgment, arguing that Paula

Petrella's 18-year delay in filing suit barred her claim in its entirety based on the doctrine of

laches.   The District Court granted MGM's motion, the Ninth Circuit affirmed, and the Supreme

Court reversed.

        In ruling as it did, the Supreme Court made very clear that so long as a claim is timely

under the applicable statute of limitations, it does not matter that there was a delay in filing the

claim, even if the reason for the delay was simply to wait and see if the infringing exploitation

would be successful.

> It is hardly incumbent on copyright owners, however, to challenge each
> and every actionable infringement. And there is nothing untoward about
> waiting to see whether an infringer's exploitation undercuts the value of
> the copyrighted work, has no effect on the original work, or even
> complements it....Even if an infringement is harmful, the harm may be too
> small to justify the cost of litigation.
>
> If the rule were, as MGM urges, "sue soon, or forever hold your peace,"
> copyright owners would have to mount a federal case fast to stop
> seemingly innocuous infringements, lest those infringements eventually
> grow in magnitude.

*Id*. at 995.

        The *Petrella* court was also unmoved by MGM's argument that it had made significant

investments in exploiting the film.  As the Court noted, MGM's potential damages exposure was

limited by the statute of limitation.  Moreover, the Court noted that if MGM had any concern

regarding its rights, it could have filed a declaratory relief action.

        Changing the name of the defendant from MGM to Sirius XM does not change the

analysis or the force of the arguments and holdings in *Premier Capital*, *RST (2005)*, *Maxim* Grp.,

or *Petrella*.  Flo & Eddie had no obligation to sue Sirius XM earlier than it did and is not seeking

damages for any period outside of the applicable statute of limitations.  Moreover, the fact that

Sirius XM made substantial investments in its systems and services is of no consequence.  It had

the full benefit of those systems and services for all the years outside the limitations period – and, in any event, had to make the investments it made to exploit post-1972 recordings.[16]

### C.   <u>Sirius XM Cannot Establish Prejudice.</u>

Laches requires more than just delay; it requires a showing based on credible evidence of prejudice to the defendant that is caused both by the delay and by the plaintiff.  *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 2013 U.S. Dist. LEXIS 109298 *94 (E.D.N.Y. Aug. 2, 2013).  Sirius XM's assertion that it has been prejudiced because it spent "billions of dollars in developing its satellite broadcast systems, internet streaming capabilities, and broad variety of programming content" based on the expectation of being able to exploit pre-1972 recordings for free is neither credible or supportable.  Sirius XM's systems are exactly the same for both pre-1972 recordings and post-1972 recordings.  Thus, any expense that Sirius XM incurred to develop and build out its satellite and Internet systems would still have been incurred by it even if pre-1972 recordings did not exist.

But where the wheels really fall off of Sirius XM's claim of prejudice is when it states that it acted in "good faith reliance" on the failure of owners of pre-1972 recordings to insist that a license was required to publicly perform those recordings.  **(Motion p. 40)**  This newly minted argument suffers from one very big problem – it is contrary to what Sirius XM testified to in this case.  Indeed, in response to Flo & Eddie's Fed. R. Civ. P. 30(b)(6) notice seeking testimony as to the "decision or decisions by Sirius XM not to license" the right to reproduce, copy, or

---

[16] Sirius XM's reliance on *White v. Priester*, 78 A.D.3d 1169, 1171 (2010) for the proposition that laches applies "regardless of whether the statutory limitations period has expired" is very misleading.  What Sirius XM omitted from its characterization of that case is that the court limited its holding to equitable actions.  In addition, Sirius XM's reliance on *Technitrol, Inc. v. Memorex Corp.*, 376 F. Supp. 828 (N.D. Ill. 1974) is troubling given that the holding in that case was completely abrogated by *Petrella*.

perform pre-1972 recordings, Sirius XM's Executive Vice President and Chief Financial Officer

testified that pre-1972 recordings are in the public domain, do not need to be licensed, and the

decision not to license them was based solely on Sirius XM's legal analysis (which Sirius XM

would not disclose) – *and nothing else*.

> Q. Okay. My question was: Can you separate the legal advice that went
> into the decision from the non-legal advice that went into the decision?
> A. I don't know what advice there would be involved in the -- it seems to
> me that it's a legal matter.
> Q. It's just a yes-or-no question.  Can you separate the two?
> A. I believe it's a legal question.
> Q. So, 100 percent of the decision was legal advice?
> A. Honestly, I'm hard-pressed to think of what else is involved in the
> decision other than what the applicable law is.
> * * *
> Q. Were any factors considered in arriving at the decision that Sirius XM
> did not need a license pre-1972 recordings in connection with its Internet
> service or its satellite service other than legal advice?
> A. I think -- I think we looked at what the applicable law was and we took
> advice on the applicable law.
> Q. So, does that mean no other factors were considered?
> A. Not that I can recall.

**(Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21)**

     Having testified that that the only factor considered by Sirius XM was its own legal

analysis, Sirius XM cannot now suggest that there were other reasons, such as the conduct or

supposed acquiescence of the owners of pre-1972 recordings resulting from their alleged failure

to initiate litigation sooner.[17]  If there really were other factors (and Flo & Eddie is not conceding

for a moment that there were), the time to identify them was in discovery.

     Aside from being bound by its deposition testimony, Sirius XM is also barred for another

---

[17] It is also important to note that the owner of a copyright has no obligation to institute legal
proceedings against any particular defendant, and any asserted failure to do so is not an
abandonment or relinquishment of rights.  *Naxos*, 372 F.3d at 483 ("failure to pursue third-party
infringers has regularly been rejected as a defense to copyright infringement or as an indication
of abandonment"); *see also Paramount Pictures Corp. v. Carol Pub'g Grp.*, 11 F. Supp. 2d 329,
337 (S.D.N.Y. 1998) (holding that there is no duty to instigate legal proceedings).

37

very basic reason from raising additional factors that supposedly influenced its state of mind.

Because Sirius XM has blocked all inquiry into the legal advice and communications it received

in connection with its decision not to license pre-1972 recordings, it cannot now testify as to any

aspect of its supposed "good faith reliance" or its state of mind.  The law is clear that a party may

not assert that it believed that its conduct was in good faith while at the same time shielding from

discovery privileged communications and analysis that bear on that state of mind.  *United States*

*v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991); *see also Kaiser Found. Health Plan, Inc. v. Abbott*

*Labs., Inc.*, 552 F.3d 1033 (9th Cir. 2009).  The selective disclosure of the information that forms

the basis for a good faith assertion is not allowed.

     In *Bilzerian*, the Second Circuit affirmed the district court's holding that the defendant's

proposed testimony about his good faith belief in the legality of his actions would necessarily

implicate his communications with counsel, and that the government was entitled to cross-

examine him regarding those communications:

> Bilzerian's testimony that he thought his actions were legal would have
> put his knowledge of the law and the basis for his understanding of what
> the law required in issue.  His conversations with counsel regarding the
> legality of his schemes would have been directly relevant in determining
> the extent of his knowledge and, as a result, his intent.

*Id*. at 1292.

     As courts have made clear, a party "cannot be permitted, on the one hand, to argue that it

acted in good faith and without an improper motive and then, on the other hand, to deny…access

to the advice given by counsel where that advice…played a substantial and significant role in

formulating the actions taken by [the defendant]."  *Pereira v. United Jersey Bank*, 1997 WL

773716, at *6 (S.D.N.Y. Dec. 11, 1997).  The Second Circuit re-affirmed *Bilzerian* in *In re*

*County of Erie*, 546 F.3d 222 (2d Cir. 2008), holding that the "assertion of a good-faith defense

involves an inquiry into state of mind, which typically calls forth the possibility of implied

waiver of the attorney-client privilege."  *Id*. at 228-29.  If a party wants to rely on its purported

state of mind regarding legal matters, the party has to open up discovery to all of the putatively privileged matters that informed its thinking or else not testify about its state of mind. *Id.*[18]

Here, Sirius XM confirmed in deposition testimony that legal advice informed its decision to not license pre-1972 recordings. **(Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21)** However, Sirius XM also has repeatedly asserted the attorney-client privilege to block both deposition testimony and document discovery that inquired into that legal advice or communications. **(Geller Decl. ¶ 28, Ex. 30)** Having asserted the attorney-client privilege that would have shed light on its contention that it acted in "good faith reliance," Sirius XM is now not permitted to use its purported "good faith reliance" to support any aspect of its defense in this case, including as part of its laches defense.

Similarly, Sirius XM's contention that it would have taken a different position in the rate proceedings before the Copyright Royalty Board had it only known that it needed a license to publicly perform pre-1972 recordings also goes to its state of mind and implicates the legal advice it received. Sirius XM is not permitted to say that it would have taken a different legal position unless it first produces all of the legal advice and communications that bore on the position it did take. *Bilzerian* does not permit Sirius XM to tell a cleansed story.

## VII. <u>CONCLUSION</u>.

Sirius XM's decision that pre-1972 recordings are in the public domain and, therefore, not capable of private ownership or legal protection runs headlong into established New York law to the contrary. Rather than obtaining licenses for either the reproduction or the performance of the pre-1972 recordings that it is admittedly exploiting and profiting from, Sirius XM has now

---

[18] The holding in *Bilzerian* is not limited to those situations where advice of counsel is raised as a defense. *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010) (quoting *John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003)).

aligned itself with the long list of piratical companies who have used the ease and scalability of

the digital distribution of music to build businesses that inflict harm on an unprecedented level.

For all the foregoing reasons, Sirius XM's motion should be denied in its entirety.


Dated:  July 11, 2014                              GRADSTEIN & MARZANO, P.C.
                                                   Henry Gradstein
                                                   Maryann R. Marzano
                                                   Harvey W. Geller


                                                   By:  _____S/ Harvey W. Geller_____
                                                                      Harvey W. Geller

                                                   Attorneys for Plaintiff
                                                   FLO & EDDIE, INC.