**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

FLO & EDDIE, INC., a California
corporation, individually and on behalf of all
others similarly situated,

                Plaintiff,

      v.

SIRIUS XM RADIO, INC., a Delaware
corporation; and DOES 1 through 10,

                Defendants.

Civil Action No.:13-CIV-5784(CM)(HP)

## LOCAL RULE 56.1 COUNTER-STATEMENT OF FACTS
## BY PLAINTIFF FLO & EDDIE, INC.

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(b) of this

Court's Local Civil Rules, Plaintiff, by its undersigned counsel, respectfully submits the

following response to the Statement of Uncontested Material Facts submitted by Defendant

Sirius XM Radio, Inc. ("Sirius XM") in support of its motion for summary judgment, along

with Plaintiff's supplemental Statement of Uncontested Facts.

## GENERAL OBJECTION

      Pursuant to Rules 56.1(a) and (d), Sirius XM was required to submit a "short and

concise statement" of the "material facts" supported by citations to "evidence which would be

admissible."  Rather than doing this, Sirius XM submitted a statement that was neither short nor

concise and that was populated with (1) irrelevant and immaterial facts that are not material or

necessary to decide the motion, (2) improper attorney and witness argument, opinion, and

characterization of the evidence, and (3) "facts" that are without support or proper foundation

or which are based on speculation.  Plaintiff Flo & Eddie, Inc. ("Flo & Eddie") objects to the

entire statement on these grounds.

1

PLAINTIFF'S RESPONSE TO DEFENDANT'S

STATEMENT OF UNCONTESTED MATERIAL FACTS

| Sirius XM's Alleged Fact | Flo & Eddie's Response |
|---|---|
| 1.  Plaintiff Flo & Eddie, Inc. ("Plaintiff") is a California corporation with its principal place of business in Los Angeles, California. Plaintiff purports to own certain sound recordings by The Turtles that are at issue in this litigation, each of which was created prior to February 15, 1972.[1]<br><br>Evidence Cited by Sirius XM:<br>First Amended Complaint ("FAC") ¶¶ 18 and 19. | 1.  UNDISPUTED, except that Flo & Eddie adds that (a) its ownership is not purported; and (b) 17 U.S.C. § 301(c) provides that the exclusive protection for recordings "fixed" before February 15, 1972 belongs to the individual States and that the federal Copyright Act cannot be used to annul or limit hose rights until February 15, 2067. |
| | |
| 2.  Plaintiff's principals, Mark Volman and Howard Kaylan, each own 50% of the corporation.  Plaintiff has no other employees. Plaintiff uses Evan S. Cohen, Esq. as its music administrator and lawyer.<br><br>Evidence Cited by Sirius XM:<br>FAC ¶ 2; Declaration of John R. Gerba, dated May 30, 2014 ("Gerba Decl."), Exhibit ("Ex.") 1 (Volman Tr. 29:9-24); Gerba Decl. Ex. 1 (Volman Tr. 30:10-11); Gerba Decl. Ex. 2 (Kaylan Tr. 29:1-4). | 2.  UNDISPUTED. |
| | |
| 3.  Defendant Sirius XM is a Delaware corporation with its principal place of business in New York, New York, and operates a satellite digital audio radio service.<br><br>Evidence Cited by Sirius XM:<br>Declaration of Terrence R. Smith, dated May 29, 2014 ("Smith Decl.") ¶ 7. | 3.  UNDISPUTED as to Sirius XM being a Delaware corporation with a principal place of business in New York.  It is also UNDISPUTED that Sirius XM operates a satellite radio service.  This fact, however, is DISPUTED to the extent that it implies that Sirius XM's activities are limited to New York and to operating a satellite radio service.<br>Declaration of Harvey Geller ("Geller Decl.") ¶ 6, Exs. 5, 6, 7, 8; Geller Decl., ¶ 17, Ex. 19 [Smith  Depo (2/11/14) 176:5-179:17,]; [Smith 3/11/14 Depo. 46:5-20, |

---

[1] Sound recordings created prior to February 15, 1972, and therefore ineligible for protection under federal law, shall be referred to herein as "Pre-1972 Recordings."

| | |
|---|---|
| | 96:21-97:25, 104:8-108:21]); Answer ¶¶ 6 and 38, [Dkt. 34]; Geller Decl. ¶ 18, Ex. 20 [Sirius XM 12/31/13 10-K pp. 1-5], [Smith 2/11/14 Depo. 194:22-25]); Geller Decl. ¶ 19, Ex. 21 [Smith 2/11/14 Depo. 224:22-226:18]); Geller Decl. ¶ 20, Ex. 22 [Smith 2/11/14 Depo. 33:25-35:25; 176:5-18] |
| | |
| 4.  Sirius XM broadcasts music and non-music content 24 hours a day, seven days a week, on more than 135 channels to subscribers across the continental United States.  The wide variety of content offered to Sirius XM's more than 25 million subscribers includes a mix of diverse genres of music and often exclusive offerings of talk, sports, news, and other entertainment programming including Howard Stern, the NFL, and Major League Baseball. | 4.  UNDISPUTED as to Sirius XM's broadcasting of music across the United States on a number of channels.  This fact is DISPUTED to the extent it implies that Sirius XM's activities are limited to offering content or that the content it offers is free or that it has not authorized third parties to broadcast music.<br><br>*See* Fact No. 3. |
| | |
| 5.  The majority of Sirius XM subscribers receive their service through a radio in a newly purchased or leased vehicle containing a proprietary computer chip designed by Sirius XM engineers to be capable of receiving and decoding digital transmissions from Sirius XM's satellite system. Sirius XM has agreements with every major automaker to offer satellite radios as factory- or dealer-installed equipment in their vehicles.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶¶ 4 and 5. | 5.  DISPUTED.  Sirius XM has many types of subscribers including for its satellite service, its internet service, and its Business Establishment Service.<br><br>*See* Fact No. 3.<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, and is irrelevant. |
| | |
| 6.  In addition to the satellite radio service, Sirius XM also offers an Internet radio service, which "simulcasts" substantially all of Sirius XM's satellite radio channels, as well as a handful of Internet-only channels, to users on personal computers and mobile devices. Most of Sirius XM's roughly 5 million Internet subscribers obtain that service as part of a package with their satellite radio subscription, although there are some standalone Internet subscribers.  Sirius XM also offers what is known as a Business Establishment Service providing music to retail | 6.  UNDISPUTED except to the extent that it implies that Sirius XM's activities are limited to these activities, or that the Internet radio service is a true simulcast, or that Sirius XM alone operates the internet radio service.<br><br>*See* Fact No. 3. |

| | |
|---|---|
| stores, bars and restaurants, and the like, as well as a service providing music channels accessible to subscribers of the Dish satellite television service.  The channels offered on the latter two services represent a subset of the channels on Sirius XM's primary consumer satellite radio service.<br><br>Evidence Cited by Sirius XM:<br>*See* Smith Decl. ¶ 6. | |
| | |
| 7.  Sirius XM's service is national in scope and not tailored by geography. Sirius XM's 130-plus channels are available to subscribers nationwide, regardless of which city or state they live in.  If Sirius XM makes a change to a channel, that change affects what its subscribers hear on that channel in every single state.   If Sirius XM were not able to play a certain group of songs in a given state, its system would not allow it to change its programming solely for that state, nor would it allow it to prevent radios solely in that state from hearing the given songs.  Specifically, Sirius XM's satellite radio system is "one way,"—i.e., radios receive Sirius XM's broadcasts, but Sirius XM does not receive a signal back from the radios telling it what channel the radio is tuned to or where the radio is located.  For that reason, it is not possible to identify those radios currently in New York, for example, or to know whether subscribers registered in New York are actually in New York, versus in a different state.  With respect to Sirius XM's Internet radio service, there is the theoretical possibility of "geo-blocking" content using a subscriber's IP (Internet Protocol) address; however, Sirius XM currently has only a very limited ability to do so (for example, Sirius XM does not allow users outside the U.S. to receive NFL game broadcasts).  Developing and implementing state-specific geo-blocking on a song-by-song basis would cost millions of dollars to develop, be incredibly complex, and would only affect a small portion of Sirius XM's subscribers, as only about 5 million of its 25 | 7.  DISPUTED.  Sirius XM claims to have geo-blocking capabilities for its internet service and can implement them if it wanted to.  As for its satellite service, Sirius XM has not contended that it cannot implement a hardware or software solution that will allow it to tailor its broadcast on geographic basis.<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, is inadmissible expert testimony, and is irrelevant. |

| | |
|---|---|
| million subscribers have access to the Internet radio service.<br><br>Evidence Cited by Sirius XM:<br> Smith Decl. ¶ 11. | |

| | |
|---|---|
| 8.  Additionally, Sirius XM's FCC licenses currently prevent it from offering state-specific programming.  Sirius XM would have to remove the relevant sound recordings from the service altogether, with the effect that subscribers in every other state would be prevented from hearing them as well.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 11 | 8.  DISPUTED.  Sirius XM is characterizing documents (which it describes as "Applications") and their legal effect which it has not produced or attached as an Exhibit<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, is inadmissible expert testimony, is irrelevant, and is an improper legal opinion. |
| 9.  Terrestrial radio broadcasters (which pay no performance royalties whatsoever to the record industry for broadcasts of sound recordings) are Sirius XM's primary competitors and the dominant form of in-vehicle listening.  AM/FM radios are in every new and used car on the road, and radio stations blanket the country. Over 90% of Americans have access to and enjoy free terrestrial radio.  Many radio broadcasters now broadcast signals in high definition (HD) —a higher quality, digital version of traditional broadcast radio that is also available for free over the air.  Sirius XM's other competitors are non-interactive webcasting services, like Pandora, which are integrated into radios in dozens of vehicles, and like Sirius XM, offer nationwide, largely commercial-free access to a diverse genre of music and other content.<br><br>Evidence Cited by Sirius XM:<br>Declaration of David Frear, dated May 29, 2014 ("Frear Decl.") ¶ 17. | 9.  DISPUTED.  It is not clear which of its services that Sirius XM is referring to – satellite, internet, Dish, or Business Establishment.  In addition, 17 U.S.C § 114 provides for a digital performance right for post-1972 sound recordings.<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, is inadmissible expert testimony, is irrelevant, and is an improper legal opinion. |
| 10.  Sirius XM's predecessor companies, Sirius Satellite Radio Inc. ("Sirius") and XM Satellite | 10.  UNDISPUTED except to the extent this fact is intended to imply that Sirius |

| | |
|---|---|
| Radio Inc. ("XM"), were each first established more than twenty years ago. Sirius was based in New York and operated the Sirius satellite radio service, while XM was based in Washington, D.C. and operated the XM satellite radio service.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 7. | and XM launched their various services more than twenty years ago.<br><br>*See*<br>http://en.wikipedia.org/wiki/Sirius_XM_Radio |
| | |
| 11.  Sirius and XM each independently and concurrently developed the infrastructure necessary to create two separate satellite radio services offering uninterrupted programming nationwide to moving vehicles, including the design and manufacture of two separate and independent satellite networks, development of terrestrial repeater networks, and the invention of chipsets and radios capable of receiving satellite content from each respective network.  The total expenditures to do so were several billion dollars. XM commenced its satellite radio service in September 2001. Sirius commenced its satellite radio service in February 2002. In 2008, XM merged with a subsidiary of Sirius, which resulted in the formation of Sirius XM.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 8. | 11.  Flo & Eddie has no independent knowledge as to when each service launched; however, it does not dispute that Wiki page for Sirius XM Radio contains these dates.<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, and is irrelevant. |
| | |
| 12.  In 2008, XM merged with a subsidiary of Sirius, which resulted in the formation of Sirius XM. Sirius XM continues to operate the two separate satellite radio networks (the former legacy Sirius and legacy XM systems) because its millions of subscribers, at the time of the merger, had satellite radios capable of receiving only one or the other service, and the company could not cut off service on one or the other of the legacy networks without shutting off access to existing subscribers.  Thus, although Sirius XM is now one combined company, subscribers are still technically either a "Sirius" or "XM" subscriber depending on which platform's radio is installed in their particular automobile.  Sirius XM divides the production of its programming between its | 12.  UNDISPUTED, except that Sirius XM's activities are not limited to New York and Washington.<br><br>*See* Fact No. 3 |

| | |
|---|---|
| New York and Washington locations, and thus continues to maintain separate production and satellite uplink facilities in each city, although the same mix of channels is generally available to all subscribers regardless of which platform they are on and regardless of where the program was produced.<br><br>Evidence Cited by Sirius XM:<br>*See* Smith Decl. ¶ 7. | |
| | |
| 13.  The development and maintenance of Sirius XM's business, the technology required for Sirius XM's satellite broadcast systems and Internet streaming capabilities, and the broad variety of programming content provided by Sirius XM, all required the investment of billions of dollars and immense amounts of risk by investors and shareholders. Specifically, Sirius XM invested over $2.6 billion to acquire spectrum and build from scratch an entirely new category of service: nationwide satellite-delivered radios.  Sirius XM has expended additional billions maintaining, updating and replacing the three principal components of its satellite radio systems: (1) satellites, terrestrial repeaters and other satellite facilities related to the network uplink and transmission of the signal, (2) broadcast studios and (3) the "chipsets" and radios that enable subscribers to receive our content. Between 2005 and 2012, for example, Sirius XM spent approximately $1.5 billion on a complete replenishment of the satellite systems on both the Sirius and XM systems. Overall, this project cost the company approximately $1.5 billion.<br><br>Evidence Cited by Sirius XM:<br>Frear Decl. ¶¶ 4-6. | 13.  Flo & Eddie has no independent knowledge as to how much Sirius XM spent to develop its systems.<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, and is irrelevant. |
| | |
| 14.  Additional investments are also made in efforts to add new subscribers and retain existing ones. For example, from 2008-2013, Sirius XM's "subscriber acquisition costs" came to over $2.5 billion.<br><br>Evidence Cited by Sirius XM: | 14.  Flo & Eddie has no independent knowledge as to how much Sirius XM spent to develop its systems.<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, and is |

| | |
|---|---|
| *See* Frear Decl. ¶ 5. | irrelevant. |
| | |
| 15.  In 2012 and 2013, Sirius XM's operating expenses were $2.53 and $2.75 billion, respectively, including over $200 million spent each year in royalty payments to recording artists and owners of sound recordings pursuant to the Section 114 statutory license applicable to works protected by federal copyright law. Sirius XM's accumulated deficit as of year-end 2013 was $6.4 billion. From 2007 to 2012, Sirius XM experienced negative net income (in the aggregate) while paying the recording industry over $800 million in royalties.<br><br>Evidence Cited by Sirius XM:<br>Frear Decl. ¶ 5. | 15.  Flo & Eddie has no independent knowledge as to how much Sirius XM spent to develop its systems or how much it has paid in royalties or what the royalties were paid for.  However, Sirius XM has admitted that it paid no royalties in connection with its exploitation of pre-1972 recordings.<br><br>See Plaintiff's Fact No. 24<br><br>This fact is further objected to on the grounds that its lacks foundation, is not based on personal knowledge, and is irrelevant. |
| | |
| 16.  The musical group The Turtles began performing in 1965.  Volman and Kaylan were two of the five original members of the group.<br><br>Evidence Cited by Sirius XM:<br>FAC ¶ 2; Gerba Decl. Ex. 2 (Kaylan Tr. 43:14-21). | 16.  UNDISPUTED. |
| | |
| 17.  In early 1965, The Turtles signed a record deal with a record label known as White Whale Records ("White Whale"), pursuant to which White Whale created and owned a  series of sound recordings of The Turtles.<br><br>Evidence Cited by Sirius XM:<br>*See* Gerba Decl. Ex. 2 (Kaylan Tr. 36:16-24, 44:5-7); Ex. 3 (Cohen Tr. 45:12-19, 56:22-57:3). | 17.  DISPUTED.  White Whale did not create the recordings.<br><br>*See* Volman Decl., ¶¶ 2-7. |
| | |
| 18.  As a result of the settlement of litigation in the 1960s between members of The Turtles and White Whale, White Whale transferred ownership of The Turtles' sound recordings to those members.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 3 (Cohen Tr. 61:3-14). | 18.  UNDISPUTED, except that the fact is vague in its reference to "those members."<br><br>*See* Volman Decl., ¶¶ 2-7. |
| | |
| 19.  Subsequently, the three other members of the | 19.  UNDISPUTED, except that the fact is |

| | |
|---|---|
| band transferred ownership of The Turtles' sound recordings to Volman and Kaylan.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 2 (Kaylan Tr. 49:21- 51:10); Ex. 1 (Volman Tr. 43:10-18). | vague in its reference to "the three other members."<br><br>See Volman Decl., ¶¶ 2-7. |
| | |
| 20.  Plaintiff claims that Volman and Kaylan transferred ownership of The Turtles' sound recordings to Plaintiff around the time Plaintiff was formed in 1974.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 1 (Volman Tr. 44:7-10); Ex. 3 (Cohen Tr. 47:14-16). | 20.  UNDISPUTED.<br><br>See Volman Decl., ¶¶ 2-7. |
| | |
| 21.  Sirius XM's predecessors, Sirius and XM, began performing certain of The Turtles' sound recordings more than a decade ago.  Since July 1, 2009 (the operative date identified in the First Amended Complaint), Sirius XM has broadcast on its satellite radio service, and transmitted over its Internet radio service, 15 out of the 100 Pre-1972 Recordings by The Turtles listed on Schedule A to the First Amended Complaint. These recordings are:<br>1.  Ain't Gonna Party No More<br>2.  Elenore<br>3.  Happy Together<br>4.  House on the Hill<br>5.  It Ain't Me Babe<br>6.  Let Me Be<br>7.  Let the Cold Winds Blow<br>8.  She'd Rather Be With Me<br>9.  She's My Girl<br>10. The Last Thing I Remember<br>11. The Story of Rock and Roll<br>12. You Baby<br>13. You Don't Have to Walk in the Rain<br>14. You Know What I Mean<br>15. You Showed Me<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 12. | 21.  Flo & Eddie has no independent knowledge as to the full extent of Sirius XM's exploitation of its recordings.  The discovery in this case has been bifurcated between liability and damages and some of the information responsive to this fact will be discovered in the damages phase. |
| | |
| 22.  The vast majority of these tracks have been | 22.  Flo & Eddie has no independent |

| | |
|---|---|
| played on Sirius XM's "60s on 6" channel, with a handful played on The Loft, Deep Tracks, and Caricia channels.  Sirius XM does not know which channels its satellite radio listeners actually tune in, so it does not know how many listeners heard the broadcasts of the songs identified above, or where such listeners are located.  Since October 2011, Sirius XM has maintained specific counts of how many times each song it plays is streamed to a listener through its Internet radio service, although it does not know where those listeners are located.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 13 | knowledge as to the full extent of Sirius XM's exploitation of its recordings.  The discovery in this case has been bifurcated between liability and damages and some of the information responsive to this fact will be discovered in the damages phase. |
| | |
| 23.  Since July 1, 2009 (again, the operative date identified in the First Amended Complaint), other than the above-identified sound recordings, Sirius XM has not publicly performed any of the other Pre-1972 Recordings identified by Plaintiff on Schedule A to the First Amended Complaint.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 12 | 23.  DISPUTED.  To the extent that Sirius XM is drawing a distinction between itself and the various third parties who publicly perform recordings on its behalf, this fact is incomplete.  In addition, Flo & Eddie has no independent knowledge as to the full extent of Sirius XM's exploitation of its recordings.  The discovery in this case has been bifurcated between liability and damages and some of the information responsive to this fact will be discovered in the damages phase<br><br>*See* Plaintiff's Fact Nos. 22 and 23. |
| | |
| 24.  In order to deliver public performances of sound recordings, Sirius XM makes certain internal, incidental copies: (1) server copies (and backups of such in case of emergency) and (2) various temporary (and mostly fragmentary) copies—retained briefly in what are commonly referred to as buffers or caches—that assist in the transmission process and then are discarded.  Only the server copies are permanent, and none of the copies are accessible to subscribers in any way.  The copies exist as a result of modern broadcasting and webcasting technology because it is no longer possible to simply queue up a record or CD and broadcast it "live" without making such incidental copies, although the end | 24.  DISPUTED.<br><br>*See* Geller Decl. ¶ 7, Ex. 9 [Smith 2/11/14 Depo. 154:2-8]; Geller Decl. ¶ 8, Ex. 10 [Smith 3/12/14 Depo. 12:10-13:6, 17:3-6, 19:24-20:10]; Geller Decl. ¶ 9, Ex. 11 [Smith 3/12/14 Depo. 38:6-44:19]; Geller Decl. ¶ 11, Ex. 13 [Smith 2/11/14 Depo. 154:13-157:7, 73:3-77:19]; Geller Decl. ¶ 12, Ex. 14 [Smith 2/11/14 Depo. 158:2-165:15], [Smith 3/12/14 Depo. 51:11-55:14]; Geller Decl. ¶ 13, Ex. 15 [Smith 2/11/14 Depo. 18:6-25, 52:20-56:18], [Smith 3/12/14 Depo. 80:2-84:21]; Geller Decl. ¶ 14, Ex. 16 [Smith 2/11/14 Depo. |

| | |
|---|---|
| result—a radio-like transmission to the public—is basically identical to what has been offered by radio stations for decades.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 17 | 19:2-16, 114:15-117:11], [Smith 3/12/14 Depo. 88:2-91:16]; Geller Decl. ¶ 10, Ex. 12 [Smith 3/12/14 Depo. 60:8-62:11]); Geller Decl. ¶ 15, Ex. 17 [Smith 2/11/14 Depo. 92:7-97:7, 111:15-112:10, 118:22-120:2, 135:18-137:18, 138:7-13]; Geller Decl. ¶ 16, Ex. 15 [Smith 2/11/14 Depo. 178:16-179:17, 193:16-19; 214:9-19]; Geller Decl., ¶ 27, Ex. 29 [Frear Depo. 53:19-22]; *Webster's Third New International Dictionary* 1142 (1986) |
| | |
| 25.  Sirius XM maintains certain libraries of digital sound recording files (commonly called "server copies" or "ephemeral" copies) in order to effectuate its public performance of sound recordings.  The library located in New York, which is used in connection with channels programmed in New York, is known as the "Prophet" Database.  Sirius XM retains a backup copy of the Prophet database on site in New York so that service is not interrupted if there is a problem with the active database, and also keeps disaster recovery copies in Vernon, New Jersey, for the same purpose.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 18 | 25.  DISPUTED as to Sirius XM's characterization of its libraries as "ephemeral," and disputed to the extent it mischaracterizes the entirety of Sirius XM databases and libraries including the databases and libraries that it has given to third parties.<br><br>*See* Fact No. 24. |
| | |

| | |
|---|---|
| 26.  Sirius XM also maintains a server copy library in Washington, DC, called the "Dalet" database.  The first version was known as Dalet 5.1; the upgraded version is called Dalet Plus.  For those channels that have been migrated over to the upgraded system (which Sirius XM has been doing channel-by-channel since 2009) Dalet Plus contains the same tracks as Dalet 5.1, plus any new tracks added after the migration.  As with the Prophet library, Sirius XM maintains a backup copy of Dalet Plus in its Washington, DC facility and disaster recovery copies in Ellenwood, Georgia.   Both Prophet and Dalet are standard database tools marketed to, and used in, the broadcast radio industry.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 19 | 26.  DISPUTED as to Sirius XM's characterization of its libraries as "standard" and disputed to the extent it mischaracterizes the entirety of Sirius XM databases and libraries including the databases and libraries that it has given to third parties.<br><br>*See* Fact No. 24. |
| 27.  The original sound recording files in the Prophet database were added just prior to Sirius's 2002 launch, and created from CDs purchased through an account with the Virgin  Megastore.  Both Prophet and Dalet are standard database tools marketed to, and used in, the broadcast radio industry.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 19 | 27.  DISPUTED as to Sirius XM's characterization of its libraries as "standard" and disputed to the extent it mischaracterizes the entirety of Sirius XM databases and libraries including the databases and libraries that it has given to third parties.<br><br>*See* Fact No. 24.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge as to each of recordings in the libraries and databases. |
| 28.  Over the years, each database was supplemented with promotional CDs or digital downloads provided directly to Sirius and XM (and then the merged company) by record companies, recording artists, or their representatives for the purpose of obtaining airplay on  Sirius XM.  Such promotional distribution has become the source for the overwhelming majority of Sirius XM's new content, although Sirius XM may still occasionally purchase a copy of a recording that has not already been provided if its programmers wish to | 28.  DISPUTED to the extent it mischaracterizes the entirety of Sirius XM databases and libraries including the databases and libraries that it has given to third parties.<br><br>*See* Fact No. 24.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge as to each of recordings in the libraries and databases. |

| | |
|---|---|
| include the track in Sirius XM programming.<br><br>Evidence Cited by Sirius XM:<br>*See* Smith Decl. ¶ 22. | |
| 29.  Of the Pre-1972 Recordings identified by Plaintiff on Schedule A to the First Amended Complaint, only 14 have been copied onto servers in New York:<br>1. Ain't Gonna Party No More*<br>2. Elenore<br>3. Guide for the Married Man<br>4. Happy Together<br>5. House on the Hill*<br>6. I'm Chief Kamanawanalea*<br>7. It Ain't Me Babe<br>8. It Was A Very Good Year*<br>9. Let Me Be<br>10. She'd Rather Be With Me<br>11. She's My Girl<br>12. The Last Thing I Remember*<br>13. You Baby<br>14. You Showed Me<br><br>This list was compiled by examining the metadata related to the Prophet Database and identifying every track where the recording artist was The Turtles.  This list differs slightly from the performance list identified in paragraph 19 above, because some of those copies were made using server copies in the Dalet database in Washington. Only five of the songs (those marked with an asterisk above) were copied into the Prophet database after July 1, 2009, and only one ("I'm Chief Kamanawanalea") was copied into the Prophet database after January 1, 2012.<br><br>Evidence Cited by Sirius XM:<br>*See* Smith Decl. ¶ 23. | 29.  DISPUTED to the extent it mischaracterizes the entirety of Sirius XM databases and libraries including the databases and libraries that it has given to third parties and DISPUTED to the extent Sirius XM claims to be able to identify all pre-1972 recordings that have been copied.<br><br>*See* Fact No. 24 and <u>Plaintiff's</u> Fact No. 17.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge as to each of recordings in the libraries and databases. |
| 30.  Although it does not reside in New York, the Dalet Plus database (in Washington, DC) contains 71 of the Pre-1972 Recordings identified by Plaintiff on Schedule A to the First Amended Complaint.  Only 15 of these have ever actually been performed on the service. | 30.  DISPUTED to the extent it mischaracterizes the entirety of Sirius XM databases and libraries including the databases and libraries that it has given to third parties and DISPUTED to the extent Sirius XM claims to be able to identify all |

| | |
|---|---|
| Evidence Cited by Sirius XM:<br>*See* Smith Decl. ¶ 24. | pre-1972 recordings that have been copied.<br><br>*See* Fact No. 24 and <u>Plaintiff's</u> Fact No. 17.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge as to each of recordings in the libraries and databases. |
| 31.  For Sirius XM's Internet radio service (which consists primarily of "simulcasts" of the satellite radio channels, along with a few Internet-only channels), the standard stream is delivered via Akamai, which functions as a content delivery network.  Sirius XM does not provide a copy of any of its databases to Akamai.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 25. | 31.  DISPUTED to the extent it mischaracterizes the Sirius XM's Internet radio service as well as the databases and libraries including the databases and libraries that it has given to third parties.<br><br>See Fact Nos. 24 and 25.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |
| 32.  Sirius XM also provides content to certain mobile devices.  In addition to using Akamai as a distributor for the delivery of streams to mobile devices, Sirius XM utilizes QuickPlay in an intermediary role similar to that of Akamai.  Sirius XM does not provide a copy of any of its databases to QuickPlay.<br><br>Evidence Cited by Sirius XM:<br>*See* Smith Decl. ¶ 26. | 32.  DISPUTED to the extent it mischaracterizes the Sirius XM's Internet radio service as well as the databases and libraries including the databases and libraries that it has given to third parties. The fact is also disputed in that QuickPlay, with Sirius XM's authorization, makes copies Sirius XM's broadcasts.<br><br>*See* Fact Nos. 24 and 25.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |
| 33.  A small number of Sirius XM's channels and/or programs are produced in "remote" locations other than New York or Washington where certain DJs and/or producers reside (for Willie Nelson's channel in Austin, Texas, for example).  For some of those channels, Sirius XM | 33.  DISPUTED to the extent it mischaracterizes Sirius XM's databases and libraries including the databases and libraries that it has given to third parties.<br><br>See Fact Nos. 24 and 25 |

| | |
|---|---|
| has created a database of the recordings available in those channel libraries on the Prophet and Dalet servers (or, in some cases, just the "tips" and "tails" of such recordings, as described below) for the producer to use on-site to aid in programming the channel.  An example of this is the Elvis Presley channel, which is programmed in a studio at Graceland in Memphis, Tennessee: the producers of that program have a local database of the recordings available for play on that channel.  Another example is the remote database at the Rock & Roll Hall of Fame in Cleveland, Ohio, which contains a copy of one Turtles' song, "It Ain't Me Babe."  (Sirius XM's MusicMaster records indicate that song has been played only one time on that channel.)<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 27. | This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |
| 34.  As part of its Internet radio service, Sirius XM also offers a feature called MySXM, which allows users to fine-tune a particular Sirius XM channel by prioritizing their preferences.  After ranking their preferences, subscribers receive a more customized version of the channel reflecting those preferences (although never the choice of particular songs).<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 28. | 34.  UNDISPUTED. |
| 35.  Sirius XM has engaged Omnifone, a company based in the United Kingdom, to help develop and deliver MySXM to Sirius XM subscribers via PC applications and mobile devices.  To do so, Omnifone required a copy of the subset of the Sirius XM library of recordings used in the MySXM service.  Sirius XM delivered the initial library subset to Omnifone (in the United Kingdom) on a computer hard drive. | 35.  DISPUTED as to the characterization of Omnifone's activities, conduct, and requirements.  Omnifone is provided with a complete database of recordings whether or not it needs or uses those recordings.<br><br>See Geller Decl. ¶ 12, Ex. 14 [Smith 2/11/14 Depo. 158:2-165:15], [Smith 3/12/14 Depo. 51:11-55:14]; (Geller Decl., ¶ 16, Ex. 18 [Smith 2/11/14 Depo. 178:16- |

| | |
|---|---|
| Subsequent updates have been delivered to Omnifone from Sirius XM's Washington facilities via a private Internet connection. Omnifone was provided with 15 of Plaintiff's Pre-1972 Recordings. These include 14 of the 15 sound recordings identified in paragraph 14 above (not including "Let the Cold Winds Blow"), as well as "Guide for the Married Man." Omnifone does not use the server copies for any other purpose.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 29. | 179:14]<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |
| 36.  Sirius XM uses standard radio industry workstations that allow producers and on-air talent to pre-record "interstitials" in advance of a program being broadcast—typically, voiceover announcements by the DJ between songs as to what song just played, what song is starting, and the like.  To assure that an interstitial is timed properly during the cross-fade from song A to song B, the workstation will retrieve, from the library database, the last few seconds of song A (a "tail") and the first few seconds of song B (a "tip").  The host can listen to cross-fade from the tail and tip as she records her interstitial to make sure she has timed her voiceover properly; that interstitial (comprising solely the voice track) is recorded in the Sirius XM library and later inserted at the proper point when Sirius XM assembles and broadcasts the particular playlist of songs comprising the program.  The tips and tails themselves are not retained at the workstation after the interstitial is recorded.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 30. | 36.  DISPUTED to the extent it mischaracterizes "tips and tails" and their storage in Sirius XM's databases and libraries.<br><br>*See* Geller Decl. ¶ 13, Ex. 15 [Smith 2/11/14 Depo. 18:6-25, 52:20-56:18], [Smith 3/12/14 Depo. 80:2-84:21]. |
| 37.  Several hours in advance of broadcasting a playlist of recordings for a particular channel (a three-hour programming block, for example), Sirius XM's computer systems will  retrieve the songs comprising the playlist from the song library (following instructions pre-programmed | 37.  UNDISPUTED as to Sirius XM's use of a play-out server to make copies of each pre-1972 recording that it broadcasts. DISPUTED to the extent there is such a thing as "standard radio industry software" and to the extent that Sirius XM is trying to |

| | |
|---|---|
| by Sirius XM producers using standard radio industry software) and assemble the program, in order, on a "play-out server" located in New York or Washington (depending on the program). This process ensures that the songs will be ready for broadcast at the time they are needed, without network congestion delaying delivery of the song from the library at the time of broadcast. The program is cached on the play-out server only until the broadcast occurs, and at no time is it accessible to the public.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 31. | suggest by this fact that caching is not a copy or reproduction.<br><br>*See* Geller Decl. ¶ 14, Ex. 16 [Smith 2/11/14 Depo. 19:2-16, 114:15-117:11], [Smith 3/12/14 Depo. 88:2-91:16]<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge |
| 38.  When the time comes to broadcast the program, the broadcast signal (whether from Sirius XM's New York or Washington production facility) is transmitted from the respective play-out server to an "earth station," where it is uplinked to the satellites. The satellites actually transmit two streams of the programming, one with a four-second delay; Sirius XM does this so that if a user's radio loses contact with one transmission (for example, if it is blocked by an overpass or mountain), it can substitute the second transmission without interrupting the user's listening experience. To effectuate this process, the computers at the earth station buffer one of the transmissions for four seconds before uplinking it to the satellites. At no time does the buffer contain a complete copy of a sound recording—just rolling four-second fragments that are continuously overwritten during the course of the transmission on a "first-in, first-out" basis. There is no buffer on the satellite itself.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 32. | 38.  UNDISPUTED as to the use of earth stations and Sirius XM's creation of buffer copies.  DISPUTED to the extent that it mischaracterizes the buffer copies as fragments or something other than copies and reproductions. The entire song is copied as part of the buffering process.<br><br>*See* Geller Decl. ¶ 15, Ex. 17 [Smith 2/11/14 Depo. 92:7-97:7, 111:15-112:10, 118:22-120:2, 135:18-137:18, 138:7-13] |
| 39.  Sirius XM's Internet radio service offers a service called "Start Now," which allows a subscriber to start a program currently being broadcast at the beginning of the program. For example, if a user logs on to SiriusXM.com at 8:30 a.m., he can use the "Start Now" function to | 39.  UNDISPUTED except to the extent that Sirius XM is trying to suggest that caching is not a copy or reproduction. |

| | |
|---|---|
| listen to Howard Stern's show from the beginning, even though that program started at 6:00 a.m.  In order to make this functionality work, Sirius XM maintains a rolling, continuously updating five-hour cache of the transmission, which is overwritten on a first-in, first-out basis.  (Sirius XM does this itself for listeners accessing the Internet radio service on a PC; QuickPlay maintains the cache on behalf of Sirius XM for listeners accessing the service on mobile devices.)  This means that a listener can go back no more than five hours to "start now," and at no time can a listener choose a particular recording on demand—the transmission itself is the same non-interactive stream the person would hear "live."<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 33. | |
| | |
| 40.  None of the server copies made by Sirius XM and none of the temporary copies made by Sirius XM and its content-delivery partners is ever distributed to the public.  The copies are made solely to assist in Sirius XM's broadcasts and Internet streams to the public, and are similar to the types of copies made by radio stations since at least the 1990s.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 20. | 40.  DISPUTED. Sirius XM uses progressive download technology to deliver content to its Internet subscribers. That technology results in a copy being distributed.<br><br>*See* Geller Decl. ¶ 6, Ex. 8.; Geller Decl., ¶ 26, Ex. 28 [Smith 2/11/14 Depo. 203:18-204:10 http://en.wikipedia.org/wiki/Progressive_download<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |
| | |

| | |
|---|---|
| 41.  Sirius XM does not distribute tracks to its subscribers in the way that iTunes or other download sellers do, where purchasers retain a permanent copy of a song on their computers or mobile devices.  Nor does Sirius XM allow users to  download tracks temporarily, as do interactive subscription services like Rhapsody and Spotify—i.e., where users can listen to specific tracks of their choosing on demand as long as they remain subscribers.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 14. | 41.  DISPUTED.<br><br>*See* Fact No. 40.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge.<br><br>. |
| 42.  Sirius XM does allow users to cache (store temporarily in computer memory)  certain designated programs in their entirety—typically for thirty days or until their subscription  lapses, whichever is less—on their mobile devices.  This allows the users to "time shift" the program—i.e., to listen to it at a later time that is more convenient.  That functionality is limited, however, to selected non-music programming (news,  sports, and/or talk programming like the "Sirius XM Fantasy Baseball" show, for example); Sirius XM would offer it for music programs where permission has been obtained from the copyright owners, but in practice it has done so only on an extremely limited basis.  None of these programs include Plaintiff's Pre-1972 Recordings.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 15. | 42.  UNDISPUTED that Sirius XM allows its subscribers to make copies of programs. DISPUTED to the extent that Sirius XM is trying to suggest that caching is not a copy or reproduction.<br><br>*See* Fact No. 40.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |
| 43.  Sirius XM does not allow subscribers to download songs to their computers or mobile devices.  When subscribers use the Sirius XM "app" to listen on a mobile device, the device may buffer a second or two of the transmission to ensure a smooth, uninterrupted signal delivery. (This is similar to what standard FM car radios have done for years.) | 43.  DISPUTED.<br><br>*See* Fact No. 40.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |

| | |
|---|---|
| Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 34. | |
| | |
| 44.  In addition, a small number of Sirius XM satellite radios buffer up to 30 minutes of the programming on the channel to which the user is tuned.  Sirius XM does this to support its limited "replay" feature, which allows the subscriber to move back in the program (if, for example, the user got a phone call and missed a few minutes of the show). As with the buffers described above, this is a temporary, rolling buffer which is overwritten on a first-in, first-out basis.<br>If the user changes channels or turns off the radio, the buffer is erased.  Because the satellite technology is "one way," Sirius XM does not know which channels users listen to, and thus does not know which particular songs are buffered using this feature.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 35. | 44.  UNDISPUTED that Sirius XM creates copies and reproductions.  DISPUTED to the extent that it mischaracterizes the buffer copies as something other than copies and reproductions.  The entire song is copied as part of the buffering process. |
| 45.  Additionally, certain mobile devices that were marketed by Sirius XM in the past did allow users to save individual tracks on the devices for later listening (as they might do with a VCR or DVR).  Sirius XM did not know whether or how subscribers were actually using that capability (and therefore has no records showing which tracks were saved by users). Such activity is covered by the terms of a class action settlement discussed below at ¶¶ 86-93.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 16. | 45.  DISPUTED to the extent Sirius XM's characterization of the settlement is incorrect.  The settlement agreements set forth their terms and do not cover the claims in this case.<br><br>This fact is further objected to on the grounds that its lacks foundation and is not based on personal knowledge. |
| 46.  Plaintiff has been aware of the existence of Sirius XM for at least ten years.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 3 | 46.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations and laches is not a viable defense.  *See* |

| | Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
|---|---|
| | |
| 47.  Volman has been a subscriber of Sirius XM's satellite radio service for about seven years.  In addition, Cohen has been a subscriber for about five years.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 1; Gerba Decl. Ex. 3 | 47.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations and laches is not a viable defense.  *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 48.  Plaintiff has also been aware that Sirius XM plays tracks by The Turtles for over seven years.  Volman testified that he has been aware of that fact since he became a subscriber to Sirius XM over seven years ago.  Kaylan admitted he has been aware of that fact since he first learned about Sirius XM.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 1; Gerba Decl. Ex. 2 | 48.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations and laches is not a viable defense.  *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 49.  Prior to commencing this lawsuit and the related actions pending in the Central District of California and the Southern District of Florida, Plaintiff never asked Sirius XM to stop performing its Pre-1972 Recordings or to take a license from Plaintiff for its performances or copies of recordings made in aid thereof.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex.4 | 49.  UNDISPUTED that Sirius XM does not have a license from Flo & Eddie, DISPUTED to the extent that the evidence cited by Sirius XM does not support the fact.  In response to RFA 5 Plaintiff stated: "Plaintiff admits that because Sirius XM did not have a license to publicly perform The Turtles Pre-1972 Recordings, Plaintiff did not seek payment from Sirius XM for the public performance of the Turtles' Pre-1972 Recordings" and in response to RFA 7, Plaintiff stated "Plaintiff admits that because Sirius XM did not have a license to reproduce The Turtles Pre-1972 Recordings, Plaintiff did not seek payment from Sirius XM for creating server copies or intermediate, buffer, cache or other temporary copies of the Turtles' Pre-1972 Recordings."<br><br>This fact is further objected to on the grounds that it is irrelevant to any issue in |

| | |
|---|---|
| | the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, and Plaintiff has no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license. *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 50.  Redacted by Sirius XM | 50.  UNDISPUTED that Sirius XM does not have a license from The Orchard, DISPUTED to the extent that evidence cited by Sirius XM does not support the fact.  This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, and there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license. *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 51.  Between 2009 and 2014, Sirius XM has spent over $2 million per year (and more than $13 million in total) solely on operating expenses related to five channels that feature Pre- 1972 Recordings either exclusively ("40s on 4," "50s on 5," 60s on 6") or predominantly  ("Elvis Radio" and "Siriusly Sinatra").  Those amounts include personnel costs (producers, DJs and the like), as well as license fees paid to the Sinatra and Presley estates for use of the name, image, and likeness of each artist, associated trademarks, and certain other benefits; they do not take into account the additional costs associated with other channels on the service that regularly play Pre- 1972 Recordings (e.g., "Classic Vinyl," "Deep Tracks," "Real Jazz").  Sirius XM made those investments without any indication that many years later, Plaintiff would decide to allege that Sirius XM's use of Plaintiff's recordings violates state law, seeking hundreds of millions of dollars | 51.  Flo & Eddie has no independent knowledge as to the full extent of Sirius XM's expenditures.  The discovery in this case has been bifurcated between liability and damages and the information responsive to this fact will be discovered in the damages phase.  This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, and Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind. *See* Section VI in the Memorandum of Law in |

| | |
|---|---|
| in damages and exposing Sirius XM to alleged infringement liability.  Sirius XM did not accrue or reserve funds to cover such alleged damages for past use or to cover new license fees for ongoing use<br><br>Evidence Cited by Sirius XM:<br>*See* Frear Decl. ¶ 7. | Opposition to Sirius XM'S Motion. |
| | |
| 52.  Plaintiff's delay in asserting its claims against Sirius XM has impacted Sirius XM's positions in litigation before the Copyright Royalty Board and Sirius XM's relationship with SoundExchange, the recording industry's agent in the collection of royalties for copyrighted sound recordings created on or after February 15, 1972 ("Post-72 Recordings") under Section 106(6) of the Copyright Act.<br><br>Evidence Cited by Sirius XM:<br>Frear Decl. ¶ 8. | 52.  DISPUTED.  Sirius XM's 30(b)(6) witness testified that the decision not to license pre-1972 recordings was based solely on Sirius XM's legal analysis and nothing else.<br><br>*See* Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21.<br><br>This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, and Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind.  *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 53.  The rates Sirius XM pays for performances of Post-72 Recordings pursuant to statutory licenses available to eligible services under Sections 112 and 114 of the Copyright Act are set by adversarial litigation before the Copyright Royalty Board ("CRB").  Sirius XM has litigated two CRB proceedings, one in 2006-2007 (covering the 2007-2012 license period) and one in 2011-2012 (covering the 2013-2017 license period).<br><br>Evidence Cited by Sirius XM:<br>Frear Decl. ¶ 9. | 53.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, and Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind.  *See* Section VI in the Memorandum of Law in Opposition to |

| | Sirius XM'S Motion. |
|---|---|
| | |
| 54.  In 2007, the CRB ordered Sirius XM to pay a rate increasing from 6% of gross revenues (as defined) in 2007 rising gradually to 8% in 2012. In 2012, the CRB increased rates from 9% in 2013 rising to 11% by 2017.  There is no additional royalty obligation for Section 112 copies; the regulations simply attribute 5% of the Section 114 payments to the Section 112 license.  Evidence Cited by Sirius XM: *See* Frear Decl. ¶ 10. | 54.  UNDISPUTED that the CRB issued two orders setting the rates owed by Sirius XM for its exploitation of post-1972 recordings.  DISPUTED to the extent that Sirius XM mischaracterizes the CRB orders, which are publicly available and speak for themselves.  *See* http://www.loc.gov/crb/proceedings/2006-1/sdars-final-rates-terms.pdf; https://www.federalregister.gov/articles/2013/04/17/2013-08657/determination-of-rates-and-terms-for-preexisting-subscription-services-and-satellite-digital-audio; http://www.loc.gov/crb/fedreg/2013/78fr31842.pdf |
| | |
| 55.  Because Sirius XM pays for the federal statutory license under a percentage of revenue, it needed a way to reduce its revenue (and thus its payments to SoundExchange) to  account for the proportion of its subscription fees attributable to the performance of Pre-1972  Recordings that are not covered by the Section 114 license.  In the 2007 proceeding, the CRB adopted a definition of revenue that exempted revenues from programming  "exempt from any license requirement" or "separately licensed."  Sirius XM understood the former to allow a deduction from revenue on account of performances of  Pre-1972 Recordings (which are not subject to any "license requirement") and reduced its  revenue base to reflect such performances.  Specifically, Sirius XM used a  straight pro-ration: if 12% of plays of sound recordings in a particular month were pre-1972, it reduces the revenue base—and thus the payment to SoundExchange—by 12%. Sirius XM did so because it believed that to be the most reasonable and logical way to implement the above-mentioned revenue exclusion; but the issue of how to account for performances of Pre-1972 Recordings was not the | 55.  UNDISPUTED that the CRB issued two orders setting the rates owed by Sirius XM for its exploitation of post-1972 recordings.  DISPUTED to the extent that Sirius XM mischaracterizes the proceedings, the evidence, and the CRB orders, all of which are publicly available and speak for themselves.  *See* http://www.loc.gov/crb/proceedings/2006-1/index.html#documents http://www.loc.gov/crb/proceedings/2011-1/ http://www.loc.gov/crb/proceedings/2006-1/sdars-final-rates-terms.pdf; https://www.federalregister.gov/articles/2013/04/17/2013-08657/determination-of-rates-and-terms-for-preexisting-subscription-services-and-satellite-digital-audio; http://www.loc.gov/crb/fedreg/2013/78fr31842.pdf  This fact is further objected to on the |

| | |
|---|---|
| focus of either side's trial presentation before the CRB, and the Copyright Royalty Judges therefore did not explicitly identify the specific mechanism a service should use to reduce its revenue base on account of such performances.<br><br>Evidence Cited by Sirius XM:<br>Frear Decl. ¶ 11. | grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, and Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind.  *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 56.  In 2012, SoundExchange sued Sirius XM, asserting that the definition adopted by the CRB in 2007 did not allow for this type of deduction, and that Sirius XM should have paid SoundExchange, under the federal statutory license, for the very same performances for which the Plaintiff here seeks license fees and damages pursuant to *state* law.<br><br>Evidence Cited by Sirius XM:<br>Frear Decl. ¶ 12. | 56.  UNDISPUTED that SoundExchange sued Sirius XM in 2013.  DISPUTED to the extent that Sirius XM mischaracterizes the allegations in that case. DISPUTED that SoundExchange seeks damages for "the very same performances for which the Plaintiff here seeks license fees and damages pursuant to state law," and DISPUTED as to Sirius XM's position in that case.<br><br>*See SoundExchange, Inc. v. Sirius XM Radio, Inc*, 1:13-cv-01290 (S.D.N.Y. 2013) (Dkts 1, 13-1, 17, 20)<br><br>This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, and it is improper attempt to litigate another case in the context of this motion. *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 57.  Had Plaintiff pursued its claims in a timely fashion, after Sirius XM's 2001/2002 launch, and had it been determined then whether or not Sirius XM's performances of Pre-1972 Recordings required licenses under state law, Sirius XM would have had reason to address the matter before the CRB, and to put forth a more detailed proposal as to how performances of Pre- 1972 | 57.  DISPUTED. Sirius XM's 30(b)(6) witness testified that the decision not to license pre-1972 recordings was based solely on Sirius XM's legal analysis and nothing else.<br><br>*See* Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21. |

| | |
|---|---|
| Recordings should be addressed in setting and calculating fees under the federal license. The resulting ruling might have avoided the lack of specificity in the regulations that SoundExchange has seized on to sue Sirius XM (however groundlessly), and thus avoided the issue Sirius XM now confronts:  Plaintiff pressing for payment under state law while its agent presses for payment for the exact same performances under federal law.  This is exactly what happened in the 2011-2012 proceeding, where Sirius XM proposed, and the Judges adopted, a more specific crediting mechanism both for performances of Pre-1972 Recordings and performances licensed directly from the copyright owner—something Sirius XM recommended after SoundExchange raised the issue with it.<br><br>Evidence Cited by Sirius XM:<br>*See* Frear Decl. ¶ 13. | This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, and Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind.  *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| | |
| 58.  Had Plaintiff (or any other record company) ever established a cognizable right in public performances of Pre-1972 Recordings as a matter of state law, the Judges might also have factored any compensability of such performances into the rates they set, and adjusted the federal license rate downward to reflect the additional royalty burden being placed on Sirius XM at the state level. The rate-setting standard guiding the Judges required them to take into account the possibility of "disruption" to Sirius XM arising out of the royalty fees.  17 U.S.C. § 801(b)(1)(D).<br><br>Evidence Cited by Sirius XM:<br>Frear Decl. ¶ 14. | 58.  DISPUTED. Sirius XM's 30(b)(6) witness testified that the decision not to license pre-1972 recordings was based solely on Sirius XM's legal analysis and nothing else.<br><br>*See* Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21.<br><br>This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind, and is improper speculation as to what the Judges in the CRB proceedings might or might not have done.  *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |

| | |
|---|---|
| 59.  Sirius XM might have also determined to stop broadcasting Pre-1972 Recordings altogether (or at least the small number of Turtles tracks it plays), thus preventing Sirius XM from incurring liability year after year.  Or Sirius XM might have worked out an arrangement with SoundExchange whereby Sirius XM could pay SoundExchange for such tracks along with its payment for Post-72 Recordings—thus avoiding the need to locate and negotiate separately with every single owner of Pre-1972 Recordings. This is the position SoundExchange has advocated on Capitol Hill and that is about to be introduced as a new bill in Congress. | 59.  DISPUTED. Sirius XM's 30(b)(6) witness testified that the decision not to license pre-1972 recordings was based solely on Sirius XM's legal analysis and nothing else. |
| | *See* Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21. |
| Evidence Cited by Sirius XM: Frear Decl. ¶ 15. Exs. C and D | This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind, is improper speculation, and misstates the role of SoundExchange.  *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
| 60.  Because Plaintiff waited so long to assert its state law claims, Sirius XM did not do any of those things—and now finds itself a defendant not only in this litigation, but in a lawsuit by SoundExchange as well. | 60.  DISPUTED. Sirius XM's 30(b)(6) witness testified that the decision not to license pre-1972 recordings was based solely on Sirius XM's legal analysis and nothing else. |
| | *See* Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21. |
| Evidence Cited by Sirius XM: Frear Decl. ¶ 16. | This fact is further objected to on the grounds that it is irrelevant to any issue in the case because Flo & Eddie's claims are timely under the applicable statute of limitations, laches is not a viable defense, there is no legal obligation to ask Sirius XM to stop performing its Pre-1972 Recordings or to take a license, Sirius XM is barred under *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) from testifying as to its state of mind, is |

| | improper speculation, and misstates the role of SoundExchange. *See* Section VI in the Memorandum of Law in Opposition to Sirius XM'S Motion. |
|---|---|
| 61.  Neither Volman nor Kaylan has read the Complaint or First Amended Complaint  in this action.  Kaylan's "only understanding" of why this suit was filed is that "we weren't paid" royalties by Sirius XM.  Volman also responded that he was "not sure" why Plaintiff sued Sirius XM.  After a break requested by his counsel, he added that "attention needed to be brought" to the fact that owners of Pre-1972 Recordings do not receive performance royalties.<br><br>Evidence Cited by Sirius XM:<br>*See* Gerba Decl. Exs. 1 and  2 | 61.  This is not a fact.  It is argument. DISPUTED to the extent the evidence cited does not support the "fact."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| 62.  Volman and Kaylan were also not provided a copy of the document requests served by Sirius XM in this action, nor, at the time of their deposition, had they searched their files for any documents relating to this action.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 1 | 62.  This is not a fact.  It is argument. DISPUTED to the extent the evidence cited does not support the "fact" and is misleading. Volman, for example, made clear that he does not maintain business records of the kind sought by the request.<br><br>*See* Gerba Decl., Ex. 1 (Volman Tr. 23:14-24:8).<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| | |

| | |
|---|---|
| 63.  Plaintiff's only licensing activities are limited to (a) licensing various entities to sell copies of certain of The Turtles' sound recordings on albums, CDs and other physical media; (b) licensing producers to include some of The Turtles' sound recordings in the soundtracks of movies, television programs, and commercial advertisements; and (c) licensing certain digital uses of The Turtles' sound recordings through The Orchard.<br><br>Evidence Cited by Sirius XM:<br>*See* Gerba Decl. Ex. 3 | 63.  UNDISPUTED that Plaintiff licenses its recordings.  DISPUTED in that the fact misstates the scope of the testimony or the scope of Plaintiff's licensing activities.<br><br>*See* Volman Decl., ¶ 7.<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity. |
| | |
| 64.  Redacted by Sirius XM | 64.  UNDISPUTED. |
| | |
| 65.  Since they were recorded in the 1960s and 1970s, The Turtles' sound recordings have been played on terrestrial radio stations, and Plaintiff has been aware of these performances for nearly fifty years.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 4 (RFA Response No. 9). | 65.  UNDISPUTED that The Turtles' recordings have been played on radio. DISPUTED to the extent it mischaracterizes the cited evidence.  In response to RFA 9, Plaintiff admitted that "although it does not have records showing that Broadcast Radio Stations publicly perform the Turtles' Pre-1972 Recordings in the states of Florida, California, and New York, it is likely that some or all of The Turtles Pre-1972 Recordings were publicly performed by Broadcast Radio Stations in those states."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| | |
| 66.  Radio stations have not obtained licenses for these performances from Plaintiff or otherwise.  At no point since the creation of Plaintiff's sound recordings have any terrestrial radio broadcasters taken a license to publicly perform these tracks.<br><br>Evidence Cited by Sirius XM:<br> Gerba Decl. Ex. 3, Ex. 4 (RFA Response No. 10) | 66.  DISPUTED to the extent that it mischaracterizes the cited evidence.  In response to RFA 10, Plaintiff admitted that "it has not granted a license to any Broadcast Radio Station to publicly perform the Turtles' Pre-1972 Recordings."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial |

|  | to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity. |
|---|---|
| 67.   Redacted by Sirius XM. | 67.  DISPUTED to the extent that it mischaracterizes Plaintiff's relationship with The Orchard.<br><br>*See* Volman Decl. ¶ 7.<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, constitutes improper opinion testimony, the witness is not qualified as an expert,  and because Plaintiff has no legal obligation to license any particular person or activity. |
| 68.  Plaintiff has also never issued a license to any terrestrial radio broadcaster to make reproductions of Plaintiff's Pre-1972 Recordings in order to publicly perform such recordings.<br><br><u>Evidence Cited by Sirius XM:</u><br>Gerba Decl. Ex. 3, Ex. 4 (RFA Response No. 15). | 68.  DISPUTED to the extent it mischaracterizes the cited evidence. UNDISPUTED that in response to RFA 10, Plaintiff admitted that it "has not granted a license to any Broadcast Radio Station to create server copies or intermediate, buffer, cache or other temporary copies of the Turtles' Pre-1972 Recordings."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity. |
| 69.  Despite decades of performances of The Turtles' sound recordings by radio stations, Plaintiff has never sued any radio station for publicly performing The Turtles' sound recordings or for making reproductions to aid those performances.  Plaintiff has never contacted even a single radio station to request compensation for public performances of The Turtles' tracks.<br><br><u>Evidence Cited by Sirius XM:</u> | 69.  UNDISPUTED that Plaintiff has not sued a radio station prior to this litigation.<br><br>This fact is objected to on the grounds that it is argument, irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity or to sue any particular person. |

| | |
|---|---|
| Gerba Decl. Ex. 2,  Ex. 3 (RFA Response Nos. 17, 18). | |
| | |
| 70.  Kaylan doubts that radio plays of The Turtles' sound recordings cause Plaintiff to lose any sales.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 2 | 70.  DISPUTED to the extent it mischaracterizes the testimony.  The witness testified he was guessing. |
| | |
| 71.  Webcasting services are media providers that stream audio or video content over the Internet, such as Internet radio or other online streaming services.  Webcasting services have publicly performed The Turtles' sound recordings since the 1990s.<br><br>Evidence Cited by Sirius XM:<br>L.M. Brownlee, *IP  Due Diligence in Corp. Transactions* § 8:87 (Westlaw 2014); Gerba Decl. Ex. 4 (RFA Response No. 20); Brian Flavin, Comment, *A Digital Cry for Help: Internet Radio's Struggle to Survive A Second Royalty Rate Determination Under the Willing Buyer/Willing Seller Standard*, 27 St. Louis U. Pub. L. Rev. 427, 428 (2008). | 71.  UNDISPUTED that webcasters stream content over the Internet.  DISPUTED to the extent that it mischaracterizes the cited evidence.  In response to RFA 20, Plaintiff admitted "that it does not have records showing that Webcasters publicly performed the Turtles' Pre-1972 Recordings in the states of Florida, California, and New York but it believes that some or all of The Turtles Pre-1972 Recordings were publicly performed by Webcasters in those states."<br><br>This fact is further objected to on the grounds that with the exception of RFA No. 20, the cited evidence is not evidence but so-called legal authorities. |
| | |
| 72.  Plaintiff has been aware that webcasting services have been publicly performing its Pre-1972 Recordings since at least 2000.<br><br> Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 4 (RFA Response No. 20). | 72.  *See* No. 71. |
| | |
| 73.  Webcasting services have not obtained licenses for their public performances of Plaintiff's Pre-1972 Recordings, and Plaintiff has not sought any such licenses.<br><br>Evidence Cited by Sirius XM:<br>*See* Gerba Decl. Ex. 1; Ex. 4 (RFA Response No. 21); Redacted by Sirius XM | 73.  DISPUTED to the extent that it mischaracterizes the cited evidence.  In response to RFA No. 21, Plaintiff admitted "that it has not granted a license to a Webcaster to publicly perform the Turtles' Pre-1972 Recordings."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal |

| | obligation to license any particular person or activity. |
|---|---|
| 74.  Plaintiff has never issued a license to any webcasting service to make reproductions of Plaintiff's sound recordings in order to publicly perform such sound recordings.<br><br>Evidence Cited by Sirius XM:<br>*See* Gerba Decl. Ex. 4 (RFA Response No. 23); Ex. 2. | 74.  DISPUTED to the extent that it mischaracterizes the cited evidence.  In response to RFA No. 23, Plaintiff admitted that "it has not granted a license to a Webcaster to reproduce the Turtles' Pre-1972 Recordings."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity. |
| 75.  Plaintiff has never filed a lawsuit against any webcasting service for publicly performing The Turtles' sound recordings or making reproductions in aid of those performances<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 4 (RFA Response Nos. 25, 26). | 75.  UNDISPUTED, except that Sirius XM mischaracterizes the admissions by adding the phrase "in aid of those performances."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity or to sue any particular person. |
| 76.  Physical establishments (as used herein, connoting spaces open to the public like retail stores, bars, restaurants, or fitness centers) have not obtained licenses for their public performances of Plaintiff's sound recordings nor been requested to do so.<br><br> Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 4 (RFA Response No. 29);[Redacted by Sirius XM] | 76.  DISPUTED to the extent that it mischaracterizes the cited evidence.  In response to RFA No. 29, Plaintiff only admitted "that it has not granted a license to a Public Establishment to publicly perform the Turtles' Pre-1972 Recordings."<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity. |
| 77.  Plaintiff has never filed a lawsuit against any physical establishment for publicly performing its Pre-1972 Recordings without a license. | 77.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue |

| | |
|---|---|
| <u>Evidence Cited by Sirius XM:</u><br>Gerba Decl. Ex. 4 (RFA Response No. 31). | in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity. |
| | |
| 78.  Redacted by Sirius XM. | 78.  UNDISPUTED as to data.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion, and because Plaintiff has no legal obligation to license any particular person or activity. |
| | |
| 79.  Plaintiff is unable to identify any cognizable harm or loss it has suffered as a result of Sirius XM's public performance of Plaintiff's Pre-1972 Recordings.<br><br><u>Evidence Cited by Sirius XM:</u><br>Gerba Decl. Ex. 1. | 79.  DISPUTED.  The cited evidence does not state that Plaintiff is unable is identify any cognizable harm.  In addition, discovery in this case has been bifurcated between liability and damages and the information responsive to this fact will be discovered in the damages phase.  Also, pursuant to New York law, the harm suffered by Plaintiff includes Sirius XM's revenues which are not addressed by the cited deposition questions and cannot be addressed until discovery is allowed. Finally, the cited testimony is only that of Mark Volman, and does not represent the comprehensive knowledge, understanding or position of Plaintiff, a corporation, or any experts that will be retained at the appropriate time. |
| | |
| 80.  Plaintiff does not consider itself a competitor of Sirius XM.<br><br> <u>Evidence Cited by Sirius XM:</u><br>Gerba Decl. Ex. 2. | 80.  DISPUTED.  The cited evidence only states that Flo & Eddie is not a satellite provider.  However, Sirius XM and Flo & Eddie are competitors in that they both sell and disseminate The Turtles' music.  *Arista Records LLC v. Lime Grp. LLC,* 784 F. Supp. 2d 398, 437 (S.D.N.Y. 2011).<br><br>*See* Volman Decl. ¶ 7.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion because New York law does not require actual competition.  *Metro. Opera Ass'n v.* |

|  | *Wagner-Nichols Recorder Corp.*, 199 Misc. 786 (Sup. Ct. 1950).; *Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. LEXIS 16165 *36 (S.D.N.Y. Aug. 28, 2002). |
|---|---|
| 81.  In response to whether or not Plaintiff has lost any sales due to Sirius XM playing The Turtles' sound recordings, Kaylan conceded that he did not "know why it would cause anything one way or another to lose or gain," or how Sirius XM's activities "would affect sales particularly." Volman also admitted that he could not identify a single lost sale caused by Sirius XM playing The Turtles' sound recordings, and that he was unaware of any evidence that Sirius XM has impaired Plaintiff's ability to sell or license The Turtles' sound recordings.   Neither Cohen [redacted by Sirius XM] could identify any license fees or sales lost by Plaintiff as a result of Sirius XM's activities.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Exs. 1, 2, and 3. [redacted by Sirius XM] | 81.  DISPUTED to the extent it mischaracterizes the testimony.  The cited evidence does not state that Plaintiff is unable to identify any cognizable harm.  In addition, discovery in this case has been bifurcated between liability and damages and the information responsive to this fact will be discovered in the damages phase.  Also, pursuant to New York law, the harm suffered by Plaintiff includes Sirius XM's revenues which are not addressed by the cited deposition questions and cannot be addressed until discovery is allowed.<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion as lost sales and lost license fees are not the totality of damages under New York law. |
| 82.  When directly asked to identify evidence to support allegations in its Amended Complaint related to how it has been harmed by Plaintiff's activities, Plaintiff could not do so.  For example, with respect to its allegation at paragraph 46 of the Amended Complaint that Sirius XM's activities place "downward pressure on the licensing fees Plaintiff is able to charge," Plaintiff could not identify a single instance of such a phenomenon, claimed that its digital licensing is handled by The Orchard, and instead offered several unsupported assertions about the effects of "piracy" on the music industry. When asked to provide specific instances where Sirius XM "diverted" to itself income that otherwise would have collected by Plaintiff in the form of sales (as alleged in paragraph 46 of the Amended Complaint), Plaintiff again responded with generalities about cost savings to "pirates" and the general shift from physical to digital music— | 82.  This is not a fact.  It is argument.  The cited evidence does not state that Plaintiff is unable is identify any cognizable harm.  Plaintiff responded that "Pirated music necessarily competes with and displaces the legitimate market for music.  In addition, suppliers of pirated music are able to provide music to consumers at a reduced or diminished price because they are not incurring all of the licensing costs and fees that are being incurred by suppliers of fully licensed and authorized music.  Also, as the market for music transitions from physical to digital, the revenue that is lost on the physical side of the business (i.e. sales of physical product) is not replaced on the digital side unless digital suppliers license and pay for the music they are supplying.  Finally, Plaintiff has not received licensing fees or royalties from Sirius XM that |

| | |
|---|---|
| again without citing any factual support for the assertions or evidence of actual "diversion" by Sirius XM. In its response to Sirius XM's request to identify specific instances of "lost license fees" and "lost sales" caused by Sirius XM's activities (as also alleged in paragraph 46 of the Amended Complaint), Plaintiff was unable to do so.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 27 (Defendant Sirius XM Radio Inc.'s First Set of Interrogatories ("ROG Response") No. 6, Florida Action). Gerba Decl. Ex. 27 (ROG Response Nos. 7 and 8) | should have been paid by Sirius XM in connection with its use and exploitation of Plaintiff's recordings."  In addition, discovery in this case has been bifurcated between liability and damages and the information responsive to this fact will be discovered in the damages phase.  Also, pursuant to New York law, the harm suffered by Plaintiff includes Sirius XM's revenues which are not addressed by the cited evidence and cannot be addressed until discovery is allowed.<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion as lost sales and lost license fees are not the totality of damages under New York law. |
| 83.  Plaintiff admits that it has no evidence of and is unaware of any actual confusion between Plaintiff and Sirius XM as a result of Sirius XM's use of The Turtles' sound recordings.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 27 (ROG Response No. 5). | 83.  UNDISPUTED that Plaintiff is not presently aware of actual confusion.<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion as "actual confusion between Plaintiff and Sirius XM" is not required under New York law. |
| 84.  Kaylan admitted that he does not believe that when an artist's recording is played by Sirius XM, the artist is sponsoring Sirius XM.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 2 (Kaylan Tr. 106:4-18). | 84.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| 85.  Plaintiff currently does not undertake any efforts, and does not expend any money, on the promotion of The Turtles' sound recordings.  This is also true for the decade following Plaintiff's receipt of sole ownership of The Turtles sound recordings.  However, Plaintiff acknowledges the promotional impact of radio plays on its ability to sell its sound recordings.<br><br>Evidence Cited by Sirius XM: | 85.  DISPUTED.  The quoted testimony is not as sweeping "any efforts." as the statement and is focused on the present as opposed to the entirety of the last 50 years.<br><br>See Volman Decl. ¶¶ 2-7.<br><br>This fact is further objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion |

| | |
|---|---|
| *See* Gerba Decl. Ex. 1 (Volman Tr. 47:19-23) Gerba Decl. Ex. 2 (Kaylan Tr. 73:12-22) (Kaylan Tr. 71:7-22 | as promotional activity is not a defense to infringement or misappropriation. |
| | |
| 86.  Sirius XM previously manufactured certain mobile devices that allowed users to  save individual tracks on the devices for later listening (as they might do with a VCR or DVR).  These devices, however, are no longer produced.<br><br>Evidence Cited by Sirius XM:<br>Smith Decl. ¶ 16.. | 86.  UNDISPUTED except that Flo & Eddie has no independent knowledge as to whether Sirius XM currently manufactures these devices. |
| | |
| 87.  These devices were the subject of two class action litigations: *In re XM Satellite Radio Copyright Litigation* and *Nota Music Publishing, Inc., et al. v. Sirius Satellite Radio Inc.*  (the "Device Actions").  At issue in the Device Actions  was the fact that these recording devices allegedly infringed the copyrights of musical composition and sound recording copyright owners.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 28 (Stipulation and Agreement of Settlement, *In re XM  Satellite Radio Copyright Litigation*, No. 06 CV 3733 (LAK) (S.D.N.Y. Nov. 15, 2010), Dkt. No. 109-1 ("XM Settlement Agreement")); Ex. 29 (Stipulation and Agreement of Settlement,  *Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc.*, No. 07 CV 6307 (AKH) (S.D.N.Y. May 13, 2011), Dkt. No. 43-1 ("Sirius Settlement Agreement")); Gerba Decl. Ex. 28 (XM Settlement  Agreement at 1-2); Ex. 29 (Sirius Settlement Agreement at 1-2). | 87.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| | |
| 88.  The Device Actions were settled pursuant to two separate written settlement agreements, and under each agreement members of the settlement class completely released  Sirius and XM from any liability, damages, or other claims—including future claims—arising  from the conduct at issue in the Device Actions.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 28 (XM Settlement Agreement | 88.  The settlement agreements set forth their terms and do not cover the claims in this case.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |

| | |
|---|---|
| ¶ 54); Ex. 29 (Sirius Settlement Agreement ¶ 49). | |
| | |
| 89.  The settlement class is defined the same way in each of the Device Actions as:  "All persons or entities who own or control (in whole or in part) exclusive rights in at least one sound recording protected under federal copyright law and/or state common law and/or unfair competition law that was transmitted by the [XM or Sirius] Service at least once during the time period from March 30, 2006 to the date of Preliminary Approval."<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 28 (XM Settlement Agreement ¶ 49); Ex. 29 (Sirius Settlement Agreement ¶ 44) (defining period as from November 1, 2005 to the date of Preliminary Approval). | 89.  The settlement agreements and the relevant court orders set forth their terms and do not cover the claims in this case.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| | |
| 90.  Plaintiff is a member of the settlement class.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 28 (XM Settlement  Agreement ¶ 49); Ex. 29 (Sirius Settlement Agreement ¶ 44). | 90.  The settlement agreements and the relevant court orders set forth their terms and do not cover the claims in this case.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| | |
| 91.  The settlement in In re XM Satellite Radio Copyright Litigation received final approval from the Court on March 22, 2011, and the settlement in Nota Music Publishing, Inc., et al. v. Sirius Satellite Radio Inc. received final approval from the Court on January 9, 2012.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 30 (Final Order and Judgment, In re XM Satellite Radio Copyright Litigation, No. 06 CV 3733 (LAK) (S.D.N.Y. Mar. 22, 2011), Dkt. No. 123 ("XM Final Order and Judgment")); Ex. 31 (Final Order and Judgment, Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc., No. 07 CV 6307 (AKH) (S.D.N.Y. Jan. 9, 2012), Dkt. No. 57 ("Sirius Final Order and Judgment")). | 91.  UNDISPUTED.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |
| | |
| 92.  The Court's orders granting final approval in | 92.  The settlement agreements and the |

| | |
|---|---|
| each of the Device Actions contained language permanently barring all members of the settlement class from commencing a proceeding against the Device Actions defendants on any of the claims brought in the Device Actions, and releasing the Device Actions defendants from all such future claims.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 30 (XM Final Order and Judgment ¶ 12); Ex. 31 (Sirius Final Order and Judgment ¶ 11). | relevant court orders set forth their terms and do not cover the claims in this case.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion |
| | |
| 93.  Plaintiff did not opt out of the settlement class.  It thus remains subject to the settlement agreements in the Device Actions, and is barred from bringing any claims brought in the Device Actions against the Device Actions defendants.<br><br>Evidence Cited by Sirius XM:<br>Gerba Decl. Ex. 30 (XM Final Order and Judgment, Exhibit A); Ex. 31 (Sirius Final Order and Judgment, Exhibit A). | 93.  The settlement agreements and the relevant court orders set forth their terms and do not cover the claims in this case.<br><br>This fact is objected to on the grounds that it is irrelevant and immaterial to any issue in connection with this motion. |

**PLAINTIFF'S**
**STATEMENT OF UNCONTESTED MATERIAL FACTS**

| Statement of Uncontested Fact | Evidence in Support of Stated Fact |
|---|---|
| 1. Sirius XM considers pre-1972 sound recordings to be in the public domain. | Declaration of Harvey Geller ("Geller Decl.") ¶ 4, Ex. 3 [Deposition of David Frear ("Frear Depo.") 25:19:21, 75:13-76:2]; Geller Decl. ¶ 5, Ex. 4 [Frear Depo. 35:13-36:12] |
| | |
| 2. The Turtles were formed in 1965 by Howard Kaylan, Mark Volman, Don Murray, Al Nichol, Charles Portz and Jim Tucker. | Declaration of Mark Volman ("Volman Decl."), filed in the California Action, ¶ 2. |
| | |
| 3. White Whale Record Co., Inc. ("White Whale") signed The Turtles to a recording agreement on May 24, 1965. Murray and Portz left the group in 1965 and were subsequently replaced by John Barbata and James Pons. In 1969, John Seiter replaced Barbata. | Volman Decl., ¶ 2. |
| | |
| 4. The Turtles recorded a number of hit songs in the 1960s, including the iconic song "Happy Together." | Volman Decl., ¶ 3. |
| | |
| 5. In 1970, The Turtles filed a lawsuit against White Whale claiming that it had systematically underpaid them royalties that they were owed from the exploitation of The Turtles' recordings. Subsequently, the parties agreed to a settlement of the litigation. As part of that settlement and in exchange for a release and waiver of claims by The Turtles (including a waiver of the large amount of underpaid royalties owed to The Turtles), White Whale transferred to Kaylan, Volman, Nichol, Seiter and Pons all right, title and interest in and to the original master recordings of The Turtles. This transfer included the 100 master recordings listed on Exhibit A to the Complaint in the California Action. | Volman Decl., ¶¶ 4 and 5. |
| | |
| 6. On May 1, 1971, in exchange for payments from Kaylan and Volman, Nichol, Seiter, and Pons transferred all of their right, title, and interest in and to The Turtles' master recordings and the name The Turtles to Kaylan and Volman. | Volman Decl. ¶ 6. |
| | |

| | |
|---|---|
| 7.  Kaylan and Volman transferred all of the rights to The Turtles' master recordings to Flo & Eddie, Inc., a corporation created in 1971 and owned and controlled by them. | Volman Decl. ¶ 7. |
| | |
| 8.  For the last four decades, Flo & Eddie has been exploiting The Turtles master recordings by, among other things, licensing the rights to make and sell records and licensing the rights for The Turtles recordings to be used in movies, TV shows, and commercials.  Flo & Eddie has also licensed The Turtles recordings to The Orchard to be exploited digitally, including through the iTunes and Amazon stores. | Volman Decl., ¶ 7. |
| | |
| 9.  Kaylan and Volman continue to devote their time and effort to promoting The Turtles and their music, and have been the main act on annual summer tours, such as the "Happy Together Tour," which features The Turtles and other musical groups from the 1960s. | Volman Decl. ¶ 7. |
| | |
| 10.  Sirius XM claims to be the largest radio broadcaster in the United States measured by revenue and is the result of the 2008 merger of Sirius Satellite Radio and XM Satellite Radio. Sirius claims to have 25.8 million paying subscribers. | Geller Decl. ¶ 6, Ex. 5. |
| | |
| 11.   Sirius XM operates both a subscription based nationwide satellite radio service as well as a subscription based internet radio service. | Geller Decl., ¶ 6, Ex. 5, 6. |
| | |
| 12.  In exchange for monthly subscription fees which range from $9.99-$18.99, a subscriber can get access to, among other things, Sirius XM's transmissions of commercial-free music. | Geller Decl. ¶ 6, Ex. 6. |
| | |
| 13.  Through its network of satellites, ground based terrestrial repeaters, and command and control earth stations, Sirius XM's satellite radio service broadcasts on hundreds of channels, including a number of channels devoted solely to playing recordings fixed prior to February  15,  1972 ("pre-1972 recordings"), such as "40s on 4," "50s on 5," and "60s on 6." | Geller Decl. ¶ 6, Ex. 7. |
| | |
| 14.  Sirius XM also streams and distributes music over the Internet. Sirius' Internet radio | Geller Decl. ¶ 6, Ex. 8. |

| | |
|---|---|
| service includes most of the same channels offered by Sirius as part of its satellite service. However, the Internet radio service also offers channels, features, and mobile and smart phones applications that are not available through the satellite radio service. | |
| | |
| 15.   Two of the features that Sirius offers through its Internet service are Sirius XM On Demand (which allows subscribers the ability to download certain broadcasts from a catalog of content to listen to whenever they want) and MySXM (which permits subscribers to personalize their music listening experience). | Geller Decl. ¶ 6, Ex. 8. |
| | |
| 16.   Sirius copied and reproduced pre-1972 sound recordings, including many of The Turtles recordings identified in Exhibit A to the Complaint in the California Action, in creating the music libraries and databases it named Prophet, Dalet 5.1 and Dalet Plus. Sirius XM maintains information that identifies which recordings within the Prophet, Dalet 5.1, and Dalet Plus databases are pre-1972 recordings.  In creating these music libraries and databases, Sirius XM copied tens of thousands of pre-1972 Recordings, including many of The Turtles recordings. | Geller Decl. ¶ 7, Ex. 9 [2/11114 Deposition of Terrence Smith ("Smith 2/11/14  Depo.") 154:2-8] Geller Decl. ¶ 8, Ex. 10 [3/12/14 Deposition of Terrence Smith ("Smith 3112/14 Depo.") 12:10-13:6, 17:3-6,  19:24-20:10] Geller Decl., ¶ 9, Ex. 11 [Smith 3/12/14 Depo. 38:6-44:19.] |
| | |
| 17.   Sirius XM copied and reproduced at least 18,000 pre-1972 recordings to the Prophet database and 24,000 pre-1972 recordings to the Dalet 5.1 and Dalet Plus databases. However, it also admitted that it probably copied many more than that. | Geller Decl. ¶ 10, Ex. 12 [Smith 3/12114 Depo. 60:8-62:11]. |
| | |
| 18.    Sirius XM copied and reproduced its entire Prophet, Dalet 5.1, and Dalet Plus music libraries and databases to create backup libraries and databases and then copied them again to create disaster recovery libraries and databases. Sirius also created additional copies of those libraries and databases (including pre-1972 recordings to give to third parties such as Omnifone, Rock and Roll Hall of Fame, Graceland Estate, and Margaritaville). | Geller Decl. ¶ 11, Ex. 13 [Smith 2/11114 Depo. 154:13-157:7, 73:3-77:19] Geller Decl. ¶ 12, Ex. 14 [Smith 2/11/14 Depo. 158:2-165:15], [Smith 3/12/14 Depo.  51:11-55:14] |
| | |
| 19.   In connection with its broadcasting of songs, Sirius XM also copied and reproduced pre-1972 recordings (including The Turtles recordings), by creating "tips and tails." "Tips and tails" are the beginnings and | Geller Decl. ¶ 13, Ex. 15 [Smith 2/11/14 Depo. 18:6-25, 52:20-56: 17], [Smith 3/12/14 Depo. 80:2-84:21]. |

| | |
|---|---|
| endings of recordings that are used by Sirius XM's programmers to bracket the voice transitions that it broadcasts between songs. The "tips and tails" are first copied to workstations by Sirius XM's programmers who then insert the voice transitions in between the "tips" and the "tails." A copy of the entire sequence (tips, tails, and voice transition) is then transferred from the workstation back to Sirius' music libraries and databases and stored for later use. | |
| 20.   Sirius XM makes a new copy and reproduction of each song that it broadcasts prior to broadcasting that song.  Sirius XM does this by sending a copy to a "play out" server.  If a particular song is broadcast one hundred times, it will be copied to the play out server one hundred times. | Geller Decl.  ¶ 14, Ex. 16 [Smith 2/11/14 Depo. 19:2-16, 114:15-117:11], [Smith 3/12/14 Depo. 88:2-91:16] |
| 21.   In order to create redundancies in its broadcasting, after a song is transmitted from the play out server but before it is perceived by Sirius XM's subscribers, Sirius XM makes additional copies and reproductions (such as buffer copies). | Geller Decl. ¶ 15, Ex. 17 [Smith 2/11/14 Depo. 92:7-97:7, 111:15-112:10, 118:22-120:2, 135:18-137:18, 138:7-13] |
| 22.  Sirius XM has authorized a third party company, Quickplay Media, to copy all of Sirius XM's broadcasts in order to maintain a five hour cache so that the broadcasts can be repackaged for later on demand delivery to mobile devices. | Geller Decl. ¶ 16, Ex. 18 [Smith 2/11/14 Depo. 178:16-179:17, 193:16-19; 214:9-19]. |
| 23.   As part of its satellite and internet radio services, Sirius XM performs pre-1972 recordings (including The Turtles recordings) by broadcasting and streaming those recordings to delivery partners who operate content delivery networks; by broadcasting and streaming those recordings directly to its own subscribers; and by broadcasting and streaming those recordings to the end users of the Dish Network.  Sirius XM has also authorized third parties to broadcast and stream recordings to Sirius XM's end users. | Geller Decl. ¶ 17, Ex. 19 [Smith Depo (2/11/14) 176:5-179:17,]; [Smith 3/12/14 Depo. 46:5-20, 96:21-97:25, 104:8-108:21] Answer Dkt. 38 (in the California Action)  ¶ 3 Geller  Decl. ¶  18, Ex. 20 [Sirius XM 12/31/13 10-K pp. 1-5], [Smith 2/11/14 Depo. 194:22-25]) Geller Decl. ¶ 19, Ex. 21 [Smith 2/11/14 Depo. 224:22-226:18] Geller Decl. ¶ 20, Ex. 22 [Smith 2/11/14 Depo. 33:25-35:25; 176:5-18]. |
| 24.  Sirius XM copied, reproduced and performed the pre-1972 recordings without a license, and without paying royalties. | Geller Decl. ¶ 21, Ex. 23 [Frear Dep. 58:10-16, 66:16-67:2, 77;20-81:5, 90:11-92:25] Geller Decl. ¶ 23, Ex. 24 [Frear Depo., 69:10-16.] |
| | |

| | |
|---|---|
| 25.  Sirius XM does not have to make any copies in order to facilitate its performances. Sirius XM can broadcast a recording through its satellite service by playing a CD. | Geller Decl., ¶ 27, Ex. 29 [Frear Depo. 53:19-22] |
| | |
| 26.  The only factor that Sirius XM considered in deciding not to obtain licenses for pre-1972 recordings was its analysis of the law. | Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21.] |
| | |
| 27.  Legal advice informed Sirius XM's decision to not license pre-1972 recordings. However, Sirius XM asserted the attorney-client privilege to block both deposition testimony and document discovery that inquired into that legal advice or communications. | Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21; Geller Decl. ¶ 28, Ex. 30 |
| | |
| 28.  On March 17, 2014, the Copyright Office stated that "[a] person wishing to digitally perform  a pre-1972 sound recording cannot rely on Section 112 and Section 114 statutory licenses and must instead obtain a license directly from the owner of the sound recording copyright." | Geller Decl. ¶ 25, Ex. 27 |
| | |
| 29.  Sirius XM gave a copy of its entire database and library to Omnifone – a third party.  In addition, Sirius XM allows Quick Play (another third party) to cache five hour blocks of its programming for later distribution. | Geller Decl., ¶ 16, Ex. 18 [Smith 2/11/14 Depo. 178:16-179:14]. |
| | |
| 30.  The type of streaming technology that Sirius XM uses distributes entire copies of every song that it broadcasts through the Internet.  As Sirius XM admitted, the streaming technology that it uses is what is commonly referred to as "progressive downloads." | Geller Decl., ¶ 26, Ex. 28 [Smith 2/11/14 Depo. 203:18-204:10] |
| | |
| 31.  Progressive download technology results in a copy of the performance being downloaded to the end users computer by Sirius XM. In other words, by using "progressive download" technology, Sirius XM is distributing an actual copy of each recording to each subscriber accessing that stream through the Internet. | http://en.wikipedia.org/wiki/Progressive_download |
| | |

Dated:  July 11, 2014                      GRADSTEIN & MARZANO, P.C.
                                           Henry Gradstein
                                           Maryann R. Marzano
                                           Harvey W. Geller


                                   By: _____S/ Harvey W. Geller_____
                                               Harvey W. Geller

                                       Attorneys for Plaintiff
                                       FLO & EDDIE, INC.