UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————————x

FLO & EDDIE, INC.,

       Plaintiff,

      -against-                   No. 13 Civ. 5784 (CM)

SIRIUS XM RADIO, INC., and DOES 1-10,

       Defendants.

——————————————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/14/14

**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

Plaintiff Flo & Eddie, Inc. ("Flo and Eddie") brings this putative class action suit against Defendant Sirius XM Radio, Inc. ("Sirius"). The complaint alleges that Sirius committed common law copyright infringement and engaged in unfair competition by publicly performing sound recordings owned by Flo and Eddie, and by reproducing those recordings in aid of its performances. Before the Court is Docket #46, Sirius's motion for summary judgment. For the reasons stated below, the motion is **DENIED**.

Furthermore, it appears to the Court that there are no disputed issues of material fact as to liability. Sirius is therefore **ORDERED** to show cause by December 5, 2014, why summary judgment should not be entered in favor of Flo and Eddie as to liability only. *See* FED. R. CIV. P. 56(f)(1).

1

## BACKGROUND

### I. Factual Background

#### A. The Parties

Flo and Eddie is a California corporation, wholly owned by its principals, Mark Volman ("Volman") and Howard Kaylan ("Kaylan"). (Sirius 56.1 Statement ¶¶ 1-2; Volman Decl. ¶ 1.) Volman and Kaylan are two of the original members of The Turtles ("the Turtles"), a 1960s rock group whose hits included "Happy Together" and a cover of Bob Dylan's "It Ain't Me Babe." (Sirius 56.1 Statement ¶ 16; Flo and Eddie 56.1 Statement ¶¶ 2-3.)

Master recordings of the Turtles' performances – all of which were made prior to February 15, 1972 – were originally held by White Whale Records. (Sirius 56.1 Statement ¶¶ 1, 17; Flo and Eddie 56.1 Statement ¶¶ 3, 5; Volman Decl. ¶ 2.) White Whale transferred those recordings to the Turtles' members as part of a legal settlement. (Sirius 56.1 Statement ¶ 18; Flo and Eddie 56.1 Statement ¶ 5.) Volman and Kaylan purchased the remaining Turtles' members' interests in the recordings, and ultimately transferred all ownership interests in the recordings to Flo and Eddie. (Sirius 56.1 Statement ¶¶ 19-20; Flo and Eddie 56.1 Statement ¶¶ 6-7.)

Sirius is a Delaware corporation engaged in the satellite radio business. (Sirius 56.1 Statement ¶ 3.) Sirius provides digital audio content to its subscribers, who pay a periodic fee. (Geller Decl., Ex. 6.) Subscribers can receive audio content in several ways. Many subscribers – a majority according to Sirius – use special digital radios installed in their vehicles. (Sirius 56.1 Statement ¶ 5; Smith Decl. ¶ 4.) Other subscribers stream the same programming over the internet to a computer or mobile device. (Sirius 56.1 Statement ¶ 6; Flo and Eddie 56.1 Statement ¶ 14; Smith Decl. ¶ 6; *see* Smith 2/11/14 Dep. Tr. at 194:22-25.) Some users receive Sirius's music programming through Dish Network set-top boxes. (Sirius 56.1 Statement ¶ 6; Flo and Eddie 56.1 Statement ¶ 3; Smith Decl. ¶ 6; Smith 2/11/14 Dep. Tr. at 224:22-226:5.) Businesses can also

2

receive music broadcasts to play in their retail establishments through Sirius's "Business Establishment Service." (Sirius 56.1 Statement ¶ 6; Smith Decl. ¶ 6.)

Sirius offers a diverse set of programming including talk radio, live sports coverage, and music. (Sirius 56.1 Statement ¶ 4.) Music programming is featured on dozens of Sirius channels. (Geller Decl., Ex. 7.) Many of those channels – for example "60s on 6" or "70s on 7" – broadcast pre-1972 sound recordings. (Flo and Eddie 56.1 Statement ¶ 13.) Some of those channels have broadcast Turtles sound recordings. (*See, e.g.*, Sirius 56.1 Statement ¶¶ 21-22; Smith Decl. ¶¶ 12-13.) Both Sirius subscribers and users those who receive Sirius content through Dish Network set-top boxes can listen to programming that features pre-1972 sound recordings. (Smith 2/11/14 Dep. Tr. at 226:6-18.)

Sirius acknowledges that it "perform[s]" sound recordings, including pre-1972 sound recordings, by broadcasting them over its satellite radio network and streaming them over the internet. (Smith 3/12/14 Dep. Tr. at 96:21-97:15.) The pre-1972 sound recordings Sirius has performed include Turtles recordings. (Smith 3/12/14 Dep. Tr. at 104:8-105:9.) Sirius does not currently know how many pre-1972 recordings it has performed, or how many times it has performed Turtles recordings. (Smith 3/12/14 Dep. Tr. at 97:16-25, 105:11-22.)

## B.     Sirius's Operations

To understand Flo and Eddie's claims, one has to understand a bit about the technical aspects of Sirius's operations. Sirius stores its permanent digital music library on three databases, named "Prophet," "Dalet 5.1," and "Dalet Plus." (Sirius 56.1 Statement ¶¶ 24-26; Smith Decl. ¶ 17; Smith 2/11/14 Dep. Tr. at 154:2-8.) The Prophet database is located in New York City, and the two Dalet databases are located in Washington, D.C. (Sirius 56.1 Statement ¶¶ 25-26; Smith Decl. ¶¶ 18-19.) Sirius maintains onsite backup copies of each database, as well as offsite disaster recovery copies of the Prophet database in New Jersey, and of the Dalet databases in Georgia.

(Sirius 56.1 Statement ¶¶ 25-26; Flo and Eddie 56.1 Statement ¶ 18; Smith Decl. ¶¶ 18-19; Smith 2/11/14 Dep. Tr. at 154:11-155:23, 156:15-157:7.)

The content of the three databases overlaps imperfectly. (Smith 2/11/14 Dep. Tr. at 156:7-14.) Some recordings may be stored on all three databases. Other recordings might be stored only on Prophet, while others may be stored only on the Dalet databases. (Smith 2/11/14 Dep. Tr. at 75:12-76:13.) Each database stores copies of pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 159:24-160:9; Smith 3/12/14 Dep. Tr. at 38:6-40:6.) At least 18,000 such copies are stored on the Prophet database, and at least 24,000 are stored on each of the Dalet databases. (Flo and Eddie 56.1 Statement ¶ 17; Smith 3/12/14 Dep. Tr. at 40:8-42:15, 43:15-44:19; *see* Smith 3/12/14 Dep. Tr. at 61:19-62:11.) The Prophet database in New York contains 14 Turtles recordings, while the Dalet databases in Washington, D.C., contain 71 such recordings. (Sirius 56.1 Statement ¶¶ 29-30; *see* Flo and Eddie 56.1 Statement ¶ 16; Smith Decl. ¶¶ 23-24.) The backup and disaster recovery databases, like the Dalet and Prophet databases also contain pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 73:9-24.)

In addition to its three main databases, Sirius stores subsets of its music library on smaller databases at off-site locations. (Sirius 56.1 Statement ¶ 33; Flo and Eddie 56.1 Statement ¶ 18; Smith Decl. ¶ 27.) Specifically, Sirius maintains recordings from the Prophet database on smaller databases in Nashville, Orlando, and Boston. (Smith 2/11/14 Dep. Tr. at 158:17-21, 159:6-9.) Recordings from the Dalet databases reside on databases in Cleveland, Austin, and Los Angeles. (Sirius 56.1 Statement ¶ 33; Smith 2/11/14 Dep. Tr. at 158:22-159:5.) These smaller databases are used to produce on-location shows tailored to a particular musical style or on-air talent. (Smith 2/11/14 Dep. Tr. at 158:17-159:9, 163:4-21.) Some of these databases contain pre-1972 recordings, and the Cleveland database contains at least one Turtles recording. (Sirius 56.1 Statement ¶ 33;

4

Smith 2/11/14 Dep. Tr. at 160:9-161:25, 162:25-163:3, 164:12-23; Smith 3/12/14 Dep. Tr. at 51:11-54:4.)

Sirius has also copied some recordings to a database that it transferred to Omnifone, a UK-based firm that operates the My SXM service, described below. (Sirius 56.1 Statement ¶ 35; Flo and Eddie 56.1 Statement ¶ 29; Smith 2/11/14 Dep. Tr. at 33:25-34:16, 165:4-11; Smith 3/12/14 Dep. Tr. at 107:15-21.) Although the parties agree that Omnifone continues to possess those copies, Sirius claims that Omnifone can use them only for a very limited purpose: to provide the customized My SXM service. (Sirius 56.1 Statement ¶ 35; Smith 2/11/14 Dep. Tr. at 35:9-25.) The database transferred to Omnifone contains pre-1972 recordings, including Turtles recordings. (Sirius 56.1 Statement ¶ 35; Smith Decl. ¶¶ 27, 29; Smith 2/11/14 Dep. Tr. at 165:7-15; Smith 3/12/14 Dep. Tr. at 54:22-55:14.)

Several hours before Sirius plays a sound recording on one of its programs, it creates an additional copy of the recording on its "play-out server." (Sirius 56.1 Statement ¶ 37; Flo and Eddie 56.1 Statement ¶ 20; Smith Decl. ¶ 31; Smith 2/11/14 Dep. Tr. at 19:5-16.) Content is broadcast directly from the play-out server; the copy ensures a smooth broadcast even if there is a network disruption. (Sirius 56.1 Statement ¶ 37; Smith Decl. ¶ 31; see Smith 2/11/14 Dep. Tr. at 114:15-116:16.) The copy on the play-out server is deleted once a recording is broadcast. (Sirius 56.1 Statement ¶ 37; Smith Decl. ¶ 31.) Each time a recording is performed, a new copy is created on the play-out server. (Smith 2/11/14 Dep. Tr. at 117:9-11; Smith 3/12/14 Dep. Tr. at 89:2-7.) Because Sirius has performed pre-1972 recordings, including Turtles recordings, it has necessarily copied those recordings to its play-out server – many times, in fact. (Smith 3/12/14 Dep. Tr. at 88:2-20, 91:5-16.) But Sirius does not know how many copies of those recordings have been made on its play out server (Smith 3/12/14 Dep. Tr. at 89:8-91:4.)

To deliver content through its streaming service, Sirius employs a third party, Akami. (Smith 2/11/14 Dep. Tr. at 176:5-11; Smith 3/12/14 Dep. Tr. at 108:3-21.) Sirius sends a signal of its programming to Akami; Akami in turn makes several temporary copies of the recordings that Sirius sends it in order to facilitate its content distribution operation. (Smith 2/11/14 Dep. Tr. at 177:21-178:11.) Pre-1972 recordings are included in the programming that Sirius broadcasts and Akami copies. (Smith 3/12/14 Dep. Tr. at 46:17-20.)

Sirius makes additional complete of recordings it has broadcast for its "Start Now" service.[1] (*See* Sirius 56.1 Statement ¶ 39; Flo and Eddie 56.1 Statement ¶¶ 15, 22, 29; Geller Decl., Ex. 5; Smith Decl. ¶ 33.) Start Now is a time-shifting feature. It allows users to start from the beginning (up to five hours earlier) a program that Sirius is currently broadcasting. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33; Smith Decl. ¶ 33.) To provide this service, Sirius keeps a running cache of its broadcasts. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33.) The cache is continually updating to store the most recent five hours – earlier data is overwritten on a first-in-first-out basis. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33.) Sirius acknowledges that copies of pre-1972 recordings have been cached for the Start Now feature. (Smith 2/11/14 Dep. Tr. at 214:9-12.)

Separately from the Start Now feature, Sirius also authorizes Quick Play, a third party, to maintain a five hour cache of Sirius programming. (Smith 2/11/14 Dep. Tr. at 179:5-17, 193:16-19.) Quick Play's role, performed in conjunction with Akami, is to deliver Sirius content to mobile devices. (Smith 2/11/14 Dep. Tr. at 179:23-180:4.) As with the Start Now cache, Quick Play has included pre-1972 recordings in its five-hour cache. (Smith 2/11/14 Dep. Tr. at 214:9-19.)

---

[1] Flo and Eddie describes the five-hour time-shifting as Sirius's "On Demand" feature. Although the parties are not entirely clear, it appears that "On Demand" and "Start Now" are separate features. The allegedly unauthorized copy made for time-shifting purposes is properly referred to as "Start Now." (*See* Geller Decl., Ex. 8; Smith Decl. ¶ 33.)

In aid of broadcasting, Sirius also makes partial copies of some recordings, known as "tips-and-tails" copies. (Sirius 56.1 Statement ¶ 36; Flo and Edie 56.1 Statement ¶ 19; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 18:4-25.) These copies contain the final few seconds of one recording and the first few seconds of the recording set to play after it. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 52:20-53:25.) Hosts of Sirius programs use the tips-and-tails copies to properly time voice-overs in which they will, for example, announce the titles of the recording that just played and the one about to play. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 18:4-25.) A host will pre-record voice-overs against the background of the tips-and-tails recording to ensure that a voice-over does not bleed over too far into the body of a recording. After the voice-over is recorded, the tips-and-tails copy is deleted. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 55:5-56:10.) (There appears to be one exception. The smaller regional "Margaritaville" database retains permanent copies of tips-and-tails recordings. (Smith 2/11/14 Dep. Tr. at 83:2-84:6.)) Partial copies of pre-1972 recordings, including Turtles recordings, have been made for tips-and-tails purposes. (Smith 2/11/14 Dep. Tr. at 56:11-18; Smith 3/12/14 Dep. Tr. at 80:11-81:4, 82:14-20, 84:8-21.) But Sirius does not know exactly how many such copies have been made. (Smith 3/12/14 Dep. Tr. at 81:6-82:13.)

The most contentious factual dispute between the parties concerns buffering, which Flo and Eddie describes as "progressive downloading." (Flo and Eddie 56.1 Statement ¶¶ 30-31; Smith 2/11/14 Dep. Tr. at 203:18-204:10.) Buffering, in general, refers to storing a small segment of audio or video content in computer memory to ensure smooth playback. Sirius's content is buffered at several points. Sirius buffers for four seconds at the "earth station," where content is uplinked to a satellite. (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32; Smith 2/11/14 Dep. Tr. at 119:12-

120:2.) The four second buffer allows Sirius to send two separate signals to its satellites. A user's radio can then substitute one transmission for another if a connection is momentarily blocked, so that playback will not be interrupted. (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32.) The satellites then send back the two signals, where they are received by a "terrestrial repeater." (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32; Smith 2/11/14 Dep. Tr. at 93:12-15.) The terrestrial repeaters buffer the first signal received until they receive the second signal, generally on the order of a few milliseconds later. (Smith 2/11/14 Dep. Tr. at 93:16-94:3, 135:18-136:25.) Finally, Sirius digital radios store signals they receive in memory, creating a four-second buffer at the point where subscribers listen to content. (Smith 2/11/14 Dep. Tr. at 96:3-97:7, 111:15-112:10; *see* Smith 2/11/14 Dep. Tr. at 137:14-18 (noting that there are two distinct four-second buffers).)

Some individual radio receivers create a buffer of up to 30 minutes on a channel to which a subscriber is listening. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) That buffer allows users to "replay" a few minutes of a show they miss. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) The replay buffer is overwritten on a rolling first-in, first-out basis and is erased if a user changes the channel or turns off the radio. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) Finally, mobile phones or other internet-connected devices also create a buffer when they stream Sirius's content. (Sirius 56.1 Statement ¶ 43; Smith Decl. ¶ 34.) Because buffers are created any time Sirius broadcasts a recording, Sirius has of course created buffers of pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 138:7-13.)

Flo and Eddie emphasizes that every second of a buffered recording will, at some point, be cached in the buffer, even if no complete copy is ever created. Sirius stresses that buffers are constantly adding new data and removing old data. At any one time, a buffer contains at most a few seconds of content, which may include portions of more than one recording.

The long and short of this is – Sirius makes multiple copies, temporary, permanent, whole or partial, during its broadcast process; and it performs the copies it makes. Furthermore, as to pre-1972 sound recordings, it does so without obtaining licenses or paying royalties. Sirius has not obtained a license to copy most of the pre-1972 recordings stored in its various databases. (Frear 3/12/14 Dep. Tr. at 77:20-79:25.) Nor has Sirius obtained licenses to perform most of those recordings over the internet, (Frear 3/12/14 Dep. Tr. at 80:2-21), or to authorize third parties Omnifone or Akami to stream its programming. (Frear 3/12/14 Dep. Tr. at 90:11-91:5.) Sirius has not paid royalties to copy or perform most of its pre-1972 recordings. (Frear 3/12/14 Dep. Tr. at 69:10-16.)

For all the copying it does do, it's worth noting what Sirius does not do. Sirius does not currently allow users to download and store complete copies of any recordings. (Sirius 56.1 Statement ¶¶ 24, 40, 41, 43; Smith Decl. ¶ 14.) In this way, Sirius differs from file-sharing services such as Napster and Limewire. (Sirius 56.1 Statement ¶ 41; Smith Decl. ¶ 14.)

Nor does Sirius allow users to listen to a particular recording whenever they choose to do so. In this way, Sirius differs from some internet radio services like Spotify. (Sirius 56.1 Statement ¶ 41; Smith Decl. ¶ 14.) Users can customize the programming they receive to a limited extent using the "My SXM" feature. (Sirius 56.1 Statement ¶ 35; Flo and Eddie 56.1 Statement ¶ 15; Geller Decl., Ex. 8; Smith Decl. ¶ 28.) For example, a user could choose to emphasize folk music and deemphasize rock music on a 70s channel. But that user could not choose to listen only to Bob Dylan, much less a particular Bob Dylan recording, while excluding anything by Led Zeppelin. (*See* Sirius 56.1 Statement ¶ 41; Smith Decl. ¶¶ 14, 28.)

9

## II.    Procedural Background

Flo and Eddie filed its initial complaint on August 16, 2013. (Docket #1.) In response to a motion to dismiss filed by Sirius, Flo and Eddie filed an amended complaint on November 13, 2013. (Docket #32.)

Flo and Eddie has filed companion suits in California and Florida. (*See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-23182 (S.D. Fla.); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-05693 (C.D. Cal.)). In each case, Flo and Eddie has asserted state-law claims under the law of the state in which the suit was filed. The district court in the California suit granted Flo and Eddie's motion for summary judgment as to liability. The district court in the Florida suit has not yet issued a decision on a pending motion by Flo and Eddie for summary judgment as to liability.

To understand why Flo and Eddie seeks relief under state law, one has to know a bit about federal copyright law. Since 1831, federal law has protected copyrights in musical compositions. *See* 17 U.S.C. § 102(a)(2); Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436. "The creator of a musical composition has long had a right of exclusive public performance of that musical piece." *Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 487 (3d Cir. 2003). Thus, when radio stations publicly perform – that is, broadcast – copyrighted musical compositions, they pay royalties to the holder of the copyright in the song – generally the composer or his heirs – for the privilege of doing so. *Woods v. Bourne Co.*, 60 F.3d 978, 983-84 (2d Cir. 1995). Those royalties are typically collected and distributed by professional clearinghouses, such as the American Society of Composers, Authors and Publishers ("ASCAP"). *Id.*; *see Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 4-5 (1979) (describing ASCAP).

A copyright in a musical composition is *not* same as a copyright in a sound recording of a performance of that composition. And this lawsuit not about musical compositions. (Pl. Opp.

10

Mem. at 10 n.6.) As far as the Court is aware, Sirius pays royalties to the holder of the copyright for the right to perform the Turtles' musical compositions.

This suit is about copyright in sound recordings, which is a different animal. A sound recording is a medium in or on which a particular performance of a musical composition (song) is fixed for posterity and for playback. *See* 17 U.S.C. § 101. In essence, a copyright in a sound recording is a copyright in the performance – not in the work being performed.

Congress only made sound recordings eligible for federal statutory copyright protection in 1971. *See* Sound Recordings Act, Pub. L. No. 92-140, 85 Stat. 391 (1971). Furthermore, that protection was limited in two important ways.

First, Congress did not originally provide sound recording copyright holders with an exclusive right to publicly perform their works. *Bonneville Int'l Corp.*, 347 F.3d at 487. Thus, the owners of copyrights in sound recordings, unlike copyright holders in musical compositions were not entitled to compensation under federal law when radio stations broadcast their recordings between 1972 and 1995. *Id.* In 1995, Congress added a limited public performance right for sound recordings, giving holders of sound recording copyrights the "exclusive right[] . . . to perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. § 106. Federal copyright law still provides no exclusive right to public performance of sound recordings by any other means. *See Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 153-54 (2d Cir. 2009).

The second important limitation of the 1971 Act was that it operated prospectively. Recordings "fixed" (recorded) prior to February 15, 1972 were not, and still are not, eligible for federal copyright protection. *See* 17 U.S.C. § 301(c). The Turtles recordings were all fixed before February 15, 1972. Therefore, none is eligible for federal copyright protection.

Instead of adopting a federal copyright scheme for pre-1972 sound recordings, Congress left the issue to the states. For works protected by federal law, Congress broadly preempted any "equivalent right in any such work under the common law or statutes of any State." *Id.* § 301(a). For sound recordings fixed before February 15, 1972, however, Congress expressly did "not . . . annul[] or limit[]" "any rights or remedies under the common law or statutes of any State." *Id.* § 301(c).

Flo and Eddie argues that New York provides pre-1972 sound recording owners with rights and remedies under its common law. Flo and Eddie further argues that New York's common law copyright protection, which extends to pre-1972 sound recordings, prohibits both reproducing and publicly performing those recordings. It also argues the law of unfair competition provides similar protection.

Sirius has moved for summary judgment. (Docket #46.) It argues that: (1) New York common law copyrights in pre-1972 sound recordings do not afford an exclusive right of public performance; (2) the copies Sirius made of Turtles recordings are protected by fair use; (3) sustaining Flo and Eddie's claims would violate the Dormant Commerce Clause; and (4) Flo and Eddie's entire action is barred by the doctrine of laches.

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see* FED. R. CIV. P. 56(a), (c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. "Summary judgment is designed . . . to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

## II.    Sirius Cannot Invoke the Defense of Laches

Sirius argues that Flo and Eddie's entire suit is barred by the defense of laches. But it is not.

"The defense of laches is unavailable in [an] action at law commenced within the period of limitations." *Cadlerock, L.L.C. v. Renner*, 898 N.Y.S.2d 127, 128 (App. Div. 2010); *see Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 499 (S.D.N.Y. 2005); *Coit v. Campbell*, 82 N.Y. 509, 512-13 (1880). Flo and Eddie has brought an action at law for damages. Flo and Eddie's unfair competition claim – grounded in misappropriation – is subject to a three-year statute of limitations. *Sporn v. MCA Records, Inc.*, 451 N.Y.S.2d 750, 751 (App. Div. 1982) *aff'd*, 58 N.Y.2d

13

482 (1983). The claim for common law copyright infringement is also an action at law, *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *Bercovici v. Chaplin*, 7 F.R.D. 61, 62 (S.D.N.Y. 1946), subject to a six year statute of limitations. *Capitol Records, LLC v. Harrison Greenwich, LLC*, 986 N.Y.S.2d 837, 838 (Sup. Ct. 2014). Flo and Eddie seeks damages on both claims, and Sirius does not argue that they are brought outside the applicable statutes of limitations. Thus, those claims are not barred by laches.

Nor does laches bar Flo and Eddie's prayer for an injunction. That request "for an equitable remedy" is made "in aid of or to enforce a legal right." *Bohemian Brethren Presbyterian Church v. Greek Archdiocesan Cathedral of Holy Trinity*, 405 N.Y.S.2d 926, 929 (Sup. Ct. 1978) *aff'd*, 416 N.Y.S.2d 751 (App. Div. 1979) (citing *Galway v. Metro. Elevated Ry. Co.*, 128 N.Y. 132 (1891)). In that situation, the defense of laches is similarly unavailable. The statute of limitation controls both the legal action for damages and the equitable remedy. *Id.*; *see Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177, at \*8 & n.87 (S.D.N.Y. Oct. 11, 2005).

## III. Flo and Eddie Holds the Valid Common Law Copyright in the Turtles' Sound Recordings

As explained above, federal law provides copyright protection for sound recordings fixed on or after February 15, 1972. *See* 17 U.S.C. §§ 102(a)(7), 301(c). As to those sound recordings, Congress broadly preempted equivalent state-law protections. *Id.* § 301(a). Federal law does not, however, provide copyright protection for sound recordings fixed before February 15, 1972. Furthermore, Congress expressly declined to preempt whatever common law copyright protection was provided to those recordings by state law until February 15, 2067. *Id.* § 301(c).

New York has elected to "fill th[e] void" Congress left, by continuing to enforce its preexisting body of copyright common law for pre-1972 sound recordings. *Capitol Records, Inc.*

*v. Naxos of Am., Inc. (Naxos)*, 4 N.Y.3d 540, 559-60, 565 (2005); *see Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 662-63 (2d Cir. 1955); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995). Under that law, artists can acquire a common law copyright in "any original material product of intellectual labor" *A.J. Sandy, Inc. v. Junior City, Inc.*, 234 N.Y.S.2d 508, 510 (App. Div. 1962) – including sound recordings – by expending "time, effort, money, and great skill" in its creation. 104 N.Y. JUR. 2D TRADE REGULATION § 262; *see RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 88 (2d Cir. 1940). The term "any original material product of intellectual labor" includes sound recordings. *See, e.g., Capitol Records, Inc. v. Greatest Records, Inc.*, 252 N.Y.S.2d 553, 554-55 (Sup. Ct. 1964); *Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492-93 (Sup. Ct. 1950) *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951).

The Turtles originally acquired a common law copyright in their sound recordings by expending time, effort, money and skill to create them. That copyright was then transferred to White Whale, and eventually to Flo and Eddie, which now owns the sound recordings. Sirius does not contest Flo and Eddie's claim to possess a common law copyright in the Turtles recordings (though it insinuates that some of the underlying ownership transfers are undocumented). Rather, Sirius contends that Flo and Eddie's rights as holder of the copyright in the sound recordings does not give them the exclusive right to publicly perform those works.

## IV. Flo and Eddie's Common Law Copyright Provides Exclusive Rights to Reproduce and Publicly Perform Turtles Recordings

Flo and Eddie alleges that Sirius has infringed its common law copyright by (1) reproducing (making copies of) the master recordings, and (2) performing those recordings (or the illicit copies of them) publicly.

15

New York unquestionably provides holders of common law copyrights in sound recordings with an exclusive right to reproduce those recordings. *See Capitol Records*, 221 F.2d at 663; *Naxos*, 4 N.Y.3d at 559-60, 563-64. Sirius does not challenge that proposition, although it argues that its reproductions of Turtles sound recordings constitute fair use. That issue will be discussed below.

Whether New York provides holders of common law copyrights in sound recordings with an exclusive right to publicly perform those recordings presents a much thornier question – one of first impression, and one that has profound economic consequences for the recording industry and both the analog and digital broadcast industries. My first task is to predict how I believe the New York Court of Appeals would rule on this question, which no appellate court in New York has yet confronted. *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F. 2d 1146, 1153 (2d Cir. 1989).[2]

I conclude that the New York Court of Appeals would recognize the exclusive right to public performance of a sound recording as one of the rights appurtenant to common law copyright in such a recording.

"In general, the rights under common law copyright . . . are at least co-extensive with the rights commanded under the Copyright Act." 2 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 8[C][2] (Matthew Bender, Rev. Ed.). But when New York first recognized common law copyrights in sound recordings – over 50 years ago – Congress had not yet authorized any federal copyright protection for sound recordings. *Naxos*, 4 N.Y.3d at 560.

---

[2] One very recent decision of the New York State Supreme Court appears to recognize just the sort of public performance right that Sirius says does not exist. *See Capitol Records, LLC v. Harrison Greenwich, LLC*, 984 N.Y.S.2d 274, 275-76 (Sup. Ct. 2014); Decision and Order, *Capitol Records, LLC v. Harrison Greenwich, LLC*, No. 652249/2012 (N.Y. Sup. Ct. May 13, 2014). But that Decision and Order does not explain its ruling and cites no prior case law recognizing any public performance right in sound recordings, so I can take no guidance from it.

16

Thus, the protections New York common law offers to holders of copyrights in sound recordings cannot be determined by reference to comparable federal protection. Instead, I must look to the background principles and history of New York copyright common law. *See id.* at 546 ("[W]hen examining copyright law, a page of history is worth a volume of logic." (internal citations and quotation marks omitted)).

The common law typically "protects against unauthorized reproduction of copies or phonorecords, unauthorized distribution by publishing or vending, *and unauthorized performances.*" 2 NIMMER ON COPYRIGHT § 8[C][2] (internal citations omitted) (emphasis added); *see Letter Edged in Black Press, Inc. v. Pub. Bldg. Comm'n of Chicago*, 320 F. Supp. 1303, 1308 (N.D. Ill. 1970); *cf. Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F. 3d 73, 81 (2d Cir. 2014) (describing the bundle). New York courts have long afforded public performance rights to holders of common law copyrights in works such as plays, *Palmer v. De Witt*, 47 N.Y. 532, 535-36, 540-41 (1872); *Roberts v. Petrova*, 213 N.Y.S. 434, 434-37 (Sup. Ct. 1925); *French v. Maguire*, 55 How. Pr. 471, 472-73, 479-80, 1878 WL 11310 (N.Y. Sup. Ct. 1878) and films, *Brandon Films, Inc. v. Arjay Enter., Inc.*, 230 N.Y.S.2d 56, 57-58 (Sup. Ct. 1962). The Second Circuit concluded over three decades ago that New York would recognize a public performance right in compilations of film clips. *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1097-99, 1101-04 (2d Cir. 1982) (applying New York law).

Nonetheless, Sirius advances a number of arguments for why New York common law copyright in sound recordings does not include any public performance right.

Sirius principally argues that no such right exists because New York case law contains no discussion of public performance rights in sound recordings. But the exact same argument could have been made (and undoubtedly was made, and rejected) in *Naxos* – a case decided only in 2005,

17

more than a century after sound recordings were invented. The very fact that *Naxos* was decided in favor of the common law copyright holder, after more than a century of judicial silence, means that this court can infer nothing – certainly not that the common law copyright in sound recordings does not encompass all of the rights traditionally accorded to copyright holders in other works, including the right of public performance – from the fact that this is the first case to raise the issue.

Of course, the conspicuous lack of any jurisprudential history confirms that not paying royalties for public performances of sound recordings was an accepted fact of life in the broadcasting industry for the last century. So does certain testimony cited by Sirius from record industry executives, artists and others, who argued vociferously before Congress that it was unfair for them to operate in an environment in which they were paid nothing when their sound recordings were publicly performed. *See, e.g., Digital Performance Rights: Hearing Before the House Judiciary Committee Subcommittee on Courts and Intellectual Property on H.R. 1506*, 104th Cong. (1995) (statement of Edward O. Fritts, President & CEO, Nat'l Ass'n of Broadcasters), 1995 WL 371107; H. Comm. On Patents, 74th Cong., Hearings on Revision of Copyright Laws 622 (Comm. Print. 1936) (statement of H.A. Huebner, representing Brunswick Record Corp. and Columbia Phonograph Co.); *see also* Sirius Summary Judgment Mem. at 9-12. That they were paid no royalties was a matter of statutory exemption under federal law; that they demanded no royalties under the common law when their product as ineligible for federal copyright protection is, in many ways, inexplicable.

But acquiescence by participants in the recording industry in a status quo where recording artists and producers were not paid royalties while songwriters were does not show that they lacked an enforceable right under the common law – only that they failed to act on it. The United States Copyright Office, in its most recent commentary on this subject, concluded, "While, as a factual

18

matter, a state may not have affirmatively acknowledged a public performance right in pre-1972 recordings as of the Office's 2011 report, the language in the report should not be read to suggest that a state could not properly interpret its law to recognize such a right." *Music Licensing Study: Second Request for Comments*, 79 Fed. Reg. 42,833-01, 42,834 n.3 (July 23, 2014).

The United States Supreme Court admonished recently against reading too much into a lack of precedent for a point:, stating (in another context), "It should be unsurprising that such a significant matter has been for so long judicially unresolved." *D.C. v. Heller*, 554 U.S. 570, 625 (2008). The Supreme Court, for example, failed to grapple with many fundamental constitutional questions for the first 150 years of the Constitution's existence. *Id.* at 625-26. I thus do not read too much into the fact that New York courts have never squarely addressed a particular feature of state copyright law in the context of sound recordings.

In fact, there is precedent for this kind of judicial silence in the copyright arena. Prior to 1976, choreography was deemed ineligible for any sort of copyright protection, under federal or common law. Courts declined to offer copyright protection to dance on the theory that choreographic works did not "tell" a story, and thus could not be considered copyright-eligible "dramas." *See, e.g.*, *Seltzer v. Sunbrock*, 22 F. Supp. 621, 628-29 (S.D. Cal. 1938); *Fuller v. Bemis*, 50 F. 926, 929 (S.D.N.Y. 1892). That changed with the 1976 amendments to the Copyright Act, which explicitly recognized "choreographic works" as copyright-eligible. *See* Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, 2544-45. Since then, an entire body of law has evolved concerning dance copyright – not all at once, or all as soon as the 1976 Act became effective, but over the ensuing decades.

So it is not surprising that sound recordings, like choreographic works, received little attention from courts before they became eligible for statutory copyright. It is likely that the issue

was just not on anyone's radar screen until Congress granted a public performance right in more recent sound recordings.

An arguably stronger argument can be made that years of judicial silence implies exactly the opposite of what Sirius contends – not that common law copyright in sound recordings carries no right of public performance, but rather that common law copyright in sound recordings comes with the entire bundle of rights that holders of copyright in other works enjoy. No New York case recognizing a common law copyright in sound recordings has so much as suggested that right was in some way circumscribed, or that the bundle of rights appurtenant to that copyright was less than the bundle of rights accorded to plays and musical compositions. The expansive nature of New York's common law protection for artistic works that do not enjoy federal statutory copyright protection was announced over fifty years ago, in *Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.*, supra – a case protecting property rights in sound recordings. There, the court said, "The law has . . . protected the creative element in intellectual productions—that is, the form or sequence of expression, the new combination of colors, sounds or words presented by the production . . . against appropriation by others." *Metro. Opera*, 101 N.Y.S.2d at 493.

Modern federal law supports the notion that an express carve-out is required in order to circumscribe the bundle of rights appurtenant to copyright. When Congress amended the Copyright Act in 1971 to protect copyrights in sound recordings, it announced quite explicitly that sound recordings would not carry any right to public performance. The relevant section of Title 17 limits copyright in sound recordings to the rights, "To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording." Sound Recordings Act, Pub. L. No. 92-140, 85 Stat. 391, 391 (1971). The 1971 Act further provided that "the exclusive right of the owner of a copyright in a

20

sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form," and that "this right does not extend to . . . reproductions made by transmitting organizations exclusively for their own use." *Id.*

This express carve-out for public performance strongly suggest that, absent such an explicit limitations, holder of sound recording copyrights would have enjoyed the entire bundle of rights traditionally granted to copyright holders – including the right to public performance, which has been part of the bundle of rights enjoyed by holders of federal copyrights in performable works since 1897 or earlier. Put otherwise, if public performance rights were not part of the normal bundle of rights in a copyright, Congress would not have needed to carve out an exception specifically for sound recordings. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 375 n.12 (2006) (same principle in the context of bankruptcy law).[3]

---

[3] The history of Congressional grants of public performance rights is convoluted. The 1831 Act, which first granted copyright protection to authors of musical compositions, did not provide a public performance right. *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436. When Congress added copyright protection for "dramatic composition[s]" in 1856, it expressly included a "sole right to . . . perform, or represent" the composition, without providing any comparable right for copyrights in other works. Act of Aug. 18, 1856, ch. 169, 11 Stat. 138, 139. That state of affairs continued through the general copyright law revisions of 1870 in which Congress expressly provided a "public[] perform[ance]" right for dramatic compositions but not for musical compositions. Act of July 8, 1870, ch. 230, § 86, 16 Stat. 198, 212. Finally, in 1897, Congress added a public performance right specifically for musical compositions. Act of Jan. 6, 1897, ch. 4, 29 Stat. 481, 481-82. When Congress revised the copyright law in 1909, it continued to provide the holders of copyrights in dramatic compositions and musical compositions with the exclusive right to "perform [their works] publicly." Act of Mar. 3, 1909, ch. 320, § 1, 35 Stat. 1075, 1075. Other types of works, however, did not enjoy that same privilege.

By the time Congress enacted copyright protection for sound recordings, public performance rights were firmly entrenched for musical compositions and dramatic compositions: the two kinds of works to which public performance rights could sensibly be provided. It was thus an accepted part of the background law that public performance rights would, absent a deliberate effort to exclude them, extend to sound recordings. That principle applies with even more force to common law copyright, which generally includes fewer limitations on exclusive rights than does federal statutory law. *See* Shyamkrishna Balganesh, *The Pragmatic Incrementalism of Common Law Intellectual Property*, 63 VAND. L. REV. 1543, 1563 (2010).

Sirius also raises several policy arguments against public performance rights in pre-1972 sound recordings.[4]

Sirius claims that affording public performance rights would not serve the underlying purposes of copyright law because pre-1972 recordings already exist and further rights cannot create incentives for the creation of new pre-1972 recordings.

But the same criticism could be leveled against the New York Courts of Appeals' decision in *Naxos*. There, in answer to a certified question from the Second Circuit, the New York Court of Appeals held that, "New York provides common-law copyright protection to sound recordings not covered by the federal Copyright Act, regardless of the public domain status in the country of origin." *Naxos*, 4 N.Y.3d at 563. The plaintiffs in *Naxos* owned several sound recordings made in the 1930s, which had fallen into the public domain in the United Kingdom where they were originally copyrighted. Allowing the *Naxos* plaintiffs to assert their common law right of reproduction could not possibly have created any incentive to produce new sound recordings – especially since all newly created sound recordings enjoy exclusive copyright protection under federal law. Yet the New York Court of Appeals held that those plaintiffs could proceed on their common law copyright infringement claims. From that holding, I conclude that New York does not protect common law copyrights only when that protection creates incentives for new similar works.

---

[4] Sirius frames these arguments with the general principle that federal courts should apply state common law as it currently stands – not as they think it should be. That is a correct statement of the role of federal courts. But I am not applying the law as I think it "should" be, but as I "predict how the New York Court of Appeals would resolve the . . . question." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005). Unlike the Second Circuit, I do not have the option to certify even profoundly uncertain issues of state law to the Court of Appeals.

New York is hardly unique in this regard. Each time that Congress is asked to extend the term of copyright protections (a request not infrequently made), someone observes that allowing the children and grandchildren of creative people long dead to collect royalties does nothing to encourage creativity, and so cuts against both the traditional argument in favor of copyright and undermines the historic belief that, at some point, a Government-created monopoly on intellectual property should yield to an expanded public use. Congress has rejected that perfectly sensible argument time and time again. I see no reason to conclude that either statutory or common law copyright any longer focuses on fostering future creativity, as opposed to rewarding past creativity.

Sirius also claims that recognizing public performance rights in pre-1972 sound recordings would unjustly punish good faith investors who provided capital for Sirius.

Investors always assume the risk that whatever economic model they are working off will turn out not to be correct, so investor expectations are rarely "settled" enough to provide a justification for declining to apply the correct legal rule.

However, I question whether the investors would be truly surprised if Sirius were to have to pay royalties in order to perform pre-1972 sound recordings. Sirius, which broadcasts exclusively in non-analog form, must pay royalties under federal law in order to broadcast post-1972 sound recordings. All Flo and Eddie seeks here is the right to receive royalties under state law for the digital broadcasting of its pre-1972 recordings – hardly a shocking development in the world of digital broadcasting.

Indeed, as a matter of public policy there would seem to be good reason to harmonize New York's common law of copyright with its federal statutory counterpart, *see* 2 NIMMER ON COPYRIGHT § 8[C][2], and recognizing public performance rights in pre-1972 sound recordings would conform the two.

23

In 1995, Congress added a limited right for sound recording copyright holders to publicly perform their works "by means of a digital audio transmission." 17 U.S.C. § 106. In creating that limited right, Congress carefully balanced the interests of all affected parties. As Senator Hatch explained, the bill establishing a public performance right was "forward looking. It largely leaves in place mature businesses that have grown up under the old copyright regime [i.e., analog broadcasting]. It seeks to ensure that creators of sound recordings will have the rights they have been denied until now as the digital age dawns." 141 Cong. Rec. 22,775, 22,779 (1995). By establishing a "new digital performance right [that] applies to digital audio transmission . . . [but] not [] to traditional broadcasts and most other free transmissions" Congress "attempted to balance the competing interests of the various copyright owners as well as users." *Id*; *see* H.R. Rep. No. 104-274, at 13-15 (1995); S. Rep. No. 104-128, at 13-17 (1995); *see generally* Kimberly L. Craft, *The Webcasting Music Revolution Is Ready to Begin, As Soon As We Figure Out the Copyright Law: The Story of the Music Industry at War with Itself*, 24 HASTINGS COMM. & ENT. L.J. 1, 9-13 (2001) (discussing the legislative history of the 1995 Act).

Sirius would of course respond that any public performance right that the New York Court of Appeals might recognize would be broader than the right legislated by Congress, encompassing analog broadcasting, the "mature" (some would say dying) industry that Congress exempted from the payment of royalties for public performance. And Sirius quite rightly notes that the right Congress has created for post-1972 works is part of a carefully crafted scheme that operates nationwide, whereas common law copyrights are the province of the several states – raising the specter of administrative difficulties in the imposition and collection of royalties, which would ultimately increase the costs consumers pay to hear broadcasts, and possibly make broadcasts of pre-1972 recordings altogether unavailable.

24

Sirius may well be correct that a legislative solution would be best. But the common law, while a creature of the courts, exists to protect the property rights of the citizenry. And courts are hardly powerless to craft the sort of exceptions and limitations Congress has created, or to create a mechanism for administering royalties. Sirius forgets that it was this court, not Congress, that, back in 1950 fashioned a consent decree that set up what became the most successful mandatory licensing and royalty scheme in the world – a system still administered by a judge of this court, which functions as a rate court for the major licensing houses like ASCAP and BMI. *See United States v. Am. Soc'y of Composers, Authors and Publishers*, No. CIV.A. 42-245, 1950 WL 42273 (S.D.N.Y. Mar. 14, 1950), *amended* (July 17, 1950); *see also United States v. Broad. Music, Inc.,* No. 64 CIV. 3787, 1994 WL 901652, (S.D.N.Y. Nov. 18, 1994) (modifying 1966 BMI consent decree). New York courts are capable of fashioning appropriate relief – and even of recognizing only such public performance rights in pre-1972 sound recordings as conform to rights statutorily conferred on holders of statutory copyright in post-1972 recordings.

In short, general principles of common law copyright dictate that public performance rights in pre-1972 sound recordings do exist. New York has always protected public performance rights in works other than sound recordings that enjoy the protection of common law copyright. Sirius suggests no reason why New York – a state traditionally protective of performers and performance rights – would treat sound recordings differently.

25

## V. Sirius Infringed Flo and Eddie's Common Law Copyright and Engaged in Unfair Competition

### A. Common-Law Copyright Infringement

#### 1. Sirius Reproduced Flo and Eddie's Copyrighted Recordings Without Authorization

"A copyright infringement cause of action in New York consists of two elements: (1) the existence of a valid copyright; and (2) unauthorized reproduction of the work protected by the copyright." *Naxos*, 4 N.Y.3d at 563.

As explained above, Flo and Eddie holds a valid copyright in the Turtles recordings. The record clearly shows that Sirius reproduced those recordings without authorization. In particular, Sirius reproduced Turtles recordings for its three main databases and associated backups, as well as for the smaller on-site databases, including the database it transferred to Omnifone. Sirius also made several temporary but complete copies of Turtles recordings: on its play-out server each time a Turtles song was performed, in each of the five-hour caches, and in the half-hour buffer available on some in-vehicle satellite radios.

To be sure, some of the alleged copies may not qualify as infringing reproductions. Buffering, for example, does not constitute infringement under federal law. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127-30 (2d Cir. 2008). The tips-and-tails partial copies may be too fragmentary or ephemeral to constitute infringement. But Sirius does not seriously dispute that many of the copies it made of Turtles recordings – in particular the permanent copies – amount to reproductions as a matter of law.

In reproducing Turtles recordings, Sirius acted without authorization. As noted above, Sirius has not obtained licenses for using pre-1972 recordings, either to store those recordings in its databases or to broadcast them. Nor has Sirius obtained licenses or paid royalties for transferring those recordings to third parties.

26

Sirius argues instead that it is not liable for infringement because it did not *distribute* the Turtles recordings. Sirius supports that argument with language from *Naxos*, "Copyright infringement is distinguishable from unfair competition, which in addition to unauthorized copying and distribution requires competition in the marketplace or similar actions designed for commercial benefit." 4 N.Y.3d at 563. This language, according to Sirius, establishes that "distribution" of a copyrighted work is an element of common law copyright infringement. A distribution requirement would be consistent with Sirius's assertion that New York does not provide any exclusive right to publicly perform sound recordings.

But as I explained above, New York law does provide copyright holders with just that exclusive performance right for sound recordings. To the extent that distribution is an element of common law copyright infringement, publicly performing sound recordings is an act of distribution. Otherwise, Sirius cannot explain how New York courts could have recognized infringement claims alleging that defendants publicly performed copyrighted works without authorization. *See, e.g.*, *Brandon Films*, 230 N.Y.S.2d at 57-58; *French*, 55 How. Pr. at 472-73, 479-80, 1878 WL 11310.

In addition to *Naxos*, Sirius cites *Hemingway's Estate v. Random House, Inc.*, 279 N.Y.S.2d 51 (Sup. Ct.) *aff'd sub nom.* 285 N.Y.S.2d 568 (App. Div. 1967) *aff'd sub nom.* 23 N.Y.S.2d 341 (1968), in which the New York Supreme Court held that a publisher did not infringe the plaintiff's copyright by including gallery proofs in a few copies of a book before the book was finally published. *Id.* at 54-56. But public performance rights were not at issue in *Hemingway's Estate*, and the Supreme Court never suggested in its opinion that public performance could not be a form of distribution. Rather, on the facts of the case, that court found that, "No use of any kind was made of the original galley proofs." *Id.* at 55.

One might argue that Flo and Eddie divested itself of its copyright in the Turtles sound recordings by "publishing" those recordings. *See Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co.*, 155 N.Y. 241, 247 (1898). Publication is a term of art in the common law of copyright and it does not encompass every dissemination of a copyrighted work, even if the work reaches thousands of people. *Jewelers' Mercantile Agency*, 155 N.Y. at 247-48; *Hemingway's Estate*, 279 N.Y.S.2d at 55.

But there is a good reason why Sirius did not make this argument. In the context of sound recordings, "it has been the law in [New York] for over 50 years that, in the absence of federal statutory protection, the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection." *Naxos*, 4 N.Y.3d at 560; *see also Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 493-95 (Sup. Ct. 1950) *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951). Public sale is exactly what Flo and Eddie have done with the Turtles sound recordings. Under *Naxos*, that does not constitute publication. Flo and Eddie therefore retains its common law copyright in those recordings.

### 2. Sirius's Creation of Multiple Complete Copies of Flo and Eddie's Sound Recordings Cannot Be Considered Not Fair Use

Although the case law is sparse, it appears that New York recognizes fair use as a defense to copyright infringement. *See Fendler v. Morosco*, 253 N.Y. 281, 291 (1930); *EMI Records Ltd. v. Premise Media Corp., L.P.*, 2008 N.Y. Misc. LEXIS 7485, at *9-11 (N.Y. Sup. Ct. Aug. 8, 2008); *Hemingway's Estate*, 279 N.Y.S.2d at 57. New York courts have not, however, articulated the scope of New York's fair use doctrine. I will assume, as do the parties, that New York's fair use defense operates similarly to the federal defense, which is codified in 17 U.S.C. § 107. *See EMI Records*, 2008 N.Y. Misc. LEXIS 7485, at *16-18.

Under federal law, courts "determin[e] whether the use made of a work in any particular case is a fair use" by considering, among other factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

On all four factors, Sirius's creation of the unauthorized copies fails to qualify as "fair use."

In considering the first factor – the "purpose and character of the use," courts must ask "whether the new work merely supersedes the objects of the original creation or instead adds something new, with a further purpose or different character . . . , in other words, whether and to what extent the new work is transformative. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal citations, quotation marks, and alterations omitted); *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

Sirius is a for-profit entity using Flo and Eddie's recordings for commercial purposes. Moreover, Sirius's use is not transformative. Sirius does not add anything new or change the Turtles recordings by copying and performing them. Publicly performing a recording adds no "new expression, meaning, or message," to the recording. *Campbell*, 510 U.S. at 579. Sirius lets subscribers hear Turtles recordings through a different medium, but that does not make its use "transformative." insofar as the recording is concerned – however "transformative" satellite radio may be in the context of broadcasting.

The cases cited by Sirius do establish that a use may be transformative even when it requires completely copying a copyrighted work. But the uses in those cases are far different than what Sirius does. Courts, for example, have upheld as fair use copying images that then appear as "thumbnail" results in response to an internet search. *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2003). But a thumbnail is a lower-quality image that does not serve the

purpose of the original – to view and appreciate. *Id.* Courts have also upheld search engines' copying original books so that users can search the books and find out where certain phrases appear. *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2013). That too is a different use from the original book, which is meant to be read, not searched by keyword. *Id.* What one wants to do with a sound recording is to hear it, and that can be done just by listening to Sirius.

The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. In particular, "creative expression for public dissemination falls within the core of the copyright's protective purposes." *Campbell*, 510 U.S. at 586; *see Authors Guild, Inc.*, 755 F.3d at 96. Even Sirius recognizes that the Turtles works are "creative." Sirius claims that the second factor does not favor Flo and Eddie because the Turtles' sound recordings have been widely disseminated for decades. This is a non-sequitur; widespread distribution does nothing to alter the creative character of a copyrighted work. The cases Sirius cites does not hold to the contrary.

The third fair use factor requires courts to consider "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. "The third factor asks whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *Authors Guild, Inc.*, 755 F.3d at 96. Further, "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. Sirius has copied and performed several Turtles recordings in their entirety. As explained above, Sirius's use is non-transformative and commercial. It has, in the words of the Second Circuit, no "valid purpose[] asserted under the

30

first factor." *Authors Guild, Inc.*, 755 F.3d at 96. Thus, the third factor does not favor even minimal copying by Sirius.

Sirius leans heavily on the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. The Second Circuit has explained that "the relevant market effect with which we are concerned is the market for plaintiffs' expression, and thus it is the effect of defendants' use of that expression on plaintiffs' market that matters." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004) (internal quotation marks and citation omitted). As a matter of "common sense[] when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591. (internal citations, quotation marks, and alterations omitted).

Sirius makes non-transformative use of Flo and Eddie's recordings and does so for commercial gain. It is, therefore, "common sense[]," *id.*, that Flo and Eddie would suffer market harm when Sirius takes its property and exploits it, unchanged and for a profit. That exploitation "supersedes the objects of the original." *Id.*

Sirius responds to this common-sense conclusion with two points: (1) Flo and Eddie points to no actual evidence or lost sales or licensing fees caused by Sirius's operations; and (2) there is no existing market for licensing pre-1972 sound recordings for public performance. Those responses are unpersuasive.

31

First, discovery on damages has not yet been conducted. The evidence might ultimately show that Flo and Eddie has lost fewer sales than one might expect as a result of Sirius' unauthorized copying and public performances of their recordings. But it is beyond cavil that Flo and Eddie has hereto been unable to obtain *any* money from the broadcasting of their sound recordings; if its common law copyright had been recognized, plaintiff could and undoubtedly would have charged Sirius something to broadcast them.

Second, Flo and Eddie describes the fourth fair use factor too narrowly. The fourth factor allows courts to consider not only presently existing markets, but also "potential" or "reasonable, [] likely to be developed markets." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir.1994)). A market for licensing post-1972 sound recordings already exists. It has to, by law. *See* 17 U.S.C. §§ 112, 114. It is not difficult to conceive that a similar market for pre-1972 recordings would develop if owners of those recordings asserted their rights.

The fourth factor also requires courts to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. Widespread public performance of sound recordings – that is, the conduct in which Sirius is engaged – could easily satisfy public demand to hear those recordings. That, again as a matter of common sense, could result in a substantial impact on Flo and Eddie's ability to sell and license Turtles recordings. If a subscriber can easily hear recordings performed by Sirius, why buy a record or download the recording from iTunes? If a potential licensee wants to perform Turtles recordings, why pay to do so, when Sirius performs them for free?

### 3. Sirius Engaged in Unfair Competition

Unfair competition is an "adaptable and capacious" tort that "has been broadly described as encompassing 'any form of commercial immorality.'" *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (quoting *Metro. Opera Ass'n*, 101 N.Y.S.2d at 492). More precisely, New York courts "have long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476-77 (2007). Palming off – "that is, the sale of the goods of one manufacturer as those of another," *id.* – is not at issue in this litigation. "An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Exp. Co.*, 672 F.2d at 1105; *see ITC Ltd.*, 9 N.Y.3d at 477-79.

Flo and Eddie's claim involves misappropriation. In particular, it argues that Sirius has taken and used the Turtles recordings – its property – to compete against it. Sirius does not truly dispute that it has "tak[en] and use[d]" Flo and Eddie's recordings. Instead Sirius raises two objections to Flo and Eddie's unfair competition claim.

First, Sirius claims that under *Naxos*, unfair competition requires "distribution" of property. *See* 4 N.Y.3d at 563. That is a strained reading of *Naxos*, which described a particular unfair competition claim grounded in physically pirating and selling records. No other opinion of which I am aware has described "distribution" as a requirement of the otherwise highly flexible and adaptable unfair competition tort. In any event, as I explained above, public performance is a form of distribution.

Second, Sirius argues that Flo and Eddie has not suffered any competitive injury. It is now well established that "the existence of actual competition between the parties is no longer a prerequisite" to sustaining an unfair competition claim. *Metro. Opera Ass'n*, 101 N.Y.S.2d at 491-92 (citing cases); *see ITC Ltd.*, 9 N.Y.3d at 478. Some "competitive injury," however, is still

33

required. *Yantha v. Omni Childhood Ctr., Inc.*, No. 13-CV-1948, 2013 WL 5327516, at *7 (E.D.N.Y. Sept. 20, 2013). A plaintiff must therefore show, "a direct financial loss, lost dealings, or lost profits resulting from the anticompetitive acts at issue or, at the very least, that defendant diverted plaintiff's customers and business to defendant." *Id.* (internal citations, quotation marks, and alterations omitted).

Flo and Eddie has satisfied the competitive injury requirement. As I explained when discussing fair use, it is a matter of economic common sense that Sirius harms Flo and Eddie's sales and potential licensing fees (even if the latter market is not yet extant) by publicly performing Turtles sound recordings. Evidence of the extent of that loss has not yet been presented because discovery has not yet been conducted on damages.

## VI. Flo and Eddie's Assertion of its Common Law Copyright Is Not Barred by the Dormant Commerce Clause

Finally, Sirius argues that Flo and Eddie's claims are barred by the Dormant Commerce Clause. Sirius is wrong.

The Constitution grants to Congress "Power . . . To regulate Commerce . . . among the several States . . . ." U.S. CONST. art. I, § 8. Although the Commerce Clause is written as an affirmative grant of power to Congress, the Supreme Court has held that it includes a negative or "dormant" implication that states may not interfere with interstate commerce. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326 n.1 (1989).

States may run afoul of the Dormant Commerce Clause's implied limits on their power in several ways: by discriminating against out-of-state goods, *see, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 454-57 (1992), by imposing generally applicable regulations that have the effect of excessively burdening interstate commerce, *see, e.g.*, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142-46 (1970), or by directly regulating commerce in other states, *see, e.g.*, *Healy*, 491 U.S. at

34

335-40. Sirius argues that the last prohibition – directly regulating commerce in other states – applies here.

Flo and Eddie argues that the Court need not reach the constitutional question because Congress has authorized New York to regulate pre-1972 sound recordings.

It is hornbook law that "Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). "But because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, th[e Supreme] Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.'" *Id.* at 138-39 (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)); *see Wyoming v. Oklahoma*, 502 U.S. at 458 (requiring an "unambiguous" congressional directive).

Flo and Eddie claims to find unambiguous Congressional authorization for New York's common law copyright scheme to be exempted from the implied limitations of the Commerce Clause in 17 U.S.C. § 301(c), which reads in full:

> With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067. The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on and after February 15, 2067. Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067.

In one of the two companion cases between Flo and Eddie and Sirius, my colleague in the District Court for the Central District of California found that § 301(c) unambiguously authorizes Flo and Eddie's companion California-law action. In a footnote, it dismissed with almost no discussion a Dormant Commerce Clause challenge similar to the one Sirius raises here, stating that "Because Congress specifically authorized protection of pre–1972 sound recording rights by the

35

states in 17 U.S.C. § 301(c), the California statute protecting those rights is not subject to the Commerce Clause." *Flo & Eddie Inc. v. Sirius XM Radio Inc.*, No. CV 13-5693, 2014 WL 4725382, at \*9 n.1 (C.D. Cal. Sept. 22, 2014).

However, I do not find the California Court's analysis persuasive, as it does not explain why the cited statute qualifies as a Commerce Clause exemption. And Flo and Eddie cites no legislative history or case law indicating that Congress intended to eliminate Dormant Commerce Clause scrutiny for state common law copyright. Instead, Flo and Eddie emphasizes the word "any," which it argues is an indication that Congress intended to permit "all" state statutes regulating copyright.

I do not read the cited section as Flo and Eddie does. I note that § 301(c) is contained in the section of the federal copyright law that addresses the law's preemptive scope. Thus, the language cited by Flo and Eddie could plausibly be interpreted, not to allow states to impose otherwise unconstitutional burdens on interstate commerce, but only to limit the scope of federal copyright law – by excluding, for a period of time, otherwise preempted state laws from the preemptive reach of 17 U.S.C. § 301(a). Under this interpretation, although § 301(c) broadly reaches "any" state right or remedy, it shields state regulation only from statutory preemption, not from Commerce Clause scrutiny.

The Supreme Court has construed an analogous statute in this very manner when analyzing a Dormant Commerce Clause challenge. In *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982), the Court decided whether Section 201 of the Federal Power Act was "an affirmative grant of power to the states to burden interstate commerce." *Id.* at 341. Subsection 201(b) provided that no provisions of the subchapter of which it was a part – including the sweeping preemption provisions of § 201(a) – "shall . . . deprive a State or State commission of its lawful authority now

36

exercised over the exportation of hydroelectric energy which is transmitted across a State line." *Id.* (quoting 16 U.S.C. § 824(b)).

The Court held that § 201(b) did "[n]othing . . . to alter the limits of state power otherwise imposed by the Commerce Clause," but "simply save[d] from pre-emption under Part II of the Federal Power Act such state authority as was otherwise lawful." *Id.* (internal citations and quotation marks omitted). So it is with 17 U.S.C. § 301(c). Like the statute at issue in *New England Power*, § 301(c) is framed as a limitation on preemption, not a relaxation of Commerce Clause limitations. That interpretation is even more persuasive here because, unlike in the statute analyzed in *New England Power*, § 301(c) makes no explicit reference to any sort of interstate commerce.

Even if the matter is not free from doubt, at the very least it is reasonable to interpret § 301(c) as a provision about federal statutory preemption, and not as an authorization for states to interfere with interstate commerce. That being so, § 301(c) does not "unambiguous[ly]," *Wyoming v. Oklahoma*, 502 U.S. at 458, or "unmistakably," *S.-Cent. Timber*, 467 U.S. at 91, permit state interference with interstate commerce in connection with pre-1972 sound recordings.

Therefore, and applying the reasoning of *New England Power*, I decline to adopt Flo and Eddie's interpretation of § 301(c).

However, Sirius's Dormant Commerce Clause challenge fails for a different reason: New York does not "regulate" anything by recognizing common law copyright. The issue is nothing more than a red herring.

The Clause itself "withholds from the states[, ]the power to regulate Commerce among the several States." *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 510 (2d Cir. 1995) (original alterations omitted). Thus, "the strictures of the dormant Commerce Clause are not activated unless a state action may be characterized as a 'regulation.'" *Id*; *United Haulers Ass'n, Inc. v. Oneida-*

37

*Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 254 (2d Cir. 2001) *aff'd*, 550 U.S. 330 (2007); *Metro. Washington Chapter v. D.C.*, No. CV 12-853, --- F. Supp. 2d ----, 2014 WL 3400569, at *16 (D.D.C. July 14, 2014).

Typically, courts have applied that principle in the context of the market participant exception, holding that states do not "regulate" commerce by actively participating in commercial markets. *See, e.g.*, *SSC Corp.*, 66 F.3d at 510.

But it is not only market participation that falls outside Dormant Commerce Clause scrutiny. In *Sherlock v. Alling*, 93 U.S. (3 Otto) 99 (1876), the Supreme Court considered whether an Indiana statute establishing liability for wrongful death, "if applied to cases of marine torts, would constitute a new burden upon commerce." *Id.* at 101-02 The Court affirmed the general principle that "States cannot by legislation place burdens upon commerce with foreign nations or among the several States." *Id.* at 102. But it noted that in every case where it had found a Dormant Commerce Clause violation, "the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between particular places was required to be conducted." *Id.* By contrast, the Indiana statute at issue "only declare[d] a general principle respecting the liability of all persons within the jurisdiction of the State for torts." *Id.* at 103.

The Court explained that "General legislation . . . prescribing the liabilities or duties of citizens of a State . . . is not open to any valid objection because it may affect persons engaged in foreign or inter-State commerce." *Id.* Otherwise, "Objection might with equal propriety be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates

of persons engaged in such commerce." *Id.* Since *Sherlock* was decided, courts have rejected Dormant Commerce Clause challenges for the reasons it cites. *See, e.g., Atl. Coast Line R. Co. v. Mazursky*, 216 U.S. 122, 132-34 (1910) (challenge to a law attaching liability to common carriers who failed to settle loss claims within forty days); *Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 46 (D. Mass. 2002) (challenge to tort action attaching liability to airline's failure to carry a defibrillator); *D.C. v. Beretta, U.S.A.*, Corp., 872 A.2d 633, 656-57 (D.C. 2005) (challenge to statute attaching strict liability to actions by firearms manufacturers); *West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 214-15 (Iowa 1972) (challenge to negligence action asserting failure-to-warn liability) (collecting cases).

What Sirius objects to is a "general principle respecting the liability of all persons within the jurisdiction of" New York. *Sherlock*, 93 U.S. (3 Otto) at 103. In particular, Sirius objects to property law principles that establish liability for infringing another party's copyright. But that property law principle is not a state-imposed regulation – even when applied to public performances by a national broadcaster. Sirius has not cited, and the Court has not found any cases holding that a state's general property law and associated liability principles could, in and of themselves, violate the Dormant Commerce Clause.

Holding Sirius liable might affect interstate commerce – just as a finding of liability did in *Sherlock. Id.* at 103. But concluding that Sirius is liable under New York property law principles would not amount to a "regulation" of interstate commerce by New York. It would, therefore, not give rise to a Dormant Commerce Clause claim.

Sirius is correct that this holding is unprecedented (aside from the companion California case, which reached the same result), and will have significant economic consequences. Radio broadcasters – terrestrial and satellite – have adapted to an environment in which they do not pay

royalties for broadcasting pre-1972 sound recordings. Flo and Eddie's suit threatens to upset those settled expectations. Other broadcasters, including those who publicly perform media other than sound recordings, will undoubtedly be sued in follow-on actions, exposing them to significant liability. And if different states adopt varying regulatory schemes for pre-1972 sound recordings, or if holders of common law copyrights insist on licensing performance rights on a state-by-state basis (admittedly, an unlikely result, since such behavior could well cause broadcaster to lose interest in playing their recordings) it could upend the analog and digital broadcasting industries.

But in the end, all this case presents me with is a suit between private parties seeking to vindicate private property rights – not a challenge to state regulation. That lawsuit can and will be resolved on its merits. The broader policy problems are not for me to consider. They are the province of Congress, the New York Legislature, and perhaps the New York Court of Appeals.

## CONCLUSION

For the foregoing reasons, Sirius's motion for summary judgment is **DENIED**. The Clerk of the Court is directed to remove Docket # 46 from the Court's list of pending motions. Sirius is **ORDERED** to advise the Court by Friday, December 5 of any remaining disputes of material fact that would require a trial. Otherwise, the Court will enter summary judgment in favor of Flo and Eddie as to liability and proceed to an inquest on damages.

Dated: November 14, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL