# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

FLO & EDDIE, INC., individually and on behalf of all others similarly situated,

        Plaintiff,

        -against-

SIRIUS XM RADIO, INC., and DOES 1 through 10,

        Defendant.

---

CIVIL ACTION No. 13-CV-5784 (CM)

## SIRIUS XM'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

Marc J. Pensabene
  mpensabene@omm.com

O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061

Daniel M. Petrocelli (*pro hac vice*)
  dpetrocelli@omm.com
Robert M. Schwartz (*pro hac vice*)
  rschwartz@omm.com
Victor H. Jih (*pro hac vice*)
  vjih@omm.com

O'Melveny & Myers LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel.: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendant*
*Sirius XM Radio, Inc.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT .................................................................................................................... 3

    I.     RECONSIDERATION IS WARRANTED. ............................................................ 3

    II.    UPON RECONSIDERATION, THE COURT SHOULD DETERMINE THAT
          THERE IS *NO* PERFORMANCE RIGHT IN PRE-1972 SOUND
          RECORDINGS UNDER NEW YORK COMMON LAW. ................................... 4

    III.   UPON RECONSIDERATION, THE COURT SHOULD DETERMINE THAT
          APPLYING A NEW YORK PERFORMANCE RIGHT TO SIRIUS XM'S
          NATIONAL BROADCASTS WOULD VIOLATE THE COMMERCE
          CLAUSE. ........................................................................................................... 12

    IV.   AT A MINIMUM, THE COURT SHOULD CERTIFY THE ORDER FOR
          INTERLOCUTORY REVIEW. ......................................................................... 17

          A.     The Order Addresses a Controlling Question of Law. ............................ 17

          B.     There Is a Substantial Ground for Difference of Opinion. ...................... 18

          C.     Review Could Materially Advance the Ultimate Termination
              of this Case. ............................................................................................ 19

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Allergan, Inc. v. Athena Cosmetics, Inc.,
  738 F.3d 1350 (Fed. Cir. 2013)....................................................................12

American Booksellers Foundation v. Dean,
  342 F.3d 96 (2d Cir. 2003)........................................................................2, 14

Am. Libraries Ass'n v. Pataki,
  969 F. Supp. 160 (S.D.N.Y. 1997)..........................................................14, 17

Arista Records LLC v. Lime Grp. LLC,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011).............................................................8

Atl. Coast Line R.R. Co. v. Mazursky,
  216 U.S. 122 (1909)...............................................................................15, 16

Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,
  476 U.S. 573 (1986)...................................................................................13

Campaign for Fiscal Equity, Inc. v. New York,
  8 N.Y.3d 14 (2006).....................................................................................11

Capital Cities Cable v. Crisp,
  467 U.S. 691 (1984)....................................................................................16

Capitol Records, Inc. v. Naxos of Am., Inc.,
  830 N.E.2d 250 (N.Y. 2005)......................................................................7, 8

Capitol Records, LLC v. Escape Media Group, Inc.,
  Case No. 12-cv-06646 (S.D.N.Y. 2014).........................................................7

Capitol Records, LLC v. Harrison Greenwich, LLC,
  Case No. 65224 (N.Y. Sup. Ct. 2014) ............................................................7

Capitol Records, Inc. v. Mercury Records Corp.,
  221 F.2d 657 (2d Cir. 1955)......................................................................7, 8

Capitol Records, LLC v. Vimeo, LLC,
  972 F. Supp. 2d 537 (S.D.N.Y. 2013).............................................17, 18, 19

Cobalt Multifamily Investors I, LLC v. Shapiro,
  2009 WL 2058530 (S.D.N.Y. July 15, 2009) ................................................3

*District of Columbia v. Beretta*,
  872 A.2d 633 (D.C. 2005) ................................................................15

*Fed. Housing Fin. Agency v. UBS Americas, Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ..........................................19, 20

*Firma Melodiya v. ZYX Music GmbH*,
  882 F. Supp. 1306 (S.D.N.Y. 1995) ..................................................8

*Flood v. Kuhn*,
  407 U.S. 258 (1972) ............................................................... *passim*

*Glatt v. Fox Searchlight Pictures Inc.*,
  2013 WL 5405696 (S.D.N.Y. Sept. 17, 2013) ...............................19

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ......................................................................13

*Klinghoffer v. S.N.C.*,
  921 F.2d 21 (2d Cir. 1990) ............................................................18

*McClure v. Life Ins. Co. of N. Am.*,
  84 F.3d 1129 (9th Cir. 1996) ........................................................10

*Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
  199 Misc. 786 (N.Y. Sup. Ct. 1950) ................................................8

*N.Y. Racing Ass'n Inc. v. Perlmutter Publ'g, Inc.*,
  959 F. Supp. 578 (N.D.N.Y. 1997) ...............................................18

*NCAA v. Miller*,
  10 F.3d 633 (9th Cir. 1993) ..........................................................15

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
  92 N.Y.2d 458 (1998) ..............................................................10, 11

*Partee v. San Diego Chargers Football Co.*,
  34 Cal. 3d 378 (1983) ..............................................................14, 16

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ............................................................... *passim*

*Pinter v. City of New York*,
  976 F. Supp. 2d 539 (S.D.N.Y. 2013) ...........................................19

*RCA Mfg. Co. v. Whiteman*,
  114 F.2d 86 (2d Cir. 1940) ..................................................... *passim*

*Reese v. BP Exploration (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ...................................................................19

*Rep. of Colombia v. Diageo N. Am. Inc.*,
    619 F. Supp. 2d 7 (E.D.N.Y. 2007) .........................................................19

*S.E.C. v. Amerindo Inv. Advisors, Inc.*,
    2014 WL 405339 (S.D.N.Y. Feb. 3, 2014)..................................................3

*Sherlock v. Alling*,
    93 U.S. 99 (1876).........................................................................13, 15, 16

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995)......................................................................3, 4

*Stone v. Frontier Airlines, Inc.*,
    256 F. Supp. 2d 28 (D. Mass. 2002) .........................................................15

*Supreme Records, Inc. v. Decca Records, Inc.*,
    90 F. Supp. 904 (S.D. Cal. 1950)...............................................................9

*Tetra Tech., Inc. v. Harter*,
    823 F. Supp. 1116 (S.D.N.Y. 1993)..........................................................12

*Transp. Workers Union, Local 100 v. New York City Transit Auth.*,
    358 F. Supp. 2d 347 (S.D.N.Y. 2005)............................................17, 18, 19

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    261 F.3d 245 (2d Cir. 2001).....................................................................13

*United States v. Lo Russo*,
    695 F.2d 45 (2d Cir. 1982).........................................................................3

*Update Art, Inc. v. Charnin*,
    110 F.R.D. 26 (S.D.N.Y. 1986) .................................................................3

*Wabash, St. Louis & Pac. Ry. v. Ill.*,
    118 U.S. 557 (1886)..................................................................................15

*Waring v. WDAS Broad. Station, Inc.*,
    327 Pa. 433 (1937).....................................................................................5

*West v. Broderick & Bascom Rope Co.*,
    197 N.W.2d 202 (Iowa 1972) ...................................................................15

*Wray v. City of New York*,
    490 F.3d 189 (2d Cir. 2007)......................................................................17

**STATUTES**

17 U.S.C. § 106.................................................................................................6, 10

28 U.S.C. § 1292(b)................................................................................................17

47 U.S.C. § 307.......................................................................................................16

Act of Jan. 6, 1897, ch. 4, 29 Stat. 481 .................................................................10

23 FCC Rcd 12348 (2008)...............................................................................14, 16

N.C. GEN. STAT. § 66-28........................................................................................16


**RULES**

FED. R. CIV. P. 54(b) .................................................................................................3

Southern District of New York Local Rule 6.3 .........................................................4


**OTHER AUTHORITIES**

*Copyright Law Revision: Hearing Before the Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, Part 2*, 90th Cong., 494 (1967)...............................................................................................................6

Douglas G. Baird, *Common Law Intellectual Property and the Legacy of International News Service v. Associated Press,* 50 U. CHI. L. REV. 411 (1983)..............................5

REGISTER OF COPYRIGHTS, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS (U.S. Copyright Office Dec. 2011)..................................................................................................5

June M. Besek & Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J. L. & ARTS 327 (2014)..................6

*Music Licensing Part One: Legislation in the 112th Congress, Hearing Before the Subcomm. on Intellectual Prop., Competition, & the Internet of the H. Comm. on the Judiciary*, 112th Cong. 213........................................................................9

H.R. Rep. No. 104-274 (1995)................................................................................11

S. Rep. No. 104-278 (1995)....................................................................................11

Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 Geo. Wash. L. Rev. 152 (1974) ........................................................................1, 5

Shyamkrishna Balganesh, *The Pragmatic Incrementalism of Common Law Intellectual Property*, 63 Vand. L. Rev. 1543 (2010) .............................................................10

Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current Law*, 1979 U. Ill. L. F. 337 (1979) ...........................................................................5, 7

Supp. Register's Rep. on the General Revision of U.S. Copyright Law (1965) ...................9

Prof. Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law*, Technology & Marketing Blog (Oct. 1, 2014), http://blog.ericgoldman.org ...............1, 6

## PRELIMINARY STATEMENT

Sirius XM seeks reconsideration of the Court's November 14, 2014 Order Denying Defendant's Motion for Summary Judgment. The Court ruled that New York common law provides a performance right to the owner of a pre-1972 sound recording, and that it would not violate the Commerce Clause to apply this New York-specific performance right to Sirius XM's national broadcasts. Reconsideration is warranted for two reasons:

*First*, the Court's ruling that New York common law provides a performance right in sound recordings was based on the false premise that "[n]o New York case recognizing a common law copyright in sound recordings has so much as suggested that right was in some way circumscribed." Order at 20. There *is* such a case, but it was not addressed in the summary judgment briefing. In *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 87-88 (2d Cir. 1940), Judge Learned Hand considered the same question facing this Court—*i.e.*, "whether [a sound recording owner] had any musical property at common-law in the records which radio broadcasting invaded"—and concluded that there was *no* such performance right. *Whiteman* established a "75-year-old consensus that state law does not provide a public performance right for sound recordings." Professor Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law*, Technology & Marketing Blog (Oct. 1, 2014), http://blog.ericgoldman.org; *see also* Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 GEO. WASH. L. REV. 152, 154-56, 171 (1974) ("The last reported case involving purported common law performing rights was *RCA Mfg. Co. v. Whiteman*…. [R]ecord companies have not tried to establish a public performance right through state legislation.").

The common law rule established by *Whiteman* is rooted in longstanding policy considerations. Sound recordings are unique among creative works in that they involve

competing stakeholders, including a composer, a performing artist, a record company that records the performance, and a broadcaster that publicly performs the recording. Creating a performance right in sound recordings would hand a windfall to record companies at the expense of not only broadcasters like Sirius XM, but composers and performing artists, because imposing restrictions on public performance will decrease the airtime for their songs and, as a result, the amount of publishing royalties and publicity they receive. As the Court recognized, this would also increase the costs to consumers, and "possibly make broadcasts of pre-1972 recordings altogether unavailable." Order at 24.

Absent reconsideration, the Court's ruling would eviscerate *Whiteman*, upset the longstanding consensus that there are no state performance rights in sound recordings, and create significant and far-reaching policy problems. The Court should reconsider and reverse its Order.

***Second***, the Court's Commerce Clause ruling overlooked controlling authorities establishing that it would violate the Commerce Clause to apply a New York-specific performance right to Sirius XM's national broadcasts of pre-1972 sound recordings, including (a) *American Booksellers Foundation v. Dean*, 342 F.3d 96, 103-04 (2d Cir. 2003), which held that it would violate the Commerce Clause *per se* to apply a state law of general applicability to commercial activities that, like Sirius XM's satellite radio broadcasting and internet streaming, "do[] not recognize geographic boundaries," and (b) *Flood v. Kuhn*, 407 U.S. 258, 284-85 (1972), which held that it would violate the Commerce Clause to apply conflicting state laws to an entity that, like Sirius XM, is required to follow a nationally "uniform" set of rules.

The Court also failed to address the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), which is an independent basis for finding a Commerce Clause violation on an "as applied" basis. That test is satisfied here, because applying a performance right to

broadcasters like Sirius XM would have "significant economic consequences" that threaten the

broadcasting industry, Order at 39-40, and there is no more than a marginal benefit to New York.

If the Court does not believe reconsideration is warranted, it should certify these issues

for interlocutory review. The Court recognized that its Order addresses a "thorn[y]" question "of

first impression," has far-reaching implications that "could upend the analog and digital

broadcasting industries," and presents "broad[] policy problems" within the province of the

Legislature or "New York Court of Appeals." *Id.* at 16, 39-40. These are precisely the

exceptional circumstances that require and deserve immediate appellate review.

## ARGUMENT

## I.    RECONSIDERATION IS WARRANTED.

In addition to the particular circumstances addressed by Southern District of New York

Local Rule 6.3, interlocutory orders granting partial summary judgment may be reconsidered "at

any time" pursuant to the Court's inherent authority. *Update Art, Inc. v. Charnin*, 110 F.R.D. 26,

35-36 (S.D.N.Y. 1986); *see also United States v. Lo Russo*, 695 F.2d 45, 53 (2d Cir. 1982) ("A

district court has the inherent power to reconsider and modify its interlocutory orders prior to the

entry of judgment."). Moreover, Federal Rule of Civil Procedure 54(b) provides that such

interlocutory orders "may be revised at any time." FED. R. CIV. P. 54(b); *see also S.E.C. v.

Amerindo Inv. Advisors, Inc.*, 2014 WL 405339, at *3 (S.D.N.Y. Feb. 3, 2014) ("Rule 54(b)

allows for reconsideration in the district court's equitable discretion").

Reconsideration is warranted where, as here, the Court failed to take into account key

legal authorities or arguments. *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.

1995) (reconsideration warranted where movant presented "additional relevant case law and

substantial legislative history"); *Cobalt Multifamily Investors I, LLC v. Shapiro*, 2009 WL

2058530, at *5 (S.D.N.Y. July 15, 2009) (granting reconsideration "to correct a clear error" of law). As set forth below, the summary judgment briefing omitted controlling authorities, including *Whiteman* and *Flood*, which would have compelled judgment for Sirius XM.

Reconsideration of the Court's Commerce Clause ruling is also warranted under Local Rule 6.3. The Court "overlooked … controlling decisions" that were cited in Sirius XM's summary judgment briefing, including *American Booksellers* and *Pike*, which could have "alter[ed] the conclusion reached by the court." *Shrader*, 70 F.3d at 257.

## II. UPON RECONSIDERATION, THE COURT SHOULD DETERMINE THAT THERE IS *NO* PERFORMANCE RIGHT IN PRE-1972 SOUND RECORDINGS UNDER NEW YORK COMMON LAW.

The Court concluded that there was "[n]o New York case [that] so much as suggested" there was not a performance right in pre-1972 sound recordings, and interpreted this "judicial silence" to mean there *was* such a right. Order at 16-20. But in *Whiteman*, the Second Circuit made clear that the owner of a sound recording has never had the right to control its public performance. Because *Whiteman* was not addressed in the summary judgment briefing, the Court did not have the benefit of considering this critical case before issuing its Order.

*Whiteman* is the only case to squarely address the existence of a common law performance right in pre-1972 sound recordings. In *Whiteman*, a record company and orchestra leader brought common law copyright infringement and unfair competition claims against a radio network for nationally broadcasting their records. In an opinion written by Judge Learned Hand, the Second Circuit considered "whether [the performer] and/or [record label] had any musical property at common-law in the records which radio broadcasting invaded," 114 F.2d at 87—*i.e.*, whether the owner of a sound recording had any common law performance right. To

answer this question, Judge Hand surveyed the common law across the United States and found that only one case—*Waring v. WDAS Broad. Station, Inc.*, 327 Pa. 433 (1937)—had ever recognized any right to control the performance of a sound recording (in the limited form of barring the unauthorized broadcast of records sold with a label prohibiting public performance). Judge Hand rejected the reasoning in *Waring*, and held that common law copyright "consists *only* in the power to prevent others from reproducing the copyrighted work," 114 F.2d at 88 (emphasis added)—*i.e.*, *there is no common law performance right*. The radio network had "never invaded any such right of [the performer]; they have never copied his performances at all; they have merely used those copies which he and the [record company] made and distributed." *Id.* Therefore, the radio network could not be liable for broadcasting the records.

*Whiteman* established the longstanding rule that no public performance right exists in sound recordings at common law. *See* Bard & Kurlantzick, *supra*, at 154-56 (noting that *Whiteman* was "[t]he last reported case involving purported common law performing rights," and that "record companies have not tried to establish a public performance right through state legislation as they successfully did with respect to unauthorized record duplication"); Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current Law*, 1979 U. ILL. L. F. 337, 346-347 (1979) ("*Whiteman* stands for the principle that the sale of a record divests the production company or the performing artists of their rights, if any, to control its use."); Douglas G. Baird, *Common Law Intellectual Property and the Legacy of International News Service v. Associated Press*, 50 U. CHI. L. REV. 411, 419 n.35 (1983) (noting that the "law did not (and in fact still does not) give a performer the right to control radio broadcasts of his performances"); REGISTER OF COPYRIGHTS, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS 44-45 (U.S. Copyright Office Dec.

2011) (report to Congress) (citing *Whiteman* and explaining that, although states could interpret common law as providing a performance right, "state law does not appear to recognize a performance right in sound recordings"); June M. Besek & Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J.L. & ARTS 327, 338 (2014) ("[S]tates do not appear to recognize a right of public performance in pre-1972 sound recordings…."); Ochoa, *supra* (recognizing the "75-year-old consensus that state law does not provide a public performance right for sound recordings").

In the Order, the Court found it "inexplicable" that sound recording owners never tried to enforce a performance right in their pre-1972 sound recordings before now. Order at 18. But this *is* explicable: there was no performance right to enforce. Sound recording owners like plaintiff knew this, which is why they "argued vociferously before Congress" for the creation of such a right. *Id.*; *see also* Dkt. 54 at 10-12 (collecting testimony); *Copyright Law Revision: Hearing Before the Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, Part 2*, 90th Cong. 494, 496, 502 (1967) (Capitol Records: "The record company receives nothing from the widespread performance-for-profit of its products …. There is no clearly established legal remedy to stop this unauthorized use."), Pensabene Decl. Ex. 1.[1]

As the Court acknowledged, no court has ever held there is a performance right in sound recordings under New York common law. *See* Order at 16. In summary judgment briefing, plaintiff cited two non-binding trial court orders, but neither one addresses *Whiteman* or the existence of a performance right in sound recordings. In *Capitol Records, LLC v. Harrison*

---

[1] The Court stated that "if public performance rights were not part of the normal bundle of rights in a copyright, Congress would not have needed to carve out an exception specifically for sound recordings." Order at 21. But the legislative history is clear and undisputed that there was no performance right, *supra*, and *Whiteman* confirms this. Congress included the carve-out to distinguish sound recordings from other copyrighted works, which enjoy the complete "bundle of rights" provided by 17 U.S.C. § 106, including a specific public performance right.

*Greenwich, LLC*, the court granted an unopposed request for a factual finding that defendant engaged in an "unauthorized performance" of a 1970 song. Dkt. 49-32 at 1 (Gerba Decl. Ex. 32). This Court rightly declined to consider that order because it "does not explain its ruling and cites no prior case law recognizing any public performance right in sound recordings." Order at 16 n.2. In *Capitol Records, LLC v. Escape Media Group, Inc.*, the magistrate merely accepted plaintiff's unopposed argument (without analysis) that if defendant infringed plaintiff's performance rights under federal law, then it also infringed plaintiff's rights under state law. Dkt. 82-2 at 51-52 (Gerba Suppl. Decl. Ex. 2). Finally, in the still-pending California litigation, the trial courts have found that California Civil Code Section 980(a) provides a performance right in pre-1972 sound recordings. But neither court was aware of *Whiteman* (or other California cases consistent with *Whiteman*) and Sirius XM is currently seeking reconsideration on that ground, among others.

*Whiteman*'s holding that there is no common law performance right in sound recordings remains good law. But in dictum, Judge Hand considered a separate question—*i.e.*, whether the sale of a record was a general publication that ended its common law copyright—and opined, based on federal preemption principles, that after a record's sale, "anyone may copy it." 114 F.2d at 89. Judge Hand later acknowledged this statement was dicta, since copying was not at issue in *Whiteman*. *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 664 (2d Cir. 1955); *see* Diamond, *supra*, at 347 ("[t]he only issue in [*Whiteman*] was the performance by radio broadcast of [a record]," and statement that "anyone may copy it" was "dictum").

Courts applying New York law have declined to follow this statement and held that the "public sale of a sound recording" does not "divest the owner of common-law copyright protection." Order at 28 (citing *Capitol Records, Inc. v. Naxos of Am., Inc.*, 830 N.E.2d 250,

259-60 (N.Y. 2005)).  But courts rejected only "the quoted statement" from *Whiteman*—*i.e.*, that after a record's sale, "anyone may *copy* it" (emphasis added)—and left undisturbed its dispositive ruling that there is no *performance* right in sound recordings.  *See Mercury Records*, 221 F.2d at 663 (citing *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 796 (N.Y. Sup. Ct. 1950)); *accord Naxos*, 830 N.E.2d at 259-60.

As these cases made clear, the *only* right in a sound recording under New York common law is the right to prevent unauthorized duplication and distribution, or "bootlegging."  *See Metro. Opera*, 199 Misc. at 796 (defendant engaged in "piratical conduct" by making unauthorized recordings of live opera broadcasts and selling them); *Mercury Records*, 221 F.2d at 661-63 (record company could enforce exclusive license to copy and sell songs against competitor); *Naxos*, 830 N.E.2d at 252 (competing record company copied and distributed plaintiff's songs); *see also Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 436 (S.D.N.Y. 2011) (file-share website facilitated illegal downloads); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995) (defendant forged copyright license to make and sell knock-off CDs).  This is consistent with *Whiteman*, which held that the "only" common law right in sound recordings is "the power to prevent others from reproducing" them.  114 F.2d at 88.  In *Naxos*, the New York Court of Appeals (on certification from the Second Circuit) conducted a comprehensive review and analysis of the protections afforded to sound recordings in New York over the past century.  The court made *no mention* of any performance right under New York law; the court merely held that the owner of a sound recording had the right to prevent a competitor from *duplicating* and *distributing* it.  830 N.E.2d at 260-61.

This common law distinction between the right to protect against unauthorized duplication and distribution of sound recordings (which has long been recognized) and the right

to control public performances of sound recordings (which has never existed) is rooted in longstanding policy considerations.  Sound recordings are distinct from other copyrighted works because they involve competing stakeholders—including, in most instances, a composer, a performing artist, a record company, and a broadcaster—such that granting or enhancing one stakeholder's rights may harm the others.  *See* SUPP. REGISTER'S REP. ON THE GENERAL REVISION OF U.S. COPYRIGHT LAW 51 (1965), Dkt. 49-11 at 7-8 (proposed addition of performance right in sound recordings "strenuously opposed" by composers, among others, who "would probably get a smaller slice of the pie"); *Music Licensing Part One: Legislation in the 112th Congress, Hearing Before the Subcomm. on Intellectual Prop., Competition, & the Internet of the H. Comm. on the Judiciary*, 112th Cong. 213 (Songwriters Guild of America: stating, in context of proposed Internet Radio Fairness Act, that "the rights of music creators such as songwriters … must be considered quite apart from those of recording artists" because "the interests of these two groups do not coincide"), Pensabene Decl. Ex. 2; *Supreme Records, Inc. v. Decca Records, Inc.*, 90 F. Supp. 904, 909 (S.D. Cal. 1950) (giving property rights to performing artist "would not aid" song's composer, who wants songs performed widely).

Today, sound recordings are almost always owned by record companies.  Giving record companies the right to control public performances would amount to an unexpected windfall at the expense of composers and performing artists because any restrictions on, or increased costs of, such performances would decrease the number of times their songs are played, and as a result, the amount of publishing royalties and publicity they receive.  In contrast, the limited common law right to prevent unauthorized *duplication* of sound recordings serves the interests of all stakeholders, since bootlegging does not generate any royalties for them and creates quality control problems and, thus, dissatisfied consumers who may blame the legitimate stakeholders.

In other industries, courts have recognized a right of public performance. *E.g.*, Order at 17, 19 (noting common law performance right for plays, films, and choreography). But those cases are not analogous, because unlike sound recordings, those creative works do not have the same competing stakeholders who benefit from widespread performance of their works. That is why Congress did not recognize any performance right in sound recordings until 1995, nearly 100 years after it first recognized a performance right in musical compositions. 17 U.S.C. § 106; Act of Jan. 6, 1897, ch. 4, 29 Stat. 481, 481-82; *see* Order at 10-11, 21 n.3 (summarizing legislative history).

Without the benefit of *Whiteman*, the Court overlooked these policy considerations and concluded that "as a matter of public policy there would seem to be good reason to harmonize New York's common law of copyright with its federal statutory counterpart" by recognizing a performance right. Order at 23. This was error.

*First*, recognizing a performance right in sound recordings would be a radical departure from the common law rule established by *Whiteman* decades ago. Courts have cautioned against this, emphasizing that evolution of the common law must be "incremental" and "not stray too far from the existing regime." *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1135 (9th Cir. 1996); *see Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 467-68, (1998) (common law should develop "at a snail-like pace" to avoid "encroachment on the legislative branch"). This principle is particularly true where expanding the common law would affect social policies and commercial relationships, such as the competing stakeholder interests at issue here. *See* Shyamkrishna Balganesh, *The Pragmatic Incrementalism of Common Law Intellectual Property*, 63 VAND. L. REV. 1543, 1569 (2010) (expanding common law property rights could "have a chilling effect on certain kinds of socially beneficial activities"). Such

policy judgments are best "left to the discretion of the political branches of government." *Campaign for Fiscal Equity, Inc. v. New York*, 8 N.Y.3d 14, 28 (2006).

**Second**, creating a performance right under New York law would not be in "harmony" with the Copyright Act, because it would not contain any of the safety valves that were carefully built into the legislative scheme. As the Court recognized, "the right Congress has created for post-1972 works is part of a carefully crafted scheme." Order at 24. Congress drafted the Digital Performance Act over months and after dozens of witnesses testified about the commercial consequences and policy considerations, after committees produced multiple reports detailing their findings, and after Congress had drafted (and re-drafted) the Act to address each issue. *See, e.g.*, H.R. REP. NO. 104-274 (1995); S. REP. NO. 104-278 (1995). Congress also put into place a complex compulsory licensing arrangement along with specific mechanisms to set licensing rates and transmit payments, including a requirement that the record companies share one-half of the compulsory license fees with the musicians and singers who created the recordings, and not just pocket the money for themselves. *See* H.R. REP. NO. 104-274, at 14-15.

There has been no judicial counterpart to this process, and there would be no common law basis on which it could rest. The Court acknowledged that creating a common law performance right in sound recordings raises questions about its scope and "administrative difficulties in the imposition and collection of royalties," Order at 24, which would ultimately increase consumer costs, shut down many broadcasters, and decrease access to pre-1972 sound recordings. These complex policy tradeoffs are to be resolved by the Legislature or Congress. *See Norcon Power*, 92 N.Y.2d at 467-68; *Campaign for Fiscal Equity*, 8 N.Y.3d at 28.

The Court should reconsider and reverse its ruling that New York common law provides a performance right in pre-1972 sounds recordings. If it grants reconsideration, the Court should

also revisit its rulings on plaintiff's reproduction claims, since the Court's conclusion that Sirius XM's performances were unlawful factored into its rulings that Sirius XM's reproductions—which were necessary and incidental to those performances—were unlawful and not fair use. *See* Order at 27, 30, 32-33.[2] The Court should thus reconsider those rulings as well.

## III. UPON RECONSIDERATION, THE COURT SHOULD DETERMINE THAT APPLYING A NEW YORK PERFORMANCE RIGHT TO SIRIUS XM'S NATIONAL BROADCASTS WOULD VIOLATE THE COMMERCE CLAUSE.

The Court rightly held that Section 301(c) of the Copyright Act does not "unambiguously" or "unmistakably … permit state interference with interstate commerce," as required by Supreme Court jurisprudence. Order at 37. To the contrary, "it is reasonable to interpret § 301(c) as a [savings clause], and *not as an authorization* for states to interfere with interstate commerce." *Id.* (emphasis added). The Court erroneously concluded, however, that "a state's general property law and associated liability principles" cannot violate the Commerce Clause. *Id.* at 39. Reconsideration is warranted because the Court overlooked controlling authorities establishing that it would violate the Commerce Clause to apply a New York performance right in pre-1972 sound recordings to Sirius XM's national broadcasts.

*First*, the Court concluded that laws of general applicability are not state "regulations" subject to Commerce Clause scrutiny. *Id.* Not so. A state's general common law constitutes a "regulation" just like a state statute or any other law. *See Allergan, Inc. v. Athena Cosmetics, Inc.,* 738 F.3d 1350, 1359 (Fed. Cir. 2013) (neither a state's courts *nor* its legislature "are permitted to regulate commerce entirely outside of the state's borders"); *Tetra Tech., Inc. v. Harter,* 823 F. Supp. 1116, 1124 (S.D.N.Y. 1993) ("Congress has the last word by virtue of the

---

[2] The Court did not address Sirius XM's affirmative defenses other than laches and fair use. Those defenses preclude judgment, as Sirius XM will explain in its December 5 submission.

[Commerce] Clause itself; it can—and on occasion does—modify dispositions made by the judiciary"). In fact, *any* time a state "exercises governmental powers that are unavailable to private parties," that action constitutes a "regulation" subject to Commerce Clause scrutiny. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255 (2d Cir. 2001) (finding that a state's "participation in the free market … like a private enterprise" is not a regulation because the state is not exercising its governmental powers in that limited context). Sirius XM made this point in its summary judgment briefing, and plaintiff *never* contested it. *Compare* Dkt. 54 at 35 (citing *Allergan* and *Tetra Tech*) *with* Dkt. 56 at 29-33.

*Sherlock v. Alling*, 93 U.S. 99 (1876), and its progeny are not to the contrary. Those cases recognized that the state laws at issue were regulations and thus not exempt from the Commerce Clause, but concluded that those regulations did not violate the Commerce Clause based on the particular facts of those cases—which are distinguishable for the reasons explained below. *See, e.g.*, *id.* at 103-04 (undertaking Commerce Clause analysis and concluding that state legislation at issue did not burden interstate commerce and was proper).

**Second**, the Court concluded that "general property law and associated liability principles"—*i.e.*, laws that do not directly target interstate commerce—cannot violate the Clause. Order at 39. This was error. A state law that has the "practical effect" of regulating interstate commerce violates the Commerce Clause *per se*, regardless of its wording or subject matter. *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989); *see Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) ("That the [law] is addressed only to sales of liquor in [state] is irrelevant if the 'practical effect' of the law is to control liquor prices in other States.").

Plaintiff does not dispute that Sirius XM is engaged in interstate commerce. Sirius XM broadcasts across the country through satellite radio and internet streaming—which are by their

very nature "boundary-less," *Am. Booksellers*, 342 F.3d at 103—and the radio receivers, mobile devices, and computers that subscribers use to access Sirius XM's broadcasts are routinely transported across state lines. In *American Booksellers*—which was cited in Sirius XM's summary judgment motion but not addressed by the Court, Dkt. 54 at 35-36—the Second Circuit held that it is a *per se* violation of the Commerce Clause to apply a state regulation to such interstate activities. In that case, the court considered a statute that forbid the distribution of material "harmful to minors" in the state of Vermont. Although the statute was not directed at interstate commerce, it violated the Commerce Clause *per se* when applied to plaintiffs' "internet speech," because its practical effect was to regulate out-of-state conduct. *Id*. at 104; *see also id.* at 103 ("Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities."); *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 177 (S.D.N.Y. 1997) (New York statute *per se* violated Commerce Clause "as applied to plaintiffs' internet speech" because it regulated conduct outside the state).

Moreover, the FCC has mandated that Sirius XM's broadcasts must be nationally uniform and cannot be tailored to a particular state. 23 FCC Rcd 12348, 12419 ¶ 155 (2008). The Supreme Court has made clear that it would violate the Commerce Clause to apply a state regulation to an entity that, like Sirius XM, is required to follow nationally uniform rules. For example, in *Flood v. Kuhn*, 407 U.S. 258, 284-85 (1972), the Supreme Court held that it would violate the Commerce Clause to apply a state's antitrust statute to the regulation of baseball and its reserve system, because "uniformity [was] required in any regulation of baseball and its reserve system," and allowing conflicting state laws to apply would unreasonably burden interstate commerce. *See also Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 383-85 (1983) (holding that California's antitrust statute could not be applied to the NFL, which

adhered to "a nationally uniform set of rules"); *Wabash, St. Louis & Pac. Ry. v. Ill.*, 118 U.S. 557, 577 (1886) (conduct "of a general and national character … cannot be safely and wisely remitted to local rules and local regulations"); *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993) (a state statute that "directly regulates interstate commerce … violates the Commerce Clause *per se*" and the court "must strike it down without further inquiry").

The Court disregarded both lines of cases and instead relied on *Sherlock* and its progeny. Those cases are inapposite. They simply held that an entity is not automatically immunized from liability for personal injuries and property damage it commits in a particular state simply because it happens to be engaged in interstate commerce. *Sherlock*, 93 U.S. at 100-01 (shipper sought to evade liability for boat accident in Indiana by claiming it was engaged in interstate commerce); *Atl. Coast Line R.R. Co. v. Mazursky*, 216 U.S. 122, 129 (1909) (postal carriers sought immunity for property damage occurring in South Carolina); *District of Columbia v. Beretta*, 872 A.2d 633, 655-56 (D.C. 2005) (national gun manufacturer sought to avoid strict liability from injuries occurring in Washington, D.C.); *Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 47 (D. Mass. 2002) (airline sought immunity for negligent actions in Massachusetts); *West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 214-15 (Iowa 1972) (rope manufacturer that distributed products nationwide sought to avoid tort liability for negligent failure-to-warn occurring in Iowa).[3] *Sherlock* held that in such circumstances, applying a state liability law would "only indirectly and remotely affect commerce." 93 U.S. at 104.

---

[3] In almost all of these cases, the court considered a state law designed to protect the health and safety of its citizens, and noted that such laws—unlike the common law rights in sound recordings at issue here—are entitled to heightened deference. *See Sherlock*, 93 U.S. at 103 (Constitution "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens"); *Beretta*, 872 A.2d at 656 (same); *West*, 197 N.W.2d at 214 (same); *Stone*, 256 F. Supp. 2d at 47 ("health and safety of state citizens [is] a traditionally paramount state interest" outweighing "limited burden" on interstate commerce).

That is not this case. Sirius XM's FCC licenses require that its broadcasts be nationally uniform. 23 FCC Rcd at 12419 ¶ 155. Other states do *not* recognize any performance right in pre-1972 sound recordings. *See supra* at 5-6; N.C. GEN. STAT. § 66-28 ("abolish[ing] any common-law rights" to restrict use of a sound recording). If New York common law recognizes a performance right, Sirius XM would have to alter its national broadcasts to comply with New York law. This is not an "indirect" or "remote" effect on interstate commerce; it is a *direct regulation* of interstate commerce in violation of the Commerce Clause. *See Flood*, 407 U.S. at 284-85 (states cannot apply conflicting laws to entity with nationally uniform operations and rules); *Partee*, 34 Cal. 3d at 383-85 (requiring entity with nationally uniform rules "to comply with the laws of the strictest state" violates Commerce Clause).[4] It would be tantamount to imposing a state "license fee" or tax on interstate commerce, which under *Sherlock* would violate the Commerce Clause. 93 U.S. at 102; *accord Mazursky*, 216 U.S. at 133.

**Third**, the Court failed to address the balancing test set forth in *Pike*, 397 U.S. at 142, which—as this Court recognized, Order at 34—is an independent basis for finding a Commerce Clause violation. In *Pike*, the Supreme Court held that even if a statute has only incidental effects on interstate commerce, it still violates the Commerce Clause if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." 397 U.S. at 142. That test is satisfied here. Applying a state-specific performance right would impose a staggering burden on Sirius XM and other broadcasters. As the Court observed, this would have "significant economic consequences" and "could upend the analog and digital broadcasting industries." Order at 39-40. On the other hand, plaintiff has yet to identify any countervailing

---

[4] Absent reconsideration, the Order would also be preempted by the Communications Act, which gives the FCC sole authority to regulate radio broadcasts. 47 U.S.C. §§ 307 *et seq.*; *see Capital Cities Cable v. Crisp*, 467 U.S. 691, 698-99 (1984) (state statute that restricted content that could be broadcast by cable system preempted by federal Communications Act).

benefit to New York.  Plaintiff claims that a performance right would benefit sound recording owners (many of whom, *including plaintiff*, are not even New York citizens).  But a state's "tenuous interest" in protecting certain of its citizens "cannot constitutionally justify" burdening interstate commerce.  *See Pike*, 397 U.S. at 145 (Arizona's interest in protecting fruit growers outweighed by burden of requiring company to build local packing plant); *Pataki*, 969 F. Supp. at 177-78 (state interest in protecting minors outweighed by chilling effect on internet speech).

## IV.    AT A MINIMUM, THE COURT SHOULD CERTIFY THE ORDER FOR INTERLOCUTORY REVIEW.

Interlocutory review is warranted where an order: (1) "involves a controlling question of law as to which" (2) "there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *see also Wray v. City of New York*, 490 F.3d 189, 190-91 (2d Cir. 2007).  All of these requirements are satisfied here.

### A.    The Order Addresses a Controlling Question of Law.

An issue represents "a controlling question of law" if its resolution could "materially affect the outcome of [the] litigation" *or* have "precedential value" in other cases.  *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013); *Transp. Workers Union, Local 100 v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 353 & n.20 (S.D.N.Y. 2005).  Here, an interlocutory appeal could serve both goals.

The Order resolved the central legal issue in this case: whether New York common law provides a performance right in pre-1972 sound recordings that applies to Sirius XM.  Resolution of this issue by the Second Circuit would materially advance—and could effectively end—this litigation.  *See Wray*, 490 F.3d at 190-91 (interlocutory appeal from summary judgment order

would "materially advance" litigation); *N.Y. Racing Ass'n Inc. v. Perlmutter Publ'g, Inc.*, 959 F. Supp. 578, 583-85 (N.D.N.Y. 1997) (issue "controlling" where resolution was "central to the Court's analysis"). If the Second Circuit agrees with Sirius XM that New York common law does *not* provide a performance right in pre-1972 recordings, or that applying such a right to Sirius XM would violate the Commerce Clause, this would dispose of plaintiff's performance-based claims. This would also dispose of plaintiff's claims that Sirius XM unlawfully reproduced and distributed its sound recordings, since if the underlying performances were lawful, then the challenged reproductions would be lawful, incidental uses.

Moreover, Second Circuit resolution of these issues could have "precedential value" in other cases. *Transp. Workers*, 358 F. Supp. 2d at 35. The parties are litigating "companion suits in California and Florida," and the Court recognized that its Order will "undoubtedly" lead to "follow-on actions" against other broadcasters. Order at 10, 40. Review would provide needed guidance on the applicable law and could avoid this onslaught of additional litigation.

**B.     There Is a Substantial Ground for Difference of Opinion.**

There is a "substantial ground for difference of opinion" where "(1) there is conflicting authority on [an] issue, or (2) the issue is particularly difficult and of the first impression." *Vimeo*, 972 F. Supp. 2d at 551. The Court already found that the existence of a performance right in pre-1972 sound recordings under New York common law is a "thorn[y] question … of first impression" that has not been resolved by the New York Court of Appeal, and indicated that the Second Circuit could certify this issue to that Court for resolution. Order at 16, 22 n.4 ("Unlike the Second Circuit, I do not have the option to certify even profoundly uncertain issues of state law to the Court of Appeals."). This in itself warrants certification. *See Klinghoffer v. S.N.C.*, 921 F.2d 21, 25 (2d Cir. 1990) (certification proper where "issues are difficult and of first

impression"); *Rep. of Colombia v. Diageo N. Am. Inc.*, 619 F. Supp. 2d 7, 11 (E.D.N.Y. 2007) ("novelty and complexity of the issues … give[s] rise to a substantial ground for disagreement").

Moreover, Sirius XM believes that the Court's ruling on this issue directly conflicts with the Second Circuit's decision in *Whiteman*, which is an additional reason certification is warranted. *See Glatt v. Fox Searchlight Pictures Inc.*, 2013 WL 5405696, at *2 (S.D.N.Y. Sept. 17, 2013) ("intra-district split … clearly show[s] a substantial basis exists for difference of opinion"); *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (certification warranted where "'reasonable judges might differ' and such 'uncertainty provides a credible basis for a difference of opinion on the issue.'"). The Court's Commerce Clause ruling also conflicts with controlling authorities, including *American Booksellers*, *Flood*, and *Pike*. *See id.*

### C. Review Could Materially Advance the Ultimate Termination of this Case.

Section 1292(b) does not "require[] that the interlocutory appeal have a final, dispositive effect on the litigation, only that it 'may materially advance' the litigation." *Reese*, 643 F.3d at 688. This includes "significantly restrict[ing] the scope of ... litigation" or "obviat[ing] the need for protracted and expensive litigation." *Fed. Housing Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 338 (S.D.N.Y. 2012); *Transp. Workers*, 358 F. Supp. 2d at 353. Allowing an interlocutory appeal, and staying this case until that appeal is resolved, could expedite resolution of this entire case and avoid expensive discovery and litigation over damages issues that could be moot. *See Pinter v. City of New York*, 976 F. Supp. 2d 539, 575 (S.D.N.Y. 2013) (certifying *second* interlocutory appeal to avoid "risk of expending scarce judicial resources by trying what may be unviable claims"); *Rep. of Colombia*, 619 F. Supp. 2d at 11 (allowing interlocutory appeal that would "significantly reduc[e] the costs of discovery"); *Vimeo*, 972 F. Supp. 2d at 556 (certifying summary judgment ruling for interlocutory review and staying case). This could also

save judicial resources by providing guidance on the common legal issues in other lawsuits between the parties and stemming the wave of "follow-on actions" this Court portended.  Order at 40; *see Fed. Housing Fin. Agency*, 858 F. Supp. 2d at 338 (interlocutory review may be warranted when it would "facilitate and streamline" other cases involving similar legal issues).

## **CONCLUSION**

For all of the foregoing reasons, the Court should grant reconsideration of its November 14, 2014 Order and, upon reconsideration, find that: (a) New York common law does not provide a performance right for pre-1972 sound recordings, and/or (b) applying such a performance right to Sirius XM's national broadcasts would violate the Commerce Clause.  At a minimum, the Court should certify these issues for immediate interlocutory review.

Dated:    December 1, 2014

Respectfully submitted,

*/s/ Marc J. Pensabene*

Marc J. Pensabene
   mpensabene@omm.com
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel:  (212) 326-2000
Fax:  (212) 326-2061

Daniel M. Petrocelli (*pro hac vice*)
   dpetrocelli@omm.com
Robert M. Schwartz (*pro hac vice*)
   rschwartz@omm.com
Victor H. Jih (*pro hac vice*)
   vjih@omm.com
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, California  90067-6035
Tel:  (310) 553-6700
Fax:  (310) 246-6779

*Attorneys for Defendant Sirius XM Radio, Inc.*