UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

FLO & EDDIE, INC.

        Plaintiff,

    -against-

SIRIUS XM RADIO, INC., and DOES 1-10,

        Defendants.
------------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/12/14
```

No. 13 Civ. 5784 (CM)

### MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION

McMahon, J.:

    Defendant Sirius XM Radio, Inc. ("Sirius") has moved for reconsideration of the Court's November 14, 2014 Memorandum Decision and Order Denying Defendant's Motion for Summary Judgment ("the Order"), Docket #88, and in the alternative, for the Court to certify the Order for interlocutory appeal. For the reasons stated below, Sirius's motion for reconsideration is **DENIED.**

    Decision on the alternative motion for certification of an interlocutory appeal pursuant to 28 U.S.C. §1292(b) is deferred pending resolution of the outstanding order to show cause why a summary judgment as to liability should not be awarded to Plaintiff.

    The reader is presumed to be familiar with the facts of this case and with the Court's prior decision.

### DISCUSSION

**I.    Standard**

    To prevail on a motion for reconsideration, the movant must demonstrate "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.

1

1983). The decision to grant or deny the motion for reconsideration is within the sound discretion of the district court, especially when there has been no appellate review of the prior decision. *Mina Invest. Holdings, Ltd. v. Lefkowitz*, 184 F.R.D. 245, 250 (S.D.N.Y. 1999).

The Court's review "is narrow and applies only to already-considered issues; new arguments and issues are not to be considered." *See Morales v. Quintiles Transnat'l Corp.*, 25 F. Supp. 2d 369, 372 (S.D.N.Y. 1998). A motion for reconsideration "is not a substitute for appeal and may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision." *See id.* (internal citations and quotation marks omitted).

## II. Sirius's Motion for Reconsideration is Denied

### A. *Whiteman* Does Not Alter The Court's Analysis of New York Common Law

Sirius (represented by newly-retained counsel) predicates its motion on the Court's admitted failure to consider in its decision a case not briefed, either by it or by Flo & Eddie, on the original motion: *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940). Sirius's new lawyers from O'Melveny & Myers assert that *Whiteman* is the very case that this Court stated did not exist: a case squarely holding that New York does not recognize any right of public performance in sound recordings that are protected by common law copyright. Obviously *Whiteman* is a very old case, and does not represent any "intervening change of controlling law," so the argument must be that the Court's failure to apply *Whiteman* constitutes "clear error."

The only clear error in this case is O'Melveny's. Sirius's former counsel had two perfectly good reasons not to argue the lack of any public performance right on the basis of Whiteman: (1) *Whiteman* does not hold that New York does not recognize a public performance right as part of the common law copyright in sound recordings; and (2) its actual holding – which is that the sale

2

of sound recordings to the public constituted "publication," which divested a creation of any common law copyright whatsoever – is no longer good law, and has not been for 60 years.

Paul Whiteman was a legendary orchestra conductor; in 1924, at Aeolian Hall, he famously conducted the first performance of George Gershwin's *Rhapsody in Blue*. Whiteman and his orchestra made a number of sound recordings on the RCA label, which were sold to the consuming public. The recordings bore a legend "Not Licensed for Radio Broadcast," or something similar. Nonetheless, W.B.O. Broadcasting went to a record store, purchased copies of the records and broadcast them over the radio. RCA Manufacturing sued to prevent W.B.O. from broadcasting certain sound recordings owned by RCA, under theories of common law copyright and unfair competition. *Id.* at 87.

The Second Circuit, in an opinion written by Judge Learned Hand, described the question raised by the case as whether RCA "*had any musical property at common-law* in the records which radio broadcasting invaded." *Id.* at 87. (emphasis added). The Court of Appeals held that RCA did not have any common law rights, of any sort, because the sale of the recordings to the public constituted "publication" of the recordings, which divested them of common law copyright protection altogether. Since sound recordings were ineligible for federal statutory copyright protection prior to 1972 (that is why we have this lawsuit), the effect of Judge Hand's ruling was to deny any sort of copyright protection to the creators of sound recording performances that were sold in the commercial marketplace.

Sirius argues that *Whiteman* rejected RCA's claims because New York law did not afford public performance rights to holders of common law copyrights in sound recordings.

I disagree. So does every other court and authority that has considered the issue.

3

The exact *holding* of *Whiteman* was this: "[W]e think that the 'common-law property' in these performances ended with the sale of the records and that the restriction [the words on the record jacket] did not save it." *Id.* All of the reasoning in *Whiteman* addressed that issue – whether RCA had "published" its sound recordings by selling them to the public, thereby losing all of its common law rights under then-applicable law. The Second Circuit did not decide what those rights might have been, let alone specifically address whether those lost rights included an exclusive right to publicly perform the sound recordings. One looks in vain in *Whiteman* for the statement, "New York's common law copyright protection for sound recordings does not encompass any sort of public performance right" – or words to that effect.

Sirius points to two sentences from *Whiteman* that it views as declaring public performance rights to be unavailable for holders of common law copyrights in sound recordings.

> Copyright in any form, whether statutory or at common-law, is a monopoly; it consists only in the power to prevent others from reproducing the copyrighted work. W.B.O. Broadcasting Corporation has never invaded any such right of Whiteman; they have never copied his performances at all; they have merely used those copies which he and the RCA Manufacturing Company, Inc.; made and distributed. *Whiteman*, 114 F.2d at 88.

Sirius argues that Judge Hand – a famously precise and articulate writer – was actually saying in these sentences that New York common law copyright in sound recordings does not come with a public performance right attached.

Even read out of context, it would be a stretch to conclude that Sirius's strained interpretation of Hand's decision is correct. But read in the context of the *Whiteman* decision as a whole (including the holding that this Court quotes above), it is perfectly clear that these sentences simply restate, in a different way, what the case actually held: once RCA offered copies of the recordings for sale (i.e., "published" them), any common law copyright was lost and the purchaser could "use[]" the copies that it purchased in any way it chose – including by playing them over the

4

radio. The reason W.B.O. "merely used" the sound recordings and "never invaded" RCA's rights, was because those rights (whatever they were) had vanished when RCA sold copies of the sound recordings.

Judge Hand's reasoning also gives the lie to Sirius' contorted reading of his decision. He observed, for example, that if a composer published a musical composition by printing copies of sheet music and selling them to the public,[1] he would have no right to limit how the purchaser used those copies of the music. Similarly, Judge Hand described how selling a book was an act of publication that destroyed common law copyrights. Judge Hand understood that both musical compositions and books were eligible for statutory copyright, whereas sound recordings were not. Nonetheless, he saw "no reason why the same acts that unconditionally dedicate the common-law copyright in works copyrightable under the act, should not do the same in the case of works not copyrightable" under federal law. *Id.*

Nothing in the justification offered for his decision so much as suggested that the Circuit was pronouncing that the bundle of rights appurtenant to common law copyright in sound recordings did not include a public performance right. Indeed, had *Whiteman* been predicated on the absence of a public performance right in sound recordings, the entire discussion of whether RCA's common law rights were divested by publication would have been superfluous; RCA could not possibly have "lost" via publication a right that never existed in the first place! That the Second Circuit felt the need to reach the publication issue actually suggests that it assumed the existence of a public performance right in the context of common law copyright.

---

[1] For this analogy to work, the copies sold would have lacked the familiar © legend; publication with the © divested common law copyright but preserved federal copyright (indeed, laid claim to federal statutory copyright) under the 1909 Copyright Act, which was in effect at the time Hand wrote *Whiteman*. That law was superseded in 1976.

5

Judge Hand also rejected RCA's suggestion that W.B.O.'s broadcasting of its recordings constituted unfair competition, again on the ground that the loss of rights associated with publication ended any unfairness. As he put it, if RCA "cannot bring themselves within the law of common-law copyright, there is nothing to justify *a priori* any continuance of their control over the activities of the public to which they have seen fit to dedicate the larger part of their contribution" through the theory of unfair competition. *Id.* at 90.

I am hardly the only jurist or scholar who reads *Whiteman* in this way. All the courts and secondary sources we have located interpret *Whiteman* as a case about publication, not about whether public performance is part of the bundle of rights conferred by common law copyright. *See, e.g.*, *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955) (*Whiteman* "stated that the common law property in the performances of musical artists which had been recorded ended with the sale of the records and that thereafter anyone might copy them and use them as he pleased."); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 554 (2005) (*Whiteman* "concluded that the sale of a record to the public is a general publication that ends common-law copyright protection."); Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current* Law, 1979 U. ILL. L. F. 337, 347 ("*Whiteman* stands for the principle that the sale of a record divests the production company or the performing artists of their rights, if any, to control its use."); Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 GEO. WASH. L. REV. 152, 155 (1974) ("Judge Learned Hand . . . ruled that any common law property of the record producer in the recorded performances ended with the record's sale, thereby making the restrictive legend on the label legally ineffective.").

Even if *Whiteman* stood for the proposition that Sirius asserts – and it does not – Sirius's motion for reconsideration fails for a second reason: *Whiteman* has been overruled, so it stands for nothing at all.

The Second Circuit in *Whiteman* was doing exactly what I am doing in this case: predicting how the New York courts, which are the ultimate authority on New York common law, would rule on an unsettled question of New York common law.[2] After *Whiteman*, New York courts spoke to the question, and they did not reach the same conclusion as Judge Hand. *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (Sup. Ct. 1950), *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951). Recognizing this development, the Second Circuit concluded, in 1955, that: "the quoted statement from the RCA case *is not the law of the State of New York.*" *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955) (citing *Whiteman*, 114 F.2d at 88-89) (emphasis added). The "quoted statement" to which reference is made spans *Whiteman*'s entire discussion of the effect of publication on the existence of a copyright. So while Sirius tries to avoid the impact of *Whiteman*'s reversal by arguing that the Second Circuit overruled only a single statement about unlimited copying of published works from the earlier opinion, that is plainly not the case. It overturned Judge Hand's ruling that the sale of sound recordings constituted publication – as this Court recognized in the Order, when it said "it has been the law in New York for over 50 years that . . . the public sale of a sound recording . . . does not constitute a publication sufficient to divest the owner of common-law copyright protection." Order at 28 (internal citations, quotation marks, and alterations omitted)

---

[2] The certification of questions to the New York Court of Appeals was almost unheard of in 1940, and that was true even when this Court was engaged in the practice of law; but it is now quite routinely done to settle issues like the one raised by this case. I rather expect that this case will be certified to the New York Court of Appeals once it goes up on appeal.

In short, *Whiteman* affords no basis to reconsider my earlier Order; if anything, it reinforces the decision reached by this Court.[3]

## B. The Court Properly Rejected Sirius's Dormant Commerce Clause Challenge

Sirius also attempts to reargue its Dormant Commerce Clause challenge. Its arguments are entirely without merit.

Sirius does not dispute that the reach of the Dormant Commerce Clause is only to state actions properly characterized as "regulations." *See* Order at 37-38. Instead of explaining how liability for common law copyright infringement constitutes a regulation, Sirius dodges and misconstrues the issues.

I did not hold, and I do not hold now, that New York common law copyright is exempt from Dormant Commerce Clause scrutiny because it is neutral and generally applicable. Nor did I hold that the Commerce Clause does not apply because New York law establishes Sirius's liability in some form. Rather, I said that the New York common law copyright – specifically a judicial decision protecting Flo and Eddie's common law copyright – is not a "regulation" subject to Commerce Clause scrutiny.

Sirius argues that state common law and state law as interpreted by courts can violate the Dormant Commerce Clause. Sirius also argues that state regulation may run afoul of the Dormant Commerce Clause entirely because of the "practical effects" on interstate commerce. That is all true, but irrelevant. The question is whether the law at issue – common law copyright – constitutes "regulation." In the one case Sirius does cite applying the Commerce Clause to a judicial finding

---

[3] Sirius does add some new spin on its arguments, claiming that public performance rights for sound recordings are unique in that they affect multiple competing stakeholders. Recordings are not really unique – musical composition copyrights raise the same issues. More importantly, those stakeholders all have an incentive to negotiate over the use of copyrighted material. Sirius's result ensures Flo and Eddie can never receive compensation of any sort for public performance of its sound recordings.

8

of liability, the law involved as a California statute requiring pre-approval for marketing cosmetic products. *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1353 (Fed. Cir. 2013). The cases holding that a law may violate the Dormant Commerce Clause because of its "practical effects" on interstate commerce each involved state liquor-pricing schemes. *See Healy v. Beer Inst.*, 491 U.S. 332 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986). All of those state laws – pharmaceutical approval and liquor pricing laws – are classic instances of states exercising their regulatory power, and are very different from this case, where the issue is protection of property rights.

Protecting Flo and Eddie from the theft of its property is not "regulation;" a simple example illustrates the point. Suppose, instead of stealing Flo and Eddie's property rights in the sound recordings, someone stole its company car, which was then used to operate an interstate taxi service. The Dormant Commerce Clause obviously would not bar Flo and Eddie from maintaining an action at common law for conversion of the car. And that would be true even though the action, and the return of the car and the end of the taxi service, would affect interstate commerce. State laws barring theft do not violate the Dormant Commerce Clause.

Sirius also argues that the Court failed to address the balancing test *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). But that test, like the *per se* tests used in other cases, applies only to regulations. Thus, there was no need to discuss it in the Order separate and apart from the *per se* tests. All fail, and for the same reason.

Finally, Sirius intimates that the Communications Act, 47 U.S.C. §§ 307 *et seq.* preempts any state from recognizing a public performance right in sound recordings because recognizing such a right would interfere with the ability of the FCC to regulate radio broadcasting. This is an entirely new argument, which could have been raised in support of the original motion but was

9

not. It is not properly raised on a motion for reconsideration; it is also inappropriately mentioned only in a footnote.

But this argument is yet another example of how Sirius' new counsel are deliberately missing the point. Nothing in this Court's Order "restricts content" of radio broadcasts. Congress expressly provided that common law copyright would subsist in pre-1972 sound recordings. *See* 17 U.S.C. § 301(c). The federal government thus recognizes the existence of common law copyright in older sound recordings. Flo and Eddie holds the common law copyright in the Turtles' pre-1972 sound recordings. Common law copyright, as Judge Hand reminds us in the very portion of his *Whiteman* decision on which Sirius relies, confers a legally recognized monopoly on the holder. That legally recognized monopoly gives Flo and Eddie – not the State of New York – the right to decide who, if anyone, is allowed to broadcast, or make any copies that are necessary to do so.

Sirius does nothing but raise red herrings. This case is not about the content of radio broadcasts; it is about whether Sirius has to pay for the privilege of copying and broadcasting pre-1972 sound recordings – just as it pays royalties through ASCAP and BMI to the composers of the music contained on all the recordings it broadcasts, and just as it pays statutory copyright holders for the privilege of playing post-1972 sound recordings. The Dormant Commerce Clause does not stand in the way of a purely private party's availing himself of his legal rights in order to protect his property. This Court harbors no doubt whatsoever that Flo and Eddie will be perfectly delighted to let Sirius play – for pay.

### III. Sirius's Motion to Certify an Interlocutory Appeal is Deferred

A district judge may certify an order for interlocutory appeal if (1) "such order involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion", and (3) "an immediate appeal from the order may materially advance the ultimate termination of

the litigation." 28 U.S.C. § 1292(a); *see Childers v. N.Y. & Presbyterian Hosp.,* No. 13 CIV. 5414, --- F. Supp. 2d ----, 2014 WL 2815676, at *21 (S.D.N.Y. June 23, 2014).

"A controlling question of law exists if: (1) reversal of the district court's opinion could result in dismissal of the action, (2) reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or (3) the certified issue has precedential value for a large number of cases." *In re Lloyd's Am. Trust Fund Litig.,* No. 96 CIV. 1262, 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997); *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 921 F.2d 21, 24 (2d Cir. 1990).

In considering a request for certification, the district court must carefully assess whether each of the three conditions for certifications is met. *See German v. Fed. Home Loan Mortg. Corp.,* 896 F.Supp. 1385, 1398 (S.D.N.Y.1995); *see also Gottesman v. General Motors Corp.,* 268 F.2d 194, 196 (2d Cir.1959) (certification is to be "strictly limited to the precise conditions stated in the law"). The determination of whether § 1292(b) certification is appropriate under the above standards is in the discretion of the trial court. *See Ferraro v. Sec. of U.S. Dept. of Health and Human Servs.,* 780 F.Supp. 978, 979 (E.D.N.Y.1992);

Sirius raises excellent arguments in favor of certification. However, I am going to defer ruling on this motion until I first address the outstanding order to show cause why summary judgment of liability should not be entered in favor of Flo and Eddie. The case for interlocutory certification is much stronger if the issue of liability is settled.

11

## CONCLUSION

For the foregoing reasons, Sirius's motion for reconsideration is **DENIED** and decision on the motion for Section 1292(b) certification is **DEFERRED**.

Dated: December 12, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL